<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-40-TNM-2** |
| **TRISTAN STEVENS** | |
| **Defendant.** | |

<div align="center">

**GOVERNMENT'S SENTENCING MEMORANDUM**

</div>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Tristan Stevens to 78 months of incarceration, three years of supervised release, restitution in the amount of $2,000, and a special assessment of $500. Such a sentence is the mid-range of the government's requested calculation of Stevens' Sentencing Guidelines range of 70-87 months and would appropriately balance the factors articulated in 18 U.S.C. § 3553, while also fully acknowledging the complexities of defendant Stevens' participation in the violent attack on the United States Capitol.   Although the government acknowledges that this Court recently imposed a significantly shorter sentence on codefendant David Judd, Stevens' conduct was significantly worse than Judd's in several respects, as explained below. This Court should therefore impose a significantly longer sentence on Stevens than it did on Judd.

**I.      INTRODUCTION**

On January 6, 2021, after attending the "Stop the Steal" rally, thousands of rioters who believed that the election had been stolen stormed the heart of our legislative branch, the United

<div align="center">

1

</div>

States Capitol. After breaking through police lines, crossing bike rack barriers that had been thrown to the side, and overcoming snow fencing that had been ripped to shreds on the ground, rioters ascended to the Capitol building.

Rioters aggregated at the center of the Capitol outside the prominent entrance on the Lower West Terrace ("LWT") commonly referred to as "the tunnel" ("LWT Tunnel"). Many of those rioters never made it inside the building. But for some, like Tristan Stevens, it was not for lack of trying. Over the course of one and a half hours, Stevens strived to overcome the police officers guarding the LWT Tunnel doors. He used his body as he physically pushed in coordination with other rioters in an attempt to create a collective force that would overcome the resistance of the outnumbered officers. He used his hands and his voice as he counted down so that the rioters could push in unison after he realized that uncoordinated efforts were bound to be unsuccessful. He used a stolen police shield when he realized he needed a bigger surface area to pin officers during the battle in attempt to break through them. And he attempted to grab a baton from an officer after he realized that his body weight and the force of the shield were not enough to break through the police line.

Stevens and his fellow rioters reigned terror on the police officers inside the LWT Tunnel. His own assaultive conduct and his direction to other rioters directly endangered officers inside the LWT Tunnel and heightened the danger to all officers, more than a hundred of whom were injured on January 6, 2021.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack On The Capitol

On January 6, 2021, hundreds of rioters – Stevens among them – ascended upon the U.S.

Capitol building and grounds in an effort to disrupt the peaceful transfer of power after the presidential election. During Stevens' joint trial with several codefendants, the Court heard testimony regarding the joint session of Congress that was in progress on January 6 and the vote count of the Electoral College, and testimony describing the breach of the Capitol by the mob and recounting the consequences of that breach.

Although the entire Capitol was under attack on January 6, this case involved conduct that occurred on the West front. The evidence presented at trial showed that the "Capitol's West lawn, lower West terrace, and West terrace tunnel were scenes of shocking violence and hostilities towards police" on January 6, 2021. Trial Transcript (TTr.) at 6, 9/13/22 (Oral Verdict). The West front saw "lengthy standoffs, fights, and numerous attacks on officers throughout the area." *Id.* "Rioters sprayed officers with OC and bear spray and fire extinguishers, threw things at them, used their own shields against them, and used poles and other weapons to strike them. They also hurled insults and epithets at the officers." *Id.* Sergeant Jason Mastony, who testified at trial regarding his experience guarding the West front on January 6, explained that the crowd was "actively assaultive." TTr. at 193, 8/29/22 (Mastony).

Despite the officers' best efforts, they were not able to maintain order on the West front or keep the rioters out of the Capitol building. As Metropolitan Police Department (MPD) Sergeant Mastony described, January 6 was unlike any other day as an MPD officer. "This [day] had thousands of people focused on one target point. And it was not a sustainable place to hold. We could not secure the Capitol Building. It was too big, too unsecurable for the manpower we had to stop what was coming at us." *Id.* at 232, 8/29/22. MPD Officer Chad Curtice testified that the West front was "chaotic . . . something I've never experienced in my CDU, civil disturbance unit,

career." TTr. at 61, 8/30/22 (Curtice). As a result of this attack, the MPD police line guarding the Capitol building broke. Sergeant Mastony, who had been an MPD officer for 12 years, testified that this was the first time he had ever heard of an MPD line failing. TTr. at 194, 8/29/22 (Mastony).

After the line broke on the West front, rioters rushed to various entry points of the Capitol. Many broke through doors and windows to gain entry. Many others aggregated in the center of the building at the LWT Tunnel. The evidence at trial revealed that the LWT Tunnel is a stairway that had been converted into a narrow entryway due to construction of the temporary inaugural platform on the lower West terrace of the Capitol building. As United States Capitol Police (USCP) Captain Ronald Ortega testified, after the presidential inauguration, the newly elected President of the United States walks out of the Capitol building through that LWT Tunnel. TTr. at 27, 8/29/22 (Ortega). Thus, historically, that tunnel has been an important and prominent pathway—a walkway through which our country's newest elected leader passes to approach and address the American people for the first time as President of the United States.

On January 6, however, the LWT Tunnel was the nucleus of violence; the core of aggression; the eye of bloodshed. As Officer Mastony testified, the LWT Tunnel was "the penetration point." TTr. at 226, 8/29/22 (Mastony). In that tunnel, a large group of rioters armed with their bodies and a variety of weapons, including batons, shields, an audio speaker, poles, a crutch, chemical irritants, fireworks, and other weapons battled with officers for several hours in an effort to enter the Capitol building through that prominent door. For officers, the experience was nothing short of traumatic. "It was claustrophobic. It was brutal. We [had] the mob yelling, screaming, chanting, the fire alarm going off, the sprinklers going off, the pepper spray, the bear

spray, the WD-40 spray, the firecrackers being thrown at us, the weapons that they used, flagpoles, the heave-ho push movement, back and forth." TTr. at 45, 8/31/22 (Gonell). Nevertheless, the call to duty encouraged officers to fend off rioters in the LWT Tunnel, no matter the cost.

The Court also heard evidence that the rioters' collective conduct on the West terrace and throughout the Capitol building and grounds "had the natural and probable effect of obstructing and impeding the certification" of the Electoral College vote. TTr. at 37, 9/13/22 (Oral Ruling); TTr. at 64, 8/29/22 (Ortega). But it was not only the Electoral College vote at stake on January 6, 2021 – officers guarding the building knew there was more at risk. USCP Sergeant Acquilino Gonell testified that he had worked the inauguration events under several prior administrations, and he knew there was much at stake when rioters began swarming the Capitol and attempting to break in: "The transfer of power is a big event. . . . Inside, during this process, we have the vice president, the speaker of the house, the Senate *pro tempore*, the nuclear codes along with the vice president, and both the House and the Senate, the senators. . . .  [T]he next three people in line to the presidency. . . . [And] the vice president's family was inside." TTr. at 41, 8/31/22 (Gonell).

Tristan Stevens played a major role in this chaos and lawlessness, both as an observer, and, notably, as a participant. His protracted and violent struggle, TTr. at 37, 9/13/22 (Oral Verdict), to break into the Capitol left officers injured and the democracy fragile.

### B.    Tristan Stevens' Assaultive Conduct In The LWT Tunnel

Before January 6, 2021, as Stevens planned his travel to Washington, D.C., his grandmother warned him. She said, "What you're doing is extremely dangerous I read about some of the other protests" and "You are really taking a chance on getting hurt with all the crazies in this world!" Stevens chose to travel to Washington, D.C. anyway.

Stevens and his brother rented a car to drive to Washington, D.C. from Pensacola, Florida on January 5, 2021. On January 6, 2021, after attending the former president's "Stop the Steal" rally, Stevens joined the crowd of rioters and walked to the West Front of the U.S. Capitol. Met with "AREA CLOSED" signs, snow fencing, bike rack barriers, and a police line, TTr. at 49, 9/13/22 (Oral Verdict); TTr. at 30-31, 8/29/22 (Oretga), Stevens and other rioters were undeterred. Stevens made his way to the front of the police line on the West grounds. Before the police line broke, Stevens approached officers and mocked them, yelled insults at them, and spit at their feet. At trial, body worn camera footage revealed Stevens yelling at officers things like: "Do you know what happens to traitors? Do you know what happens when you commit treason? YOU GET TIED TO A POST AND SHOT FOR BEING A TRAITOR. Are you prepared for that? Are you? Are you ready? Are you ready? HUH?! Yeah fuck you. You're a coward, man. You're nothing but a coward. HUH? Speak the fuck up, you pussy! Like a fucking man. Speak up! Speak up! Use your voice. I can't hear you because you're a little bitch!" Stevens then pointed at officers and yelled at each one: "Coward! Coward! Coward! Coward!" TTr. at 41, 9/13/22 (Oral Ruling). Appalled at his rhetoric, a person close by pulled Stevens back and encouraged him to calm down.

Eventually, the police line on the West front broke. As police officers fell back, Stevens gave a thumbs up, indicating his approval for what he had sought all along: access to the Capitol. TTr. at 41, 9/13/22 (Oral Ruling). Stevens and others progressed forward. Rioters climbed walls and scaffolding, passed battles between rioters and police officers, heard the LRAD system blaring and alarms sounding, and observed chemical irritants in the air. *Id.* at 49. Nothing could stop them.

Stevens had made his way past the OC spray, over the barriers, through the police line and, finally, reached the LWT Tunnel. For the next one and a half hours, Stevens assumed an integral

role in the attack on officers in the strive to enter the Capitol building.

### Count 14: Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. § 111(a) and 18 U.S.C. § 2

Stevens first entered the LWT Tunnel at 2:49 p.m., less than ten minutes after rioters had first engaged officers there. TTr. at 14, 9/13/22 (Oral Ruling). There, he carefully observed the retreat of rioters in front of him, at which point he moved forward, leaned into the people in front of him, and applied his strength and weight to push the mob forward towards the tunnel doors. *Id.* at 15. Stevens and the mob of rioters collectively and forcefully pushed against the officers who were trying to prevent the mob's entry into the Capitol building. *Id.* at 10, 16.



*Figures 1 & 2: Screenshots of Capitol surveillance footage showing Stevens (blue box)
entering the tunnel and moving towards the front of the pack of rioters in the tunnel*

Seconds after bracing the rioter in front of him, Stevens quickly realized that a mob of tens of rioters pushing in an uncoordinated manner would be fruitless. They would never prevail. At that point, Stevens took it upon himself to assume a "leadership role." TTr. at 17, 9/13/22 (Oral Ruling). Attempting to direct the rioters, Stevens "raised his hand and started counting up to three." *Id.* at 15. By the third count, the mob finally pushed as one, making forceful contact with the police line. *Id.* Stevens continued using his hand and voice to direct rioters – at least five times. *Id.* at 17.



*Figures 3 & 4: Screenshots of Capitol surveillance footage showing Stevens (blue box)*
*using his hand (in a black glove) to count as he coordinated rioters' pushes*

Stevens exited the interior of the LWT Tunnel but remained near its mouth, watching as other rioters continued to battle with police officers inside the tunnel.



*Figure 5: Screenshot of open source footage showing Stevens (red box) peering into the tunnel as rioters battle officers*

### Count 16:  Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. § 111(a) and 18 U.S.C. § 2

Shortly after, at about 2:56 p.m., Stevens re-entered the LWT Tunnel. This time, he recorded a video with his cell phone as he made his way into the LWT Tunnel and through the pack of rioters. TTr. at 16, 9/13/22 (Oral Ruling). Rioters at the time were blocking the police line in the LWT Tunnel and preventing the police from pushing the crowd out of the tunnel. *Id.* at 9.

The mob started to pass shields and other objects forward to the front line of rioters to use against the officers. *Id.* at 11, 16. Rioters chanted "THIS IS OUR HOUSE!" *Id.* at 11. Stevens quickly joined a "coordinated heave-ho" with other rioters, using the full weight of his body and continuously pushing into the line of officers while the rioters chanted, "HEAVE!" *Id.* at 17, 19.

***Count 21: Assaulting, Resisting, or Impeding Certain Officers (***USCP Sergeant Acquilino Gonell***) and Aiding and Abetting, in violation of 18 U.S.C. § 111(a) and (b) and 18 U.S.C. § 2***

At 3:03 p.m., Stevens re-entered the LWT Tunnel for the third time, just as rioters had started coordinated pushes against the officers.



*Figures 5, 6, 7, & 8 (clockwise): Screenshots of Capitol surveillance footage showing Stevens (blue box) entering the tunnel, grabbing a stolen police shield, and moving to the front of the tunnel*

As Stevens walked forward, rioters yelled "SHIELD WALL!" and "FRESH PEOPLE!" Stevens responded to the call. He grabbed a stolen United States Capitol Police shield that was four feet long and weighed approximately 13 pounds that rioters has passed forward. TTr. at 57, 8/29/22 (Oretga). Shield in hand, Stevens pushed his way to the front of the line of rioters. He instantly pulled the shield down in front of him and used the force of his strength, weight, and those behind him to push the shield into the officer line.

On the other side of the line, guarding the Capitol building like he had dutifully done for more than 15 years, stood USCP Sergeant Acquilino Gonell. For several minutes, Sergeant Gonell bore the brunt of Stevens' aggression in the LWT Tunnel. Stevens, with outstretched arms and the weight of his body and the force of the rioters behind him, forcefully pushed the shield directly into Sergeant Gonell's body, face, and helmet. TTr. at 29, 9/13/22 (Oral Ruling); TTr. at 54, 8/31/22 (Gonell). As Stevens pinned Sergeant Gonell, Stevens tried several times to grab an officer's baton. TTr. at 52, 9/13/22 (Oral Ruling); TTr. at 54, 8/31/22 (Gonell). When he was unable to do so, Stevens called Sergeant Gonell a "pussy." TTr. at 54, 9/13/22 (Oral Ruling). Sergeant Gonell shifted in attempt to break free from Stevens' assault, but Stevens adjusted the placement of his shield to further attack Sergeant Gonell, and the weight of Stevens' force and the rioters' force pushing behind Stevens proved too much for Sergeant Gonell to overcome. *Id.* at 52.

Sergeant Gonell recounted this encounter during his trial testimony:

> [Stevens] began to press against my face shield, my helmet, to the point of lifting the face shield and exposing my head. I could see – feel the chemical interactions, pepper spray and things like that that was in the air, interacting with my sweat. It was burning my head, too, whenever he was doing that, pressing against me to the point that I could hardly see. I was trying to keep my head straight to see what I was doing or how to do anything possible . . . .

TTr. at 53, 8/31/22 (Gonell); TTr. at 29-30, 9/13/22 (Oral Ruling).

Sergeant Gonell explained that when Stevens pinned him with the shield, "[t]here [was] nothing I could do. . . . The shield was completely being used against me to the point that there's hardly anything I could do. . . ." TTr. at 53, 60, 8/31/22 (Gonell).



*Figures 9, 10, 11, & 12 (clockwise): Screenshots of open source footage showing Stevens (blue box or blue arrow) forcefully pinning Sergeant Gonell with a stolen police shield*

After this prolonged battle, Stevens eventually retreated and left the LWT Tunnel.

### Count 33: Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. § 111(a) and 18 U.S.C. § 2

Over the next hour, after much back-and-forth between rioters and police officers fighting to gain ground in the LWT Tunnel, the officers had gained momentum and pushed the rioters out of the tunnel. TTr. at 219, 8/29/22 (Mastony). Unwilling to relent, Stevens positioned himself in the mob of tightly packed rioters near the mouth of the tunnel and, at about 4:15 p.m., he joined the rioters' efforts to push through the line of officers. TTr. at 9, 16-17, 9/13/22 (Oral Ruling). This time, Stevens maneuvered himself farther into the LWT Tunnel. *Id.* at 19. The mob continued to coordinate their pushes to "exert the greatest possible amount of force on the police line," *id.* at 10, and Stevens rhythmically moved his body with others as they pushed en masse, *id.* at 18.

The rioters never made it through the LWT Tunnel on January 6, 2021, thanks to the strength, endurance, and persistence of officers in the tunnel, including those who testified at trial.

## III.   THE CHARGES

On December 1, 2021, a federal grand jury returned the fifth superseding indictment, charging nine defendants in fifty-three counts. That indictment charged Tristan Stevens in ten of the counts:

- Count 14, Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. § 111(a) and 18 U.S.C. § 2;

- Count 16, Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. § 111(a) and 18 U.S.C. § 2;

- Count 21, Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. § 111(a) and (b) and 18 U.S.C. § 2;

- Count 33, Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. § 111(a) and 18 U.S.C. § 2;

- Count 34, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2;

- Count 35, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

- Count 36, Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- Count 44, Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and

(b)(1)(A);

- Count 52, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) and 18 U.S.C. § 2; and

- Count 53, Act of Physical Violence in the Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F) and 18 U.S.C. § 2.

Following a bench trial, the Court found Stevens guilty of all counts except for Count 34, on which it entered a verdict of not guilty.[1]

## IV. STATUTORY PENALTIES

Stevens now faces sentencing for Counts 14, 16, 21, 33, 35, 36, 44, 52, and 53. Counts 14, 16, 21, and 33, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Class D Felony), each carry a maximum penalty of 8 years of incarceration. Count 35, Civil Disorder, carries a maximum penalty of 5 years of incarceration (Class D Felony). Counts 14, 16, 21, 33, and 35 carry a term of supervised release of not more than three years, a fine of up to $250,000, and special assessment of $100 per count. Counts 36 and 44 each carry a maximum penalty of 1 year of incarceration, up to 5 years of probation, a maximum fine of $100,000, and a special assessment of $25 per count. Counts 52 and 53 each carry a maximum term of imprisonment of 6 months of incarceration, up to 5 years of probation, a maximum fine of $5,000, and a special assessment of $10 per count.

---

[1] In Count Twenty-One, the Court found Stevens guilty of 18 U.S.C. § 111(a), but not 18 U.S.C. § 111(b). In Counts Thirty-Six and Forty-Four, the Court found Stevens guilty of 18 U.S.C. § 1752(a)(2) and 18 U.S.C. § 1752(a)(4), respectively, but did not find Stevens guilty under 18 U.S.C. § 1752(b)(1)(A) for either count.

14

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Guidelines set out the specific "order" of the analysis: first, for each count of conviction, determine the offense guideline; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3. U.S.S.G. § 1B1.1(a)(1)-(3). Then, repeat each step for each additional count of conviction. U.S.S.G. § 1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3. *Id.*

The Probation Office did not follow this procedure in preparing the PSR. Rather, Probation started with the grouping analysis in Part D of Chapter 3, PSR ¶ 73, then did the Guidelines analysis in U.S.S.G. § 1B1.1(a)(1)-(3), but only for Counts Fourteen, Sixteen, Twenty-One, and Thirty-Three. PSR ¶¶ 75-102. But the grouping analysis should be "[a]ppl[ied]" only *after* the Guidelines analysis is performed for each separate count. U.S.S.G. § 1B1.1(a)(4).

The government submits that the appropriate offense level computations for each Count, prior to any grouping analysis under Part D of Chapter 3, are as follows:

Count 14: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |

*Applying U.S.S.G. § 2A2.2 (Aggravated Assault)*

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3B1.1(c) | Leader | +2 |
| | **Total for Count 14:** | **22** |

<u>Count 16: 18 U.S.C. § 111(a)(1)</u>

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |

*Applying U.S.S.G. § 2A2.2 (Aggravated Assault)*

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 3A1.2(b) | Official Victim | <u>+6</u> |
|  | **Total Offense Level:** | **20** |

<u>Count 21: 18 U.S.C. § 111(a)(1)</u>

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|

*Applying U.S.S.G. § 2A2.2 (Aggravated Assault)*

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(3) | Bodily Injury | +3 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3A1.3 | Physical Restraint | <u>+2</u> |
|  | **Total Offense Level:** | **25** |

<u>Count 33: 18 U.S.C. § 111(a)(1)</u>

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|

*Applying U.S.S.G. § 2A2.2 (Aggravated Assault)*

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 3A1.2(b) | Official Victim | <u>+6</u> |
|  | **Total Offense Level:** | **20** |

<u>Count 35: 18 U.S.C. § 231</u>

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|

*Applying U.S.S.G. § 2A2.2 (Aggravated Assault)*

| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1)(B) | Dangerous Weapon | <u>+3</u> |
|  | **Total Offense Level:** | **17** |

Count 36: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. § 2A2.4(b)(2) | Bodily Injury | +2 |
| | **Total Offense Level:** | **15** |

Count 44: 18 U.S.C. § 1752(a)(4)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. § 2A2.4(b)(2) | Bodily Injury | +2 |
| | **Total Offense Level:** | **15** |

Pursuant to U.S.S.G. § 1B1.9, the Guidelines do not apply to Counts Fifty-Two and Fifty-Three.

The seven counts of conviction should be placed into two groups under U.S.S.G. § 3D1.2(a) and (c). Counts 14, 16, 33, and 35 involve the same victim – the line of officers inside the LWT Tunnel protecting the Capitol – and thus constitute one group. U.S.S.G. § 3D1.2(a). Counts 36 and 44 embody conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline for Count 21, and thus should be grouped with Count 21. U.S.S.G. § 3D1.2(c).

| **Group / Count** | **Adjusted Offense Level** | **Units** |
|---|---|---|
| Group 1 (Counts 14, 16, 33, 35) | 22 | 1 |
| Group 2 (Counts 21, 36, 44) | 25 | 1 |
| **Total Number of Units:** | | **2** |

The greater of the adjusted offense levels is 25 for Group 2. After increasing the offense level by 2 levels, pursuant to the number of units assigned, the combined adjusted offense level is **27.** With a criminal history category of I, PSR ¶ 112, and a total adjusted offense level of 27, the guidelines range is 70-87 months.

### A.    Cross-Reference: U.S.S.G. § 2A2.4

The cross-reference under U.S.S.G. § 2A2.4(c)(1) applies to Counts Fourteen, Sixteen, Twenty-One, Thirty-Three, and Thirty-Five. "Aggravated assault" means "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, to attempting to strangle or suffocate; or (D) an intent to commit another felony. U.S.S.G. § 2A2.2 Application Note 1.

For Counts Fourteen, Sixteen, Twenty-One, and Thirty-Three, the Court described the forceful nature of Stevens' conduct. *E.g.*, TTr. at 9-10, 9/13/22 (Oral Ruling). The Court found that, when engaging in these assaults, Stevens "was also acting with the intent to commit civil disorder, a felony." *Id.* at 29. Thus, the cross-reference applies to these counts.

For Count Thirty-Five, when Stevens engaged in Civil Disorder based on his actions within the LWT Tunnel, his conducted constituted aggravated assault, because he acted with the intent to commit another felony, *i.e.*, 18 U.S.C. § 111(a). Specifically, as recounted above, when Stevens entered the tunnel with a stolen police shield and used the shield to make physical contact with Sergeant Gonell by pinning him, Stevens violated 18 U.S.C. § 111(a)(1). *See* TTr. at 13-14, 9/13/22 (Oral Ruling) ("At all times relevant to Counts 14, 16, and 33, rioters in the tunnel knowingly obstructed officers as part of a civil disorder as defined by the statute. That is enough for them to commit a felony violation of Section 111(a)"). Therefore, the cross-reference under U.S.S.G. § 2A2.4(c)(1) applies to Count Thirty-Five.

### B.    Application Of Adjustment: U.S.S.G. § 2A2.2(b)(3)

United States Sentencing Guideline § 2A2.2(b)(3) applies to Count Twenty-One because the victim of the assault "sustained bodily injury." As the evidence at trial demonstrated, Stevens

violently and persistently pushed Sergeant Gonell with a shield. Sergeant Gonell credibly testified that his head was pushed backed in an awkward manner and he felt a burning sensation when his face shield was pushed up due to the chemical irritants in the LWT Tunnel. Sergeant Gonell was pinned by Stevens' shield and unable to defend himself. Although the Court found that Stevens's push with the shield was not likely to cause "serious injury or death," (for the purposes of 18 U.S.C. § 111(b)) the injury suffered by Sergeant Gonell  nevertheless constitutes "significant injury" under U.S.S.G. § 1B1.1 n.1(B) ("[A]ny significant injury; e.g., an injury that is painful and obvious, or is of a type which medical attention ordinarily would be sought.").

### C.    Application Of Specific Offense Characteristics: U.S.S.G. §§ 3A1.2(a), (b)

Respectfully, a six-level adjustment applies under United States Sentencing Guidelines §§ 3A1.2(a) and (b) to Counts Fourteen, Sixteen, Twenty-One, and Thirty-Three. This adjustment applies because "the victim[s]" of Stevens's assaults were "government officer[s] or employee[s]" and the offenses of conviction were motivated by such status. The victims of Stevens's assaults were MPD and USCP officers who were all wearing official law enforcement gear and insignia. Their job was to protect the Capitol and clear the LWT Tunnel, and, by virtue of that role, Stevens and other rioters engaged in prolonged assaults against them in attempt to gain access to the Capitol building.

Specifically, for Count Fourteen, Officer William Bogner and Sergeant Jason Mastony, who were in the group of officers defending the LWT doors at 2:51 p.m., were clearly identified as a police officers in the group that Stevens pushed against in a forceful heave-ho effort. Both Officer Bogner and Sergeant Mastony were wearing a full MPD uniform and helmet, with a distinctive police riot gear. The evidence at trial also showed that all the officers were dressed in

full uniform as they guarded the entrance to the Capitol. It was clear that they were government officers and, as the Court found, there was "no doubt" that Stevens knew he was intentionally acting against police officers.

For Count Sixteen, from 2:56-2:58 p.m., Stevens joined in coordinated physical pushes against the police line in the LWT Tunnel after he had seen police officers in the tunnel. As the Court stated in its oral verdict, Stevens knew that rioters were obstructing police officers (as opposed to just trying to break through the door) because Stevens watched as rioters passed stolen police shields forward into the LWT Tunnel to keep their place in front of the officers. The evidence at trial also showed that all the officers were dressed in full uniform while they guarded the entrance to the Capitol. Stevens' own cell phone footage showed police helmets. It was clear that they were government officers.

For Count Twenty-One, Stevens used a stolen police shield to assault Sergeant Gonell. Sergeant Gonell was wearing his full uniform and was part of the police line engaging in the performance of his duties when Stevens used the stolen police shield to forcefully press into Sergeant Gonell's body, face, and helmet.

For Count Thirty-Three, Stevens joined in coordinated physical pushes against the police line in the LWT Tunnel forcing police to retreat further into the tunnel from 4:15-4:19 p.m. The Court found that the officers were "obviously engaging in their official duties protecting the Capitol from unauthorized visitors [and] they were all wearing official law enforcement gear and insignia."

**D.      Application Of Adjustment: U.S.S.G. § 3A1.3**

United States Sentencing Guideline § 3A1.3 applies to Count Twenty-One, because the

"victim was physically restrained in the course of the offense." "'Offense' means the offense of conviction and all relevant conduct under §1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." *See* U.S.S.G. § 1B1.1 cmt. n.1(I).

As demonstrated at trial, in the course of assaulting Sergeant Gonell, Stevens restrained Sergeant Gonell's movements such that Sergeant Gonell was unable to stop the attack from Stevens or other rioters. Sergeant Gonell testified that Stevens pressed him against the wall – on his chest, face, and head – and in doing so, prevented Sergeant Gonell from moving. Sergeant Gonell testified that "[t]here [was] nothing I could do." TTr. at 53, 8/31/22 (Gonell). This attack put Sergeant Gonell in a place of extreme vulnerability.

### E.    Total Adjusted Offense Level

Accordingly, the government's calculation of Stevens's total adjusted offense level is 27, Stevens's criminal history score is category I, PSR ¶ 112, and the guidelines range is 70-87 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, the section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature And Circumstances Of The Offense

As shown in Section II (B) of this memorandum, Stevens' violent actions and persistent aggression against police officers on January 6, 2021, put numerous officers at risk of severe harm and gave momentum to a violent mob seeking to interrupt the certification of the 2020 Electoral

College vote. The nature and circumstances of Stevens' offenses were of the utmost seriousness and fully support the government's recommended sentence of 78 months.

**B.      Stevens' History And Characteristics**

Defendant Stevens is a college-educated 27-year-old. He is currently unemployed and relies on his grandparents for financial support. Stevens joined the Air Force in 2019 but received an Entry Level Separation because he lied about marijuana use during basic training. Defendant Stevens has a brief history of working in the service industry but has remained mostly unemployed. Stevens has no criminal history.

**C.      The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense And Promote Respect For The Law**

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Stevens' criminal conduct in joining rioters for nearly one and a half hours as they engaged in a sustained onslaught against police was not only highly dangerous but is the epitome of disrespect for the law. His actions demonstrate a disregard for the safety of the officers inside the LWT Tunnel, including Sergeant Gonell, who Stevens viciously attacked.

**D.      The Need For The Sentence To Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a lengthy term of incarceration. There is no indication that Stevens holds any regrets regarding his participation in the riot. Indeed, he continues to post on social media accounts fake news suggesting that January 6 was a government set up or that it did not happen as the video footage shows. A lengthier term of incarceration will provide necessary specific deterrence here.

### E.      The Importance Of The Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Id.* at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (Statement of Judge Chutkan).

Moreover, section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[4]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (Statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Thus, while no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. McGrew*, 21-cr-398, Chief Judge Howell sentenced the defendant to 78 months of incarceration after he pled guilty to a single count of violating 18 U.S.C. § 111(a)(1). McGrew joined the storming of the police line on the West Plaza and eventually worked his way to the Capitol building. Defendant McGrew entered the Capitol through the Upper West Terrace doorway. As he entered through the door, McGrew struck an officer with his hand as he entered the door, causing the officer's helmet to be displaced. While in the Capitol, McGrew joined other rioters in pushing against an officer to gain access to a staircase. The officer relented and let McGrew and others pass. Then, while in the rotunda, McGrew was involved in several physical altercations with officers. McGrew attempted to grab officers' batons twice and gripped an officer's coat as officers tried to push rioters out. McGrew loudly berated officers, calling them "traitors" and saying things like, "There are way more of us than y'all, way more . . . there's 2 more million people right behind us, 2 million more people who are tired of this shit!" McGrew eventually left the building and made his way to the LWT Tunnel. At the mouth of the tunnel, around 4:13 p.m., McGrew threw a long pole into the LWT Tunnel, hitting another rioter and an officer's visor. Then, McGrew joined the rioters by collectively pushing into the officers.

Defendant McGrew and Stevens both engaged in prolonged violence against police officers on several occasions over the course of one and a half hours. In fact, McGrew entered the Capitol building only minutes before Stevens entered the LWT Tunnel, and they both finished their day in the same collective push in the LWT Tunnel around 4:19 p.m. Like McGrew, who engaged in one-

26

on-one violence against an officer in the rotunda, Stevens engaged in a similar assault against Sergeant Gonell when he pinned the officer with a shield in the LWT Tunnel. In addition, Stevens was able to leverage the force of the rioters behind him to apply collective pressure on Sergeant Gonell. During their altercations with officers, both defendants attempted to disarm officers of their batons. Both defendants also coupled their physical violence against officers with verbal abuse – berating officers for doing their jobs. Given the similarities in conduct, a comparable sentence is justified.

Next, in *United States v. Thomas Webster*, 21-cr-208, Judge Mehta sentenced the defendant, convicted after a jury trial, to 120 months of incarceration. That case involved a protected physical assault against a single officer who the defendant had picked out from the police line. Webster initiated his attack by yelling insults at officers standing guard behind bike racks. Eventually, Webster forcefully pushed the bike rack barriers and then swung a flagpole aggressively into the bike racks until the flagpole broke. As Webster swung the flagpole, officers were forced to step back, allowing the mob to surge forward and breach the barricade. As one officer stepped back, Webster crouched down and charged at the officer, tackling him to the ground. Webster tried to tear the officer's gas mask off his face. Webster did not show regret for his actions following January 6.

Like Webster, Stevens went to trial but was convicted on *four* felony assault charges of 18 U.S.C. § 111(a)(1), whereas Webster was convicted of a single violation of 18 U.S.C. § 111(a)(1) and (b), admittedly a more serious crime. Webster played an integral role in the collapse of the police line on January 6 when he directly attacked an officer and paved the way for rioters to breach the barricades. Similarly, Stevens played an integral role in the attack on dozens of officers

inside the LWT Tunnel as a persistent assaulter and as a leader when he coordinated the rioters' collective push in the tunnel. Both defendants refused to succumb to authority – Webster at the police line and Stevens for one and a half hours in the LWT Tunnel. Unlike Webster's conduct, Stevens assaultive conduct was not limited to a single officer. The guidelines in *Webster* were significantly higher (210-262 months), because of multiple enhancements for destroying evidence and using body armor. Stevens, like Webster, has not taken responsibility for his actions and continues to lack remorse for his role in the attack of our democracy.

Finally, in *United States v. Judd*, 21-cr-40, this Court sentenced co-defendant David Judd to 32 months of incarceration after he was convicted in a stipulated trial to a single count of 18 U.S.C. § 111(a) and a single count of 18 U.S.C. § 1512(c)(2).[5] Judd was an active participant in the LWT Tunnel for one and a half hours and acted as an "on the ground commander" by directing rioters in and out of the tunnel and cheering and encouraging rioters. Judd passed several shields and a crutch into the tunnel to be used as weapons against officers. He also lit and threw a firework into the tunnel. The Court credited Judd's remorse for his actions on January 6.

Both Stevens and Judd acted as leaders inside the tunnel. For Judd, he used hand movements to direct fresh rioters into the tunnel. For Stevens, he used hand movements to count rioters down to make coordinated pushes against officers. Both rioters joined the mob in collectively pushing against officers. But when it came to one-on-one combat against officers, Stevens' actions were more aggravating.

---

[5] Because Judd entered into a stipulated trial, his guidelines range included a three-point deduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Thus, Judd's sentence is not comparable on that basis. Additionally, the court varied downward in Judd's case. Although we respectfully disagreed with the Court's ultimate sentence (*i.e.*, an imposition of a downward variance), Stevens' conduct is both different and distinguishable, both factually and procedurally.

For one, in Judd's sentencing, the Court found important the fact that the firework Judd threw did not actually injure anyone. Indeed, much of the sentencing hearing assessed the dangerousness of the device the defendant threw. The same cannot be said of Stevens' actions. The Court heard live testimony from Sergeant Gonell that Stevens forcefully pinned Sergeant Gonell with a shield. Sergeant Gonell described the burning sensation that he felt throughout the assault. Thus, although Judd's actions could have injured all of the officers and rioters inside the tunnel, Stevens actually injured an officer.

Second, although Judd passed shields inside the tunnel, Stevens actually *used* one of the shields as a weapon. And worse, in addition to using the shield, Stevens also attempted to disarm an officer of his baton while Stevens battled at the front of the tunnel.

Third, Stevens spewed venomous rhetoric at police officers before and during his assaultive conduct. While on the West front, Stevens threatened officers with being shot for their purportedly traitorous acts. He then entered the tunnel and physically assaulted officers that he considered to be traitors. While doing so, Stevens called Sergeant Gonell a "pussy."

Finally, and perhaps importantly, the Court credited Judd's remorse and acceptance of responsibility after January 6. The same cannot be said of Stevens. To this day, Stevens has failed to accept responsibility for his actions and, in fact, continues to allege that his and other rioters' actions on January 6 were warranted.

Therefore, Stevens should receive a substantially higher sentence than this Court imposed on Judd, notwithstanding our prior disagreements about the application of the various guidelines and §3553(a) factors in the *Judd* sentencing.

While there are no identical factual scenarios, these cases provide guidance as to the appropriate range for convictions under this statute in the context of the violence on January 6, 2021. It further helps to show that the government's recommendation, at the end of the day, is reasonable.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papageno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014)

(restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[6]  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[7]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).  "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that . . . Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of "victim" contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[8]  *United States v. Gushlak*, 728 F.3d 184, 196

---

[6] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice*, Case No. 13-cr-0495-01 (ES), 2020 WL 220089, at *5 (D.N.J. Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[7] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[8] The sentencing court should "articulate the specific factual findings underlying its restitution

(2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (holding that restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence,"

---

order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Stevens' actions, including using a stolen police shield to assault an officer, as well forcibly attempting to breach the police line and to enter the Capitol building, caused damage to that building.

§ 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered

a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires

imposition of full restitution without respect to a defendant's ability to pay.[9]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued

and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves

the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the

defendants jointly and severally liable for the full amount of restitution owed to the victim(s),

*see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court

shall order restitution to each victim in the full amount of each victim's losses as determined by

the court and without consideration of the economic circumstances of the defendant"); or (2)

apportion restitution and hold the defendant and other defendants responsible only for each

defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter

approach is appropriate here.

More specifically, the Court should require Stevens to pay a total of $2,000 in restitution

for his convictions on Counts 14, 16, 21, 33, 35, 36, 44, 52, and 53. The breach of the Capitol

ultimately resulted in more than 2.8 million dollars in losses,[10] and a $2,000 restitution order would

fairly reflect Stevens' role in the offense and the damages resulting from his conduct. Moreover,

in cases where the parties have entered into a guilty plea agreement, two thousand dollars has

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

[10] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 78 months of incarceration, three years of supervised release, restitution in the amount of $2,000, and a special assessment of $500. This sentence falls in the mid-range of Stevens's Sentencing Guidelines range of 70-87 months and appropriately balances the factors articulated in 18 U.S.C. § 3553.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Ashley Akers*
ASHLEY AKERS
Trial Attorney
MO Bar No. 69601
U.S. Attorney's Office (Detailee)
601 D Street, N.W.
Washington, D.C.
 202-353-0521
Ashley.Akers@usdoj.gov

</div>