UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


* * * * * * * * * * * * * * *    )
UNITED STATES OF AMERICA,          )      Criminal Action
                                   )      No. 21-00040-2
                Plaintiff,         )
                                   )
   vs.                             )
                                   )
TRISTAN CHANDLER STEVENS,          )      Washington, D.C.
                                   )      March 10, 2023
                Defendant.         )      2:42 p.m.
                                   )
* * * * * * * * * * * * * * *    )


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE TREVOR N. McFADDEN,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:      ASHLEY AKERS, ESQ.
                         JOCELYN P. BOND, ESQ.
                         UNITED STATES ATTORNEY'S OFFICE
                           FOR THE DISTRICT OF COLUMBIA
                         555 Fourth Street, Northwest
                         Eleventh Floor
                         Washington, D.C. 20530


FOR THE DEFENDANT:       LAUREN COBB, ESQ.
                         OFFICE OF THE FEDERAL DEFENDER
                         NORTHERN DISTRICT OF FLORIDA
                         3 West Garden Street
                         Suite 200
                         Pensacola, Florida 32502


FOR U.S. PROBATION:      SHERRY BAKER

```
1     REPORTED BY:            LISA EDWARDS, RDR, CRR
                             Official Court Reporter
2                            United States District Court for the
                               District of Columbia
3                            333 Constitution Avenue, Northwest
                             Room 6706
4                            Washington, D.C. 20001
                             (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 THE COURTROOM DEPUTY:  Your Honor, this is
 2     Criminal Case 21-40-2, the United States of America versus
 3     Tristan Chandler Stevens.
 4                 From Probation, Officer Sherry Baker.
 5                 Counsel, please come forward to identify
 6     yourselves for the record, starting with the Government.
 7                 MS. AKERS:  Good afternoon, your Honor.  Ashley
 8     Akers for the United States.  With me is my co-counsel
 9     Jocelyn Bond.  And with us in the audience is former
10     Sergeant Aquilino Gonell.
11                 THE COURT:  Good afternoon, ladies.
12                 And good afternoon, Sergeant Gonell.
13                 Ms. Akers, I've read Sergeant Gonell's victim
14     impact statement.  Is he going to be interested in making a
15     statement here in court as well?
16                 MS. AKERS:  Yes, your Honor.  He would like to
17     make a brief statement.
18                 THE COURT:  Okay.
19                 MS. AKERS:  Thank you.
20                 MS. COBB:  Good afternoon, your Honor.  Lauren
21     Cobb.  I'm here for Mr. Stevens.  He's present at counsel
22     table.
23                 THE COURT:  Good afternoon, Ms. Cobb.
24                 Good afternoon, Mr. Stevens.
25                 Ms. Cobb, do you have any witnesses today?
```

1          MS. COBB:  I do not, your Honor.

2          THE COURT:  We're here for the sentencing of the

3    Defendant, Tristan Stevens, who was found guilty by this

4    Court on Counts 14, 16, 21, 33, 35, 36, 44, 52 and 53 of the

5    fifth superseding indictment.

6          Those are -- Counts 14, 16, 21 and 33 are

7    assaulting, resisting or impeding certain officers and

8    aiding and abetting; as to Count 21, I note the Court found

9    the Defendant guilty of 18 USC 111(a)(1), but not guilty of

10   the 111(b) enhancement.

11         Count 35 is civil disorder; Count 36 is disorderly

12   or disruptive conduct in a restricted building or grounds

13   with a dangerous or deadly weapon; Count 26 -- or I think

14   that's Count 36 -- the Court found the Defendant guilty

15   under 1752, but not guilty under the enhancement for the

16   deadly weapon.

17         Count 44 is engaging in physical violence in a

18   restricted grounds with a deadly or dangerous weapon.

19   Again, the Court found the Defendant guilty of the lead

20   count, but not guilty of the weapons enhancement.

21         Count 52 is disorderly conduct in a Capitol

22   building; Count 53 is act of physical violence in a Capitol

23   building or grounds.

24         I have received and reviewed the presentence

25   investigation report and sentencing recommendation from the

1    probation office as well as sentencing memoranda from the

2    Government and the defense.  I've also reviewed the

3    Government's February 23rd filing in response to my order

4    and Sergeant Gonell's victim impact statement, which was

5    filed last week -- or I think earlier this week, actually.

6              Are there any other documents or materials that I

7    should have reviewed?  Ms. Akers?

8              MS. AKERS:  No, your Honor.

9              THE COURT:  And Ms. Cobb?

10             MS. COBB:  No, your Honor.

11             THE COURT:  Mr. Stevens, this sentencing hearing

12   will proceed in four steps, some of which may seem a bit

13   mechanical to you.  But I want you to keep in mind why we're

14   here today and the gravity of the situation:  You've

15   committed several federal crimes.  Today's proceeding is a

16   serious matter, as it is about the consequences that you

17   will face because of your decision to engage in criminal

18   behavior in violation of federal law.

19             The first step of today's hearing is for me to

20   determine whether you've reviewed the presentence report and

21   whether there are any outstanding objections to it and, if

22   so, to resolve those objections.

23             The second step is to calculate your recommended

24   sentence under the sentencing guidelines.

25             The third step is to hear from Sergeant Gonell,

1    from the Government, from your attorney and you, sir, if you

2    wish to be heard about sentencing in this case.

3            And the last step requires the Court to fashion a

4    just and fair sentence in light of the factors Congress set

5    forth in 18 USC 3553(a).  As part of this last step, the

6    Court will actually impose the sentence along with the other

7    required consequences of the offense.

8            So turning to that first step, Probation filed its

9    final presentence investigation report and sentencing

10   recommendation on March 3rd.  The Government and Mr. Stevens

11   filed their memoranda in aid of sentencing on the same day.

12           Does the Government have any objection to any of

13   the factual determinations set forth in the presentence

14   report?  Ms. Akers?

15           MS. AKERS:  We have no objections.

16           But I would note in Paragraph 141, the Defendant

17   reported that he didn't have any social media accounts to

18   Pretrial Services.  He does have a known Twitter account, so

19   that would be an inaccuracy as far as that goes.  But we

20   didn't previously note that for the office.

21           THE COURT:  Thank you.

22           Ms. Cobb, have you and Mr. Stevens read and

23   discussed the presentence report?

24           MS. COBB:  We have, your Honor.

25           THE COURT:  And does the Defendant have any

1    objection to any of the factual statements set forth in it?

2              MS. COBB:  No, your Honor, we don't.

3              And I can't -- I don't know about the comment

4    Ms. Akers just made about the social media, so I can't

5    really comment on that.  But otherwise, no, we don't have

6    any objections.

7              THE COURT:  Mr. Stevens, can I ask you to join

8    Ms. Cobb at the stand.

9              Sir, are you fully satisfied with the services of

10   your attorney in this case?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  And do you feel you've had enough time

13   to talk with her about the probation office's presentence

14   report and the papers the Government filed in connection

15   with this sentencing?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  Thank you.

18             You may have a seat.

19             The Court will accept the facts as stated in the

20   presentence report.  The presentence report will serve as my

21   findings of fact for purposes of this sentencing.

22             My thanks to Officer Baker for all her work on

23   this matter.  I know it was a complicated one.

24             The presentence report lays out the probation

25   office's calculation of the advisory guideline range that

1    applies in this case.  The Government and defense disagree

2    about how the probation office grouped the guidelines.  They

3    agree with each other on the grouping, but have other

4    disagreements.

5              First, I'll summarize what Probation has proposed.

6    Then I'll give the attorneys an opportunity to voice any

7    further objections they wish to make.  Then I'll look to

8    resolve those.

9              So the probation office says the guideline for

10   Counts 14, 16 and 21 is found in 2A2.4 of the guidelines.

11   And the applicable guideline for Count 35, civil disorder,

12   is found in 2X5.1 of the guidelines, which provides that if

13   the offense is a felony for which no guideline has been

14   promulgated, I should apply the most analogous offense

15   guideline.

16             Probation submits the most analogous guideline is

17   2A2.4.  That guideline contains a cross-reference stating

18   that if the conduct constituted aggravated assault, I should

19   apply 2A2.2.  Additionally, Probation submits that the

20   appropriate guideline for Counts 36 and 44, disorderly and

21   disruptive conduct in a restricted building and engaging in

22   physical violence in a restricted building, is guideline

23   2A2.4.

24             The guidelines do not apply to Counts 52 and 53,

25   which are Class B misdemeanors.

1          Under guideline 3D1.2(a) and (c), closely related

2     counts are grouped together.  Probation formed four groups

3     of counts with the lead counts being 14, 16, 21 and 33.

4          Without separately calculating the enhancements

5     potentially applicable to each charge, Probation's position

6     is that 111(a) charges cannot be grouped because the victim

7     in guideline 3D1.2(a) contemplates individual officers who

8     are not the same victims.

9          Then, after grouping, the highest offense level is

10    supplied in guideline 2A2.2(a).  That section carries a base

11    offense level of 14.

12         Probation submits that for each of the four groups

13    calculated, a six-level enhancement applies to the base

14    offense level of 14 under 3A1.2.  That section states that

15    if the victim was a government officer or employee and the

16    offense was motivated by such status, the enhancement should

17    follow.  Thus, the adjusted offense level for each group is

18    20.

19         Probation also includes multiple count adjustments

20    which assigns one unit to the group at the highest offense

21    level.  One additional unit is assigned to each group that

22    is equally serious or from one to four levels less serious.

23         Probation submits that one additional unit should

24    be applied for each of the four groups, resulting in a

25    four-level enhancement under guideline 3D1.4.

1          All told, according to Probation, the total

2     offense level is 24.

3          Mr. Stevens has no prior criminal history and zero

4     criminal history points, placing him in Criminal History

5     Category I.  So based on a total offense level of 24 and a

6     criminal history category of I, the guideline range

7     applicable to him is 51 to 63 months for Counts 14, 16, 21

8     and 33 and 12 months for Counts 36 and 44; and there's no

9     guideline for the remaining counts.

10          The guidelines fine range is $20,000 to $200,000.

11          The remaining applicable penalties under the

12     statute include probation, fines and restitution.

13          First, looking to the statute for imprisonment,

14     Counts 14, 16, 21 and 33 carry a maximum prison term of

15     eight years.  For Count 35, the maximum prison term the

16     Court may impose is five years.  For Counts 26 and 44, the

17     Court can impose up to one year.  And for Counts 52 and 53,

18     the Court can impose up to six months.

19          Turning to fines, for Counts 14, 16, 21 and 35,

20     the maximum fine is $250,000.  For Counts 36 and 44, the

21     maximum fine is $100,000.  For Counts 52 and 53, the maximum

22     fine is $5,000.

23          There is also a mandatory special assessment of

24     $100 for Counts 14, 16, 21, 33 and 35 and $10 for Counts 52

25     and 53.

 1          For Counts 14, 16, 21, 33 and 35, the Court may

 2     also impose a term of supervised release of not more than

 3     three years.  For Counts 36 and 44, the Court may impose a

 4     term of supervised release of not more than one year.  And

 5     supervised release does not apply to Counts 52 and 53.

 6          Because the guidelines range is in Zone D of the

 7     sentencing table, the Defendant is ineligible for probation

 8     under guideline 5B1.1.

 9          Under 18 USC 3663A, restitution is mandatory in

10     this case; and the Government is requesting $2,000 in

11     restitution.

12          Ms. Cobb, why don't I hear from you first.  Let me

13     know if you disagree with my recitation as to the statutory

14     framework under which we are operating in regard to this

15     situation.  And then feel free to make any comments, both as

16     to Probation's proposed guideline range and the Government's

17     objections.

18          MS. COBB:  Thank you, your Honor.

19          I don't disagree with the statutory layout that

20     you just gave.

21          And I just want to make sure I'm clear.  Is now

22     when you want me to address my objections to the range?

23          THE COURT:  Yes.

24          MS. COBB:  Perfect.

25          We have two main objections.  The first one is to

1    grouping.  And as you already noted, I know the Government

2    agrees; I think the Government agrees with us maybe for a

3    slightly different position.

4            But our position on grouping is that we recognize

5    Count 21 as different as the count for Mr. Gonell and we

6    recognize that as its own group.  But our position is that

7    Counts 14, 16 and 33, there is not a single identifiable

8    victim for those counts.  It is the group of officers.

9    There's also not a distinct harm for each of those counts.

10   And our position is that Mr. Stevens's conduct by sort of

11   walking out and then walking back in and a few minutes later

12   walking out and walking back in is part of a continuous act.

13   So that's why we believe those counts should group

14   differently.  We agree with the Government on that.

15           THE COURT:  Understood.

16           MS. COBB:  The second main objection we have is to

17   the probation office's decision to calculate Mr. Stevens's

18   range under 2A2.2.  So our position is that Mr. Stevens's

19   conduct did not constitute an aggravated assault.  For that

20   reason, however you originally got to 2A2.2, our position is

21   that 2A2.4 is the appropriate guideline.

22           And -- I thought you had a question.  Sorry.

23   That's why I'm pausing.

24           THE COURT:  Go ahead.

25           MS. COBB:  I will keep going.

1          We recognize that Mr. Stevens was convicted of two

2     separate felonies, certainly, of violating 111(a)(1) and

3     then also of civil disorder, violating 231(a)(3).  We

4     acknowledge that those have separate elements.

5          The biggest difference is that the civil disorder

6     count requires that the assaulting, impeding, opposing of an

7     officer occur during and incident to a civil disorder that

8     affects interstate commerce.

9          And so while those are two separate crimes and we

10    recognize they have separate elements, our position is that

11    the guidelines -- if you look -- we all know relevant

12    conduct in the guidelines is not about technicalities; it's

13    about what actually happened and no matter how it shakes out

14    in the trial, essentially.

15         THE COURT:  You referred to *Blockburger* in your

16    briefing.  I take it that was kind of by analogy?

17         MS. COBB:  It was, your Honor.  Yes.

18         Our position here is that if you look to the

19    definition of aggravated assault, which is under 2A2.2, in

20    the commentary -- it's Note 1 -- my understanding is the way

21    that Probation is getting Mr. Stevens's actions -- the way

22    they believe they fall under that definition is that he

23    committed either a 111(a) offense or the 231 offense with

24    the intent to commit another felony.

25         And our position is that we recognize he did

1   commit two felonies, but that the intent for those felonies

2   is the same.  And when the guidelines says intent to commit

3   another felony, it doesn't mean intent to commit essentially

4   the same felony, just charged differently.

5            I cited in my memo a number of cases -- really,

6   all the cases I could find -- where a 111(a) conviction

7   qualified as aggravated assault based on intent to commit

8   another felony; and every single one of those cases involves

9   something else, whether it's assaulting an officer while

10  possessing drugs, whether it's assaulting an officer while

11  running from a state officer, whether it is --

12           THE COURT:  Can I ask you, I'm trying to think --

13  like maybe a bank robbery or something.  Someone assaults a

14  teller and accomplishes the bank robbery that way.

15           Wouldn't you agree that I guess at least for the

16  assault that it's the same nucleus of facts that would make

17  out both -- say an attempted robbery and the assault, but

18  that couldn't count as an aggravated assault here because

19  it's done with an intent to commit a bank robbery?

20           MS. COBB:  I think I understand your question.

21  And I do agree that it would be the same nucleus of facts.

22  So I'm not saying that you have to have one event and then

23  another event.  I think they can happen essentially

24  simultaneously.

25           But in your example, there are two intents.

1    There's an intent to rob the bank, but also an intent to

2    assault the teller.  And that's what we don't have in this

3    case.  We have an intent to assault, impede, oppose or

4    resist an officer while -- it's a circle.  It's the same

5    thing.

6              THE COURT:  I hear you.

7              I mean, I guess my instinct is there is some

8    daylight even -- well, one, I think, is a general intent.

9    You're assaulting a police officer, but this civil disorder

10   involves kind of a mob element and a fray element that not

11   only is it a different element that you have to prove, but

12   it feels like there's kind of a bigger purpose beyond just a

13   felony assault.

14             MS. COBB:  I understand that, your Honor.  And I

15   don't disagree.  There are those added elements, the added

16   element that has to happen incident to or during a civil

17   disorder and that that civil disorder has to affect commerce

18   or a government function.

19             I think my point, though, again, it just keeps

20   going back to the intent, because you can prove a violation

21   of 231(a)(3) by only proving -- the intent of the Defendant,

22   the only intent required is that he intended to impede or

23   oppose an officer.  You don't have to prove that he intended

24   necessarily that a civil disorder was happening, that he

25   knew that commerce was affected.

1          And so that's my argument, is just that under the

2     guidelines, we are looking at conduct and intent.  And

3     there's only one here.  There aren't two separate things.

4     And our position is that that is why Mr. Stevens's conduct

5     should not fall under the aggravated assault guideline.

6          THE COURT:  So I guess I'm going back to this

7     civil disorder.  I don't think civil disorder is necessarily

8     a specific intent crime.  But I suppose if you aided and

9     abetted it, then it would have this specific intent.  Right?

10    I guess what I'm trying to get to is whether you can assault

11    someone with the intent to commit civil disorder and

12    therefore that would be -- that would hit what you're

13    describing, what you're saying isn't happening here.

14         MS. COBB:  It would, your Honor.

15         But the jury instructions that this Court accepted

16    for civil disorder require that the Defendant intended or

17    knowingly -- first you have to knowingly commit an act that

18    was intended to obstruct, impede or interfere.

19         For the other elements, there's not an intent

20    required on the Defendant's part.  And so it's my point that

21    the intent required under 231 is the same intent required

22    under 111(a).

23         THE COURT:  Thank you.

24         Anything else on any of the others you want to

25    say?

 1          MS. COBB:  Your Honor, I didn't have any other

 2     specific objections.  But I do object to some of the

 3     Government's requests that they're asking.  Should I do

 4     those now --

 5          THE COURT:  Yes.

 6          MS. COBB:  -- or do you want me to wait?

 7          THE COURT:  Go ahead.  I'll let you know if I need

 8     to hear --

 9          MS. COBB:  Understood.

10          And I mentioned these briefly in my sentencing

11     memo.  But our position is that the bodily injury

12     enhancement under 2A2.2(b)(3) should not apply in this case.

13     In your verdict, you specifically stated that Sergeant

14     Gonell's injuries were caused by other people.

15          THE COURT:  I understand.

16          MS. COBB:  So we object to that.

17          And then we also object to the application of the

18     restraint enhancement --

19          THE COURT:  Yes.

20          MS. COBB:  -- for the same reason.  The verdict

21     contradicts that.

22          THE COURT:  Thank you, ma'am.

23          MS. COBB:  Thank you, your Honor.

24          THE COURT:  Ms. Akers, do you wish to be heard on

25     any of this?

1        MS. AKERS:  Yes, please.

2        All right, your Honor.  I'll start with 2A2.2 in

3   the cross-reference.  I would just note initially that

4   there's no case law that supports the Defendant's position

5   here that the cross-reference can't apply.  The only case

6   that the defense pointed to was the *Hamner* case, and that's

7   different from this case.

8        THE COURT:  Was that with Judge Jackson?

9        MS. AKERS:  Correct.

10       That's different from this case because in that

11  case, Judge Jackson was saying there was some

12  double-counting.  And the reason there is because the 111(a)

13  charge became a felonious assault because there was an

14  intent to commit another felony, the 231.  And so Judge

15  Jackson held that was -- 231 was used for the 111 once.

16       And then at sentencing, the Government relied on

17  the cross-reference to say that 2A2.2 applied because there

18  was an intent to commit another felony, 231.  So then Judge

19  Jackson said, Well, now you're relying on 231 twice, so

20  there's a double-counting.

21       In this case, though, the Defendant at least as it

22  relates to Count 21 against Sergeant Gonell actually made

23  physical contact.  So the Government doesn't have to rely on

24  the intent to commit another felony for it to be a felonious

25  assault under 111(a).  So there was never any double-

1    counting.

2          So our position is that the cross-reference to

3    2A2.2 applies here for all of the counts.  But our lead

4    charge that's dictating our guidelines is Count 21.  We

5    believe it should apply there easily because of the physical

6    contact, and you would never get to the double-counting for

7    the 231.

8          THE COURT:  What about Ms. Cobb's point that

9    there's just kind of one intent here, that both of these

10   statutes look for intent to obstruct, impede or interfere

11   with one or more law enforcement officers?

12         MS. AKERS:  Well, the one overlapping element, as

13   Ms. Cobb said, does require the intent, the first element,

14   for both 231 and 111(a).  But then at 231 we also have the

15   third element that doesn't require an intent.  It's a

16   different element of the crime.

17         And there's really just no case law that supports

18   this overlapping intent theory, especially as it relates to

19   the aggravated assault cross-reference.

20         This Court in the *Council* case has applied the

21   cross-reference in a similar circumstance, as has this

22   general court in other cases.  And so I think that I guess

23   it's an interesting academic experiment to think about the

24   intent; but there's really no case law that would prohibit

25   the cross-reference just because one of the elements may

1    share an intent even if they could demonstrate that.

2           THE COURT:  Am I right there's not much case law

3    on this, period?  Right?

4           MS. AKERS:  That's correct.  Yes.

5           But the Court -- this district court that has

6    looked at a lot of 111 cases primarily in the January 6th

7    context has applied the cross-reference, I believe, in all

8    but the one case that defense has cited under 2A2.2 for 111

9    charges.

10          We believe it's appropriate here not only on the

11    technical arguments we're making here, but on this

12    Defendant's specific conduct, especially Count 21, where he

13    actually made physical contact with Sergeant Gonell and all

14    his other relevant conduct your Honor saw at trial.

15          As it relates to the official victim plus-six, the

16    Government agrees with Probation that that applies.  I think

17    that defense didn't note this because they were under 2A2.4,

18    and so there wouldn't be that same plus-six.

19          But for the reasons that your Honor stated in his

20    verdict, that it was very clear that this Defendant saw the

21    officers, that the officers were wearing law enforcement

22    gear and it was very clear that the reason that these

23    rioters, including the Defendant, were taking their actions

24    was because they were officers.  And therefore, the plus-six

25    applies.

1          I'll go now to 2A2.2(b)(3), which is the bodily

2    injury that we're asking for.

3          I'd note here that the definition of bodily injury

4    under 111(b) is different than the guidelines' definition.

5    So we agree with the defense here that although your Honor

6    found at trial that this Defendant's conduct wasn't

7    sufficient to be convicted under 111(b), that doesn't

8    necessarily mean that the bodily injury enhancement doesn't

9    apply here.

10          Under 1B1.1, Note 1B, bodily injury is any

11    significant injury; for example, an injury that is painful

12    and obvious or is of a type for which medical attention

13    ordinarily would be sought.

14          And so that definition is much broader than the

15    111(b) definition of serious bodily injury.  We're not

16    seeking a serious bodily injury enhancement here, which

17    would be the plus-five.  We're only seeking the plus-three.

18          Your Honor heard at trial that this Defendant

19    violently and persistently assaulted Sergeant Gonell with a

20    shield.  Sergeant Gonell credibly testified his head was

21    pushed back in an awkward manner.  His face was burning.  He

22    had issues breathing when he was pressed with a shield.  He

23    had pain to his face.  And Sergeant Gonell testified that

24    when he was pinned, he felt pain.

25          And so our position is that the bodily injury

1    addition is appropriate in this case.

2           And then finally, we also have sought an addition

3    for physical restraint under 3A1.3.  The probation office

4    has not applied this because they have found that this

5    Defendant's conduct doesn't meet the definition of physical

6    restraint, which is "forcible restraint of the victim as

7    being tied, bound or locked up."

8           The D.C. Circuit has explained that that's only

9    some examples of what could constitute forcible restraint.

10   Your Honor heard at trial the testimony that this Defendant

11   used a physical shield and his body to press Sergeant

12   Gonell.  Sergeant Gonell testified credibly that he couldn't

13   move, couldn't do anything.  This happened for several

14   minutes.  We assert that conduct falls exactly with what's

15   intended under the physical restraint guideline here, and

16   therefore we ask that your Honor apply it.

17          And I believe those are all of the things we'd

18   like to note.  Thank you.

19          THE COURT:  Thanks, Ms. Akers.

20          Officer Baker, anything you want to say?

21   Obviously, I've read your report.  But certainly I welcome

22   your comments.

23          THE PROBATION OFFICER:  First of all, good

24   afternoon, your Honor.

25          THE COURT:  Good afternoon.

1          THE PROBATION OFFICER:  No.  We rely on our

2     submission, specifically what we noted in our addendum, in

3     response to both the Government and defense objections.

4          THE COURT:  Thank you.

5          So let me try to go through my determination of

6     the various issues here.

7          First, I agree with the Government that the counts

8     should be listed out first with the applicable enhancements

9     and then grouped.  I'm going to start with the 111(a) count,

10    because ultimately they supply the highest guideline level.

11         I believe the appropriate guideline for Counts 14,

12    16, 21 and 33, which are the assaulting, resisting or

13    impeding officers, is 2A2.4(a), which carries a base offense

14    level of 10.

15         The Government argues that the cross-reference to

16    aggravated assault in 2A2.2 should apply for each count,

17    which would make certain enhancements available.

18         The Defendant objects to the aggravated assault

19    cross-reference.

20         The notes to 2A2.2 define aggravated assault as a

21    felonious assault that involved an intent to commit another

22    felony.

23         The key question here is whether the Defendant

24    assaulted, resisted or impeded officers with the intent to

25    commit another felony; here, civil disorder.

1        For the following reasons, I think that his

2    conduct in the tunnel does qualify:  First, I'll note that

3    I'm not relying only on the definition of aggravated assault

4    in the notes to the guideline.  The overall guideline refers

5    to aggravated assault, which has a very broad definition.

6        Indeed, *Black's Legal Dictionary* defines it as,

7    quote, "criminal assault accompanied by circumstances that

8    make it more severe, such as the intent to commit another

9    crime," closed quote.

10       The application note to the guideline defining

11   aggravated assault mirrors that definition, explaining that

12   if an underlying assault involved an intent to commit

13   another felony, it qualifies as aggravated assault.

14       For Mr. Stevens, as I explained in my oral ruling

15   on Counts 16 and 33, I found him guilty of aiding and

16   abetting in violation of 111(a) because he pushed with

17   intent that others in front of him would continue

18   obstructing officers in the tunnel.

19       I think Mr. Stevens's conduct, which includes

20   leaning his body into the rioters in front of him and then

21   raising his hand in the air to count to three while rioters

22   began to coordinate their push into the officers, was done

23   with the intent to commit the felony of civil disorder.

24       Similarly, for Count 14, I found that the

25   Defendant led pushes to help rioters at the front of the

1    group.

2            As for Mr. Stevens's felony assault on Sergeant

3    Gonell, Count 21, I found after trial that the Defendant

4    assaulted Sergeant Gonell with the intent to commit civil

5    disorder.

6            While I note Stevens's argument that his

7    convictions for 111(a)(1) and 231(a)(3) were based on the

8    same conduct of pushing up against officers in the tunnel, I

9    don't think that means I can't apply the aggravated assault

10   cross-reference.

11           I'm aware of Judge Jackson's ruling declining to

12   apply the cross-reference in *Hamner*, where the Defendant

13   pled guilty to violating 231(a)(3) and was alleged to have

14   simultaneously violated 111(a).

15           Judge Jackson reasoned that the application note

16   is asking whether someone committed the assault with the

17   intent to commit some other offense rather than the same

18   assault charged differently.  In other words, I think she

19   was reasoning that both the offense conduct and intent had

20   to be different to satisfy the "intent to commit another

21   felony" language.

22           For the reasons I just discussed, especially the

23   overall definition of aggravated assault in the guideline

24   title, I disagree that the offense conduct and intent has to

25   be entirely separate for a second offense to count as

1    another felony.

2           And unlike in Judge Jackson's case, I'm basing my

3    ruling on my assessment of Mr. Stevens's conduct at trial,

4    where I specifically found he assaulted and impeded officers

5    under 111(a) with the intent to commit civil disorder.

6           I also think 111(a)(1) encompasses forcible and

7    intentional conduct against law enforcement officers.  And

8    in particular, 231(a)(3) speaks more to the danger of mob

9    resistance to law enforcement, requiring that the Defendant,

10   quote, "commit an act," closed quote, with the intended

11   purpose of interfering with officers performing their duties

12   incident to and during a civil disorder.

13          There is something substantially different to my

14   mind and aggravated about assaulting an officer as part of a

15   riot that Section 231 understandably punishes as separate

16   and apart from run-of-the-mill assaults on police officers.

17          Here, Mr. Stevens is both assaulting, obstructing

18   and impeding a line of officers and doing so during a civil

19   disorder, i.e. in a mob situation in the tunnel.

20          I think my findings of fact and conclusions of law

21   at trial are clear on that point.

22          Therefore, I think it is appropriate to apply the

23   cross-reference in 2A2.2 for Counts 14, 16, 21 and 33,

24   therefore providing a base offense level of 14.

25          The Government asks for the plus-six official

1   victim enhancement for all these counts.

2       I agree that it's appropriate to apply that

3   enhancement because the line of police officers and Sergeant

4   Gonell in particular were official victims within the

5   meaning of the guidelines.

6       The Government argues that a plus-two leader

7   enhancement would apply to Count 14 based on the Defendant's

8   work coordinating the rioters to push.

9       I don't agree that 3B1.1's aggravating role

10  enhancements apply here.  That requires the Defendant to be

11  an organizer, leader, manager or supervisor in any criminal

12  activity.  While he might have been trying to help the

13  mob -- indeed, I think he was -- I don't think it's really

14  accurate to say he was a leader within the meaning of the

15  guidelines.

16      I reject this enhancement for similar reasons as I

17  did for his Co-Defendant Mr. Mehaffie.

18      The Government argues that a plus-three bodily

19  injury enhancement should apply to Count 21 based on the

20  Defendant's assault on Sergeant Gonell.

21      Section 1B1.1's application instruction defines

22  bodily injury as, quote, "any significant injury, e.g. an

23  injury that is painful and obvious or is of a type for which

24  medical attention ordinarily would be sought."

25      I found at trial that Sergeant Gonell testified

1  that he felt a burning sensation when his face shield was

2  pushed up and his head was pushed back in an awkward manner.

3      I agree with the defense that Sergeant Gonell

4  didn't even really claim to be injured specifically by

5  Mr. Stevens, more that he felt uncomfortable, frustrated and

6  impeded.  And I found that Sergeant Gonell's injuries appear

7  to have come from other rioters, not specifically the

8  Defendant, and that the dislocation of Sergeant Gonell's

9  face shield and helmet was not likely to cause serious

10  injury.

11      A burning situation was doubtless due to pepper

12  spray in the air, not directly because of Mr. Stevens's

13  assault.  While this is not dispositive, there is no

14  suggestion that Sergeant Gonell needed medical attention

15  based on any injury received specifically from Mr. Stevens.

16      Therefore, while I admit this is a close question,

17  I don't think the Government has shown that the bodily

18  injury enhancement applies to the Defendant's conduct, which

19  requires a, quote-unquote, "significant injury."

20      Next, the Government submits that a plus-two

21  physical restraint enhancement should apply to Count 21

22  under 3A1.3.  "Physically restrained" is defined in

23  guideline 1B1.1 as, quote, "the forcible restraint of the

24  victim such as being tied, bound or locked up," closed

25  quote.

1          I don't think that language applies to

2    Mr. Stevens's conduct with Sergeant Gonell.  I found in my

3    oral ruling that Sergeant Gonell was not being crushed

4    between Mr. Stevens's shield and a fixed object, contrary to

5    the situation Officer Hodges was in.  And I found that

6    another officer was pushing into Sergeant Gonell's back to

7    support him against the line.

8          I reasoned that that officer could have relented

9    to give Sergeant Gonell escape space.  These findings, among

10   others, led me to acquit Mr. Stevens of the dangerous weapon

11   enhancement in 111(b).

12         For the same reasons, I don't think the

13   enhancement applies to his conduct and I don't think the

14   physical restraint enhancement applies.

15         In sum, I'm going to apply the plus-six official

16   victim enhancement to 2A2.2's aggravated assault base

17   offense level of 14 for a total offense level of 20.  But I

18   am rejecting the Government's other proposed enhancements

19   for the 111(a) counts.

20         Now, looking to the remaining charges, I'll

21   calculate the applicable levels and enhancements for the

22   remaining charges, which are Count 35, Counts 36 and 44,

23   physical violence in a restricted building.

24         For civil disorder, I agree that the base offense

25   level is supplied by 2A2.4, which involves obstructing or

1     impeding officers.  The Government argues once again that

2     the cross-reference to aggravated assault in 2A2.2 should

3     apply.

4          I disagree, because I do not think the Government

5     has shown that the Defendant committed civil disorder with

6     the intent to commit another felony.  But even if I'm wrong,

7     this doesn't ultimately matter, because Count 35 gets

8     grouped with Counts 14, 16 and 33 because they have the same

9     victim, i.e. the line of officers.  And those other counts

10    have a total higher offense level.

11         The Government argues that a plus-three dangerous

12    weapon enhancement should apply.  For the reasons I've

13    discussed above related to the bodily injury enhancement, I

14    don't think the Defendant used a dangerous weapon to further

15    civil disorder such that this enhancement would apply.

16         Finally, for Counts 36 and 44, violence in a

17    restricted building, the base offense level is 10; and the

18    Government asks for plus-three for physical contact and

19    plus-two for bodily injury.

20         For the reasons I've already stated, I think the

21    physical contact enhancement is appropriate, but the bodily

22    injury one is not.  This also is not ultimately going to

23    matter because those counts will get grouped with Count 21,

24    which carries a total higher offense level.

25         Now, to move on to grouping:  I agree with the

1    parties that Counts 14, 16, 33 and 35 should be grouped

2    under guideline 3D1.2(b).  I understand Probation's point

3    that 111(a) counts can never be grouped because that

4    potentially understates the harm to individual victims.

5         To reach that conclusion, Probation relies on the

6    background commentary to the grouping provision of the

7    guidelines.  But I think for Mr. Stevens, four groups based

8    on 111(a) counts would overstate his conduct.  The counts

9    rather arbitrarily involve time chunks based on when he

10    entered and exited the tunnel.  I think he would have only

11    been charged with one count of 111(a) if he had remained in

12    there the whole time.

13         I also think the police line was substantially the

14    same group of officers each time he went back into the

15    tunnel; and in only one of the counts was he charged with

16    assaulting a specific officer.

17         Thus, I group Counts 14, 16, 33 and 35 because the

18    victim in those counts is the line of officers.

19         I also agree with the parties that Counts 36 and

20    44 consist of conduct that is contained within Count 21, so

21    these are also grouped.

22         That leaves us with two groups.  The first is

23    Counts 14, 16, 33 and 35 and the second is Counts 21, 36 and

24    44.

25         Ultimately, after my rulings that I've just made,

1     the highest adjusted offense level in Group 1 is 20,

2     supplied by Counts 14, 16 and 33; and the highest adjusted

3     offense level for Group 2 is also 20, supplied by Count 21.

4              Then two grouping units are added under guideline

5     3D1.4.  All told, I find that the total adjusted offense

6     level is 22, which carries a guideline range of 41 to 51

7     months.

8              The upshot of this is that I end up just below

9     where Probation was range-wise and in the same general area

10    for the sentence.

11             Officer Baker, can I ask you to do an updated PSR?

12    I think it would be a little crazy if I tried to summarize

13    all that.  Thank you, ma'am.

14             THE PROBATION OFFICER:  Yes.

15             THE COURT:  Before I discuss the other sentencing

16    factors that will bear on the Court's final decision, I will

17    at this point share with the parties the particular

18    sentencing the probation office has recommended, taking into

19    account the advisory guidelines sentence, the available

20    sentences and all of the factors listed in Section 3553(a):

21    Probation has recommended a sentence of 51 months on Counts

22    14, 16, 21, 33 and 35; 12 months on Counts 36 and 44; and

23    six months on Counts 52 and 53, all to run concurrently.

24             Probation also recommends 24 months of supervised

25    release on Counts 14, 16, 21, 33 and 35 to run concurrently,

1    plus a special assessment of $570 in restitution to be

2    determined by the Court.

3            The recommendation of the probation office is

4    based solely on the facts and circumstances contained in the

5    presentence report.

6            I must now consider the relevant factors that

7    Congress set out in 18 USC 3553(a) to ensure that the Court

8    imposes a sentence that is sufficient but not greater than

9    necessary to comply with the purposes of sentencing.

10           The purposes include the need for the sentence

11   imposed to reflect the seriousness of the offense, promote

12   respect for the law and to provide just punishment for the

13   offense.  The sentence should also afford adequate

14   deterrence to criminal conduct, protect the public from

15   further crimes of the Defendant and promote rehabilitation.

16           In addition to the guidelines and policy

17   statements, I must consider the nature and circumstances of

18   the offense, the history and characteristics of the

19   Defendant, the need for the sentence imposed, the guideline

20   ranges, the need to avoid unwarranted sentence disparities

21   among defendants with similar records who have been found

22   guilty of similar conduct and the types of sentences

23   available.

24           Before I hear from the parties, Sergeant Gonell,

25   would you like to make a statement at this point, sir?

```
 1                 SERGEANT GONELL:  Yes, sir.
 2                 THE COURT:  If I could ask you to approach the
 3       podium.  And if you can state your name for the record.
 4                 SERGEANT GONELL:  Good afternoon, your Honor.
 5       Sergeant Gonell, former Capitol Police, now retired due to
 6       the injuries that I sustained on January 6th.
 7                 THE COURT:  Good afternoon.
 8                 Can I ask you to state your full name, sir.
 9                 SERGEANT GONELL:  Aquilino Antonio Gonell.
10                 May I ask you two questions before I speak?
11                 THE COURT:  Sure.
12                 SERGEANT GONELL:  If I punch somebody here, you or
13       anybody else, or outside and come back, is that -- and punch
14       you again, does that constitute two punches or one punch?
15                 THE COURT:  That would be two purges.
16                 SERGEANT GONELL:  That's what I thought.
17                 If I commit a crime and that crime leads to
18       another action, do that -- and I didn't know that, does that
19       constitute -- am I waived from responsibility?
20                 THE COURT:  Sorry.  You'll have to say that again,
21       sir.
22                 SERGEANT GONELL:  Ignorance of the law:  Is that a
23       waiver for not to be held accountable?
24                 THE COURT:  Almost never.
25                 SERGEANT GONELL:  That's what I thought.  All
```

 1      right.  I'll begin my statement now.

 2              When I joined the military, I raised my right hand

 3      and I promised to support and defend a great country at any

 4      cost.

 5              On January 6th, I rose to the occasion once again

 6      as a police officer.  I've given half my life to public

 7      service.

 8              I'm here today because I wanted to make sure that

 9      Mr. Stevens is held accountable for taking part in the

10      violence that -- of that fateful day.  Mr. Stevens's

11      participation was detrimental to me and to the other

12      officers attempting to restore order in the Capitol.

13              More than 140 officers were injured, as I was, by

14      the mob of insurrectionists he joined.  Mr. Stevens was not

15      peaceful -- a peaceful sightseer or a tourist.  He was

16      ransacking the Capitol.  He did not have any authority to be

17      there on that day.

18              I was the officer, not the other way around.

19              He tried to disarm me by taking my baton and

20      shoving a six-foot shield on my chest and my head.  He was

21      actively blocking me, impeding me from doing the job as I

22      tried to stop other rioters who were more violent than he

23      was.

24              Stevens even called me a pussy because I refused

25      to stand down as he assaulted me.

1          On January 6th, he was not -- January 6th was not

2     a setup.  And he was not a member of Antifa, to my

3     knowledge.  He was there inside the tunnel willfully.

4     Nobody told him but himself to be there.

5          Two years ago, Mr. Stevens felt empowered, mighty

6     and powerful, because he had the mob on his side to help him

7     push the line of officers, the line of officers where I was.

8     He didn't care about the damage he was causing to me or the

9     other officers or the Capitol or the harm that he was doing

10    to our democracy.

11         Today, he's seeking leniency, sounding remorseful.

12    I don't buy it.  Neither should you.

13         He knew what he was doing.  Due to his actions as

14    a member of the mob, my family and I have suffered

15    physically, mentally and financially.  I ended up retiring

16    because of the injuries that I sustained that day.

17         And although I'm not attributing all those

18    injuries to him, he was actively doing things to aggravate

19    my injuries.

20         I can no longer do the job that I love and trained

21    my whole life because of those injuries.  He changed my life

22    for the worse.  I will never fully recover.

23         Your Honor, I believe that if he were given a

24    second chance, Mr. Stevens would not hesitate to return to

25    the Capitol again and go through multiple layers of security

1    to assault me if the same event happened again.

2          The whole country watched and witnessed it.  The

3    world watched and witnessed what happened at the Capitol on

4    that day on TV.  It was horrific chaos.  You all watched it.

5    I lived it.  I experienced it.  I survive it, barely.  I

6    still have PTSD remembering some of those moments where I

7    was attacked by him and by others.

8          I'm asking you for a maximum years in prison to

9    deter him and others from repeating these crimes.  Failure

10   to hold Mr. Stevens accountable would result in the

11   likelihood of another January 6th.  But next time I will not

12   be there.  I will not be there to help restore order and

13   prevent any other damages that -- preventing things from

14   getting worse.

15         Downplaying what transpired and not holding --

16   punishing and not punishing the violence -- the violent mob

17   for their role will make it more likely to reoccur.

18   Everything my fellow officers and I sacrificed will be in

19   vain.  We defended the Capitol, not from a foreign entity,

20   not from -- but from my fellow American citizens, who

21   attacked us as we did our job.

22         As an immigrant who love America, this still

23   shocked me.  If the attack was done by another group, we

24   would call it as it was:  a terrorist attack.  Mr. Stevens

25   should receive such sentence for trying to violently

1     overturn the U.S. democracy.

2              Your Honor, it wasn't by chance that all those

3     elected officials and their staff made it out to safety on

4     January 6th.

5              They were unharmed, but not because of the lack of

6     trying or intent.  That was the intent that you were asking

7     earlier a few moments ago.  The intent of him to be there

8     was to stop the process, the government process of peaceful

9     transfer of power.

10             And guess what?  He was part of the mob; and his

11    intent was, regardless what we were doing, regardless that

12    we were telling him to back up, to leave the tunnel, to

13    leave the Capitol grounds, he refused to.  Instead, he

14    charged forward and continued to press on me and my fellow

15    officers.

16             Officers like me, we risk our lives to stop people

17    like him.  He's the one who assaulted me that day, along

18    with others.  And he -- although he may not be at the

19    forefront the whole time, he was the leader at that moment

20    fighting me in front.  He was spearheading the charge to

21    attack me and others.

22             Please do not desecrate the sacrifices that my

23    fellow officers and myself did on that day.  Some of those

24    officers died by suicide, because they couldn't bear what

25    happened that day.

1        And just a reminder:  What was happening that day

2    on the Capitol, the intent was to stop the process of

3    peaceful transfer of power from one president to the next.

4    Inside was the vice president with his daughter, the nuclear

5    codes, the speaker of the House, the Senate pro tem and a

6    whole bunch of other elected officials doing their

7    government duty.

8        Each three people that I just mentioned, the vice

9    president, the speaker of the House and the Senate pro tem,

10   those are the next three people in line to the succession of

11   the presidency.  They were targets of the mob that

12   Mr. Stevens was part of.  And they hunted them down room by

13   room.  They wanted to execute them.

14       That's what I risked my life for, regardless of

15   what I feared that day.  And boy, did I have fear.  But

16   guess what?  I plowed through.

17       Thank you.

18       THE COURT:  Thank you, sir.  I appreciate your

19   presence here today and your statements.  Thank you for your

20   service to our country.

21       Does the Government wish to be heard on the

22   application of the factors set forth in 3553(a), request a

23   variance or otherwise make a sentencing recommendation?

24       MS. AKERS:  Yes, your Honor.  Thank you.

25       The Government requests 78 months of incarceration

```
 1    as laid out in our sentencing memorandum.  And I think
 2    that's appropriate under a fair balance of the 3553(a)
 3    factors, of which I'll go through briefly for your Honor.
 4           Just at the outset, I just want to say that
 5    January 6th was a very tragic day.  As your Honor knows, it
 6    was tragic for a lot of reasons, one of which Sergeant
 7    Gonell just mentioned, that there were a lot of officer
 8    injuries on that day, and many of which were done in the
 9    tunnel, the place where Mr. Stevens spent about two hours of
10    his time and his energy attacking police officers.
11           It was a tragic day because our nation's elected
12    officials were hiding and scared for their lives as rioters
13    roamed the halls of the Capitol chanting, "Where are they?
14    We're going to drag them out."  And at the same time, a
15    large number of officers were guarding the entrance of the
16    tunnel so that thousands of more rioters wouldn't be able to
17    break in.  And this Defendant was part of that at the
18    tunnel.
19           And it was a tragic day because rioters like
20    Tristan Stevens decided to violently attempt to prevent a
21    fair and valid election from being certified.
22           And that is one of the reasons that this
23    particular Defendant deserves the term of incarceration that
24    we're asking for, because his actions throughout the course
25    of the day on January 6th were in fact violent.  They were
```

1    not peaceful.

2            Mr. Stevens started his day, as your Honor saw at

3    trial, right in front of the bike racks that the officers

4    were behind.  And this Defendant used his voice to yell at

5    the officers really malicious, violent, aggressive rhetoric

6    that probably shouldn't be stated again in this courtroom

7    and threatened the officers, threatened them with execution

8    for doing their jobs, saying that they should be shot for

9    doing their jobs.

10           Mr. Stevens then watched and was at the front line

11   as the rioters pulled the bike racks from the officers,

12   stormed through them and ran over them.  He was right there

13   when that happened.  And that sets him apart from a lot of

14   rioters who were on his back.

15           He then made his way to the tunnel.  As your Honor

16   knows, the tunnel was the epicenter of violence on

17   January 6th.  It's where a lot of the injuries happened.

18   And this Defendant was in the tunnel within the first ten

19   minutes of the rioters being there.

20           He was not there once; he was not there twice; he

21   was not there three times.  He entered the tunnel

22   intentionally four separate times, as your Honor saw at

23   trial, and he did so intentionally and he -- his actions got

24   worse as they went on.

25           The first time he went in, he went in and he

1    joined a heave-ho pushing, using his physical body to push

2    with the rioters.  And he quickly realized that the rioters

3    were uncoordinated; and at that point is when the Defendant

4    took a step back and began counting the rioters down:  One,

5    two, three.

6         He did this several times, as your Honor noted in

7    his oral verdict, and eventually was able to coordinate the

8    rioters so that they could more effectively use their bodies

9    and the weapons that they brought into the tunnel against

10   the officers in an attempt to break into the Capitol.

11        He then left the tunnel and came back a second

12   time.  And as he came back the second time, he was filming

13   as officers were being assaulted at the front of the tunnel.

14   He again used his body over and over in heave-ho pushes to

15   assault officers and attempt to get into the building.

16        He came in a third time.  And when he came in a

17   third time, rioters in the tunnel were yelling, "Shield

18   wall, shield wall."  They were yelling, "We need more

19   rioters.  We need fresh rioters."

20        And the Defendant listened.  He quickly entered

21   the tunnel.  He grabbed a shield that was being passed

22   overhead and he worked his way to the front of the tunnel

23   where he met many officers, including Sergeant Gonell, and

24   used the force of his body, the force of all of those

25   standing behind him, to repeatedly assault the officers who

1   were just doing their job in the tunnel guarding the Capitol

2   and the lawmakers inside.

3          And he did that for several minutes intentionally,

4   with the intent to harm the officers; and while doing so, he

5   attempted to disarm one of the officers of his baton, as

6   your Honor saw in footage during the trial.

7          After all of those assaults, he was pushed out of

8   the tunnel as the officers gained ground and then he entered

9   again at 4:15.  This is two hours after his first entry.

10   And when he joined again, as your Honor noted in his oral

11   verdict, the mob was exerting the greatest amount of

12   possible force by collectively pushing against the officers.

13          And so, your Honor, this particular Defendant's

14   conduct is very aggravating.  The nature and circumstances

15   of his four times in the tunnel, his not only passing up

16   shields, but using a shield against an officer; his

17   counting, one, two, three to coordinate the rioters; him

18   joining the chants and heave-ho efforts and doing everything

19   he could for two hours to break through the tunnel and get

20   into the Capitol Building.

21          And thanks to officers like Sergeant Gonell, he

22   didn't.  But it wasn't for lack of trying.  And it wasn't

23   without a lot of injury that happened to the officers that

24   day.

25          THE COURT:  Ms. Akers, I'll ask you what I've

1    asked you before:  How would you rate the Defendant's

2    conduct in comparison to his Co-Defendants?

3         MS. AKERS:  We think, your Honor -- we've been

4    talking about this because we anticipated that this question

5    was coming.  As I stated a couple weeks ago with his

6    Co-Defendant Judd, who we thought was at the high end based

7    on his conduct, we similarly think Defendant Stevens is on

8    the high end.  I noted when I was here for the other

9    sentencing that it was hard to compare those two because

10   Defendant Judd didn't actually injure someone, although the

11   potential for injury was there, whereas this Defendant did

12   in fact injure not only one officer, but he was part of the

13   heave-ho-ing that injured a lot of officers over the course

14   of the day.

15         So our position is that he is in the higher end of

16   these Defendants.  It's difficult, though, your Honor, to

17   rank them.  These Defendants were tried together for a

18   reason.  And we believe that their conduct was comparable,

19   which is why they're a group.

20         It was easier with Defendant Mehaffie, for

21   example, because he was the lone Defendant who didn't commit

22   any physical assertions or assaults against officers.  And

23   so we do think because of this Defendant's use of the

24   shield, this Defendant's counting down and this Defendant's

25   direct physical assault on Sergeant Gonell, that he is in

1    the higher of the nine of these Defendants.

2            THE COURT:  And where would Mr. McCaughey fit on

3    that?

4            MS. AKERS:  I think, your Honor, Mr. McCaughey and

5    Mr. Stevens are similar in nature.  And I think that you'll

6    see that we're recommending similar sentences.  There are

7    different aggravating and mitigating factors for each of

8    them.  But we believe their conduct was comparable.

9            Defendant McCaughey's perhaps was worse because of

10   his pinning of Officer Hodges with the door frame and the

11   shield, whereas in this instance, as your Honor noted

12   before, the pinning with the shield was against the weight

13   of another officer.  So the injury perhaps was different,

14   certainly was different.  But the conduct, the intent and

15   the actions were quite similar.

16           THE COURT:  Okay.

17           MS. AKERS:  Next, the sentencing here needs to

18   reflect the seriousness of the offense and promote respect

19   for law.

20           We would submit that this Defendant's actions over

21   this prolonged period of time are really the epitome of

22   disrespect not only for law, but for law enforcement.

23           The Defendant's words when he was at the bike

24   racks to the officers, yelling at them that they were

25   traitors and pointing at them, yelling at them that they

1    were going to get shot, yelling at them really all sorts of

2    vitriolic and malicious things, show this Defendant lacks

3    respect for law and for law enforcement.  And we believe

4    that the sentence we're recommending is appropriate.

5           Next, to deterrence, your Honor is obviously very

6    aware and has knowledge in other cases including for the

7    Co-Defendants that general deterrence is very important.

8           We believe that in this case, maybe contrary to

9    some of his other Co-Defendants, specific deterrence is

10   especially important.  I would note that this Defendant has

11   not taken responsibility to date for his actions.  In fact,

12   he continues to maintain on social media that January 6th

13   was a setup and continues to minimize his conduct.  So

14   contrary to, for example, Defendant Mehaffie or Defendant

15   Judd, who your Honor has already sentenced, this Defendant

16   has not accepted responsibility.  He's not even acknowledged

17   the actions that occurred on January 6th.

18          And he was a part of those actions.  He physically

19   assaulted officers for hours; and yet refuses to acknowledge

20   what happened on that day and what he specifically did on

21   that day.

22          So for that reason, we believe that specific

23   deterrence is especially important in this case.

24          THE COURT:  Can you remind me, about how long was

25   the Defendant actually at the tunnel?  I know you kind of

1    divided up the four different points.  But what is that all

2    together?

3             MS. AKERS:  Yes, your Honor.  He arrived at the

4    tunnel at 2:49 and he entered the tunnel for the last time

5    at 4:15 and left a few minutes later.  We were able to see

6    him on camera for a little while after that, so it was right

7    at about two hours that he was at or inside the tunnel.

8             THE COURT:  Thank you.

9             MS. AKERS:  Finally, your Honor, the history and

10   characteristics of the Defendant:  We don't have a lot to

11   say here.  He doesn't have an extensive or in fact a

12   criminal history at all.  He's been unemployed most of his

13   adult life.  He has attended some college, but I don't think

14   that that should impact your Honor's sentence very much at

15   all.

16            Thank you.

17            THE COURT:  Thank you.

18            Ms. Cobb, do you wish to be heard on the

19   application of the factors set forth in 3553(a), request a

20   variance or other otherwise make a sentencing

21   recommendation?

22            MS. COBB:  I do.  Thank you, your Honor.

23            Your Honor, our position is that there are

24   mitigating factors in this case that weigh in favor of a

25   sentence significantly below the 78 months that the

1    Government is requesting.

2             Mr. Stevens is 27 years old as he sits here today.

3    He is two semesters away from completing a degree in

4    computer engineering.  He's taken -- he's very intent, has

5    taken very high-level coding, math, science classes and

6    again is very close to completing a significant and a

7    difficult degree.

8             On January 6th, your Honor, he was just a few days

9    after his 25th birthday.

10            As the Government noted, and of course I'm going

11   to say it again, he's never been arrested before, before

12   this.

13            In the 25 months since he was arrested in this

14   case, he's been on pretrial supervision.  He's had zero

15   issues.  We have letters from his family members, from

16   classmates, all describing him as someone who works hard,

17   who's kind, logical, always outdoors, growing food, growing

18   plants.

19            And, your Honor, we recognize there's this almost

20   two-hour period where he has broken the law.  But our

21   position is that that period, that two hours, doesn't erase

22   25 years that came before it and it doesn't erase the two

23   years that have come after it.

24            It doesn't cancel out an otherwise sort of

25   productive, responsible, law-abiding life that Mr. Stevens

 1    has lived.

 2          Your Honor, in the Government's sentencing memo,

 3    they give a few examples of other January 6th Defendants who

 4    have received sentences similar to the 78 months that

 5    they're requesting.  And I want to just address a few of

 6    those, if I might.

 7          The first one they talk about is Mr. McGrew.  But

 8    what they don't mention is Mr. McGrew had 11 criminal

 9    history points.  He was in Criminal History Category V.

10    That's night and day from Mr. Stevens, who has zero prior

11    arrests.

12          The second Defendant they bring up is Mr. Webster.

13    We all know Mr. Webster's a retired New York City police

14    officer.  His guideline range was over 20 years, was 210 at

15    the low end, 262 at the high end.  Again, that's not what we

16    have here today with Mr. Stevens.

17          And then the Government mentions Mr. Judd, and

18    they mentioned him here to the Court.

19          What is a little bit perplexing to me is the

20    Government in their sentencing memo for Mr. Judd asks for a

21    sentence that's exactly a year higher than the sentence

22    they're asking for for Mr. Stevens.  So that's a difference

23    right there.  They ask for 90 months in their sentencing

24    memo for Mr. Judd.

25          They also -- it wasn't in the memo, but they

1    mentioned, because you asked, Mr. McCaughey today.  They

2    said they think Mr. Judd, Mr. McCaughey and Mr. Stevens are

3    similar.  And I don't know as much about Mr. Judd's facts,

4    but I argue to the Court that Mr. Stevens and Mr. McCaughey

5    are absolutely not similar.  And I think that your verdict

6    shows the differences.

7         There is not similar conduct or similar intent,

8    because Mr. McCaughey was convicted of significantly more

9    serious crimes than Mr. Stevens was.

10        Mr. Stevens -- there's something very significant

11   about him that puts him in the same category as

12   Mr. Mehaffie.  That's the fact that he has not been

13   convicted and was not convicted of obstructing an official

14   proceeding.  He didn't plead guilty to it.  He hasn't been

15   convicted of it.

16        And for that reason, your Honor, our position is

17   that he is less culpable than Mr. Judd, certainly less

18   culpable than Mr. McCaughey, and that the sentence should

19   reflect that.

20        Again, I think in some ways the Government's

21   recommendations reflect that because of the difference

22   between what they asked for for Mr. Judd and what they ask

23   for for Mr. Stevens.

24        The other difference, certainly besides the

25   obstruction of an official proceeding difference, is that

1    the most serious charge that anyone in this group is charged

2    with is that Mr. Stevens used a shield as a shield.  I know

3    we've litigated this and dealt with it a million times, but

4    he didn't use a weapon.  And that's something else that sets

5    him apart from Mr. McCaughey and from Mr. Judd.

6            Your Honor, our position is that a sentence below

7    the sentence that you imposed on Mr. Judd is appropriate for

8    Mr. Stevens.

9            And that is again based on the mitigating factors

10   I've already mentioned and the differences in his case from

11   Mr. Judd's.

12           THE COURT:  Mr. Judd pled guilty.  That tends to

13   be a pretty big difference.

14           MS. COBB:  I recognize that that is a difference.

15   But he pled guilty to obstructing an official proceeding,

16   which Mr. Stevens has been acquitted of; and I think that's

17   significant as well.

18           THE COURT:  Mr. Stevens, you have the right to

19   make a statement or present any information to mitigate the

20   sentence.  Would you like to say anything that you would

21   like me to consider before imposing sentence?

22           THE DEFENDANT:  I would.

23           THE COURT:  If you could approach the podium, sir.

24           THE DEFENDANT:  I'll bring up some notes.

25           Evening, your Honor.

1    I just would like to sort of walk you through my

2    mentality in, I guess, what led me to that day, so that you

3    can better understand and provide for sentencing.

4    So I guess back to, like, October-ish of -- early

5    October 2020 -- well, I saw, you know, Hunter Biden's

6    laptop, first of all.  And it was, like, really bad stuff on

7    there.  And like one of the -- like what it shows on there

8    is that he was compromised by, like, China, Russia and

9    Ukraine, various other national entities; and also, that his

10   family got 30 million from the Chinese chief of spies.

11   So, like, discounting all the stuff else on that

12   stuff -- on the laptop, like all the pedophilia, it implied,

13   like -- there's really bad stuff on there.  Okay?

14   So what I saw -- so I saw this and I was like,

15   Okay.  Surely, you know, someone is going to, you know, look

16   out for that.  Right?

17   And then I see what happens instead was a mass

18   censorship campaign where there was collusion between the

19   government and Twitter and Facebook to remove the stuff off

20   the internet and hide it from people.

21   And so that's, like, how it started off.  And then

22   really -- I was just going up to protest.  I had no

23   intention to interrupt anything.  I was just trying to, you

24   know, make my voice heard on severe criminality.  I'm a

25   concerned citizen.

1          On that day, like, so -- like -- so I arrived

2     there at the Capitol on that day.  Right?  And when I get

3     there, what I see, the first thing I pretty much see as I

4     walk up is I see a man with his leg blown open and I see his

5     shinbone.  He's pointing to me, like, Look what they did to

6     me.

7          And I see an old man with his head bleeding.  And

8     that's really just like -- so I'm, like, Okay.  What's going

9     on here that there is this much violence going on here?

10          Then what I'm told is someone threw a flash bang

11     into a prayer group and -- they were having a prayer and

12     they threw a flash bang into the group and they have killed

13     the old man.

14          So that's kind of where my mindset was at the

15     time.

16          I do respect law.  I do respect law and order.  I

17     consider myself a man of law and order.  Like my profession

18     is based on logic.  I have to have reasoned and articulated

19     thoughts to be able to do what I do.

20          So, you know, I am remorseful.  I didn't mean to

21     make Gornell [sic] feel frustrated and ineffective.  I

22     didn't -- I really feel embarrassed and shameful about what

23     I said to that one cop.  I didn't -- you know, what happened

24     right before that, I got, you know, pepper sprayed in the

25     face.  And what happened is I had an old lady help me out.

1    Right?  She, like, comforted me and was rinsing my eyes out

2    and she was, like, thanking me for standing up.

3            And, you know, whenever, you know -- just how

4    people like that -- it was a crowd composed of mainly, like,

5    old ladies and old men.  Right?  And, you know, they were

6    thanking.

7            So that's kind of where my mentality was, you

8    know.

9            I do apologize.  I apologize for getting caught up

10   in this and for my actions and my -- for what I said.  I

11   didn't mean to.

12           And that's like on that day.  Personally, I am

13   pretty deterred by it.  I had an ankle monitor on for, like,

14   a year and a half.  And it was an unpleasant experience.  I

15   put on a lot of weight.  It was unhealthy.

16           I don't think I'll ever go into a crowd again

17   ever.  I don't like being suggestible like that.  I felt

18   greatly influenced by the crowd.

19           I know that's not an excuse.  But that's just kind

20   of how it was.  Like everyone around me was -- you know,

21   it's a big influence, you know.  There's studies on this

22   where, like, you lose some IQ points just from being in a

23   large body of people.

24           But really, like, this is really bigger than all

25   of us.  Like because, like, present-day, like, this is two

1    years later.  And I've learned, like, so much more about

2    what happened on that day and, like, the reasons for it.

3            Frankly, what happened is we had unelected

4    bureaucrats.  Anthony Fauci.  They funded a bioweapon and

5    they released it on the population in order to illegally

6    change election laws.  That was the pretext for it.  And

7    that was in order to overthrow our president.  Okay?

8            And what they did is they did January 6th in order

9    to -- they did an entrapment operation in order to cover up

10   what happened that day.  Okay?

11           You know, there's plenty of evidence at this

12   point -- I wasn't there for even the election stuff.  I was

13   there because of the stuff on the laptop.  All right?

14           But now that I'm learning all this stuff about

15   this, I learned how, like, what actually happened.  And it

16   was -- it really -- like the entire thing was dirty.

17           Like Ray Epps, for instance.  Right?  So he was on

18   number, like, 16 on the FBI's Most Wanted List after this

19   event.  He and his -- he had a team together.  Right?  And

20   what they did is right as everyone was going down

21   Constitutional Avenue [sic], what they did was he initiated

22   the breach right before the mass of people came through.

23   Okay?  And then they proceeded -- he talked into his

24   walkie-talkie.

25           And there's work online about this from Darren

1    Beatty.  Right?

2             And what they did is they took down all the green

3    fencing, all the bike racks, all the trespassing signs all

4    at the same time exactly, so when a crowd -- mass of people

5    showed up, they didn't encounter any trespassing signs or

6    green fencings.  Instead, they had a direct route straight

7    up to the stairs.  Right?

8             And, like, this is not excusing my actions.  I'm

9    just providing you with information about what is going on

10   right now.

11            And the thing is that, like, the FBI, the

12   rank-and-file FBI, knew what happened.  Like they saw all

13   that he was a suspect and all this.  Right?

14            And what happens instead is he gets taken off the

15   FBI's Most Wanted List and he's defended by the J6

16   committee.  Like it's troubling what's going on in this

17   country to me.

18            And really, like, once you really start, like --

19   all this stuff on [indiscernible] is coming out now about

20   how --

21            THE COURT REPORTER:  I'm sorry.  Stuff on what?

22            THE DEFENDANT:  So right now, there's really seen

23   more footage of January 6th.  And it's showing how much of

24   an entrapment operation it was.  It really just poisons the

25   whole -- all the cases, in my opinion.

1          Yeah.

2          THE COURT:  Anything else, sir?

3          THE DEFENDANT:  Yeah.  Give me a second, sir, your

4     Honor.

5          They denied the National Guard from being there.

6     And they also intentionally lowered the security of the

7     Capitol Police.  It was an orchestrated event by the Federal

8     Government to cover up ultimately what was the crime -- the

9     real crime of insurrection on that day.

10          So right now, right now, we're pretty much in the

11    state where we have an overthrown U.S. Government.  China

12    did a complex psychological illegal biological attack on the

13    United States.

14          You know, Klaus Schwab of the Left, of the World

15    Economic Forum, they work together.  They pretty much brag

16    about infiltrating in -- infiltrating cabinets of different

17    governments around the world to implement policy changes.

18    It's what's going on in this country right now.  We have a

19    hijacked government.

20          Right now, we're under -- in my opinion, we're

21    under a foreign occupation under DOD law of war, which I'm

22    pretty sure is federal law.  There's plenty of evidence to

23    point to this.

24          That's what's going on.  They're trying to weaken

25    the United States so that it can properly do an invasion.

1    That's the reality of our situation we're in right now.  I

2    mean, that's really the situation.

3            That's all I can really say right now, I guess.

4            I'm sorry personally for my actions on that day,

5    but there is more going on than just that.  And it's

6    important that it's known to people, because it's a serious

7    threat that we face.  Okay?

8            Thank you for your time.  Thanks for listening to

9    me.

10           THE COURT:  Thank you, sir.

11           I'm going to take a couple minutes.

12           (Thereupon a recess was taken, after which the

13   following proceedings were had:)

14           THE COURT:  Mr. Stevens, if you could approach the

15   podium, sir.

16           I've assessed the particular facts of this case in

17   light of the relevant 3553(a) factors, and I now want to

18   provide remarks for the record and for you, sir, about my

19   considerations in regard to the relevant factors.

20           Among the many rioters who embarrassed the country

21   on January 6th, 2021, your actions were among the most

22   embarrassing.  After attending the Stop the Steal Rally, you

23   walked down to the Capitol and made your way through the

24   crowd to the very front of the confrontation with police

25   officers on the west lawn of the Capitol Building.

1       There, you yelled things like this:  "Do you know

2   what happens to traitors?  Do you know what happens when you

3   commit treason?  You get tied to a post and shot for being a

4   traitor.  Are you prepared for that?  Are you?  Yeah.  Fuck

5   you.  You're nothing but a coward.  Speak the fuck up, you

6   pussy.  I can't hear you because you're a little bitch."

7       Any American of good conscience should be outraged

8   by your treatment of these police officers.  They were far

9   outnumbered, facing objects being thrown at them, pepper

10  spray and nasty taunts like yours.

11      They did not deserve that.  Your actions were

12  disgraceful.

13      Because of the actions of you and others, the

14  police line broke, something Sergeant Mastony said he had

15  never seen in his many years of service.

16      You joined the mob that pressed forward over the

17  barriers, up the area of the inauguration stage and to the

18  lower west terrace, where a couple dozen officers were

19  desperately trying to hold back the mob from penetrating the

20  Capitol into an area where injured officers were recovering

21  and some members of Congress were cowering in fear.

22      For over an hour and a half, you worked with other

23  rioters to overcome that final police line, using your body

24  weight along with the fellow rioters to push against the

25  officers in unison, using your hand signals and your voice

1       to coordinate these efforts.

2               Four times you reentered that tunnel.  You even

3       tried to grab an officer's baton.  So frenzied were your

4       efforts that you again made your way to the very front of

5       the line and used a stolen police shield to push against the

6       officers.  In particular, you pushed against Sergeant

7       Gonell, causing his face shield to be pushed back, and

8       therefore exposing him to the pepper spray in the air and

9       pushing his head back painfully.  To add insult to injury,

10      you also called him a pussy.

11              Sergeant Gonell has submitted a victim impact

12      statement in which he states:  "Due to your actions as a

13      member of the mob, my family and I have suffered physically,

14      mentally and financially.  I can no longer do the job I

15      loved and trained my whole life for due to my injuries.  You

16      changed my life for the worse, and I might never fully

17      recover."

18              I think he's right that, but for the valiant

19      efforts of him and officers like him, members of Congress,

20      even the vice president could have been hurt by you and

21      people like you.  I think Sergeant Gonell is asking for the

22      maximum sentence, and I understand his anger and his concern

23      by what you've done.

24              In short, your conduct on January 6th was

25      appalling and egregious.  The contempt and aggression you

1     displayed towards law enforcement officers, the lengths you

2     took to resist them and push your way into the Capitol and

3     the willful disregard of all evidence showing you had no

4     business being there all argue for a significant punishment.

5          Having said that, I recognize that your conduct on

6     January 6th was a strange aberration for you.  You have no

7     criminal history, not even an arrest; and you have a record

8     of gainful employment and education, and your family and

9     friends describe you as a trustworthy, selfless and kind

10    person.  These are important factors in your support.

11         I've also considered what you've just said here.

12    And I've got to say, I was kind of surprised by it.  I

13    appreciate your embarrassment for what you said to the

14    officers.  I think you're right in recognizing how shocking

15    that was.

16         But I've got to tell you, I don't hear a lot of

17    remorse.  I certainly don't hear a lot of remorse for what

18    you did to Sergeant Gonell.  Your statement about being

19    sorry about how he felt sounded a lot like someone who

20    really isn't very sorry for what they did at all.

21         I do believe you got caught up in the moment.  But

22    your list of excuses about Dr. Fauci, about Epps, nobody was

23    making you do what you did on that day.  I do think you got

24    caught up in a mob, but what happened on January 6th was

25    because of people like you, their actions, their decisions,

1      not these other people.

2              I think it's ridiculous to suggest there was some

3      sort of entrapment that caused you to do what you did.  You

4      said those things.  You battled those officers.  For over an

5      hour, you did those things.

6              I've also carefully considered the Government's

7      proposed comparator cases.  I think that your conduct is

8      more aggravated than your Co-Defendant David Judd; and of

9      course, he accepted responsibility for his actions while you

10     did not.

11             Therefore, I think your sentence should be

12     significantly north of his, which was 32 months.

13             I agree with the Government's restitution analysis

14     and I intend to award $2,000 in restitution for the reasons

15     stated in the Government's memorandum.

16             I don't think the other comparators the Government

17     provided are very relevant for the reasons Ms. Cobb stated.

18             I also agree with the Government that there is a

19     pressing need for general deterrence here and specific

20     deterrence and for recognizing the seriousness of the

21     offense and for the need to promote respect for the law.

22             In fact, I intend to vary upward in this case due

23     to what I believe to be your lack of remorse and because of

24     the need to promote respect for the law and to provide just

25     punishment for the offense.

1          I want to make clear that I would give the same

2     sentence even if I'm incorrect about the guidelines

3     calculation in this case.  There are a number of factors

4     that are necessarily difficult to quantify in the guidelines

5     such as your treatment of the officers, the number of

6     officers that you were involved with and the nature of the

7     January 6th riot that lead me to believe that Ms. Cobb's

8     recommended sentence is woefully inadequate even if she's

9     correct about the guidelines calculation.

10         I issue this sentence confident that it is

11     sufficient but not greater than necessary to achieve the

12     purposes of sentencing.

13         I'll now impose the sentence:

14         It is the judgment of the Court that you, Tristan

15     Chandler Stevens, are hereby sentenced to serve a term of 60

16     months' incarceration on Counts 14, 16, 21, 33 and 35; 12

17     months' incarceration on Counts 36 and 44; and six months'

18     incarceration on Counts 52 and 53.

19         You are also sentenced to 24 months of supervised

20     release on Counts 14, 16, 21, 33 and 35 and 12 months'

21     supervised release for Counts 36 and 44.

22         All terms of incarceration are to run concurrently

23     and all terms of supervised release are to run concurrently.

24         You must also pay $500 in special assessment.

25         Within 72 hours of release from custody, you shall

1   report in person to the probation office in the district to

2   which you are released.

3          While on probation, you must abide by the

4   following mandatory conditions:  You must not commit another

5   federal, state or local offense; you must not possess or use

6   any controlled substance; you must refrain from any unlawful

7   use of a controlled substance; you must submit to one drug

8   test within 15 days of placement on supervision and at least

9   two periodic drug tests thereafter as determined by the

10  Court.

11         You must cooperate in the collection of DNA.  You

12  must also abide by the recommended standard conditions of

13  release found in guideline 5D1.3(c).

14         You shall also comply with the following special

15  conditions:  You must submit to substance abuse testing to

16  determine if you've used a prohibited substance, including

17  marijuana.  You must not attempt to obstruct or tamper with

18  the testing methods.

19         You must provide the probation officer access to

20  any requested financial information and authorize the

21  release of any financial information.  The probation office

22  may share financial information with the United States

23  Attorney's Office.

24         You must not incur any credit charges or open

25  additional lines of credit without the approval of the

1    probation officer.

2          The Court waives the -- finds that you do not have

3    the ability to pay a fine, and therefore waives imposition

4    of a fine in this case.

5          You are ordered to make restitution to the

6    Architect of the Capitol in the amount of $2,000.  You must

7    pay the balance of any restitution owed at a rate of no less

8    than $100 a month.

9          Restitution payments shall be made to the Clerk of

10    the Court for the U.S. District Court for the District of

11    Columbia for disbursement to the Architect of the Capitol,

12    Office of Chief Financial Officer.

13          The $570 special assessment is immediately payable

14    to the Clerk of the Court for the U.S. District Court for

15    the District of Columbia.

16          Within 30 days of any change of address, you shall

17    notify the Clerk of the Court of the change until such time

18    as this financial obligation is paid in full.

19          The probation office shall release the presentence

20    investigation report to all appropriate agencies, which

21    includes the United States Probation Office in the approved

22    district of residence, in order to execute the sentence of

23    the Court.

24          Treatment agencies shall return the presentence

25    report to the probation office upon the Defendant's

1    completion or termination from treatment.

2          Pursuant to 18 USC 3742, you have the right to

3    appeal the sentence imposed by this Court if the period of

4    imprisonment is longer than the statutory maximum.  If you

5    choose to appeal, you must file any appeal within 14 days

6    after the Court enters judgment.

7          As defined in 18 USC 2255, you also have the right

8    to challenge the conviction entered or sentence imposed if

9    new and currently unavailable information becomes available

10   to you or on a claim that you received ineffective

11   assistance of counsel in entering a plea of guilty to the

12   offense of conviction or in connection with sentencing.

13         If you are unable to afford the cost of an appeal,

14   you may request permission from the Court to file an appeal

15   without cost to you.

16         Pursuant to *United States versus Hunter*, 809 F.3d

17   677 from the D.C. Circuit, 2016, are there any objections to

18   the sentence imposed that are not already noted on the

19   record?  Ms. Akers?

20         MS. AKERS:  No, your Honor.

21         THE COURT:  And Ms. Cobb?

22         MS. COBB:  No, your Honor.

23         THE COURT:  Ms. Cobb, I'll hear you as to why I

24   should not revoke the Defendant's release.

25         You can have a seat, sir.

 1          MS. COBB:  Your Honor, I would ask you not to

 2     revoke his release because he has shown for 25 -- over 25

 3     months now that he is willing and able and will comply with

 4     your orders.  And I don't think that there's anything that's

 5     changed so that you can't trust that the same way we trusted

 6     it for the past 25 months.

 7          THE COURT:  Well, I just heard a pretty shocking

 8     statement from your client that gives me very significant

 9     concern about his willingness to follow the law.

10          MS. COBB:  I didn't say it and I can't speak for

11     my client.  But all I can say is that if you look to the

12     past 25 months, he has done everything that's been asked of

13     him.  And that's why we would ask you to allow him to

14     self-surrender.

15          THE COURT:  Ms. Akers, what's the Government's

16     position?

17          MS. AKERS:  The Government will maintain his

18     current conditions of pretrial release.

19          MS. COBB:  Your Honor, may -- I wanted to make a

20     request for a recommendation for designation --

21          THE COURT:  Okay.

22          MS. COBB:  -- when it's appropriate.

23          THE COURT:  Go ahead.

24          MS. COBB:  I think generally our request would be

25     as close to Pensacola, Florida, as possible.  Specifically,

1    we have a federal prison camp in Pensacola, Florida.  If he

2    doesn't qualify for that, we have a Federal Correctional

3    Institution in Yazoo City, Mississippi.  We'd ask for those

4    two.

5              THE COURT:  I'll make the recommendation.

6              MS. COBB:  Thank you, your Honor.

7              THE COURT:  Mr. Stevens, you're lucky.  If the

8    Government had asked for step-back, I would have ordered it.

9              I'll direct you to report to prison at the time

10   and place ordered by the Bureau of Prisons.

11             Anything further for the Government?

12             MS. AKERS:  No, your Honor.

13             THE COURT:  And Ms. Cobb?

14             MS. COBB:  No, your Honor.

15             THE COURT:  All right, folks.  Have a good

16   weekend.

17             (Proceedings concluded.)

18

19

20

21

22

23

24

25

<u>**CERTIFICATE**</u>

I, LISA EDWARDS, RDR, CRR, do hereby
certify that the foregoing constitutes a true and accurate
transcript of my stenographic notes, and is a full, true,
and complete transcript of the proceedings produced to the
best of my ability.


Dated this 26th day of April, 2023.


<u>/s/ Lisa Edwards, RDR, CRR</u>
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269