```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
       * * * * * * * * * * * * * * *   )
 3     UNITED STATES OF AMERICA,       )      Criminal Action
                                       )       No. 21-00040
 4                    Plaintiff,       )
                                       )
 5        vs.                          )
                                       )
 6     PATRICK EDWARD McCAUGHEY, III,  )      Washington, D.C.
       TRISTAN CHANDLER STEVENS and    )      September 8, 2022
 7     DAVID MEHAFFIE,                 )      9:44 a.m.
                                       )
 8                    Defendants.      )
                                       )
 9     * * * * * * * * * * * * * * *   )

10                TRANSCRIPT OF BENCH TRIAL - DAY 6
11          BEFORE THE HONORABLE TREVOR N. McFADDEN,
                   UNITED STATES DISTRICT JUDGE
12

13
       APPEARANCES:
14
       FOR THE GOVERNMENT:     KIMBERLY L. PASCHALL, ESQ.
15                             JOCELYN P. BOND, ESQ.
                               ASHLEY AKERS, ESQ.
16                             UNITED STATES ATTORNEY'S OFFICE
                                 FOR THE DISTRICT OF COLUMBIA
17                             555 Fourth Street, Northwest
                               Eleventh Floor
18                             Washington, D.C. 20530

19
       FOR THE DEFENDANT       LINDY R. URSO, ESQ.
20          McCAUGHEY:         LAW OFFICES OF LINDY R. URSO
                               810 Bedford Street
21                             Suite 3
                               Stamford, Connecticut 06901
22

23     FOR THE DEFENDANT       LAUREN COBB, ESQ.
            STEVENS:           OFFICE OF THE FEDERAL DEFENDER
24                             NORTHERN DISTRICT OF FLORIDA
                               3 West Garden Street
25                             Suite 200
                               Pensacola, Florida 32502
```

```
 1     APPEARANCES, CONT'D:

 2     FOR THE DEFENDANT          WILLIAM L. SHIPLEY, JR., ESQ.
              MEHAFFIE:          LAW OFFICES OF WILLIAM L. SHIPLEY
 3                               Post Office Box 745
                                 Kailua, Hawaii 96734
 4
                                 JOSE M. LOPEZ, ESQ.
 5                               LOPEZ, SEVERT & PRATT CO.
                                 18 East Water Street
 6                               Troy, Ohio 45373

 7
       REPORTED BY:              LISA EDWARDS, RDR, CRR
 8                               Official Court Reporter
                                 United States District Court for the
 9                                District of Columbia
                                 333 Constitution Avenue, Northwest
10                               Room 6706
                                 Washington, D.C. 20001
11                               (202) 354-3269

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3     EXHIBITS RECEIVED IN EVIDENCE                          PAGE

4     Defendant McCaughey's Exhibit WWW                        6

5
      Closing Arguments by Ms. Bond              Page 6
6
      Closing Arguments by Mr. Urso             Page 71
7
      Closing Arguments by Ms. Cobb             Page 120
8
      Closing Arguments by Mr. Shipley          Page 141
9
      Rebuttal Closing Arguments by Ms. Paschall   Page 163
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.

 2              THE COURTROOM DEPUTY:  Your Honor, this is

 3   Criminal Case 21-40, United States of America versus Patrick

 4   Edward McCaughey, III, Tristan Chandler Stevens and David

 5   Mehaffie.

 6              Counsel, please come forward to identify

 7   yourselves for the record, starting with the Government.

 8              MS. PASCHALL:  Good morning, your Honor.  Kimberly

 9   Paschall for the United States.  I'm here with my colleagues

10   Jocelyn Bond and Ashley Akers.

11              Mr. Clements is not with us today.  He had a death

12   in the family, so we're going to be doing our best with the

13   technology.

14              THE COURT:  Good morning, ladies.

15              MR. URSO:  Good morning, your Honor.  Lindy Urso

16   for Mr. McCaughey.

17              THE COURT:  Good morning, Mr. Urso.

18              MS. COBB:  Good morning, your Honor.  Lauren Cobb

19   for Tristan Stevens.

20              THE COURT:  Good morning, Ms. Cobb.

21              Good morning, Mr. Stevens.

22              And I should have said good morning earlier,

23   Mr. McCaughey.

24              MR. SHIPLEY:  Good morning, your Honor.  William

25   Shipley and José Lopez on behalf of Defendant David
```

```
 1    Mehaffie.
 2              THE COURT:  Good morning, Mr. Shipley.
 3              Good morning, Mr. Lopez.
 4              Good morning, Mr. Mehaffie.
 5              Mr. Shipley, did you have any additional exhibits
 6    you wished to admit?
 7              MR. SHIPLEY:  No, your Honor.  I believe we're
 8    prepared to close with the exhibits that we have sought to
 9    have admitted and that the Court has admitted.
10              THE COURT:  Specifically on the grand jury
11    testimony, I don't have anything at this point.  So --
12              MR. SHIPLEY:  No further testimony.
13              THE COURT:  Okay.
14              MR. SHIPLEY:  I confirmed this morning with your
15    law clerk he received the grand jury testimony from us last
16    night.
17              THE COURT:  So we need to put that on the record.
18    Do you have an exhibit number for that?
19              MR. SHIPLEY:  Well, that's what I asked yesterday,
20    if I should admit it as an exhibit.
21              THE COURT:  Yes.  You should.
22              MR. SHIPLEY:  I think next in line, since we
23    omitted -- we'll just admit it as WWW.  We'll print out a
24    hard copy and put an exhibit sticker on it.  Actually, we
25    could add it to our disc.  We've got an electronic version.
```

1    So we'll just download it to the thumb drive we have with

2    our other video exhibits on it and then deliver it to your

3    clerk.

4               THE COURT:  Has Ms. Paschall had an opportunity to

5    see it?

6               MS. PASCHALL:  Yes, your Honor.  No objection.

7               THE COURT:  So WWW is in.

8               (Whereupon, Defendant McCaughey's Exhibit WWW was

9    entered into evidence.)

10              THE COURT:  Anything else we should be discussing

11   before we begin closings?

12              Ms. Paschall?  Or Ms. Bond.

13              MS. BOND:  Good morning, your Honor.

14              THE COURT:  Good morning.

15              MS. BOND:  On January 6th, 2021, these three

16   Defendants, Patrick McCaughey, Tristan Stevens and David

17   Mehaffie, they were determined.  They were absolutely

18   determined to get inside the United States Capitol Building

19   that day no matter what stood in front of them.

20              It didn't matter that there was a line of bike

21   racks standing between them and the building.  It didn't

22   matter that there was a line of police officers manning

23   those bike racks with men and women with families at home,

24   all standing there to protect the Capitol Building and the

25   people inside.

1          And it most certainly didn't matter to these

2     Defendants if some of those officers got hurt or injured as

3     they did everything in their power to get inside that

4     building.

5          In the eyes of these Defendants, those officers

6     were nothing but an obstacle to their ultimate goal:  Get

7     inside the building and stop the proceeding.

8          In the process, all three of these Defendants

9     willingly and enthusiastically joined into the actions of an

10    angry mob to repeatedly assault, to resist, to oppose and to

11    impede those officers who were defending the lower west

12    terrace tunnel entrance.  And they all made their way

13    through or around or over that violent chaos on the west

14    plaza after the police line broke and headed straight for

15    that tunnel entrance.

16         There, Mr. McCaughey and Mr. Stevens physically

17    engaged in multiple assaults against officers in the tunnel.

18    And Mr. Mehaffie, a little bit more worldly-wise than his

19    younger counterparts, he approached the task at hand a

20    little bit differently:  Instead of using his own hands to

21    push through the line of officers, instead of using his own

22    body to force his way through, he aided and abetted that

23    throng of rioters inside the tunnel as they attempted to

24    force their way through the police line to stop that

25    proceeding.

1          And for their actions out on the terrace and in

2     that tunnel, each of the Defendants has been charged with

3     multiple counts, including under 18 USC 111(a), and

4     sometimes with a dangerous weapon under the Section (b).

5     They've also all been charged with obstruction of that

6     official proceeding that was taking place inside that

7     building and they've been charged with civil disorder.

8          And of course, each Defendant has been charged

9     with associated misdemeanors for their conduct that day.

10         And the Government submits the evidence that we've

11    shown proves beyond a reasonable doubt each of the charges

12    in this case.

13         So starting first with Count 14, Count 16 and

14    Count 33:  The Government here has charged all three of

15    those counts under 18 USC 111(a) under an aiding and

16    abetting theory.  And the shorthand for 18 USC 111(a) is

17    often called assault on officers, but that really is a

18    misnomer, because that statute includes so much more than

19    just a classic assault.  It also encompasses resisting; it

20    encompasses opposing, impeding, intimidating or interfering

21    with law enforcement, all these things that are happening

22    repeatedly in that tunnel throughout that day.

23         And any one of those words satisfies the statute.

24    A defendant doesn't have to commit a classic assault to

25    violate the statute.  It's only one of six different ways

1    that someone can run afoul of that charge.

2              When charged as a felony, 18 USC 111(a) also

3    requires that the principal, not the aider and abettor,

4    actually make physical contact with law enforcement or that

5    the principal intends to commit another felony.  Either

6    finding is sufficient here.

7              And the Court isn't limited to one specific

8    felony.  The Court can find that the principal here intended

9    either to commit the obstruction or the civil disorder that

10   you've seen throughout all the evidence in this case.

11             So starting with Count 14, which is charged

12   against both Mr. McCaughey and Mr. Stevens -- and I'm

13   hopeful that our PowerPoint is available at this point.

14             So starting with Count 14, it is charged between

15   the time period of 2:49 p.m. and 2:51 p.m.  And as you can

16   see in these still images of that surveillance camera,

17   camera 74, both Mr. McCaughey and Mr. Stevens are in that

18   tunnel at that time.  And this refers back to Government's

19   Exhibit 101.2, which may or may not be available for

20   actually playing at the moment.  But I'll describe it to

21   you.

22             So 101.2:  By this point in the day, 2:50 p.m., as

23   the Court has heard, that west plaza had already been

24   overrun.  And the rioters had already broken through the

25   glass doors in the tunnel just a few minutes earlier, and a

1    line of officers was there.  They were multiple officers

2    deep at that entrance barring the mob from coming into the

3    building.

4             And the Court heard from Sergeant Mastony,

5    Sergeant Bogner, Officer Hodges, Officer Abdi that the

6    police had taken their stand at that tunnel line.  And so

7    many of the officers in that tunnel did not know that other

8    entrances had been breached.  For them, this was their last

9    stand.  So they were there resisting or holding back that

10   line of rioters.

11            Cue Mr. McCaughey and Mr. Stevens.  That's when

12   they both entered the tunnel, right around 2:49.  And within

13   a minute, the mob begins to push against the line of

14   officers.

15            And is this exhibit available to play?  I can play

16   this for the Court.  So starting at 2:49 -- 2:50 exactly.

17   We can start there.

18            (Whereupon, segments of Government's Exhibit No.

19   101.2 were published in open court.)

20            MS. BOND:  Once it plays, what the Court is going

21   to see is -- if it plays.  So starting at timestamp 2:50:47,

22   what you'll see is Mr. Stevens stick his arm in the air,

23   shouting and counting:  One, two, three.  And that's going

24   to be behind us just a little bit, if we can get this backed

25   up.

Closing Arguments by Ms. Bond

 1          THE COURT REPORTER:  I'm sorry.  This is the same

 2     exhibit?

 3          MS. BOND:  This is Exhibit 101.2, starting at 2:49

 4     and 50 seconds.

 5          (Whereupon, segments of Government's Exhibit No.

 6     101.2 were published in open court.)

 7          MS. BOND:  What this video shows, if we get an

 8     opportunity to see it now, is that Mr. McCaughey and

 9     Mr. Stevens enter into this tunnel.  They both -- the mob

10     begins to push against that line of officers.  After they're

11     both inside -- and you'll see this at timestamp 2:50:47 --

12     you'll be able to see Mr. Stevens stick his arm up into the

13     air and he shouts something which looks like:  One, two, and

14     three.

15          And the mob in that moment then begins to push in

16     this coordinated effort with the help of both Mr. McCaughey

17     and Mr. Stevens, who are in that tunnel using their bodies

18     in coordination with the mob.  They both join with the

19     combined force to try to push through that police line that

20     we know is standing right by those double doors.

21          And the front portion of those rioters is making

22     physical contact with that police line.  As you heard from

23     multiple officers, those rioters kept coming at them.

24          So I'll let us watch it here for about two

25     minutes.

 1          (Whereupon, segments of Government's Exhibit No.

 2     101.2 were published in open court.)

 3          MS. BOND:  There is Mr. McCaughey and there is

 4     Mr. Stevens.

 5          THE COURT:  So Mr. McCaughey, the evidence would

 6     just be his general participation.  Mr. Stevens is -- I'm

 7     going to be seeing his participation, but also this kind of

 8     leadership.  Is that --

 9          MS. BOND:  Yes.  It is -- both men in different

10     ways are contributing to help that mob push past the police

11     line.

12          (Whereupon, segments of Government's Exhibit No.

13     101.2 were published in open court.)

14          THE COURT:  Is that what I'm seeing right now

15     from --

16          MS. BOND:  They haven't begun to push.  The camera

17     keeps stopping, as the Court can see.  But momentarily.  So

18     there the crowd begins.  And then Mr. McCaughey and

19     Mr. Stevens are then participating with the crowd as the

20     crowd begins to push.

21          THE COURT:  I think I just saw what you were

22     describing.  Is that right?  Or does it happen again?

23          MS. BOND:  It does continue to happen.  But yes.

24     You did see that mass push with the crowd.  But this one is

25     particularly short-lived.

1           You can clear this from the screen.

2           The police are able to push the rioters back

3     within about 30 seconds.  And both Mr. McCaughey and

4     Mr. Stevens are pushed out of the tunnel at that point.

5     Both of them are swept past the tunnel entrance.

6           Not only that, but in this particular time period,

7     about 2:51:38, you can see Mr. Mehaffie being pushed out of

8     the tunnel from where he's standing.  That's the moment we

9     know that he is making his way out of that front line where

10    he was and coming back toward the mouth of the tunnel.

11          THE COURT:  So for Count 14, I take it this is

12    a -- is this an interfering theory?

13          MS. BOND:  So, your Honor --

14          THE COURT:  Does it matter?

15          MS. BOND:  Your Honor, I don't think "assault" is

16    the strongest word here.  But any of those other words are

17    perfectly suited for this situation.  They are resisting;

18    they are opposing that police line that doesn't want them to

19    be there, trying to push them out; they're impeding the

20    police from clearing that tunnel; and absolutely

21    interfering.

22          So I think four of those are beautifully

23    appropriate for what Mr. McCaughey and Mr. Stevens were

24    doing in this moment.

25          THE COURT:  And then I take it the fifth element

1    is kind of with an intent to commit another felony.  Is that

2    correct?

3            MS. BOND:  So no.  That's part of it.  So the

4    fifth element is either the principal has to use physical

5    force or the principal has to intend to commit another

6    felony.  It does not have to be both.  It can be one or it

7    can be the other.

8            And here, we think that the strongest argument is

9    that that mob, those principals on the front line, they were

10   making that physical contact with the officers.  But there's

11   also ample evidence that the principals in that group were

12   intending to commit other felonies, whether it be civil

13   disorder or obstruction.  But here, the strongest -- the

14   physical contact is so clear.  The Court doesn't need to

15   make those other -- consider those other issues.

16           THE COURT:  So your primary theory is this is

17   aiding and abetting the people in the front --

18           MS. BOND:  Yes.

19           THE COURT:  -- the front line, who are clearly

20   making physical contact?

21           MS. BOND:  Yes, your Honor.

22           THE COURT:  Okay.

23           MS. BOND:  So the same argument and the same

24   evidence is very similar in Count 16.  And that is charged

25   just against Mr. Stevens in the time period of 2:56 to 2:58

1    p.m.  He is back in the tunnel.  He is a little bit more

2    experienced now.  He has done this once before.

3            And starting again, if we're able to pull up

4    101.2, that would be great.  If not, we'll rely on the

5    PowerPoint.

6            But he approaches that tunnel; and as he

7    approaches, it looks like he is carrying a large object.  It

8    happens to look like a speaker, but he sets that aside.  He

9    hands it off in the crowd and then enters the tunnel.

10           And once again, that crowd begins to push against

11   the front line of officers and Mr. Stevens comes in there.

12   We can see it here on our PowerPoint slide, Count 16,

13   timestamp 14:56:49.  And Mr. Stevens is right there in the

14   crowd.  And what you can see from the video is him

15   contributing his body weight, pushing against that police

16   line.  And again, the principals here are making that

17   physical contact with the front line of officers.

18           And you heard testimony from Sergeant Bogner about

19   what he experienced in the tunnel that day.  And I think a

20   good way to think about it is the reverse of what the crowd

21   is seeing.  We have a still image from Sergeant Bogner's

22   body-worn camera here on the PowerPoint, and you can see how

23   that front line of rioters is pushing against that line of

24   officers there.  Those officers are being resisted; they are

25   being opposed; they are being impeded; they are being

1     interfered with in the course of trying to do their job to

2     keep that Capitol safe.

3            And so we ask that the Court find that Mr. Stevens

4     here by rushing into that tunnel, by contributing his body

5     weight to that mass push, he aided and abetted the

6     resistance, the opposition of that police line that day.

7            Unless the Court has any questions about that,

8     Count 33 is very similar in kind.  It has similar evidence.

9            Oh, one of the things I wanted to mention on the

10    prior slide is Mr. Stevens -- in fact, the Court had an

11    up-close view of that particular push, because that is

12    Exhibit 419 -- I think it's 419.3 -- where Mr. Stevens is

13    actually video-recording part of that push that he rushes in

14    to participate in.

15           Count 33:  Again, charged just against

16    Mr. Stevens.  It is much, much later in the day.  It is

17    after a whole lot has unfolded in the tunnel.  And still,

18    Mr. Stevens has not given up.  He and the rest of the mob

19    are still determined.  And he comes into that tunnel again

20    between 4:15 and 4:19.

21           You heard the testimony of Officer Foulds.  And he

22    testified that shortly before 15 [sic], the rioters had been

23    pushed back at that point and they had been held off at the

24    mouth of the tunnel for a while.

25           But if we are able to get Exhibit 101.6 -- we may

1    or may not; we've got the camera up here on the

2    PowerPoint -- you see again that the rioters, including

3    Mr. Stevens, start to push into the tunnel.  And at 4:16,

4    again they are trying to push through that police line.  And

5    that is a four-minute push.

6         It goes on for a long time with rioters using

7    coordinated movements, rocking and pushing that police line

8    until the police line is actually pushed back against the

9    double doors.  The rioters in this four-minute period were

10   able to move those police back from the mouth of the tunnel

11   all the way to the double doors.

12        And the same analysis for Count 14 and Count 16 is

13   true for Count 33.  Mr. Stevens, by rushing into the tunnel,

14   by contributing his body weight to the mass push, that

15   ultimately pushed that police line back, that is opposition.

16   That is resistance.  That is interfering with officers.  And

17   that is a violation of 18 USC 111(a).

18        The next set of charges are different in kind.

19   Counts 21, 24 and 25 all charge a very different kind of

20   assault committed by Mr. McCaughey and Mr. Stevens.  And

21   these counts, these individuals, are charged as principals

22   with assaulting three different officers while using a

23   dangerous weapon.

24        In Count 21, Mr. Stevens is charged with

25   assaulting Sergeant Aquilino Gonell.  In Count 24,

1    Mr. McCaughey is charged with assaulting Officer Hodges by

2    crushing him in that metal door frame.  And in Count 35,

3    Mr. McCaughey is again charged with assaulting Officer

4    Foulds by pushing at him and striking him with that riot

5    shield as Officer Foulds is attempting to close the door and

6    push back the rioters.

7         So I think the important question here is:  What

8    is a riot shield?  And a riot shield is a 13-pound

9    inflexible 4-foot force multiplier.  And that is so

10   important in the context of what was going on in that

11   tunnel.

12        There's one thing that was not in short supply in

13   that tunnel.  It's force.  For hours on end, body on body,

14   blow after blow, flying objects hurtling at these officers,

15   what the rioters were bringing over and over again is force.

16        THE COURT:  And, Ms. Bond, can you remind me, I

17   guess I should be thinking about this definition here.  "An

18   object is a deadly or dangerous weapon if it is capable of

19   causing serious bodily injury or death to another person and

20   the Defendant used it in that manner.

21        "In determining whether the object is a deadly or

22   dangerous weapon, you may consider both physical

23   capabilities of the object used and the manner in which the

24   object was used."

25        MS. BOND:  Yes.

1          THE COURT:  That's what I'm focusing on here?

2          MS. BOND:  Absolutely.  That's absolutely the

3    definition, and I believe that comes straight from

4    *Arrington*.  It is not only the physical capability of what

5    that object itself can do, but what it is capable of --

6    whether it is capable in the context in which it is used of

7    causing serious bodily injury or death.

8          So starting with Count 24, Mr. McCaughey --

9          THE COURT:  Sorry.

10         MS. BOND:  Sure.

11         THE COURT:  Is there a definition of "serious

12   bodily injury" that I'm supposed to --

13         MS. BOND:  I do not believe there is one.  I don't

14   think it has been included in the bench instructions that we

15   have provided.  But that is certainly something that we can

16   address by rebuttal, if need be.

17         THE COURT:  I can certainly look into this.  But

18   it might be helpful for me to focus in on that.

19         MS. BOND:  Understood, your Honor.  Thank you.

20         So with respect to Count 24, the Court has seen

21   videos of this --

22         THE COURT:  Sorry.  Did we skip over 21?

23         MS. BOND:  I'll come back to 21.  I want to start

24   with the evidence of Officer Hodges, because I think it

25   helps to lay out more clearly what that riot shield is

1       capable of.

2              THE COURT:  Okay.

3              MS. BOND:  So starting with Count 24 and

4       Mr. McCaughey:  All 6 feet and more than 200 pounds of

5       Mr. McCaughey grasping that riot shield.  In that context,

6       Mr. McCaughey -- we can play the video if the Court would

7       like to see -- you can see his hands clenched as he is

8       straining with all of his might to push against that riot

9       shield, that force multiplier, against Officer Hodges.

10             And we've heard that Officer Hodges was trapped.

11      His back was against that metal door frame.  He was

12      prevented from moving out of the spot by the line of

13      officers that were behind him.  And as Mr. McCaughey begins

14      to push, all 6 feet, more than 200 pounds of Mr. McCaughey's

15      weight, are being channeled and multiplied through that

16      force multiplier which is the shield.

17             After a little bit, about 20 seconds or so, then

18      it becomes even more dangerous for Officer Hodges because he

19      is being pinned in that spot.

20             Another rioter takes advantage of the moment while

21      Officer Hodges is totally defenseless to begin pulling off

22      his gas mask and striking him with his baton.  Mr. McCaughey

23      doesn't let up.  He doesn't let up.  He continues to push.

24             And that's when it gets even more dangerous in

25      this moment, because the rest of the crowd rushes in and is

1    contributing their weight to what Mr. McCaughey is doing.

2    So now we're not just worried about the 200 pounds of

3    Mr. McCaughey crushing Officer Hodges; we've got the weight

4    of the entire crowd being charged right through that riot

5    shield into Officer Hodges in that moment.

6              So -- until Officer Hodges finally screams out.

7    He screams out in pain.  He screams out for -- in the hope

8    of rescue.  He said both were true.  But he screams out

9    because he was afraid of losing consciousness.  And what was

10   his testimony?  His testimony is that he didn't want to

11   become a liability to the other officers in that moment.

12             And I think one of the things that's really

13   important to remember about that tunnel is how hard it would

14   have been to get medical aid in that particular context.

15   The Court heard about three different people who needed

16   medical aid in that tunnel.

17             There was Officer Fanone, whose body was dragged

18   back in, unconscious, by Sergeant Mastony as they're trying

19   to get him the medical aid that he needs.  There was the

20   individual with asthma right at those double doors who

21   needed medical aid that Sergeant Bogner was trying to figure

22   out how to help this man.  And there was the woman that

23   Sergeant Gonell later had to assist, give medical aid as

24   they pulled her out of the tunnel.

25             How difficult it was for first responders in that

1   moment to actually be helpful if somebody got hurt.  And

2   that's important context, because the statute requires the

3   manner in which the object is used, and that encompasses

4   whatever else is going on in that moment.

5           Mr. McCaughey wasn't using a riot shield in an

6   open field where medical aid was easily available.  This is

7   a tightly packed tunnel where it is very hard to get medical

8   aid.  I think it was Officer Hodges who testified if he had

9   gotten hurt or if he had lost consciousness, of course, of

10  course, his colleagues would have rushed in to try to help

11  him, to do what they could.  But Sergeant Mastony said:

12  Medical aid was not a foregone conclusion.  And that is

13  important context for the way in which this riot shield was

14  used in all three assaults here.

15          THE COURT:  Do you think that works, though?  I

16  mean, I'm just wondering if the same action out in the

17  country would be more dangerous than in the city because it

18  would take longer for an ambulance to get there.  What do

19  you --

20          MS. BOND:  Your Honor, what I think it brings me

21  to is *Arrington* and the way the vehicle was used in

22  *Arrington*, because the Court there is pretty clear that if

23  Arrington was just using that vehicle as a getaway vehicle,

24  it wouldn't have been as a dangerous weapon.  It became a

25  dangerous weapon not necessarily because of the specific

1    choices Arrington made.  It became a dangerous weapon

2    because of what was going on.  It became a dangerous weapon

3    because police officers were leaning into the car, because

4    one of them got caught and was dragged.

5         If Arrington had used that vehicle in the country

6    as a getaway vehicle, it would not be a dangerous weapon.

7    It became a dangerous weapon because of the context, the

8    manner in which it was used.

9         Manner is important here.  Location, context is

10   important here.

11        THE COURT:  I certainly agree about manner.  I'm

12   wondering if how long it's going to take to get an ambulance

13   to somebody is a fair consideration.

14        MS. BOND:  Whatever the situation of medical aid

15   was, we know that Mr. McCaughey had that riot shield, that

16   inflexible, 13-pound force multiplier.  He was adding the

17   more than 200 pounds of his body, channeling it into Officer

18   Hodges.  And that weight was then multiplied by the weight

19   of the crowd right into Officer Hodges's body.  He was

20   concerned about whether he was going to lose consciousness

21   in that moment.

22        THE COURT:  I'd be interested to see how you

23   analyze the interaction between Mr. McCaughey, the other

24   rioter and Officer Hodges.  Mr. McCaughey said that he was

25   telling -- he said:  Let go of the stick.  I mean, you can

Closing Arguments by Ms. Bond

1      see him saying something as he's pushing against Officer

2      Hodges and the other rioter is grabbing at Officer Hodges.

3      Mr. McCaughey says that he was saying that to both the

4      rioter and Officer Hodges.

5              Do you agree with that?

6              MS. BOND:  No.  I do not agree with that.  I don't

7      think the Court should credit Mr. McCaughey's testimony on

8      that point because what Mr. McCaughey is saying in those

9      moments is, "Go home.  Go home.  Tell your buddies, 'Go

10     home.'"  And he says, "Don't you use that stick on me, boy."

11             I think what Mr. McCaughey -- what I think is the

12     more reasonable interpretation of his comments in those

13     minutes is he is using derogatory language, "boy," on the

14     officer because he wants the officer to go home.  He doesn't

15     want the officer to strike back, use his baton against him.

16             I don't think that the Court should credit

17     Mr. McCaughey's explanation for that.

18             THE COURT:  So do you think -- is your take that

19     he's kind of pinning the officer there, allowing the rioter

20     then to grab his mask?  Do you think this is -- he didn't

21     foresee that?  Or those are two separate and independent

22     assaults?  And how do I consider then what you've described

23     as this moment of humanity afterwards?

24             MS. BOND:  So Mr. McCaughey is charged

25     specifically with his use of the riot shield.  He is not

Closing Arguments by Ms. Bond

1    charged with what that other rioter did in pulling the gas

2    mask on [sic].  What happened to happen in that moment is

3    that other rioter being there made it a much more dangerous

4    situation for Officer Hodges.

5          But Mr. McCaughey is not fundamentally responsible

6    for what the other rioter did.  So he is not -- he is only

7    charged with the single assault here of crushing Officer

8    Hodges with the riot shield.

9          And that moment of humanity that we talked about,

10    that is very clear on the video.  Maybe it's even a moment

11    of regret.  I don't think that ultimately comes into the

12    analysis at all, because what we saw leading up to that is

13    Mr. McCaughey acting very intentionally.  He comes into that

14    tunnel he has been in more than once before.  He makes his

15    way up to the front of the tunnel and he gets a riot shield.

16          When he starts to press against Officer Hodges, as

17    that video starts, what we saw in the video, what he

18    admitted during cross-examination, is there is space behind

19    him to step back.  He could turn around and leave.  There is

20    a hand from a man behind him on his back, but that man isn't

21    forcing him to crush Officer Hodges.  There is space for

22    this 6-foot, 200-pound man to turn around and make his way

23    out of the tunnel.  But he chooses to stay.

24          And I submit that what we see in those first

25    moments of Mr. McCaughey pushing against with his hands

1    clenched, his whole body weight, that is anger.  That is

2    determination to get past Officer Hodges.  And that's

3    supported by his words where he's saying:  "Cops, go home.

4    Don't hit me with that stick, boy."  For all of that, the

5    most logical inference is he is determined in that moment.

6         So that brings us to this moment of humanity,

7    where he tries to help Officer Hodges.  Maybe it is regret;

8    maybe that scream from Officer Hodges sort of clues him in

9    that he did more damage than he really wanted to do.

10         And he helps him.  The Government says that is

11    what the evidence shows.  He helps Officer Hodges, gets

12    somebody's else's attention, to get out of that spot.

13         Now, that moment of regret could have been a

14    turning point.  And I want to emphasize here that regret

15    doesn't undermine his intent.  So whatever he did in that

16    moment to help Officer Hodges does not negate what he

17    intended to do 30 seconds earlier.

18         Now, that regret is very short-lived because it

19    comes right on the heels of what he does next, because

20    within moments then he turns to Officer Foulds.  This is

21    seconds.  This is not a ten-minute break.  He doesn't leave

22    when he has a chance, when he realizes how badly he hurt

23    Officer Hodges.  He stays.

24         So I'll talk a little bit about the assault on

25    Officer Foulds and we'll go back to Mr. Stevens's evidence

1      with the weapon.

2            But with his -- with Mr. McCaughey's assault of

3      Officer Foulds, these are very close in time after he had

4      just been crushing Officer Hodges.  And then he sees that

5      Officer Foulds is there.  And Officer Foulds, just like

6      Officer Hodges, is an obstacle to what Mr. McCaughey is

7      trying to do to get into that building.

8            As we saw from that video, Officer Foulds is

9      trying to close the metal door; and Mr. Stevens is using

10     pushing and shoving motions to oppose Officer Hodges.  And

11     again, he's using something with very significant physical

12     capabilities.  13 pounds, 4 feet:  As Officer Hodges

13     testified, it is a force multiplier.  And again, it is

14     multiplying the force of this man, this 6-foot, more than

15     200-pound man, coming at Officer Foulds, shoving him,

16     striking him repeatedly.  That is how he is using this

17     dangerous weapon.

18           THE COURT:  So this is that kind of slashing?  Am

19     I remembering correctly?

20           Ms. Akers, do you have the video ready?

21           MS. BOND:  It's going to be 301.

22           THE COURT:  If you could show me your best video

23     of that, I have some questions.

24           (Whereupon, segments of Government's Exhibit No.

25     301 were published in open court.)

1          MS. BOND:  Try to move it forward to about 19 and

2     a half minutes.

3               (Whereupon, segments of Government's Exhibit No.

4     301 were published in open court.)

5          MS. BOND:  And if there's sound available, that

6     would be great, too.

7               (Whereupon, segments of Government's Exhibit No.

8     301 were published in open court.)

9          THE COURT:  That was it?

10         MS. BOND:  Yes.

11         THE COURT:  So I think the defense disputes that

12    you really see any kind of offensive action there.  I think

13    you see him trying to keep the door open, and so maybe that

14    would be an interfering -- you primarily are relying on

15    Officer Foulds' testimony, which was certainly --

16         MS. BOND:  We're relying on both Officer Foulds's

17    testimony and the video here.  Is the Court more concerned

18    about the assault portion or you're more concerned about the

19    dangerous weapon portion in this moment?

20         THE COURT:  Well, I guess maybe you can show me

21    exactly where you see an assault, because obviously things

22    are happening very quickly there.

23         MS. BOND:  Sure.  And I will preface it with, if

24    the Court doesn't believe that this particular conduct rises

25    to assault, which our position is that it absolutely does,

1    if Mr. McCaughey is doing any of those other things, the

2    opposing, the resisting, impeding, and he's doing those with

3    force, that satisfies the statute as well.

4           So our primary theory is that he was assaulting

5    here.  But if the Court doesn't think it rises to that

6    level, if Mr. McCaughey was forcibly opposing Officer

7    Foulds, then that still satisfies the statute.

8           So yes.  Let's play it starting at, I think, 22.

9           (Whereupon, segments of Government's Exhibit No.

10   301 were published in open court.)

11          MS. BOND:  Strike there.  Strike.  Strike.

12          So all of those strikes there.

13          THE COURT:  Did I hear two or maybe three?

14          MS. BOND:  There were three, and that last one was

15   specifically against Officer Foulds.  But his strike there,

16   that is an assault in every sense of the word.

17          THE COURT:  So let's say that I agree with you.

18   Where does the dangerous weapon part come in?

19          MS. BOND:  I think it comes in with what that riot

20   shield physically is, its size, its weight, that it is being

21   wielded by somebody who is very powerful with a lot of

22   weight and force that he is bringing himself.  That is where

23   it is a dangerous weapon.

24          And context here again is relevant.  This is not

25   someplace where medical aid is easily accessible.  It is a

1     choke point that is packed with people.  It is packed with

2     people with all sorts of different weapons.

3          I think Mr. Mehaffie's friend here, his experience

4     with his friend in 1979, is really a perfect illustration of

5     how dangerous a choke point like that can be.  Mr. Mehaffie

6     testified about how he learned from his friend of this

7     tunnel in Cincinnati where multiple people were stampeded.

8     That's in the context of happy concertgoers trying to go get

9     to see a concert.  That did not involve all of the weapons

10    that this particular choke point involved.  That did not

11    involve all of the angry members of the mob that this choke

12    point involved.

13          Mr. McCaughey utilizing that weapon in that

14    manner, in that space, made this a highly dangerous weapon.

15          THE COURT:  So my recollection -- Officer Foulds,

16    I thought, had very clear and I'm inclined to think pretty

17    credible testimony, including about the Defendant striking

18    him.  I think he also said he was not at all injured by

19    this.

20          MS. BOND:  Absolutely.

21          THE COURT:  It feels especially -- obviously,

22    comparing it to what we saw with Officer Hodges a few

23    moments ago.  You're not taking the position that anytime

24    someone uses a shield it's being used as a dangerous weapon.

25    Correct?

1          MS. BOND:  Not at all.  It depends on the physical

2     capabilities and the manner.

3          THE COURT:  Yes.

4          MS. BOND:  And the statute doesn't require injury.

5     It can be charged in other ways.  But in the way it's

6     charged here, there is no requirement of injury.

7          THE COURT:  I get that.

8          But it's supposed to be used in a manner -- I

9     mean, help me if I'm wrong on this.  I think you've got to

10    be using it in a manner that could cause serious bodily

11    injury or death.

12         MS. BOND:  Capable of.  Yes.

13         THE COURT:  Yes.  And so it's certainly relevant

14    if it doesn't cause any injury whatsoever.

15         MS. BOND:  Not necessarily, your Honor.  And think

16    about it in the context of someone taking a hammer to a

17    helmeted head.  Someone takes hammer with all their might,

18    whacks somebody in the head who just happens to be wearing a

19    helmet.

20         That person wielding the hammer has something

21    that's not intended at all to be a weapon but is quite

22    capable of doing damage.  They're using force to strike that

23    head.  If that head was unhelmeted, it would be very capable

24    of possibly death, possibly significant brain injury,

25    concussions, all manner of things that are obvious when we

1    think about a hammer.

2            But changing the context a little bit, and that

3    helmet just happens -- that head just happens to be

4    helmeted.  The hammer's going to do a lot less damage.

5            THE COURT:  But surely it's relevant if you're

6    using a hammer on a helmeted head versus using a hammer on

7    an unhelmeted --

8            MS. BOND:  It's not relevant to the dangerous

9    weapon analysis.  That hammer is equally dangerous with the

10   helmet or without the helmet.  It's just a question of

11   whether it does or does not cause injury.  And injury is not

12   part of the way it's been charged.  Injury is a separate

13   analysis.

14           Dangerousness is what it is capable of.  Injury is

15   what it did.

16           THE COURT:  If I disagree with you on this, is

17   there a lesser included that you're seeking?

18           MS. BOND:  If the Court does not find that this is

19   a dangerous weapon, we would ask for the lesser included of

20   assault, a felony assault by making physical contact with

21   that officer.  It would just be that the dangerous weapon

22   drops away.

23           THE COURT:  So it's basically the (a) that we'd

24   been discussing earlier?

25           MS. BOND:  Yes.

1          THE COURT:  Okay.

2          MS. BOND:  So moving on to Mr. Stevens:

3   Mr. Stevens also picks up one of those riot shields and he

4   uses it against Sergeant Gonell.

5          This is Count 25.  It actually happens before

6   Mr. McCaughey, so it's earlier in time just by a few

7   minutes.

8          Now, Sergeant Gonell, he testified that he is

9   standing on the left-hand side of that tunnel.  Here we go.

10  At 3:09 p.m.  He's on the left-hand side.  And he told the

11  Court about what had happened earlier in that day.  He was

12  already working at a deficit because he had been out on that

13  plaza and his own round riot shield that he had had already

14  been cracked by another rioter.  So he's working at a

15  deficit, having lesser protection than he normally would.

16         He also had a bloodied hand by that point in the

17  day.  So in Exhibit 301, starting at minute 16:45, this is

18  the point Mr. Stevens moves towards the front of the line

19  with the shield.

20         (Whereupon, segments of Government's Exhibit No.

21  301 were published in open court.)

22         MS. BOND:  We know this happens right before 3:07

23  p.m., because Sergeant Mastony with his body-worn camera was

24  standing right behind Sergeant Gonell at that moment and he

25  remembered some of his interaction with Mr. Stevens.  He

1    sort of recalled this whole thing happening.

2            So if we could play it from 16:25.

3            (Whereupon, segments of Government's Exhibit No.

4    301 were published in open court.)

5            MS. BOND:  So I think the video speaks for itself.

6    But there is a lot happening in there.  As Mr. Stevens gets

7    up to the front of that line, he gets that riot shield,

8    again, 13 pounds of a riot shield, angled in there pressing

9    against the officers, which includes Sergeant Gonell.

10            And Mr. Stevens is using the weight of his body.

11    He is an adult male, brings a lot of force with him.  And he

12    is pushing on that riot shield.

13            And as he's pushing, then of course the weight of

14    the crowd fills in.  They come in behind him.  Once again,

15    as we discussed Officer Hodges, the weight of that crowd is

16    concentrating their weight into Sergeant Gonell.  The

17    sergeant testified about that, how when the crowd added

18    their weight it really concentrated right into him.

19            So addition to this pushing, which forced Sergeant

20    Gonell down to this crouched position that we see him here

21    in the video, Mr. Stevens also uses the shield to strike

22    Sergeant Gonell in the face.  13 pounds of that riot shield,

23    as the Court saw in slow motion during testimony, an upper

24    movement striking Sergeant Gonell in the face, throwing his

25    head back.

Closing Arguments by Ms. Bond

1            And Sergeant Gonell testified about how precarious

2      of a position he was put in.  The shield not only pushed his

3      head back, but it pushed up his riot shield, so the face

4      shield was pushed back and his helmet was pushed back and he

5      was stuck in that moment.

6            And defense counsel asked him:  You were just

7      frustrated.  Right?

8            And he said:  Yes.  Of course he was frustrated.

9      But he was so much more than frustrated.  He wasn't just

10     frustrated because he was stuck in that position and

11     couldn't get out.  He was frustrated because he was in pain,

12     frustrated because he was completely defenseless in that

13     moment as a mob is coming at him.  Frustrated and blocked

14     into that because of the riot shield that Mr. Stevens was

15     pushing down on him from above.

16            So we have a 13-pound riot shield being pressed by

17     an adult male, then being compounded by the weight of the

18     crowd.  And then Sergeant Gonell, after, you know, this

19     assault goes on, being crushed for a while, he is struck in

20     sort of an upper-cut strike, which throws his head back.

21            Your Honor, the Government submits that this was

22     being used as a dangerous weapon in that moment again in

23     this tunnel with all of the mayhem.  That is the dangerous

24     weapon here.

25            THE COURT:  So I think Sergeant Gonell had

1    testified that the Defendant used a stolen baton to strike

2    him.  You're not standing by that testimony.  Is that

3    correct?

4            MS. BOND:  So, your Honor, that is not what's

5    charged here. We've specifically charged the riot shield.

6    We haven't charged Mr. Stevens with using the baton.  The

7    Court can see in the video that a baton goes in and out of

8    his hand.  But that is not what the charge is about.

9            THE COURT:  Okay.

10           MS. BOND:  So with respect to Counts 21, 24 and

11   25, Mr. McCaughey and Mr. Stevens both picked up those riot

12   shields and they used them against three different officers

13   in that tunnel.

14           And Mr. McCaughey -- we submit the evidence shows

15   that the way in which they used them, the manner in which

16   they used this 13-pound, 4-foot force multiplier, was

17   absolutely dangerous for the officers who were defending the

18   tunnel that day.  They were crushed; they were pushed; they

19   were shoved; they were struck; and they were done so with a

20   dangerous weapon at the hands of these Defendants.

21           THE COURT:  Is it basically your position that

22   every time we see one of these rioters using a shield

23   against the officers in the tunnel that is a dangerous

24   weapon?

25           MS. BOND:  I wouldn't say that across the board.

1    I think it's pretty clear from the evidence that rioters

2    came along a continuum:  some who were not interested in

3    violence, really truly were there for a peaceful protest;

4    some who were highly violent; and then everything in

5    between.

6              So there are a lot of videos that the Court could

7    watch if a rioter is just standing there holding a riot

8    shield that it wouldn't be a dangerous weapon in that

9    context.  But I think once we get into the forceful strikes,

10   the forceful pushes, shoves, crushing that we see from

11   Mr. McCaughey and Mr. Stevens, that absolutely is a

12   dangerous weapon.

13             THE COURT:  And so I think -- I believe it's maybe

14   Sergeant Mastony that talked about training in offensive

15   strikes.  Do you remember the term he used?

16             MS. BOND:  I recall the testimony.  I don't recall

17   if that was a specific term, but it was something along

18   those lines.

19             THE COURT:  Now, would your position be that that

20   would be inherently a 111(a) and (b) violation if not used

21   in accordance with the law?

22             MS. BOND:  Do you mean by the officers against

23   citizens?

24             THE COURT:  Well, I mean, an officer could

25   obviously assault a citizen.

1          MS. BOND:  Sure.  Absolutely not.  No.  Because in

2     the context that those offensive strikes may be used, it

3     would not be typically in this confined space where the

4     officers had nowhere to go.  They had no place to step back

5     to.

6          So that's a pretty wide-ranging hypothetical, and

7     I don't want to go down all of the rabbit holes that that

8     could go down.  But the short answer is no.  For an officer

9     who is doing his job against an angry mob, that would not be

10    an assault on the part of an officer.

11         THE COURT:  Understood.

12         So in your mind, this context of the tunnel is

13    pretty key.

14         MS. BOND:  Yes.  I think it's part and parcel of

15    the object that was used; and the fact that it was used in

16    this tunnel is part of the manner in which it was used.

17         THE COURT:  Okay.

18         MS. BOND:  So moving on to Count 12, Mr. Mehaffie,

19    Mister "We don't hurt them; we just push them":  Now, his

20    conduct on January 6th is very, very different from that of

21    Mr. McCaughey and Mr. Stevens.  But it is to the same effect

22    and ultimately for the same purpose.

23         Mr. Mehaffie is a little more seasoned than his

24    Co-Defendants.  He is an experienced protester, as he told

25    us.  He knows the importance of leadership, of coordination,

1    of structure, as he told us, in getting a crowd to achieve

2    their goals.

3              And as an experienced protester, he also knows

4    that there is a line.  There is a line between a peaceful

5    protest and violence.  As he told you, when the police start

6    using teargas, that is a clue to him that he has crossed

7    that line.

8              So Mr. Mehaffie is not charged as a principal with

9    personally assaulting any of those officers.  No one's

10   claiming that he lifted his hands to push or hit or shove

11   anyone that day.

12             THE COURT:  You have "and (2)."  Is that just

13   the aiding and --

14             MS. BOND:  It's aiding and abetting.  Yes.  And

15   that's what he's charged with.  He is charged with aiding

16   and abetting.

17             THE COURT:  So it's essentially the same theory

18   that we talked about at the beginning?

19             MS. BOND:  Very similar.  But his conduct is

20   wildly different from that of Mr. McCaughey and Mr. Stevens

21   here.

22             THE COURT:  Pretty similar to what you're

23   describing Mr. Stevens kind of doing, organizing.

24             MS. BOND:  In that context.  Yes.  Yes.

25   Absolutely.

1           So the indictment charges Mr. Mehaffie with this

2    almost 40-minute time period.  It charges from 2:40 p.m. to

3    3:18 p.m.  And during that time period, from the moment he

4    walks into that tunnel, which is when the charge starts, to

5    the time he gets down off of that perch after police push

6    him down from that line, that is the time period he's

7    charged with.  He's charged with assisting those rioters who

8    were in that tunnel, resisting, opposing, impeding,

9    intimidating, interfering with officers, because as we know

10   this was not a sit-in.  This was not one of those protests

11   that Mr. Mehaffie went to and precleared his conduct with

12   the police officers, because he's done that before and he

13   knows that that's something important to do.

14           What he provided was leadership.  He provided

15   leadership to a chaotic and violent and unruly mob.

16           Now, from up on the perch that he was on -- and I

17   believe it's 26 minutes that he's up on that perch -- he had

18   a clear line of sight all the way into the tunnel.  And

19   unlike the rioters who were on the ground, he could see

20   straight back to the police line.  He could see the heads of

21   the police, which is something most other people didn't have

22   the advantage of.

23           Now, Mr. Mehaffie testified yesterday, and he

24   claimed that he had some difficulty seeing into the tunnel.

25   But multiple videos show that clear view that he would have

Closing Arguments by Ms. Bond

1    had.  And the videos also show that behind the police line

2    was well lit.  So Mr. Mehaffie would have had that light

3    that would have aided him to see what was going on.

4            And he knew exactly what was going on, because a

5    few minutes earlier he had been at the front of that police

6    line.  He knocked on the doors.  He knew what was happening

7    with those police.  And he told you on the stand that it was

8    the point where he saw that rioter with the flagpole going

9    over his head at the line of officers, that is when he knew

10   that people were going to be violent.

11           But still, he assisted them.

12           THE COURT:  But it doesn't really matter whether

13   or not he wanted them to be violent.  Right?  Your theory is

14   that even if he wants them to be pushing the officers, that

15   alone would suffice?

16           MS. BOND:  Yes.  And I think the strongest

17   arguments for Mr. Mehaffie, given his words, given that he

18   repeatedly said he didn't want to hurt police, the strongest

19   arguments are relying on that opposition, that resistance,

20   that impeding, because that is what he was coordinating and

21   helping with that day.

22           So I want to walk through a couple of highlights

23   of Mr. Mehaffie's conduct and then I'll show the Court the

24   Government's -- the specific acts the Government thinks are

25   the strongest that the Court could rely on here to find

1    aiding and abetting.

2        So just going through the slides here, if you

3    click to the next slide, at 2:56, Mr. Mehaffie has already

4    climbed up to the -- his perch at that point and he begins

5    to help.  He begins to direct.

6        At 2:56, he is handing a riot shield in to the

7    rioters at the front of the line.  Of course, we know

8    Mr. Mehaffie knows what was going on at the front of the

9    line.

10        Next one:  Again, at 2:56, he begins waving in

11    rioters to fill that tunnel.

12        Keep going.

13        And we know also at 2:56 what was going on with

14    the police line.  Sergeant Bogner is there being pushed

15    against by that front line of rioters.

16        THE COURT:  Sorry.  So just back to my question.

17        MS. BOND:  Sure.

18        THE COURT:  Your position isn't that he had some

19    secret desire for the officers to be assaulted.  Right?

20        MS. BOND:  No.

21        THE COURT:  You take his actions and his comments

22    where he's saying "We don't hurt them" as credible.  And

23    you're saying:  That's fine, but he was nonetheless trying

24    to help, interfering with them?

25        MS. BOND:  Yes.  That is absolutely our position.

1            THE COURT:  Okay.

2            MS. BOND:  So moving on to 2:58, Mr. Mehaffie is

3    giving direction, "In on this side, out on this side,"

4    keeping the flow of traffic moving for those rioters.

5            2:59:  Again, he's directing them to push.  The

6    Court has seen this in multiple videos.

7            Next one:  Skipping forward about ten minutes.  If

8    the Court has any questions about what Mr. Mehaffie was

9    doing in that intervening time, I invite you to go watch

10   from front to back Exhibit 101.  Watch Mr. Mehaffie for his

11   26 minutes that he is standing there.  I'm showing you the

12   highlights, but there is so much more.

13           At 3:11 -- go back to 3:11.  At 3:11, between 3:11

14   and 3:13, Mr. Mehaffie is waving in rioters at that point.

15   And this is a very specific act by Mr. Mehaffie that I'd

16   like to talk about.

17           So the Court can rely on any of Mr. Mehaffie's

18   acts during the 26-minute period.  But three -- the time

19   period between 3:11 and 3:13 I think really illustrates some

20   of the damage that he did as he aided and abetted those

21   rioters.

22           So if we have Exhibit 101 -- it would be 960,

23   which I think we do have.  Could we play Exhibit 960.  This

24   starts at 3:11:44.

25           (Whereupon, segments of Government's Exhibit No.

Closing Arguments by Ms. Bond

1    960 were published in open court.)

2            THE COURT:  What do you think he's doing there?

3            MS. BOND:  He is absolutely waving people in

4    there.

5            THE COURT:  But does he have his fist up in the

6    air?

7            MS. BOND:  If you could pause for a moment.

8            What we saw in that first 30 seconds or so is the

9    tunnel isn't full.  The tunnel's only about half full at

10   that point.  Mr. Mehaffie starts waving his arms, waving

11   rioters in.  What he does is he sticks his arms straight up

12   in the air.  I didn't see if it was a fist or no.  But that

13   is a motion to stop.  And the rioters follow his direction.

14   They stop.  They stop flooding in at that moment.

15           And you'll see it again if we keep going for a few

16   seconds.  He does it again.  He waved them in to pack the

17   tunnel more tightly and then he stops them again.

18           (Whereupon, segments of Government's Exhibit No.

19   960 were published in open court.)

20           MS. BOND:  There he is, waving again, as all the

21   rioters fill in the second time.  He stops it again.

22           You can stop it there.

23           What is really important about that moment is what

24   is happening outside of that camera, what we see from other

25   angles.  So at 3:11 and 3:12, Mr. Mehaffie is waving people

1    in.  He is not creating space, like he talked about in his

2    testimony; he is filling that space.

3                And what we know from our other evidence is what

4    we see here in this particular slide right here.  What was

5    going on at 3:12 is this mass heave-ho on the -- please put

6    it back -- the mass heave-ho against the police line there.

7                And in exhibit -- by Sergeant Mastony -- I don't

8    think we'll be able to bring it up.  It's Exhibit 233.1.

9    Sergeant Mastony showed his body-worn camera and talked

10   about his body-worn camera at that particular minute.  What

11   you see is body on body at that moment, officers completely

12   unable to move.  They're being opposed by that crowd.  They

13   are being resisted by that crowd that Mr. Mehaffie is

14   directing.

15               And the timing of this particular push is so

16   important because after the fact, as Sergeant Mastony was

17   listening to his body-worn camera in this exact moment, at

18   3:12, in that period between 3:11 and 3:13, he could then

19   hear after the fact Officer Hodges screaming, an officer

20   from his platoon whose voice he knew.  And we all know what

21   was happening to Officer Hodges as he was screaming.

22               Mr. Mehaffie was directing that mass push,

23   flooding people in, not creating space, filling that space

24   with people determined to push through the police line.

25               So Mr. Mehaffie, I think that this is a very

1    strong, very particular act that the Court could rely on if

2    you so choose.  But there are so many to choose from.

3            Mr. Mehaffie talked about wanting to make sure

4    that nobody in the tunnel got crushed.  He had this very bad

5    experience with a friend years ago.

6            But Mr. Mehaffie was not a hero that day.  He knew

7    very early on that this was not a peaceful protest.  And it

8    did not stop him from pouring his leadership skills, his

9    experience skills, into helping those rioters achieve their

10   goal of getting past the police line and getting into that

11   building.  He knew how important leadership would be, and he

12   was not afraid of contributing to that.

13           And I also want to address his comments that he

14   was sickened by what he saw in that tunnel.

15           Your Honor, that man at 3:12 p.m. was not sickened

16   by what he saw in that tunnel.  That man was not anxious or

17   fearful.  Maybe he was anxious or fearful when he was

18   standing by those doors and suddenly got pushed into that

19   police line.  We all saw him put his hands up.  Maybe he was

20   anxious and fearful then.

21           But he figured out where the exit was.  He knew he

22   could get out.  The man standing on that perch for 26

23   minutes was not anxious.  That man was not sickened and that

24   man was not fearful.  That man was determined to help the

25   rioters accomplish their goal of getting in the building.

1          And I think that begs the question and moves us to

2     Count 34, obstruction, because if Mr. Mehaffie is pouring

3     all of this effort, all of his leadership knowledge into the

4     rioters, helping them get through that door, why?

5          And I think the clear answer to that is despite

6     his testimony, Mr. Mehaffie wanted to stop the proceeding

7     that was happening inside, because despite his testimony

8     yesterday, his actions speak so much louder than his words.

9          Now, each of the three Defendants here has been

10    charged in Count 34 with one count of an official proceeding

11    [sic].  And again, they have been charged both as

12    principals, but also under an aiding and abetting theory.

13          Because their ultimate goal and what I think the

14    evidence bears out is the three of them were all there to

15    stop the certification that was happening inside.  That was

16    fundamentally driving them to do what they did that day.  It

17    is the most logical explanation of their actions.

18          Of course, you know, there's no question that

19    there was indeed a proceeding happening and there's no

20    question that the mob as a whole obstructed that proceeding.

21    But I think the evidence of their intent to obstruct that

22    proceeding is also clear.  And if the Court doesn't find

23    that one or more of them didn't have their own intent as

24    principal, most certainly these individuals aided and

25    abetted other rioters who were determined to obstruct that

1      proceeding by getting through that doorway that day.

2              THE COURT:  I mean, I don't know that that -- the

3      aiding and abetting doesn't feel like it helps you very much

4      there because you've still got to show the aider and abettor

5      had the intent that other people obstruct.  Right?  I mean,

6      one way or the other, you need to show an intent for an

7      obstruction, I believe.

8              MS. BOND:  To aid and abet -- just a moment --

9              THE COURT:  I'm looking at Page 13 of your trial

10     brief, if that's what you're looking at.

11             MS. BOND:  Thank you.

12             So the intent is that others commit the offense.

13     And I think that it does make it a little bit easier for the

14     Court to get there because even if someone, say,

15     Mr. Mehaffie, didn't specifically intend -- which the

16     Government believes that the evidence bears that out -- if

17     he didn't specifically intend to stop that proceeding

18     himself, because the Court did hear his testimony that maybe

19     he thought it had been over by that point, he absolutely

20     intended to help those other people.

21             THE COURT:  But that's the problem.  If I credit

22     his testimony that he believed the proceeding was over,

23     that's it.  It doesn't matter if he was trying to obstruct

24     it himself or if he was trying to obstruct -- he had the

25     intent to help other people obstruct.  Either way, you have

1      a problem.  Right?

2            MS. BOND:  Not in the evidence that we have in

3      this case, because I think the evidence can show either way

4      that they were principals or aiders and abettors.  Maybe I'm

5      trying to cut it too finely.  But let me lay out the

6      evidence, because I think that does demonstrate intent here,

7      if not to fully commit the offense themselves, then to aid

8      others in committing the offense.

9            So starting --

10           THE COURT:  Well, I'm not sure I quite -- if he

11     believed the ceremony was over, how could he aid and abet

12     somebody in obstructing it?

13           MS. BOND:  Whether Mr. Mehaffie actually believed

14     that -- and I fundamentally don't think the Court should

15     credit that.

16           THE COURT:  Sure.  And I hear that.  But if I did.

17           MS. BOND:  Other people in that tunnel clearly

18     believed that it was going on and that they could do

19     something about it.  And Mr. Mehaffie through his actions

20     demonstrated his intent to help those people who believed

21     that.

22           THE COURT:  But it's with the intent that others

23     commit the offense of an obstruction of an official

24     proceeding.  That's what I'm saying.  Like I don't see how

25     he could have the intent to help other people obstruct an

1    official proceeding that he believes has already occurred.

2          MS. BOND:  I do think that it is a very fine

3    distinction.  Again, I don't think that the Court has to

4    find that they are aiders and abettors because the intent of

5    all three of these is clear as a principal.

6          THE COURT:  You're not answering my question.  But

7    go ahead.

8          MS. BOND:  Thank you, your Honor.

9          Mr. McCaughey's intent:  He demonstrated his

10    intent in numerous ways that day.  First of all, the reason

11    that he came to Washington, D.C., in the first place.  And

12    this is true of all three of them.  They came specifically

13    for January 6th, and all three of them came and participated

14    in that rally and were there at the rally that day.

15          Mr. McCaughey, he made a multistate trip with his

16    father for that very specific reason.  And it's significant

17    that they came on January 6th because this wasn't just any

18    rally being held in the city.  As the Court knows, there are

19    rallies; there are protests held day in and day out in this

20    city.  And Mr. McCaughey could have come for any of those.

21    But he specifically chose the one on January 6th, the one

22    that's been called the Stop the Steal Rally.

23          So I think we show an indication of his intent

24    right from the beginning.  He talked about in his testimony

25    being concerned about election integrity.  So of course

1    these were things that were already in his mind.  Go to the

2    Stop the Steal Rally.  I am concerned about election

3    integrity.

4             While he is there in the city, he heard Trump's

5    speech.  And he stayed there for at least an hour.  He

6    testified that he may have heard a second speaker, but he

7    can't really remember.  But during Trump's speech, he heard

8    first that the certification was in progress right down the

9    street; he testified he knew the certification was happening

10   that day; he heard President Trump encourage the crowd to

11   walk down the street; and he heard then-President Trump tell

12   the crowd that he might even march down with them.

13            So Mr. McCaughey before he even gets to the

14   Capitol, he knew what was going on.  He knew that proceeding

15   was happening.  He knew where it was happening.  And it was

16   already a concern of his because he had been told by Trump

17   that it was a concern and because he was there because he

18   was concerned about election integrity.

19            THE COURT:  And that's all from his testimony?

20            MS. BOND:  Yes, it is.

21            When he makes it down to the west plaza, he gets

22   there and he's standing in front of the police.  And what do

23   we see him tell the police?  He's there by about 2:05.  We

24   see him multiple times at 2:05, 2:19, 2:22.  What's he

25   saying is:  Cops go home.  He's telling the cops to go home.

1          He's not telling them to go home so they can have

2     a nice vacation.  He's telling them to go home because

3     they're there in his way.  They are an obstacle to what he

4     wants inside the building, which is to stop the proceeding.

5          So he's already out there a half an hour or 40

6     minutes before he gets to that tunnel telling the cops to go

7     home.

8          He doesn't stop there.  He shows his intent

9     through his unrelenting determination to get into that

10    building.

11         As the line of officers is overrun at 2:30 on that

12    plaza, Mr. McCaughey makes his way up the scaffolding.  He

13    talks about then heading over to the tunnel.  And the Court

14    has seen the evidence of what he did in that tunnel.  This

15    was not a one-off.  Mr. McCaughey was in there early on, I

16    think starting about 2:50.

17         We see him again with Officer Hodges at 3:12.  He

18    is determined over a span of multiple minutes.  He is going

19    into that tunnel again and again, which is really an

20    interesting contrast to what Mr. Mehaffie says, because

21    Mr. Mehaffie says that he knew what was happening at that

22    line.  And if people -- and he knew that when people got to

23    the front, they would want to get back out.

24         But not Mr. McCaughey.  And not Mr. Stevens,

25    either.  Both of those individuals were coming back in

Closing Arguments by Ms. Bond

1    repeatedly, because they wanted to be part of that line.

2         So that unflagging determination to get into the

3    building, get past the police line, people don't do that for

4    no reason.  You don't put yourself in that kind of danger.

5    You don't show that kind of aggression for something that

6    isn't important to you.  And we know it was important to

7    Mr. McCaughey.  It was stopping the steal, dealing with

8    election integrity, stopping the proceeding that was going

9    on inside.

10         So I think Mr. McCaughey demonstrates his intent

11    with his words, "Cops go home"; he demonstrates his intent

12    by why he was here that day, why he made that march down the

13    street to the west plaza; and he demonstrates his intent by

14    assault after assault that he commits on officers as he is

15    determined to get through that police line.

16         "Go home, boy.  Talk to your buddies.  Go home."

17    He wants them to go home because they are obstacles.  They

18    are obstacles to going inside.

19         And Mr. McCaughey testified that he thought he

20    might waltz in, say a few chants.

21         Your Honor, he could have said a few chants down

22    the street.  He could have said a few chants on the west

23    lawn.  He did not need to get into that building to say a

24    few chants.  What he needed to do was get into that building

25    to stop the proceeding.  And that is what he intended to do.

1           Mr. Stevens --

2           THE COURT:  Sorry.  So if I don't credit his

3    explanation for why he wanted to go in, does that help you

4    or do I need to just consider whether you've proved the case

5    beyond a reasonable doubt regardless of his explanation?

6           MS. BOND:  I think that your Honor has to look at

7    the evidence; and you would look at the totality of the

8    evidence.  And I don't think that the Court should credit

9    his particular statement that he just wanted to go in and

10   say a few chants, because it's entirely inconsistent with

11   everything else that he did.

12          THE COURT:  So you believe that his statement is

13   actually corroborative because it's so unbelievable?

14          MS. BOND:  Your Honor, I wouldn't say that it is

15   corroborative.  I would say it is incredible and it is

16   inconsistent with other things he does.  But I don't think

17   it really detracts in any way with the rest of the evidence

18   of his intent.

19          THE COURT:  Okay.

20          MS. BOND:  So Mr. Stevens:  Very, very, very

21   similar in that he came from Florida, made this multistate

22   trip, came to D.C. on a very specific day for a very

23   specific rally.  We know that he was at that rally because

24   on his phone there's a video of John Eastman speaking at

25   that moment.  We don't know who else Mr. Stevens heard, but

1    he at least heard Mr. Eastman.

2           We know that Mr. Stevens was also part of a group

3    chat that was planning this trip in advance.  One of them

4    had planned to come be a marcher.  So they knew something

5    big was going on.  Another one planned to be at an event of

6    Alex Jones's at Freedom Plaza the night before.  All of that

7    Mr. Stevens would have been privy to, was reading his

8    text -- had these text messages in the lead-up to his trip

9    to D.C.  So it was not a social visit that he came for, just

10   like Mr. McCaughey.  It was for very specific person.

11          He also decides to walk down the street.  He makes

12   it onto the west Capitol.  And there he stands right in

13   front of Officer Curtice at 2:22 --

14          THE COURT:  Sorry.  Can we go back?  What were you

15   saying about John Eastman?

16          MS. BOND:  Mr. Stevens was at least there for

17   Mr. Eastman's speech --

18          THE COURT:  I see.

19          MS. BOND:  -- because he recorded a video.  So we

20   know he participated in that rally to some degree.

21          THE COURT:  Okay.  But we can't say exactly what

22   he would have heard.

23          MS. BOND:  Correct.

24          THE COURT:  Understood.

25          MS. BOND:  So by the time Mr. Stevens -- if you

1    can go back one slide -- gets down to the Capitol, we know

2    that he is present by 1:56 p.m.  That's because we can see

3    him on Officer Brian Madison's body-worn camera.  And

4    there's a corresponding video, a news video, that shows the

5    opposite position.  There's Mr. Stevens already sort of

6    working against the police line.  They're there.  He's right

7    by the bike racks.

8           And I think that his early presence there and his,

9    you know, actions there are part and parcel of his intent.

10          So that brings us to 2:22, where he is still out

11    there, 25 minutes later, standing right in front of Officer

12    Curtice saying:  Do you know what happens when you're

13    surrounded by the enemy?  Do you know what treason is?  He

14    calls Officer Curtice a traitor.

15          He even shows his disdain for those officers by

16    spitting at the feet of Officer Curtice.  But he wasn't

17    calling Officer Curtice a treasonous traitor because he was

18    being prevented from engaging in a peaceful protest; he was

19    calling Officer Curtice a traitor because that officer was

20    once again blocking his way to the building, which I submit

21    is what Mr. Stevens's ultimate goal was.

22          So just like Mr. McCaughey, he's standing at that

23    bike line frustrated by being prevented from getting in that

24    building to stop the proceeding.

25          Of course, the west front folds.  Rioters make

1     their way up and Mr. Stevens eventually finds himself on the

2     upper terrace.

3               Of course, we have the video of him giving a

4     thumbs-up as the police line breaks, as he's making his way

5     through what we know was a very violent crowd.  He gets up

6     to that tunnel; and just very similar to Mr. McCaughey, this

7     absolute total determination to get into the building,

8     repeatedly going into the tunnel, coming back out, giving it

9     another go, going back into that tunnel, coming back out.

10              Of course we see him with Sergeant Gonell,

11    pressing against Sergeant Gonell because Sergeant Gonell is

12    another obstacle in his way to getting into that building,

13    his ultimate goal.

14              So I think Mr. Stevens, the purpose of his trip,

15    the fact that he is out on that police line calling officers

16    treasonous traitors, the intent is clear.  Those officers

17    are an obstacle.

18              He demonstrates his intent again in that tunnel as

19    those officers are blocking him from getting into that

20    building.  His total determination once again demonstrates

21    his intent.  I think the intent for both Mr. McCaughey and

22    Mr. Stevens is evident.

23              Mr. Mehaffie:  His actions again are a little bit

24    different from the two other individuals.  But he, too,

25    makes that eight-hour trip for a very specific rally.  We

1    know that in advance he knew what a certification was

2    because he remembered learning about the 2017 certification.

3    So he more than any of these Defendants is sort of more

4    intimately familiar with that because he's interested in

5    that kind of thing.

6         But he went.  And we know that there was some

7    planning involved because all the way back on December 21st,

8    he was already sending text messages to the family group

9    chat, encouraging his other family members to be in D.C. on

10   January 6th, challenging them.  He challenges one member of

11   every family to be there.  And there's this whole

12   back-and-forth for days on end from the family, bouncing

13   this around.

14        Now, Mr. Mehaffie testified that he thought it

15   would be a fun family trip.  Of course he loves his kids.

16   He likes doing things with his kids.  There's nobody

17   challenging that.  But it was clear from the group chats

18   that this trip was a little bit different because one of the

19   family members talks about being nervous.  And another

20   father member talks about, "Oh, the Proud Boys aren't going

21   to be there because they're tired of getting stabbed."

22   Another --

23        THE COURT:  That's all good reasons.  That has

24   nothing to do with the certification.  Right?

25        MS. BOND:  Not directly, your Honor.  But I think

1    it demonstrates more of Mr. Mehaffie's knowledge than he was

2    willing to let on on the stand.  The Government submits that

3    he really minimized his knowledge of what was going on.

4           But Mr. Mehaffie is a savvy man.  He has paid

5    attention to certifications in the past.  He knew what was

6    happening on that day.  He knew that there was a Trump

7    rally.  And his family members were engaging with his

8    interest in going and expressing their own concerns about

9    this might not be quite the peaceful protest you think --

10   you've experienced in the past.

11          THE COURT:  Yes.  I agree about that.

12          But I mean, I took that to be concerns about the

13   battles that have been occurring between Proud Boys and

14   antifa and the protests earlier in the year.

15          MS. BOND:  I think some of those family texts and

16   Mr. Mehaffie's interest in going strongly suggest that he

17   knew the purpose of that rally.  He knew that the proceeding

18   was happening that day.  He knew that this was a Stop the

19   Steal type of rally.  And that shows his knowledge of what

20   was going on.

21          And that's why it's important, just like

22   Mr. Stevens and Mr. McCaughey, that he came on January 6,

23   not on December 21, not on any other day of the year.  He

24   came on January 6th for a specific purpose.

25          THE COURT:  So are you saying you believe that the

1    purpose of the Stop the Steal Rally on the Ellipse was to

2    obstruct the certification?

3              MS. BOND:  No.  Absolutely not.  No.

4              Some of the members of that mob then walked down

5    the street and attempted to obstruct that certification.

6    Again, we know that members of that crowd, there is a big

7    continuum of conduct.

8              THE COURT:  Right.  So I guess I'm just -- with

9    all of them, obviously, your kind of first point is they're

10   coming from out of town to attend the Trump rally.  And I'm

11   just weighing how much that shows that there is actually an

12   interest in --

13             MS. BOND:  It's one piece of the puzzle of their

14   intent.

15             THE COURT:  Okay.

16             MS. BOND:  That's what it is.

17             So Mr. Mehaffie, he goes to that rally.  And he

18   hears at minimum Trump speak.  We know from Mr. McCaughey's

19   testimony that President Trump talked about the

20   certification happening, talked about Pence being able to do

21   something about it, talked about encouraging the crowd to go

22   down there.  Now, Mr. Mehaffie minimized -- the Government

23   submits he minimizes what he heard.  It's hard to really

24   know.

25             But don't you think that if someone who traveled

1    eight hours to come to this rally, had been planning this

2    for weeks all the way since December 21st, that he would

3    have made an effort to hear what the keynote speaker was

4    saying?  The Government submits that what he says he heard,

5    which was nothing, was Mr. Mehaffie minimizing his own

6    conduct there.  And it's not credible.

7         Whatever he may have heard, he still makes his way

8    down the street.  And we don't have a timestamp for when

9    Mr. Mehaffie makes his way to the west front of the Capitol.

10   But we do have Exhibit 308.  We may -- if we have it, great.

11   If we don't, we'll rely on this PowerPoint.  But that is the

12   Yvonne Burton livestream.  And it shows Mr. Mehaffie

13   standing on the Capitol grounds, making this impassioned

14   speech:  We have to fight over this wall.  I don't think we

15   need to play it.  It's fine.

16        But this is before all of the mayhem.  This is

17   earlier in the day.  We know that because of the shots we

18   can see of the Capitol in the background, the terrace is

19   still clear.  And Mr. Mehaffie is urging, encouraging other

20   people to fight over this wall.

21        Now, Mr. Mehaffie talked about other concerns that

22   he had going on that year, other -- he talked about multiple

23   reasons for coming to D.C.

24        But during his speech here in those family text

25   messages, there is no mention of those other things.  There

Closing Arguments by Ms. Bond

1    is no mention of COVID or how hard it had been on his

2    family.  There is no mention of Ivermectin, of cancel

3    culture.  If those had been his primary concerns in this

4    moment as he's standing on this wall encouraging rioters to

5    come over the wall, it would not make any sense for him to

6    be protesting these things at this date and time when

7    there's this mass rally and the Electoral College happening

8    right inside.

9          The only thing that fits this evidence, that makes

10    sense in this context, is Mr. Mehaffie was ready to fight

11    for something that was important to him.  Whether this was

12    hyperbole or not, he was ready to fight and he was ready to

13    fight about what was going on inside that building, which

14    was the certification proceeding.

15          After the police line folds, we know that

16    Mr. Mehaffie actually climbed the scaffolding and he made

17    his way to the tunnel.  And he made a beeline.  He didn't

18    hang back.  He was in that very first group.

19          Again we see the direction, the intention, the

20    total focus on getting to that tunnel.  He knew he was

21    headed to an entrance.  And he had a purpose.  And

22    Mr. Mehaffie claims that he was climbing the scaffolding --

23    that as he was climbing the scaffolding, he didn't see what

24    was going on on the terrace below him.

25          The Government submits that is really not

1    credible.  Mr. Mehaffie would have had a good view from

2    where he was.  And if he didn't see -- if the Court chooses

3    to credit his statement that he didn't see all of the

4    violence and chaos below him --

5              THE COURT:  That doesn't matter much for this

6    charge, does it?

7              MS. BOND:  Again, I think it is another piece of

8    the puzzle of intent.  Mr. Mehaffie is going through not a

9    peaceful protest like he's done before.  He's not looking at

10   a sit-in.  He is going through violence.  This should have

11   been a clue to him.

12             And if he really, truly did not see that, if the

13   Court credits that statement, then it is only because

14   Mr. Mehaffie is either the most happily oblivious man on the

15   face of the planet or he was so singularly focused on

16   getting through the door that he didn't see the violence.

17   He didn't see the weapons.  He didn't see the bear spray and

18   the pepper spray and the chemicals that were floating all

19   over the place, that he even had to cover his mouth for,

20   because he was focused on getting in that door.  That shows

21   intent.  The determination shows intent.

22             THE COURT:  Do you think leaving his family is

23   relevant to that?

24             MS. BOND:  To intent?  I think it's relevant.  But

25   I don't think that it's something that I'm going to argue

1        strenuously.  But sure.  Yes.  I think it's relevant.

2                Now, one of the pieces of evidence that just came

3        in very early this morning in the defense case was the grand

4        jury testimony, which I believe the Court has now.  It's

5        very interesting, the evidence that they admitted there,

6        because in that grand jury testimony, what comes in is an

7        exchange between the prosecutor and the FBI agent testifying

8        about Officer Carlton Wilhoit, who the Court didn't hear

9        from.  But in that grand jury testimony, what they are

10       recounting is Officer Wilhoit says he remembers

11       Mr. Mehaffie, the guy in the gray shirt, saying:  We don't

12       want to hurt you.  But it's our Capitol.

13               So even in that moment, that moment when he's

14       opening the door, making this claim that he didn't really

15       want to be at that door, there is an officer there

16       remembering him saying:  This is our Capitol.

17               He's not looking for a choke point in that moment.

18       He is not looking to relieve pressure of that tunnel.

19       Mr. Mehaffie knows the tunnel.  He knows how to get out.

20               What he is looking for in that moment is to get

21       into the Capitol.  And the only reason that makes sense,

22       that completes the puzzle of all his intent, is because he

23       knew what was happening.  He knew the proceeding was going

24       on and he wanted it to stop.

25               The Court should not credit his statement that he

1    thought it was over.  The Court should not credit his

2    statement that he didn't think anything could be done,

3    because Mr. Mehaffie's actions speak so much louder than his

4    words.

5            Mr. Mehaffie intended to stop that proceeding.

6    And the Court can find either of these individuals guilty as

7    principals or as aiders and abetters.

8            THE COURT:  Do you think your evidence as to one

9    of these Defendants is stronger than the others on the

10   obstruction count?

11           MS. BOND:  I think all of them are very strong.  I

12   think all of them were working of one mind.

13           That, I think, brings me back to Officer Hodges's

14   testimony that was so fascinating because he makes this

15   interesting comparison during his testimony.  He talked

16   about how in other riots he had worked, the violence was

17   very different, because the violence in those other riots

18   was a lot more like anarchy.  People would run out of the

19   crowd and destroy something just for the sake of destroying

20   it.  But for the riot on January 6th, it was totally

21   different.

22           Officer Hodges talked about how the entire crowd

23   was working for the same purpose.  This wasn't the same

24   anarchy he had seen before.  And all three of these

25   Defendants were a part of that crowd who were working for

1    the same purpose.  They put their words behind it.  They put

2    their actions behind it.  And Officer Hodges felt it.

3              THE COURT:  I mean, I guess I'm not sure that I

4    agree with you that there's these kind of strong cases here

5    on these three.  I'm becoming something of a connoisseur on

6    January 6th cases.  And I mean, the Seefrieds actually broke

7    into the Capitol Building.  I don't think you charged

8    obstruction there.

9              MS. BOND:  There was 1512 in there.

10             THE COURT:  There was.

11             MS. BOND:  The Seefrieds, yes.  You found -- if my

12   recollection is correct, you found both Seefrieds guilty of

13   obstruction there.

14             THE COURT:  On Mr. Council, you dropped the count;

15   and I think there were good reasons for that.

16             For Mr. Hale-Cusanelli, there was all of that.

17   There's a lot of text messages and what have you on the

18   front end that showed a real knowledge about the

19   certification process.

20             I mean, it seems to me that the Government has

21   been charging these where there's a lot more evidence from

22   text messages and what have you about the certification

23   process that I don't really feel like I see with these

24   Defendants.

25             MS. BOND:  So, your Honor, knowledge and intent

Closing Arguments by Ms. Bond

1    are so hard to prove.  They're so hard to prove in any case

2    because we never see inside a defendant's mind.

3            The Court would not expect a homicide defendant to

4    have a litany of text messages saying:  Yep.  I killed that

5    guy.  I'm the one who pulled out the gun and shot him.

6            THE COURT:  Well, you don't need specific intent

7    for most homicides, do you?

8            MS. BOND:  Fair enough.  But most defendants are

9    not going to use magic words.  They're not -- maybe on some

10   occasions, somebody who is careless or brazen or whatever

11   the case might be, they might use the magic words.  But so

12   rarely in cases with specific intent are there the magic

13   words.

14           The Court should not be looking for magic words

15   here.  The Court should be looking at the totality of the

16   circumstances of the actions to find intent, because that is

17   what the law requires.  The law does not demand magic words.

18   We know why these guys were here.  We know they were

19   absolutely determined to get in that building.  And people

20   don't act with that much determination, that much fervor,

21   that much passion, because they're clueless.  They act

22   because they have a purpose.  And that is what they are

23   doing here.  They don't need to have the magic words.

24           THE COURT:  All right.

25           MS. BOND:  Civil disorder.

1          THE COURT:  Don't spend much time on this.

2          MS. BOND:  Of course, so I think that the totality

3     of the evidence that the Court has seen meets each of the

4     elements of civil disorder.  Civil disorder is much broader

5     than 111(a).  It includes acts.  It doesn't necessarily have

6     to be forcible.

7          And of course the Court has seen the evidence of

8     all of the acts of these three individuals.  The Court has

9     seen the evidence of -- the Court has also heard the

10    stipulated testimony that meets the interstate commerce

11    prong that of course Safeway, their commerce was affected

12    during the course of the whole riot.

13         And in addition to civil disorder, each of these

14    Defendants is charged with associated misdemeanors for

15    disorderly conduct with a weapon.  And, of course, for

16    Mr. Stevens and Mr. McCaughey, they are charged with a

17    weapon.  If the Court does not find that that weapon was

18    dangerous in this context, of course, there are other lesser

19    includeds there.

20         THE COURT:  Sorry.  How is that relevant?

21         MS. BOND:  We have charged a litany of

22    misdemeanors for their conduct.  And I believe it is Count

23    36 and 37 where Mr. Stevens and Mr. McCaughey --

24         THE COURT:  Oh, you've moved on from civil

25    disorder.

Closing Arguments by Ms. Bond

1          MS. BOND:  I did.  You said you wanted me to be

2     short, so I made it very short.

3          THE COURT:  I appreciate that.  Ms. Akers and I

4     missed it, though.

5          MS. BOND:  I'm sorry.  I can talk much more about

6     civil disorder.

7          THE COURT:  I'll let you know if you need to.  So

8     keep going.

9          MS. BOND:  Misdemeanors:  I'll barely touch on

10    these.  All of the misdemeanors -- I think you have seen all

11    of the evidence.  Here, the two that have been charged with

12    a dangerous weapon, that's Counts 36 and 37 for Mr. Stevens

13    and Mr. McCaughey.  And, of course, if the Court doesn't

14    find that there was a dangerous weapon used by one of them,

15    there is the lesser included disorderly conduct without a

16    weapon that the Court can find.

17         THE COURT:  So there's a lesser included

18    misdemeanor and a misdemeanor?

19         MS. BOND:  I believe.  Yes.  Yes.  You could

20    simply drop the dangerous weapon portion.

21         THE COURT:  Okay.

22         MS. BOND:  So that they acted in a disorderly

23    manner, but didn't use the weapon in a dangerous weapon way.

24         THE COURT:  Which one?

25         MS. BOND:  I'm sorry?

```
 1                    THE COURT:  Which one is it?
 2              MS. BOND:  1752.
 3              MS. PASCHALL:  (A)(2) and (a)(4) also include
 4    (b)(1)(A).
 5              I don't remember the exact count number.  But it's
 6    1752(a)(2) --
 7              MS. BOND:  It's 36 and 37.
 8              MS. PASCHALL:  It also includes (b)(1)(A).  So
 9    (b)(1)(A) makes it a felony.  It's a lesser included
10    misdemeanor if the (b)(1)(A) is not included.
11              THE COURT:  I see.  So this is charged as a
12    felony, but could be a misdemeanor?
13              MS. BOND:  Yes.
14              THE COURT:  Understood.
15              MS. BOND:  I'm grateful to my colleague.
16              And of course, we've also charged in Counts 44 and
17    45 Mr. Stevens and Mr. McCaughey using physical violence
18    with a weapon under 1752(a)(4).
19              And then we've charged all three of these
20    Defendants under 5104(e)(2)(D) and 5104(c)(2)(F) with
21    disorderly conduct and physical violence.
22              THE COURT:  Okay.
23              MS. BOND:  Does the Court have any additional
24    questions?
25              THE COURT:  I think this is a good time for a
```

1    break and for the defense to get a chance to talk.  And we

2    can address any of the misdemeanors or apparently

3    misdemeanors that can be felonies sometimes afterwards.

4            Thanks.  Let's take a ten-minute break.

5            MS. BOND:  Thank you so much.

6            (Thereupon a recess was taken, after which the

7    following proceedings were had:)

8            THE COURT:  Who's up first?

9            MR. URSO:  That would be me, your Honor.

10           THE COURT:  Mr. Urso.

11           MR. URSO:  Good morning again, your Honor.

12           THE COURT:  Good morning.

13           MR. URSO:  I want to start just with a comment

14   that Ms. Bond made, a point she conceded:

15           If they were just standing there holding a riot

16   shield, it would not be a dangerous or deadly weapon.

17           And I submit -- I'll get into the details, but I

18   think absolutely that is a reasonable interpretation of

19   what -- of the events that occurred as to Mr. McCaughey in

20   this case.

21           And for proof beyond a reasonable doubt, you've

22   got to preclude all other reasonable conclusions.  I'll get

23   into that later.  But I think that -- I think that I agree

24   with that wholeheartedly.

25           And I do want to start with the obstruction of

1     official proceeding, because I do think that's the only

2     cognizable other felony the Government can use for purposes

3     of 111(a), because civil disorder as I understand it, it's

4     basically the same crime.  I mean, the statute

5     contemplates --

6                 THE COURT:  The same crime as what?

7                 MR. URSO:  As the 111.  It's impeding, interfering

8     with an officer.

9                 So how can you say, Well, it's an enhanced penalty

10    because while you were impeding -- intending to impede an

11    officer, you were intending to impede an officer during a

12    civil disorder?  I mean, I don't think that's what's

13    contemplated by the statute.  I think obstruction is exactly

14    what's contemplated.  You're trying to commit another

15    felony, and in that process you end up assaulting police or

16    interfering with police.

17                THE COURT:  So I --

18                MR. URSO:  I think it's an incidental -- civil

19    disorder is just an incidental felony.  It's not the kind of

20    felony that the statute -- like I said, it contemplates --

21    you're intending to do a separate felony and then you do the

22    111(a).

23                THE COURT:  I think -- I just want to go back and

24    make sure I'm tracking with you.

25                Well, wouldn't it be -- how about just the

1    physical contact?  Isn't that enough?

2              MR. URSO:  Oh, of course.  I'm just talking about

3    the other felony part, the other -- if physical contact

4    wasn't there, which I'm going to argue in some cases it

5    wasn't; not with Officer Hodges, but with Officer Foulds.

6              But yes.  I'm just talking about the other felony

7    prong.

8              THE COURT:  That's an interesting point that I

9    don't think we discussed with Ms. Bond.  But let me know

10   where you think that's relevant, because when we were

11   talking about it, it seemed like it was physical contact.

12             MR. URSO:  I think it would be relevant with

13   Officer Foulds because I don't think there is proof beyond a

14   reasonable doubt of physical contact.  And I'll go through

15   that.

16             THE COURT:  Great.

17             MR. URSO:  Thank you.

18             So, your Honor, with respect to the obstruction --

19   and before I even get into the elements, there was some talk

20   of Mr. McCaughey's testimony about what he probably would

21   have done had he gotten into the Capitol.

22             And I think it sounds like your Honor might have

23   been skeptical.  But it's -- I think that answer probably --

24   it's entirely consistent with the unplanned nature of how he

25   got to that point.

1              THE COURT:  That he would protest inside?

2              MR. URSO:  Yeah.  And he probably would just

3    protest.  Like, he didn't know what he was going to do.  He

4    came for the Trump rally.  Trump said they're going to go to

5    the Capitol.  He followed the crowd to the Capitol, got up

6    to the bike racks, was standing around.

7              The line opened up.  He made his way up to the

8    scaffolding.  He took a selfie.  He didn't beeline right to

9    the tunnel to go in there or anything like that.  And he did

10   testify that he thought for sure the proceeding was long

11   over.

12             But it's -- his whole actions that day were

13   following along with the crowd.  And it's not an excuse in

14   any stretch, by any stretch.  But I think the answer that "I

15   probably would have just protested" is totally consistent

16   with the idea he didn't plan to go in there in the first

17   place when he got there.  It all just kind of developed.

18   And he got there, and now he said he hears people saying

19   whatever.  "Let's get in."

20             And he just sort of got there.  And I think

21   probably -- he probably didn't even know what he would do

22   when he got in there.  You know?

23             And he did testify that he was aware of other

24   protests that happened in the building, people that got too

25   aggressive and got arrested in the past.  So obviously he

1    wasn't allowed there that day, and that was clear to him at

2    some point.  So there's no excuse for that.

3         But I think for his mindset, I think that makes

4    total sense:  "I probably would have just chanted or

5    something in there," because if he thought the proceeding

6    was done, what else would he do?

7         THE COURT:  I guess -- I think what I take

8    Ms. Bond's point to be is, they're demonstrating outside.

9    They've been demonstrating all day, which is fine.  Why go

10   to such efforts?  Why, you know, hurt multiple officers to

11   just go in and demonstrate inside?  It just doesn't pass the

12   laugh test.

13        MR. URSO:  Well, the reason I think it does in the

14   sense if you just watch how it happened, he was -- he didn't

15   come with a plan.  There's no evidence he had any kind of

16   plan.  He came down with his father.

17        By the way, he had -- he didn't just come on

18   January 6th.  He and his father had come on December 14,

19   too, for another rally.  So he wasn't just coming to stop an

20   event.  He came for the rally.  This is the second one he

21   came to.

22        And he was expecting President Trump to join him.

23   You see, that's why -- you've got to believe that's why he

24   said to his friend in a Signal chat basically, you know,

25   "Donald's a pussy," because he didn't come as he said he

1    would to lead the protestors in front of the Capitol.  So

2    that's what he was expecting.  He wasn't going down there to

3    go into the Capitol once he got there.  It was all off the

4    cuff as things developed.

5            THE COURT:  But the whole idea is that the

6    demonstration is supposed to be in front of the Capitol.

7    Why --

8            MR. URSO:  Right.  Of course.  That's why he's

9    very likely going to be convicted of some crimes.

10           But what exactly was he -- I think if you watch

11   it, how it developed, and there's no -- and the lack of

12   other evidence that he intended to interfere with any

13   proceeding, no text messages, everything had to do with him

14   just going down to see.  He went the last -- the month

15   before for a rally.  He went down to D.C. the month before

16   on a different rally.  Not trying to obstruct a proceeding;

17   just coming to be heard.

18           Obviously, he had real -- he, like millions of

19   other Americans, had real questions about the integrity of

20   this election.  Still do.  Millions still do.

21           So he wanted to be heard.  And it just developed

22   that way.  I think -- I mean, even if you watch the videos,

23   I mean, somebody says something and then he starts saying

24   something.  He just was kind of following along.  Again,

25   it's not an excuse.  But I don't think he had a big plan in

1      his head.  I think when he said, "I wasn't thinking very

2      much that day," I think that's 100 percent accurate.

3              And I do think he was very credible in general,

4      your Honor.  As you know, he didn't have to testify.  He got

5      up there and he answered every question Ms. Bond put to him

6      on cross.  He didn't once try to evade.  He didn't once try

7      to get around something.  He answered, gave answers, knowing

8      that those answers were going to help seal his fate on

9      certain crimes for sure.

10             So I mean, I think he was -- his testimony was

11     very credible.  And I think it's supported by the rest of

12     the evidence in the case.

13             And I'm going to bounce around because we've got

14     these rebuttal points versus my prepared comments.

15             THE COURT:  I've got some questions for you.

16             MR. URSO:  Yeah.  Yeah.

17             THE COURT:  So Ms. Bond points to your client's

18     testimony about hearing the president talk about

19     certification and also this, you know, telling -- saying,

20     "Cops, go home."  I mean, that's kind of a surprising

21     statement to make in a general protest point.

22             MR. URSO:  Well, I think it's indicative -- it's

23     consistent with his actions, which he ultimately tried to

24     do.  Just -- it doesn't add much to what he was going to do

25     once he got in.  It doesn't say -- he's just saying:  Go

1    home so we can get in the building.  He didn't say:  Go home

2    so we can get in the building and try to stop the

3    proceeding.

4            And he did testify that -- I mean, he was at the

5    Trump rally when the proceeding was going on.  So he thought

6    it was long done.  He thought it would  -- and

7    that's usually a ceremonial, 15-minute deal.  And all news

8    accounts indicated that it was going to be certified.

9            And I think his testimony was clear and credible

10   on that.  And again, if he had made a beeline for the door

11   when he got there, that could be a different story.  But he

12   got down there.  He milled around down by the gates for a

13   while.  Then he went up to the scaffolding, took a selfie.

14           And then when he gets down there, then -- that was

15   about 2:36, we know, from the father's cell phone video.

16   And we know from then he kind of saw a lot of activity by

17   the door, and that's when he went that way.  And he wasn't

18   nearly one of the first people to go there.  So he didn't

19   make a beeline there, you know.

20           And again, "Police go home," that was basically

21   the only thing he said.  And he said it a few different

22   times from different places.  That adds nothing to what his

23   intent would have been had he got in.  That's just:  I'd

24   like to get inside and protest.

25           Ms. Bond mentioned that Officer Hodges testified

1    how different the violence was in this case.  Well, Sergeant

2    Mastony, who I think along with probably Task Force Officer

3    Metz was the two most credible witnesses to testify here,

4    Sergeant Mastony said the violence -- he's dealt with this

5    kind of violence, same exact kind of violence in the past.

6    The difference here was the scope.  It was just so many

7    people.  And in the past, it had been like 40 people to one

8    officer.  Now it was so many.

9         But he said he dealt with this type of violence

10   many times in the past, I believe.

11        So it's completely inconsistent with what Officer

12   Hodges's testimony was.  I think Mastony has double the

13   service time that Officer Hodges has.  He's 12 years versus

14   six at the time.  Both on the same CDU unit, but he's --

15   Sergeant Mastony is a sergeant.

16        So I think that calls into question a little

17   bit -- and I think there's other things, I think, that call

18   into question Officer Hodges's testimony, and I'll get into

19   that.  But I'm not trying to besmirch Officer Hodges.  I

20   think, much like Officer Gonell, he can be prone to a little

21   bit of exaggeration, unintentional.  I don't think he

22   purposely lied.  I don't think anybody did.

23        But certainly what he said is completely

24   contradicted by Sergeant Mastony in that regard.

25        Again, just on the obstruction, with respect to

1    the intent, there's just nothing -- your Honor was touching

2    on it.  There's nothing beyond his desire to want to get in

3    the building.  There's nothing from which the Court could

4    draw an inference beyond a reasonable doubt that he intended

5    once he got in that building to stop a proceeding.

6        To the contrary, he testified he thought for sure

7    the proceeding was over.  There's countervailing evidence.

8    There's no evidence -- there's a -- and if your Honor were

9    to make that giant inferential leap, then basically anyone

10   who entered the Capitol while the Senate was in session for

11   First Amendment purposes could subject themselves to this

12   charge, this serious, serious felony.  That could not have

13   been the intent of Congress when they passed this

14   anticorruption act, Sarbanes-Oxley.

15       There's got to be more than just:  You wanted to

16   get in and protest.  There's got to be evidence that you

17   wanted to corruptly stop a proceeding.  And if you find him

18   guilty of that on this evidence, you just are making that

19   giant inference.  It's just a huge inference to get to proof

20   beyond a reasonable doubt based on only a desire to get into

21   the building.  Especially, like I said, when you've got the

22   countervailing testimony that he thought it was long over,

23   which is consistent with these proceedings in the past.  And

24   he seems like a citizen who paid attention.  He mentioned

25   the 2017 certification.

1          And again, they had his phone.  They had access to

2     his social media.  All they could find was that he had an

3     intention to go down there on that day.

4          He didn't come down as part of any organized

5     group.  No Proud Boys.  Didn't come down in military

6     fatigues, the kind of things you might expect if you wanted

7     to break -- if you came down with the intention to break

8     into the Capitol to obstruct a proceeding.  No weapons, no

9     gas masks, no face masks to hide his identity.  He came down

10    in his brown hoodie with his father and not appearing like

11    he wanted to go storm a building and stop a proceeding once

12    he got down there.

13          Again, the only thing he said of evidentiary value

14    is "Go home," which again is -- it's just consistent with

15    his efforts to get into the building.  It doesn't add

16    anything beyond that for what he would have done intent-wise

17    if he was able to get in there.

18          I don't think he acted with the awareness that the

19    natural and probable effect of his conduct would be to shut

20    down a certification vote.  I don't think he acted with

21    awareness of much, quite frankly.  And again, I -- I think

22    that's borne out if you look at it, if you look at the big

23    picture.

24          Like I said, he -- there was no indication he came

25    down to do this.  It was all sort of one decision at a time.

1    It seems like he expected the president to come and lead the

2    protest.  If he expected President Trump to come -- that's

3    why he indicated that he was a pussy for not coming, it

4    seems like -- then he would have -- he certainly wouldn't

5    expect Trump to lead a charge into the building, you know.

6    I mean, it's clear to me that his actions that day were

7    clearly unplanned and off the cuff.

8            And I agree wholeheartedly with the idea of aiding

9    and abetting.  It's the same thing.  If you don't have any

10   intent, you can't aid and abet.

11           The Government hasn't pointed to anybody in

12   particular that Mr. McCaughey aided and abetted to obstruct.

13           And again, obviously, it is the province of the

14   Court, the finder of fact, to draw reasonable inferences

15   from competent evidence.  But there's just no evidence from

16   which the Court can make that inferential leap beyond a

17   reasonable doubt for his intent.

18           Turning to Count 24:  As to Officer Hodges, to be

19   sure, there is no justification for what happened to Officer

20   Hodges, Gonell, Foulds or any -- all the rest of the

21   officers on duty that day.  It's unacceptable what happened,

22   what they had to deal with, for sure.

23           But the question still is, then:  What particular

24   crimes did the Government prove Mr. McCaughey guilty of

25   beyond a reasonable doubt, regardless?  And I've got to say,

Closing Arguments by Mr. Urso

1    frankly, I was taken aback yesterday, Judge, when you

2    mentioned -- sort of previewed where your thoughts were on

3    the 111(b) as to Officer Hodges.  I actually was thinking

4    there was so much reasonable doubt as to that that if this

5    was a jury, you might consider actually acquitting him on a

6    Rule 29.  I'm glad you said it, because it refocused me on

7    that issue.

8            But I mean, obviously, the Court needs a single --

9    just a single reasonable doubt.  And I think there's

10   multiple, multiple, multiple independent reasonable doubts,

11   each independently that could give the Court reasonable

12   doubt about that.  Taken together, it's overwhelming

13   reasonable doubt as to whether Mr. McCaughey used a police

14   riot shield in a manner that could cause serious physical

15   injury or death.

16           As a matter of fact, there was testimony about --

17   by Sergeant Mastony; I think it was the only officer who

18   testified he used that -- a shield this way that could cause

19   serious physical injury or death.  And he said at one point

20   he lifted the shield up and used the edge to strike

21   somebody.  Now, that is how you can use an inherently

22   defensive shield in a deadly or dangerous manner.  There's

23   no evidence -- and he testified he wasn't trained to use it

24   that way.  It was just a spur-of-the-moment self-defense

25   move.

Closing Arguments by Mr. Urso

1              There's no testimony Mr. McCaughey did anything

2       like that.  He's consistently holding the shield the entire

3       time he's there.  He did actually more movement with the

4       shield with Officer Foulds in trying to hold the door open

5       than he did any other time.

6              Now, I'll just get back into that.  But -- and

7       though injury is not an element of the crime charged, it is

8       relevant, obviously.  And Officer Hodges's testimony that

9       the shield pressing on him caused him some kind of pain or

10      unexplained injury didn't make a lot of sense.

11             THE COURT:  What do you think "serious bodily

12      injury" means?

13             MR. URSO:  Well, I mean, I think maybe we should

14      brief that really quick before the end of the week.  But I

15      do think my understanding of it is physical injury is

16      something -- some sort of minor injury that causes you pain.

17      And serious physical injury is the kind of thing that --

18      like a broken bone, that could require hospitalization.

19      "Serious physical injury or death."  So they're close.

20      Serious physical injury should be -- it goes hand in hand

21      with death in this definition.  So I think it's got to be

22      serious, I mean, in the commonsense use of it.

23             So if it -- even if it was proven that, A,

24      Mr. McCaughey purposely was pushing Officer Hodges and, B,

25      that Officer Hodges felt pain or had this unspecified injury

1    that he didn't specify, that's not serious physical injury.

2    That's maybe physical injury if you credit the testimony.

3    But no way that could be considered serious physical injury

4    under any kind of definition.

5            He identified an injury to his lip, an injury to

6    his head that both came from the other guy.  He's not

7    charged with that.  He didn't identify any way he was hurt

8    by Mr. McCaughey, any specific place where the pain was.  He

9    said something along the lines of "It contributed to the

10   injuries of the day and I felt a lot of pain" or something

11   like that.  He didn't say where.  I don't believe he even

12   said where.  It was very, very vague.  But even if it's all

13   true, that can't rise to the level of serious physical

14   injury.

15           THE COURT:  Yes.  I don't think the Government is

16   alleging that your client caused serious bodily injury.  I

17   think the question is whether pushing -- kind of pinning

18   someone between a door frame and a solid plastic shield and

19   pushing not only with Mr. McCaughey's strength, but with the

20   weight of this crowd behind him, whether that could cause

21   serious bodily injury.

22           MR. URSO:  Well, that would require proof beyond a

23   reasonable doubt that Mr. McCaughey sort of knew that the

24   crowd was going to push and intended to join in.  And I

25   don't think there's any proof of that.

1          And I can't emphasize enough that -- we talked

2     about inferences.  Ms. Bond is right:  It's hard to get into

3     somebody's mind, their intent.

4          But one of the best ways to find out what

5     somebody's intent is is to look at their conduct.  And

6     Mr. McCaughey's conduct immediately after Officer Hodges

7     screamed for help says everything.  That is the stuff of

8     reasonable doubt, Judge.  You can infer -- it makes no sense

9     that he would be purposely injuring Hodges in any way, let

10    alone in a way that could cause serious bodily injury, and

11    then immediately turn around and be the only person who

12    could help Officer Hodges.

13         And he did.  He took multiple steps.  Immediately

14    he yelled:  Get back, let me back, let me back, let me back.

15    The crowded listened immediately behind him and gave him

16    room.  Officer Hodges was able to extricate himself.

17         And while we're there, I want to pull up that

18    video.  I'm going to pull up -- it's Defendant's Exhibit A.

19         (Whereupon, segments of Defendant McCaughey's

20    Exhibit A were published in open court.)

21         MR. URSO:  Judge, I also ask you while you're

22    watching these videos to pay attention to what I'm talking

23    about, but also I'm going to get into the demonstrative

24    shield in a little bit.  And I don't believe -- I believe

25    the shields that were in use on this day were much lighter

 1    and flimsier than this particular shield, this 13-pound

 2    shield.  I'll get into that later.  But if you can, just

 3    kind of ancillarily pay attention to how easily those things

 4    are wielded over people's heads with one hand, you know,

 5    things like that.

 6              (Whereupon, segments of Defendant McCaughey's

 7    Exhibit A were published in open court.)

 8              MR. URSO:  Before I get into more, pay attention

 9    also, Judge:  The entire -- at all times relevant, at all

10    times relevant, Mr. McCaughey's arms are as close to his

11    body as they could be, whether they're up like this, down

12    like this.

13              I'm going to show you another video shortly.  If

14    you're pushing somebody with a shield, you're going to push

15    with the shield.  His hands were like this.  And he was not

16    leaned forward.  He was not leaned where he can get leverage

17    with his legs.  He was standing up right like a sardine.

18              As Sergeant Mastony testified, anybody who was at

19    the front during these times had no freedom of movement,

20    couldn't do anything.

21              And that's -- there was one moment where they

22    showed Mr. McCaughey had a little space between his torso

23    and the other guy's torso, the bigger guy behind him with

24    the forearm on his back.  That guy was pushing on his back.

25    And Mr. McCaughey's hands were always still like this.

1          But I want to show you here, your Honor.

2               (Whereupon, segments of Defendant McCaughey's

3      Exhibit A were published in open court.)

4          MR. URSO:  Your Honor heard the "Let me back."

5      You don't need to hear that again.  Right?

6          THE COURT:  I beg your pardon?

7          MR. URSO:  You heard him say, "Let me back, let me

8      back."

9               (Whereupon, segments of Defendant McCaughey's

10     Exhibit A were published in open court.)

11         MR. URSO:  Watch the position of Mr. McCaughey's

12     shield at this point, your Honor.  And then you're going to

13     see him reach two hands over his shield to deploy for

14     Officer Hodges's -- Officer Hodges's -- his helmet face

15     shield because his gas mask had been taken off.

16         And again, the conduct is the best way to infer

17     what his intent was around that same timeframe.

18              (Whereupon, segments of Defendant McCaughey's

19     Exhibit A were published in open court.)

20         MR. URSO:  He just took his two hands off the

21     shield and deployed Officer Hodges's face shield.  We're at

22     about 44 seconds.

23         If you look at the shield, Mr. McCaughey's shield

24     never dropped.  It was still suspended in the air.  That's

25     how tightly packed even after the crowd backed up -- they

1    were still so tightly packed that his shield didn't drop to

2    the ground.

3         I'll try to go back again.  Just take a look at

4    it.

5         (Whereupon, segments of Defendant McCaughey's

6    Exhibit A were published in open court.)

7         MR. URSO:  There we go.  See how we're still up on

8    Mr. McCaughey's face?  He put his hands back.  This is just

9    indicative of the shield.  That's the pressure they were

10   under the whole time.  And that's consistent with

11   McCaughey's testimony, consistent with his arms and

12   consistent with his conduct in coming to Hodge's aid after

13   that he did not intend to injure -- to seriously physically

14   injure or injure Officer Hodges in any way.

15        And Officer Hodges talked about the shield causing

16   him pain and it being a force multiplier.  I think I agree

17   that a shield is a force multiplier.  But it's a force

18   multiplier when used as it's supposed to be used, either

19   defensively, hooked arm in arm like the officers talked

20   about, or -- by the way, the only offensive way officers are

21   trained to use that shield is -- and I believe Sergeant

22   Mastony and Officer Gonell testified to this -- is as a

23   crowd control measure, to move people back, to push them

24   back, shove them back.

25        And Officer Gonell confirmed on cross that that

1    was not something -- that's not some move that would cause

2    pain or injury, pushing somebody back, using it offensively

3    as it is designed to be used offensively.  So even using it

4    to push somebody is not designed to cause injury or pain.

5    And so that's not consistent with Officer Hodges's

6    testimony.

7                I'm going to show you Government's Exhibit 201.1.

8                (Whereupon, segments of Government's Exhibit

9    No. 201.1 were published in open court.)

10               MR. URSO:  I'll fast-forward to 2:22.

11               Watch here, your Honor.  You're going to see one

12   of the officers has a shield, the same size as the shields

13   that were used that day, same dimensions.  And this is the

14   police line trying to hold the crowd back.  And it looks

15   like this is at 2:43.  This is before Mr. McCaughey got to

16   the tunnel.  So it has nothing to do with that.

17               But this just shows an officer using her shield --

18   his or her; I think it's a woman -- using the shield,

19   pressing it up against the officer in front of her.  You'll

20   see her arms extended, as I indicated before, when you're

21   pushing; and, two, she's pressing against the back of her

22   fellow officer.  This is Officer Abdi's body-worn camera.

23   And even he put his hands on that shield at the same time to

24   add pressure.

25               And that just makes no sense, if there was a

1    concern that that pressing of a shield could cause any kind

2    of pain, that they would never do that to their fellow

3    officers.

4             (Whereupon, segments of Government's Exhibit

5    No. 201.1 were published in open court.)

6             MR. URSO:  You can see it on the top left at 2:25.

7    You can see a little better now.  Arms extended, the shield

8    pressed against another officer's back.  And you see Officer

9    Abdi has his hand on the edge of that shield.  He's adding

10   pressure himself.

11            And just going back to the force multiplier:  I

12   mean, it's physics.  It's common sense.  Pressure -- the

13   shield would actually alleviate pressure.  If your shoulder

14   was being jammed into somebody's sternum, it's going to hurt

15   a lot more, cause a lot more damage, than a shield that's

16   4 feet by 2 feet that's spreading out the force.

17            So technically, Officer Hodges is correct.  It's a

18   force multiplier, but not in the context of him being

19   supposedly injured as the shield was pressed against him.

20   And I don't doubt that he could have been injured when the

21   mob pushed and he got heave-hoed.  But just in the general

22   sense that he testified that being pressed with a shield

23   caused pain I just don't think is credible.

24            And again, I'm -- again, I don't think -- I'm not

25   saying Officer Hodges purposely testified inaccurately.  I

 1   think he's been on the circuit with Officer Gonell, the

 2   media circuit, the congressional circuit, since shortly

 3   after January 6th.  And I think, like Officer Gonell, he

 4   tends to exaggerate a little bit.  And I think it's

 5   unintentional.  I really do.

 6          THE COURT:  On that point, I mean, I guess they

 7   are not necessarily similarly situated to most officers who

 8   testify in criminal cases, where there's no personal

 9   interest in the case.

10          MR. URSO:  Right.

11          THE COURT:  How do you think that factors in here?

12          MR. URSO:  I think it definitely factors in.  And

13   I've been careful, and I don't want to besmirch any of these

14   officers.  But I think -- I don't know how much, but we know

15   Officer Hodges has been out and about, testifying and

16   interviewing everywhere he can.  And the comments he's made:

17   Again, they're not evidence, but I'm sure your Honor has

18   heard them.  I think he's a little more prone.  I think he

19   has a little more personal political interest at stake in

20   this than your average officer.

21          I don't want to speak outside the evidence because

22   I know it's a court trial, but I don't want to -- but --

23          THE COURT:  I must say, I don't watch the news

24   much.  So actually I was not aware when Ms. Cobb asked

25   Sergeant Gonell about those things.  That was all news to

 1    me.

 2              MR. URSO:  So where are we here?

 3              I want to finish this video, because it's very

 4    clear that these officers -- this officer is pushing with

 5    deliberate force, extending the arms against one of the

 6    officers, the shield.

 7              (Whereupon, segments of Government's Exhibit

 8    No. 201.1 were published in open court.)

 9              MR. URSO:  It makes perfect sense to me.  That's

10    what you would do to try to keep the line.  But you wouldn't

11    do it if it was likely to cause pain or injury.  That

12    doesn't make sense.

13              Again, just to finish up on Officer Hodges:  I

14    think it's entirely understandable that he would be

15    unintentionally exaggerating a little bit given what he's

16    been through to a certain extent.  But his testimony should

17    not be given extra weight or undue weight simply because he

18    was a victim, especially when it's belied by other

19    testimony, belied by other testimony he's made and other

20    competent evidence in the case.

21              I think Sergeant Mastony -- the difference is a

22    perfect example.  Sergeant Mastony directly contradicted

23    what Officer Hodges said about the amount of force that was

24    used, the type of force that was used on January 6th.

25    Mastony was very clear.  He said he's been through this kind

1    of force before.  The difference was it was just more

2    people.  He was very clear on that.

3         And we know Officer Hodges acknowledged he had

4    been questioned I believe two other times that I was aware

5    of under oath about -- oh, let me backtrack.

6         Another factor, your Honor, I think he

7    acknowledged that he put himself in that position knowingly,

8    that he was basically in the broken window door pane where

9    the glass was broken.  He put himself there because he

10   thought he'd have more leverage.  I'm not blaming him, but

11   it matters how we got there.  We talked about context and

12   everything else.  He put himself in that position.

13        And I think he was -- I think his unusual position

14   was exacerbated by the guy next to Mr. McCaughey -- I forget

15   his name -- who was pulling on his mask and his baton.  I

16   think he probably pulled his arms further into that little

17   windowpane area.  But neither of those things had anything

18   to do with Mr. McCaughey.

19        And I think Mr. McCaughey even recognized that

20   earlier in -- I forget the Government's exhibit, the fuller

21   exhibit showing this -- Mr. McCaughey could be heard saying,

22   "Come on, dude.  You don't want to get squished."  I think

23   that was an acknowledgement by Mr. McCaughey:  You're in a

24   bad position.  You're going to be squished here.  You're

25   stuck in this stupid door here.  But he put himself there.

1          And I think he got in a worse position if you

2     watch that guy pull on his arm.  He got -- ultimately, when

3     that guy was assaulting or grabbing him -- and you could see

4     Officer Hodges had at least one hand free.  I believe he had

5     a baton in the other, because that's what Mr. McCaughey was

6     talking about.

7          Let me digress:  Mr. McCaughey was heard to say,

8     "Let go of the stick."  I looked at that.  He believes he

9     was talking to the other protester.

10          THE COURT:  And the officer.  That's what he said.

11          MR. URSO:  And the officer.  Yeah.

12          And I could see either way he was very clear.  All

13     his intention was was he wanted that to stop.  And he said

14     that.  And that's entirely consistent with what he did in

15     the ensuing seconds.  It's all consistent.

16          And by the way, when he was leaning down saying

17     that, again, his shield -- I think -- I don't even think he

18     had his hand on his shield.  It was just in place again.

19     That's just the situation there were in.

20          And again, Sergeant Mastony confirmed.  He said:

21     Anybody at the front of that line during those rushes had no

22     control over their movements.  So to say that somehow

23     there's evidence beyond a reasonable doubt that

24     Mr. McCaughey was pressing -- purposely pressing Officer

25     Hodges at all, I think is -- it's just -- it's -- it's not

1    supported by the evidence.

2         Again, everything points the other way.  His arms

3    were collapsed the entire time.  When he removed his hands

4    from his shield, it was still suspended.  And he said:  I

5    was just trying to maintain my balance during that

6    timeframe.

7         But Officer Hodges testified two other times under

8    oath.  And both times he said the mob, mob pushing him, the

9    heave-ho mob pushing him, was the reason he was pinned in

10   the doorway.

11        Now he comes here and he adds:  Well,

12   Mr. McCaughey was pushing, too.  How he knows that, I have

13   no idea.  How could he know who's pushing, who's not in that

14   situation?

15        But he didn't mention Mr. McCaughey those two

16   other occasions.  And we know -- your Honor will probably

17   recall the very first recorded account probably of Officer

18   Hodges was an interview he did about a week later with WUSA.

19   And in that interview, he stated unequivocally the reason he

20   screamed out for help was because he was defenseless and he

21   was trying to alert his officers that he was in need of

22   help.

23        He said nothing, not a thing in that interview,

24   about being in pain at that time or being injured.

25        In fact, I mean, I believe those -- those

1     statements were the key reason the Court reopened

2     Mr. McCaughey's bond hearing and he was able to get released

3     on conditions.  And so it's that interview, those

4     statements.

5               THE COURT:  There's no doubt he was, in fact,

6     injured.  Right?

7               MR. URSO:  I actually don't think that's been

8     proven.  But -- not injured by that incident.  And because

9     he didn't specify.  I mean, if you were injured, you'd say,

10    "I hurt my back.  I had a bruise on my arm.  I this."

11              He said he felt great pain and he said -- I think

12    he said it contributed to the overall injuries of the day.

13    I mean, that couldn't be more nonspecific.

14              So I think if you're injured, you say it.  I think

15    you say it when you're first interviewed about it.  I think

16    you say it consistently.  I think you say it under oath in

17    court, how you're injured, why you're injured.  His injuries

18    were very specific:  his lip and his head.

19              Neither one of those had anything to do with

20    Mr. McCaughey.  Admittedly, I believe.

21              Again, even -- and even if it did, Judge, even if

22    you concede that he was injured, which is certainly

23    reasonable, reasonable to believe, I mean, he was in that

24    weird position and the crowd was pushing and he screamed.

25    So he must -- he could very well have been feeling some

1    pain.  But nothing about that could rise to the level of

2    proving beyond a reasonable doubt that Mr. McCaughey himself

3    intended -- or used the shield in a way likely for him to

4    cause serious bodily injury or death.

5          It's the mob.  It was -- it -- even the mob, that

6    was not likely to -- even that whole incident, there's

7    nothing in that incident that's likely to cause the kind of

8    serious physical injury or death that I think is

9    contemplated.  I mean, it's a serious, serious enhancement.

10   Serious bodily injury and death.  They go hand in hand.  So

11   it's got to be something that could be causing death or very

12   serious injury.

13         So I don't think anything about that episode could

14   be construed as him being in danger of serious bodily injury

15   or death.  I think he got a little dramatic and said

16   something about he thought he might pass out or he didn't

17   want to be a liability.  But no evidence that was happening.

18   And I don't even know if passing out would be serious

19   physical injury.  People pass out all time.  People pass out

20   from low blood sugar, you know?

21         But again, just going back to just Mr. McCaughey's

22   actions, I just -- I think there's mounds and mounds of

23   reasonable doubt about whether he himself used the shield.

24   He did exactly what Ms. Bond conceded would not be [sic].

25   He held the shield consistently in front of him.  Like I

1    said, I think he did more with the shield with Officer

2    Foulds trying to open the door.  He just stood with the

3    shield in front of him and never extended his arms and --

4    and had no room for leverage to move his body.  So how was

5    he pushing him?  If he's standing straight up with his arms

6    like this, how could he be pushing him?

7              All he could possibly, theoretically, be doing is

8    leaning forward because you can see from the video there's

9    no room for him to bend down and get leverage with his legs.

10             And The Who concert came up a couple times.

11   Again, that's when 11 people were suffocated.  The crowd was

12   the weapon, not any shields or anything like that.  It was

13   the crowd.  It's the crowd that causes these problems.

14             Obviously, we have the heave-ho, the massive

15   crowd, right, you know, clearly moving as one right before

16   Officer Hodges screamed for help.  So obviously, that was

17   the direct sort of cause of his predicament.

18             Let me just -- I've gone over this stuff.  Let me

19   just make sure I don't repeat myself.

20             Oh, before this -- right before he got in that

21   predicament, before he had to scream, Mr. McCaughey said to

22   him, "Listen, do not use that baton on me.  I'm not hurting

23   you."

24             Now, if Mr. McCaughey wanted not to get hit with

25   the baton, would he -- and -- would he have, A,

1        intentionally been putting pressure on him and, B, lying

2        about it to his face?  It doesn't make sense.

3               And Officer Hodges, if he was putting pressure on

4        him and causing him pain, you'd expect him to say:  Yes, you

5        are.  Get back.  He didn't say anything.

6               And just to -- I think your Honor knows it, but

7        just again, the efforts to help Officer Hodges.  It doesn't

8        end with the move back.  It didn't end with moving the face

9        shield.  He reached out, tapped on several officers or at

10       least one officer's shoulder twice, continuously called out,

11       tried to alert the fellow officers.

12              Because I think Ms. Bond mentioned Sergeant

13       Mastony testified in there he didn't hear the scream.  He

14       only heard it on his body-worn camera because you couldn't

15       hear anything in there.  Clearly, none of those officers

16       knew what was going on with Officer Hodges.  The only person

17       who knew about it and was in a position to help was

18       Mr. McCaughey; and he did, instantly.  And he wouldn't stop

19       until he knew the officers were aware of it.  He just -- he

20       was singularly focused until somebody said:  Yes.  He nodded

21       yes.

22              Now, of course he didn't leave right then.  And

23       that's stupid and it was wrong.  But that doesn't make --

24       that doesn't say that he then -- that he's now a violent

25       felon.  I mean, he made a stupid decision.  He never should

1   have been in there.  But that doesn't make him a violent,

2   assaultive felon.

3           And you recall when -- I mean, I -- I keep saying

4   it makes no sense that Mr. McCaughey would help so quickly

5   after trying to hurt.

6           When I asked Officer Hodges about that, What's

7   your explanation?  What would you say?  How does that make

8   sense?

9           And he said something along the lines of, well he

10  just wanted one more officer -- one less officer in his way

11  so that he can get to the Capitol or get to his target.

12          I mean, that's -- again, that sort of shows his

13  bias, his tendency to exaggerate, because it makes -- that

14  makes no sense.  I mean, who -- even the most ardent --

15  maybe a military commander trying to get in, leading a

16  battalion might think:  Yeah.  Let's get rid of one guy.

17          But it's absurd to suggest that that's the reason

18  Mr. McCaughey helped him.  But that's the sort of

19  explanation you have to try to come up with?  Because it

20  doesn't make sense unless Mr. McCaughey was not trying to

21  hurt Officer Hodges.

22          I'm not going through the videos again.  There was

23  that one video where the Government found a space between

24  the torso.  I mentioned this earlier.  There was a guy

25  behind Mr. McCaughey with his forearm and his upper back and

1   the guy was towering over Mr. McCaughey, who is not a small

2   guy.  He was leaning forward.  That's -- and that's

3   obviously the only time the Government could find presumably

4   something where they could say he could have backed up.

5          But if -- I would submit that that just shows if

6   Mr. McCaughey was actually intending to push on Officer

7   Hodges, he had some room.  He had about six inches behind

8   him to do that.  He could have extended his arms.  And his

9   body would have gone back, but he would have more leverage

10  to push on him.

11         But at no time in this whole time did

12  Mr. McCaughey's arms leave his torso.  They were recoiled

13  back, tucked in, not in a position where you would expect to

14  be pushing on somebody.

15         Now, I want to touch on the shield, Government's

16  Exhibit 801.

17         When you look at the videos -- I'm going to show a

18  couple of them with the relative ease that -- by which these

19  shields were passed around over the heads, sometimes with

20  one hand, sometimes holding just the very back portion of

21  it.  And they're holding it in the air.  And if you feel

22  that thing, there's no way that they're the same weight.

23  It's not plausible.

24         Now, it's kind of unconscionable that law

25  enforcement would charge these people and they knew they

1    were going to charge them right away with assault with a

2    dangerous and deadly weapon with the shield, why they didn't

3    procure one of these shields before they got destroyed.

4            I think what makes more sense, your Honor, is

5    Capitol Police after this event decided they needed to

6    upgrade their shield and get a little beefier version, and

7    that's why they got these new shields.

8            We don't know because the Government didn't put

9    anybody on to explain it.  All they did was bring this thing

10   in and have a couple of MPD officers who didn't even get

11   shields.  Sergeant Mastony said, "We didn't even get issued

12   shields."  A couple of those guys.  "Does that look and feel

13   the same?  Yeah.  That looks and feels similar."  That's all

14   we know about the comparison between this thing and what was

15   used on that day.

16           I'm going to show a couple of videos.  I've tried

17   lifting it up.  To me, there's no chance it's plausible that

18   that's the same shield, the 13-pound version that we're

19   hearing about here.

20           Again, I mean, if the Government had brought in

21   somebody who said, Yes, I got rid of the old shields and

22   procured this one, this is the model, this is what the

23   inspections were, okay.  But they didn't do that.  And they

24   should not get the benefit of that of evidence.  I mean,

25   they're charging these people with serious, serious, serious

1       violent felonies based on the use of that shield.  It's

2       really unbelievable -- and it didn't really dawn on me until

3       later -- unbelievable that they don't have one of those.

4       And they want -- they want you to find beyond a reasonable

5       doubt and based on this, the weight of this demonstrative

6       shield, that these guys are guilty?

7               It's --

8               THE COURT:  Didn't we have testimony from one of

9       the Capitol Police officers as well that that's the same?

10              MR. URSO:  Just -- they -- nobody said it's the

11      same.  They just said it feels the same, looks the same.  I

12      don't believe anybody said:  Yes.  That's the same.

13              THE COURT:  Is Captain Ortega with the Capitol

14      Police?  I don't remember.  But I thought we had a list of

15      Capitol Police officers.

16              Yes.  Captain Ortega.  I mean, the shield was

17      introduced through him.  That feels pretty credible to me.

18              MR. URSO:  What did he say?

19              THE COURT:  Captain Ortega was the one who

20      actually the Government introduced 801 through.  He's the

21      Capitol Police officer.

22              MR. URSO:  Yeah, but he didn't say:  Yes, I was

23      responsible for procuring these or I'm aware that these are

24      the exact same specs, same size.  I don't believe he said

25      that.

1          THE COURT:  Well, I think he -- you're right.  He

2     didn't say he was responsible for it.  But I thought he said

3     that they were substantially similar.

4          MR. URSO:  I'm just going to show briefly

5     Defendant's Exhibit D.

6          THE COURT:  Mr. Urso, if you could find a pausing

7     place in the next couple minutes.

8          MR. URSO:  Sure.

9          THE COURT:  I have a swearing-in for one of the

10    magistrate judges.

11         MR. URSO:  There is Exhibit D.  This is where you

12    can see people jockeying over -- one of these shields

13    over -- over -- I think it's over Mr. McCaughey's head,

14    actually.

15         (Whereupon, segments of Defendant McCaughey's

16    Exhibit D were published in open court.)

17         MR. URSO:  You see how it's bending.  You see how

18    it's flopping.  I don't think Government's Exhibit 801 would

19    bend or flop like that from my handling of that.  Your Honor

20    can check it out.

21         THE COURT:  Yes.  I'll have to do some practice

22    with it later.

23         MR. URSO:  And then I'm going to show Exhibit C.

24         (Whereupon, segments of Defendant McCaughey's

25    Exhibit C were published in open court.)

1          MR. URSO:  Look how easily these things are going

2     over their heads.  Again, if you -- if you feel it yourself,

3     your Honor, I think you'll see what I'm talking about.  This

4     guy's holding it, basically, near the end.

5          This also is going to show also, I think, how it

6     sort of goes to Mr. McCaughey's intent, too, how he ended up

7     with the shield.  I mean, people were passing shields and

8     once or twice he came -- it came to him and he passed it

9     forward.  Then he gets one and he's trying to -- holding it

10     like this, and ultimately nobody took it.  So he just kind

11     of went down with it and just sort of incidentally ended up

12     with it.  He wasn't looking for a shield to hurt somebody

13     with it.

14          THE COURT:  Why don't we stop here.  I'll ask the

15     parties to return at, let's say, 1:35.

16          Thank you.

17          Oh, could I ask the Government in particular, I'd

18     love kind of a list of what you think the best exhibit is

19     for each assault.  I assume it's the 900 range.

20          Obviously, if defense counsel want to give me a

21     list also, it would be good.

22          (Thereupon, a luncheon recess was taken, after

23     which the following proceedings were had:)

24          THE COURT:  Mr. Urso.

25          I apologize for the delay.

Closing Arguments by Mr. Urso

1          MR. URSO:  Thank you, Judge.

2          Your Honor, the last point on the shields, I just

3    would point out that in this way, the shield's presence or

4    absence doesn't enhance the dangerousness or deadliness.

5    It's the crowd.  The crowd is the danger, irrespective of

6    whether there were shields or not.

7          And with respect to the *Arrington* analogy Ms. Cobb

8    was talking about -- I mean -- I'm sorry -- Ms. Bond was

9    talking about *Arrington* and the context of the tunnel and

10   ambulances.  Arrington, as she indicated, was a person

11   having a car, which is not inherently dangerous unless it

12   was used in that manner.  It was used where there was an

13   officer hanging out of the vehicle.

14         That's analogous here.  The car is the shield,

15   which is not inherently dangerous, but capable.  And the

16   analogy would be using the shield like Sergeant Mastony did,

17   picking it up, using the edge.  That would be using a

18   noninherently dangerous thing in a deadly and dangerous

19   manner, just like driving a noninherently dangerous car with

20   a person hanging out of the side would then be a deadly and

21   dangerous manner.  Nothing about the context or ambulances.

22   I think your Honor kind of picked up on that.  I don't think

23   that has anything to do with it.  It's how you use the

24   weapon.

25         And that would be analogous -- the -- the Mastony

1     usage would be analogous to the *Arrington* usage of the

2     vehicle.

3              Just wrapping up on the 111(b) of Officer Hodges,

4     for all the reasons I pointed out, I think there's plenty of

5     reasonable doubt again, your Honor.  His conduct alone

6     immediately after as it bears on his intent immediately

7     before I think in and of itself is enough reasonable doubt.

8     But there's real questions looking at all the -- based on

9     all the points I was pointing out on the evidence we have

10    about whether Mr. McCaughey intentionally exerted force on

11    Officer Hodges at all, let alone in a manner that could

12    cause serious physical injury or death.

13             So for those reasons, I think he should be

14    acquitted of that most serious charge, your Honor, 111(b).

15             As to the 111(a), with Officer Hodges, for mostly

16    the same reasons and basically the same evidence, we submit

17    the Government did not prove beyond a reasonable doubt the

18    following two essential elements of the 111(a) as to Officer

19    Hodges:  one, that he intended to assault or interfere,

20    impede with Officer Hodges; and, two, that he forcibly did

21    so, that he purposely exerted force.

22             And again, it's the same argument.  I mean, to be

23    sure, Mr. McCaughey intentionally put himself in that

24    tunnel.  Beyond stupid.  Dead wrong.  But the evidence was

25    clear that once he got near the front, he was consistently

Closing Arguments by Mr. Urso

1    being propelled forward by the crowd.

2             Again, I keep going back to what Sergeant Mastony

3    said.  But I think it's borne out in the videos of

4    Mr. McCaughey.  Once you got to that front and when the

5    crowd was packed, you didn't control your movement.  You

6    couldn't -- you were just there.  You were getting moved

7    with the ebb and the flow.

8             And so I don't think there's sufficient evidence

9    to prove beyond a reasonable doubt for all the other reasons

10   I mentioned that Mr. McCaughey was intending to interfere,

11   impede with Officer Hodges.  And again, I think it's belied

12   by his conduct after the scream.

13            So I would submit that the Government didn't meet

14   its burden even on the 111(a) felony, Judge.

15            Misdemeanor's a different story.

16            As to Officer Foulds, I'll just sort of address

17   (a) and (b) at the same time.  111(a) and 111(b) you recall,

18   your Honor, on cross-examination -- obviously you noted it.

19   He testified he wasn't injured.

20            But as we went through the two videos we had at

21   the time, the two ground-level opposing views, his body-worn

22   camera and a citizen camera, he kept insisting he was shoved

23   three separate times.  We kept -- spent a lot of time

24   beating that horse, as you recall.

25            And later on -- and I think I would submit those

 1    two angles are just not conclusive.  But later on, the

 2    Government submitted Exhibit 961, which is a montage of that

 3    encounter with a third angle from behind the crowd, but a

 4    higher angle.  And that's what I just wanted to go through.

 5    This is Government's 961.

 6          And Ms. Bond had counted a couple of different

 7    interactions here.  There was some movement with

 8    Mr. McCaughey at the beginning of this video.  But it wasn't

 9    towards Officer Foulds.  Just pay attention.  He's charged

10    with -- Officer Foulds is the guy with the green mask.  So

11    I'm going to try to go through it a little slowly so you can

12    see where that encounter begins.

13          At this point, Officer Foulds is -- you can see in

14    the top right corner, he's two officers deep.  He's not

15    engaged with Mr. McCaughey at this point.

16          By the way, Judge, while we're at this, we're

17    going to get to the charge of whether he did commit a

18    disorderly conduct in a Capitol building.  I think this is

19    probably the best angle.  I'm going to just jump ahead to

20    that, since we're watching that.

21          These doors -- we know these doors open outward.

22    These are the entryway doors to the Capitol Building.  These

23    are the doors that lock.  These are the gold doors with the

24    glass that had been broken previously.  And they open

25    outward.  So presumably, the building begins inside the

1    doorjamb, where the door is installed.

2            Now --

3            THE COURT:  Isn't it "building or grounds"?

4            MR. URSO:  Well, there's one count that I believe

5    is just building.  Let's see.  If I'm wrong, I'm wasting my

6    time.  But I'm pretty sure -- if I could just have a moment,

7    your Honor.

8            THE COURT:  5104?

9            MS. PASCHALL:  I believe it's Count 52, your

10   Honor, (e)(2)(D).

11           MR. URSO:  Yeah.  That's what I just wanted the

12   Court to pay attention to, so we don't have to rewatch the

13   video again.  In here, it doesn't appear that -- so the

14   doors -- he's always within the area of the door, the depth

15   of the doors that are swung open outward.

16           THE COURT:  Okay.

17           MR. URSO:  I don't think he ever -- I think the

18   only time I've seen on video where any part of his body has

19   broken the plane of the building is when he reached across

20   after he was helping Officer Hodges, when he reached across

21   the door plane to tap the officers on the shoulder.  But at

22   that point, he wasn't committing any disorderly conduct; he

23   was trying to help.

24           So I'm going to play this.  This is the encounter

25   with Officer Foulds.  He's not there yet.  He's still too

1    deep on the right corner.  Mr. McCaughey bends down, picks

2    something up or moves it, moving a -- getting a shield out

3    of the way.  I'm going to just pay attention -- ask you to

4    pay attention to the left side of the video, your Honor.

5              This is Officer Foulds.  That's -- when he first

6    got to the front, the first thing he did was reach for

7    Mr. McCaughey's shield and missed it.

8              (Whereupon, segments of Government's Exhibit No.

9    961 were published in open court.)

10             MR. URSO:  Mr. McCaughey puts the shield up in

11   anticipation of a baton strike.  And there's a strike.  I

12   can't tell if it connected, but Officer Foulds swung the

13   baton at Mr. McCaughey.  Still no shoving of Officer Foulds,

14   clearly.

15             Now, this is when Officer Foulds first tries to

16   close the door.  Mr. McCaughey hooks the inside of the

17   windowpane in the door with the shield to prevent the door

18   from being closed, clearly impeding him in his duties, but

19   not shoving him.  He just kept the door open with his body

20   weight.

21             And there, you see Officer Foulds throw another

22   baton strike from a distance.  Now Officer Foulds again is

23   reaching for the door, and Mr. McCaughey again puts the

24   shield on the door to stop it from being closed.  We got

25   that one quick obstruction from a flag, but you can look

1    from the other angles even on the top right there's no

2    contact there with Officer Foulds.

3            You see Officer Foulds now move the shield out of

4    the way and swing the baton again.

5            Mr. McCaughey brings the shield back up.  That's

6    the extent of their encounter.  On the top right, there's no

7    contact.  And now you see Mr. McCaughey on the left side.

8    This is when he's about to get sprayed.  He's just standing

9    there.  He's still, by the way, not inside the plane of the

10   building.

11           Now you just saw him duck.  He got sprayed with

12   something.  He hightails it out of there.

13           So I would submit, your Honor, from that angle,

14   which we didn't have the benefit of at the time Officer

15   Foulds was testifying, it's clear that, number one, he

16   didn't shove Officer Foulds at all.  Officer Foulds

17   testified that he shoved him three times.

18           And again, a lot happened that day with Officer

19   Foulds.  So I don't -- I think he believed -- he probably

20   just was interpreting the two other angles that he had, was

21   interpreting the video as opposed to remember specifically.

22   I bet if he had seen this angle he would have acknowledged

23   that there was no shoves.

24           So -- and it would explain why he wasn't hurt.  So

25   I think that video clearly shows that there was no -- not

1   only no shoving, but I don't believe there was any physical

2   contact.

3           So for purposes of -- well, I still got to go to

4   111(b).  As I indicated, I actually think there was more

5   usage of the shield by Mr. McCaughey in this encounter than

6   there was with Officer Hodges.  But certainly he did not --

7   he did not in any way use the shield in an encounter either

8   in a deadly or dangerous manner.

9           He was using it as an implement to hold the door

10  open and to protect himself.

11          So for purposes of (b) and (a), again, I don't

12  think there's physical contact proven with Officer Foulds.

13  That's one of the necessary elements for the felony portion

14  of 111(a).  And obviously, for 111(b), I don't believe

15  there's any evidence, let alone proof beyond a reasonable

16  doubt, that Mr. McCaughey used that shield in any kind of

17  deadly or dangerous manner in that encounter.

18          And another thing that could have affected Officer

19  Foulds was he did -- in his interpretation of the videos, he

20  did volunteer on cross-examination his belief that, had he

21  attempted baton strikes and somebody was not being

22  assaultive, then he might have violated use-of-force policy.

23  So maybe that subliminally affected how he interpreted those

24  videos.  I think it probably has to do more with the angles

25  of the videos.  They just weren't clear.  Obviously, he went

1    through a hell of a lot that day.  So...

2          One other point the Government made in that video

3    was before Mr. McCaughey got sprayed -- or maybe even before

4    it -- there was suggesting he had room to back out, which is

5    absolutely true.  He could have left.  And he should have

6    left.  He shouldn't even have been in there, clearly.  But

7    by the same token, he had plenty of room to advance forward

8    if he was intending to assault any police officers or

9    physically engage police officers.  He had plenty of room to

10   step forward into the building and engage them.  He never

11   did.  He just stood his ground at the door, holding the door

12   open.

13         And so again, just because he was stupid to be

14   there and stupid to not leave does not make him a violent

15   felon.

16         And interestingly, Judge, the first sign of

17   distress, he got hit with some spray and he left.  And he

18   never came back.  There's another video shortly after that.

19   I think your Honor saw it before.  But it's -- this is

20   Defendant's Exhibit F, where he's -- shortly -- within

21   seconds of this encounter, you see Mr. McCaughey coming out,

22   squinting his eyes.

23         (Whereupon, segments of Government's Exhibit No.

24   961 were published in open court.)

25         MR. URSO:  And at the first sign of distress, he

1   left the tunnel, never to come back.  As he testified, he

2   went down to the pool to rinse out his eyes.  That was his

3   prearranged meet spot with his dad.  His dad's phone wasn't

4   getting service.  So he hung around there for a while,

5   hoping his dad would show up.

6           Then the female journalist asked -- wanted to go

7   up to the terrace but was nervous, and she asked him to

8   accompany her, and he did.  And that's verified because we

9   see the video when they're coming back from that area about

10  4:15.  I'll get the exhibit.  It's a Government's exhibit

11  where you can see Mr. McCaughey walking with the female,

12  carrying her equipment for her, doing another good deed for

13  the day, which I think is a little bit indicative of his

14  general character.  He did some stupid things that day, but

15  I don't think -- I think what he did in helping Officer

16  Hodges and what he did with this woman I think is more

17  indicative of his character.

18          And it corroborates his testimony, too.  He

19  even -- there was even mention of that Ukranian journalist

20  in the Signal messages, too, I believe.  It all sort of

21  corroborates what his testimony was.  Anything that could

22  corroborate testimony is beneficial when you're determining

23  his credibility overall.

24          So now, your Honor, I'm going to move to Count 4,

25  the aiding and abetting count.  I don't have that video, but

Closing Arguments by Mr. Urso

1    saw it this morning with Ms. Bond, where he and Mr. Stevens

2    come into the tunnel for the first time.  It was about 2:49,

3    2:50.  Mr. McCaughey is seen -- it's not fully packed, but

4    there's enough people in there.  Mr. McCaughey is seen at

5    the back of the line.  And maybe the Government can play it

6    for you after.

7            But again, it seems clear this is not a situation

8    where Mr. McCaughey knew what was going to be at the front

9    of the line.  That's the first time he had been in that

10   area.  Then he got -- just jumping ahead, he got pushed

11   back.  He didn't -- and then within a few minutes, he was

12   back in the tunnel.  That's when he made his way to the

13   front and he had these encounters with officers.

14           But at the time of this aiding and abetting

15   incident at 2:49, 2:50, Mr. McCaughey had not been anywhere

16   near that tunnel, close to that tunnel.  So he didn't know

17   what was going up at the doors.  He didn't -- he didn't know

18   that it was hand to hand.

19           He testified when he was pushing, he certainly

20   knew he was pushing and helping somebody push for about five

21   or six seconds.  But he testified that he was hoping they

22   would -- he thought he was helping them force the door open.

23   Now, if the door was locked and he was helping the crowd

24   push to try to open the door, that wouldn't involve physical

25   contact with police.

1          And there's just no indication that he could see.

2     He didn't know what was going on down there.  It's not like

3     some other people that were in and out, in and out.

4     Ms. Bond said he was in and out.  That's not the case.  He

5     was in at 2:49, 2:50.

6          That's the aiding and abetting video.  He got

7     pushed back and milled around.  And he came back at, like,

8     17:59 [sic] or 3:00 or thereabouts.  That's when he got in

9     and made his way to the front, ended up with a shield in his

10    hand and the rest happened with the officers.

11         But he wasn't in and out, in and out.  At the time

12    of the aiding and abetting, there was no way.  I think we

13    heard testimony there's an uphill ramp, so it would be hard

14    to see what was going on.

15         THE COURT:  Mr. Urso, I can give you about five

16    more minutes and then I need to hear from your colleagues.

17         MR. URSO:  Okay.  I'll skip civil disorder.

18         With respect to Count 37, your Honor, I think the

19    felony, the dangerous or deadly weapon counts, should fail

20    for the same reasons I argued previously.  And the same

21    thing with Count 45.

22         Although I do also -- so I agree it should fail on

23    that element.  But I think the count surely should fail -- I

24    don't know that there's proof beyond a reasonable doubt that

25    he engaged in acts of physical violence against a person or

1    property.  As indicated, he was pushed -- he was

2    involuntarily moved during the Hodges situation.  And with

3    Foulds, he was just using the shield to open the door.  He

4    didn't hurt the door and he didn't hit or hurt Officer

5    Foulds.  So I don't think he had that element, either,

6    proven.

7              Exhibit 52 [sic] I just addressed.  I don't think

8    he was in the building ever.  If he went in -- if he was, he

9    wasn't committing disorderly conduct at the time.

10             Let me just conclude, your Honor.  The same

11   argument goes for Count 53.

12             Just in conclusion, your Honor, obviously, most

13   importantly are the 111(b) counts.  I'm not going to

14   reiterate that again.  But I think there is plenty, plenty

15   of reasonable doubt in the evidence that Mr. McCaughey

16   intended to cause or use the shield in a way to cause

17   serious physical injury or death or that he used it at all

18   with Hodges, and not with Foulds.  It's -- I -- I urge the

19   Court to give him the benefit of that reasonable doubt on

20   those counts.

21             The other counts, I do think there's some room for

22   reasonable doubt.  But that's obviously up to the Court.

23   But I do think if he didn't intentionally do anything to

24   Officer Hodges, then he shouldn't be convicted of 111(a).

25   And the same thing with Officer Foulds if there is no

1    physical contact, which I believe there is [sic].

2              For those reasons, your Honor, I urge the Court to

3    really give due consideration to the evidence and the

4    questions and the reasonable doubt.

5              Thank you, your Honor.

6              THE COURT:  Thank you, Mr. Urso.

7              Ms. Cobb.

8              MS. COBB:  Thank you, your Honor.

9              Your Honor, Mr. Stevens obviously has exercised

10   his right to trial.  He exercised his right to remain

11   silent.  We're not here to tell a story; we're here to hold

12   the Government to their burden.  And it is our position that

13   there are numerous elements of the counts charged that the

14   Government hasn't proven beyond a reasonable doubt.  And I'm

15   just going to go through them.

16             Please stop me -- I don't want to be redundant

17   with Mr. Urso -- if you have any questions or want to direct

18   me.  But I'm going to start just with the deadly or

19   dangerous weapon for Mr. Stevens.  That's Count 21.  And

20   then there's also Counts 36 and 44, which are the

21   misdemeanors that were sort of enhanced up to felonies based

22   on the deadly or dangerous weapon.

23             Your Honor, it's our position, of course, that the

24   Government hasn't proven that Mr. Stevens used the shield in

25   a manner that could cause death or serious bodily injury.

1    From the Government's closing, it almost seems like their

2    position is that they put forth these officers who testified

3    about how scary and how traumatic the tunnel was.  And

4    Mr. Stevens was in the tunnel and he had a shield; and

5    therefore, he used it as a dangerous weapon.

6         And I -- I would urge you as the trier of fact

7    that it is your job to sort of tease out and look at exactly

8    how Mr. Stevens did use the shield.

9         What the evidence shows in the video and in --

10   also in the testimony of Sergeant Gonell is that Mr. Stevens

11   used the shield to block strikes; he used the shield to

12   block OC spray; and he used the shield to push forward in an

13   attempt to move the person in front of him.

14        Sergeant Gonell testified that Mr. Stevens's use

15   of the shield with the one point made him unconformable

16   because his head was tilted to the side.  I'd submit, your

17   Honor, that being prevented from moving the way you want to

18   move is not the same as having a weapon used against you in

19   a way that could cause serious bodily injury or death.

20        And so I know Officer Gonell also at the end of

21   the video, there's sort of a bop on Officer Gonell's helmet.

22   I don't think he even testified that that caused him any

23   injury or pain.  I think the testimony that I recall was

24   based on him being again in a position that he did not want

25   to be in and having his head tilted to the side where he

Closing Arguments by Ms. Cobb

1    could not straighten his head and then his helmet is -- sort

2    of becomes askew.

3           THE COURT:  So this would -- are you basically

4    conceding the 111 and saying there's no deadly weapon?

5           MR. URSO:  I'm not in a position to make any

6    admissions at this point.  But the argument that I'm making

7    is against the element of the deadly or dangerous weapon.

8           THE COURT:  Okay.

9           MS. COBB:  Yes.  I think you're correct.

10          THE COURT:  Is Sergeant Gonell's credibility

11   really relevant here?  I mean, you raised some interesting

12   points about -- in cross-examination about Sergeant Gonell's

13   testimony versus that of your typical police officer.

14          MS. COBB:  I did, your Honor.  And I think that it

15   was pretty clear that he is different from a typical police

16   officer in a lot of ways, the first way just being he's

17   never actually arrested anyone.

18          And then besides that, being the financial

19   component.  I don't want to say the -- I don't want to use

20   the word "fame."  I don't know how to say the fact that he's

21   done many, many, many interviews.  I think -- so again, I

22   don't -- I think "fame" is the wrong word, but I can't think

23   of exactly how to say it.  But he has been in the media

24   pretty much since day one.  He also again has the financial

25   component.

1          And I would need to read his testimony to give you

2     specifics.  But I do think, based on the answers that he

3     gave to many of my cross-examination questions that were

4     always relating back to what he did right and what the

5     Defendants did wrong, I'd submit that there is at least the

6     possibility that he was exaggerating.

7          THE COURT:  Does that --

8          MS. COBB:  I think it would matter maybe only to

9     the extent that he was trying to talk about the pain that he

10    went through.  And that's why I think I would need to read

11    the transcript to really recall exactly what pain he

12    testified about.

13         My recollection again was that he testified that

14    his head was sort of held in a position to the side where he

15    felt like he couldn't move the way he wanted to move.  And

16    so taking that as absolutely true, I still -- our position

17    is that that's not using a shield as a deadly and dangerous

18    weapon.

19         THE COURT:  Right.

20         MS. COBB:  I think I have notes from his redirect,

21    you know.  I didn't write down everything he said.  But in

22    his redirect, I have a note here that says:  I'm here today

23    because he -- and by "he," he's talking about Mr. Stevens --

24    impeded me, blocked me and prevented me from rendering aid.

25         So our position is that that is not using a shield

1    in a way that could cause serious bodily injury or death;

2    it's using a shield in a way that is frustrating and

3    certainly bothered Sergeant Gonell.

4            But again, I think you see as an example -- I'm

5    going to keep calling it the bop, this bop on Sergeant

6    Gonell's head, which is like the very last contact between

7    the shield that Mr. Stevens has and Sergeant Gonell.  There

8    is no attempt to -- by Mr. Stevens to push the shield up

9    into Sergeant Gonell's throat, hold him against the wall,

10   restrict his breathing, anything like that.  And so I would

11   submit that that is what would be required in that situation

12   to use the shield in a manner that's capable of causing

13   serious bodily injury or death.

14           THE COURT:  So you agree that a shield could be a

15   deadly weapon?

16           MS. COBB:  I do, yes.

17           THE COURT:  And what do you think about -- what

18   would serious bodily injury be?  Do you have thoughts on

19   what that is?

20           MS. COBB:  I've been thinking about this since you

21   asked the Government and Mr. Urso.

22           And I think that because there's the word

23   "seriously" and because it's also next to the word "or

24   death," it means more than just any injury.  I think if this

25   is what Congress intended, it would just say "injury."  And

1    so serious bodily injury is something more than any old

2    injury or any old pain.  And it is something closer to the

3    second word, which is "death."

4        So I would argue it'd be something that requires

5    some sort of treatment or prolonged pain or disfigurement or

6    the words that we normally see in those definitions.  I just

7    don't have one right now.

8        THE COURT:  So you'd agree that the Government

9    doesn't have to show that Sergeant Gonell actually

10   experienced serious bodily injury and that it's just

11   whether --

12       MS. COBB:  No.  There's a total separate charge

13   for injuring someone during a 111.  No.  So I don't think

14   the Government has to show that Sergeant Gonell was actually

15   injured, though if he was injured that could be some

16   evidence -- some circumstantial evidence of the way that

17   Mr. Stevens used the shield.

18       But I think this charge -- and that's what I said

19   sort of at the beginning, is that this is focused on the

20   manner in which Mr. Stevens used the shield.

21       THE COURT:  Okay.  Anything else on Count 21?

22       MS. COBB:  I don't think -- if you don't have any

23   additional questions, again, I don't want to just repeat

24   everything that Mr. Urso said.

25       THE COURT:  Do you think there's an exhibit on

1    Count 21 that's particularly helpful to seeing what

2    happened?

3            MS. COBB:  Your Honor, I think the Farina video,

4    which is the exhibit that the Government constantly plays,

5    there's only really one video that shows that action.  I

6    don't recall the number.

7            MS. AKERS:  301.

8            MS. COBB:  It's No. 301.

9            And I would ask you to watch through the entire

10    interaction with Mr. Stevens and Sergeant Gonell.  There is

11    a point -- a couple times the video pans, and so you cannot

12    see -- we don't know exactly what's happening.  But there's

13    a point towards the end of the interaction which is right

14    around the same exact time where Mr. Stevens's shield bops

15    Gonell's helmet or Mr. Stevens is then grabbing his own head

16    as if he's been hit.

17            There are also multiple shields behind him that

18    could have hit him.  It's not shown on the video.

19            But I think the fact that he's grabbing his head

20    is some evidence that even that actual -- the bop on the

21    head may not have even been intentional on Mr. Stevens's

22    part because he's grabbing his head almost immediately and

23    then is turning to leave as if he's been injured.

24            THE COURT:  Understood.

25            MS. COBB:  Thank you, sir.

1          Next I want to talk about Counts 14, 16 and 33,

2    which are the three counts where Mr. Stevens is charged in

3    111(a).

4          I have two arguments.  So I want to echo

5    Mr. Urso's argument about what Mr. Stevens could actually

6    see during those times that he was in the tunnel.  So Counts

7    14 and 16 are shown in Government's Exhibit 101, which is

8    that camera 74, the surveillance video.  You see Count 14

9    between 2:49 and 2:51.  Mr. Stevens comes partway into the

10   tunnel and then is leaving.

11         Count 16 is 2:56 to 2:58, where again he comes

12   partway in and then leaves.

13         The Government also --

14         THE COURT:  Sorry.  Are you suggesting that your

15   client didn't know what was at the other end, what they were

16   shoving?

17         MS. COBB:  I'm suggesting that I don't think

18   they've proven that he could see what was at the other end.

19         THE COURT:  Is there any plausible explanation?

20   Do you think they're trying to push the door open --

21         MS. COBB:  It could have been doors; it could have

22   been any type of a barrier.  I don't know what it would have

23   been.  But it could have been a barrier.  It could have been

24   pushing fellow protesters through.  I don't believe the

25   Government's shown that at that point in the tunnel any of

1    those protesters could see what was happening.

2              I wrote down one of Ms. Bond's statements.  She

3    said:  Unlike rioters on the ground, Mr. Mehaffie could see

4    all the way back to the police line.

5              Your Honor, we have Government's Exhibit 419.3,

6    which is the video that the Government says Mr. Stevens made

7    on that second trip, which is Count 16, the second trip.

8    You can see in Exhibit 101 he's holding his camera up.  He's

9    not holding it at eye level.  His holding his phone, with a

10   light on it.  He's holding it up.

11             In that video, it's almost impossible to see that

12   there are officers.  At the end of the video, you can kind

13   of -- you know, slowing it down, you can kind of see that

14   there are officers there.  But I submit again that that's

15   above his head.  That's not even his eye level.  We also

16   have the Farina video --

17             THE COURT:  Isn't there pepper spray going on,

18   fire extinguishers, all this other type of thing?  I mean,

19   it seems absurd that he wouldn't know there are officers on

20   the other side.

21             MS. COBB:  Your Honor, I don't think that's

22   necessarily the argument.  So it's not necessarily that he

23   thought it was totally open and I'm trying to argue that he

24   believed he could just go right in, that it was open, that

25   the officers were not trying to block that door.

1          My argument is that as I understand it from the

2   Government's closing, they are saying that he aided and

3   abetted either an imposing -- opposing, impeding or

4   resisting and that it's a felony because of the physical

5   contact that people at the very front of the line were

6   making with the officers.  And that physical contact is what

7   I'm saying he could not see.

8          So I'm not saying he believed he was -- that

9   everyone was just walking straight through.  But I'm saying

10  he could not see the people at the front having physical

11  contact with officers.  And it could have been physical

12  contact with doors, with the barrier, with any number of

13  things.

14          THE COURT:  Or pepper spray and that sealed door.

15          MS. COBB:  Your Honor, there is not a situation --

16  there's not evidence where Mr. Stevens is walking out like

17  Mr. McCaughey with the pepper spray in his eyes.  We don't

18  have evidence of that.

19          I would submit --

20          THE COURT:  Did these counts merge?

21          MS. COBB:  That's a good question.  And I've

22  thought about it.  And I honestly -- I think they could.

23  And they should.

24          Technically, is the Government allowed to charge

25  how they want to charge?  Yes.  But I think that you have

1      the ability to say if you find Mr. Stevens guilty of those

2      to merge them.  I think that the fact that there are just a

3      few minutes separated by literally barely walking to the

4      edge of the tunnel and walking back would be in favor of

5      merger.

6              I also -- I have another legal argument that

7      relates to these that I think is important to put on the

8      record as well, your Honor.

9              THE COURT:  Sorry.  Just on that, if you want

10     to -- I haven't seen any case law from anybody on this.  I

11     feel a little uncomfortable being the one to raise it at

12     this point.

13             If you want to file something in the next couple

14     days suggesting that merger is appropriate, I'll hear from

15     you.  But --

16             MS. COBB:  Thank you, your Honor.

17             THE COURT:  -- I would certainly imagine at

18     sentencing they would be -- you wouldn't necessarily have

19     consecutive sentences or something like that.  And maybe

20     this is -- I haven't dealt with this situation.  Maybe this

21     is something we deal with at sentencing.  I don't know.

22             MS. COBB:  Right.

23             THE COURT:  But if you think I'm supposed to be

24     doing something now, you need to do something more than just

25     tell me that it's a good question.

Closing Arguments by Ms. Cobb

 1          MS. COBB:  Understood.

 2          I have another legal argument I want to make.  But

 3   first, I do just want to note that another piece of evidence

 4   besides Mr. Stevens's video that he has holding above his

 5   head is Government's Exhibit 301, which is the Farina video.

 6          If you watch that video at the front of the

 7   tunnel, which is at the very beginning of the video, we know

 8   Mr. Farina had a tripod.  We know his camera was up as well.

 9   And you cannot see the police.  And so that's just one other

10   piece of evidence to support my argument.

11          THE COURT:  Okay.

12          MS. COBB:  Legally, though, your Honor, there's an

13   argument to be made -- and I didn't know that the Government

14   was going to fall back from the assault element of these

15   crimes and say that they are trying to prove it by

16   resisting, opposing, impeding, making it a felony with the

17   physical contact.  I didn't know that until we were here in

18   this closing argument.

19          But, your Honor, there is some support in the case

20   law for this notion that in order to become a felony by

21   physical contact, there has to be an assault.  And it's

22   in -- from the statute itself.  It says:  Where the acts in

23   violation constitute only simple assault, it's a

24   misdemeanor.  But where the acts involve physical contact or

25   the intent to admit another felony, it's a felony.

 1              Again --

 2              THE COURT:  Where was that from?

 3              MS. COBB:  That's from 18 United States Code

 4    111(a).

 5              THE COURT:  You were just quoting the statute?

 6              MS. COBB:  The statute.  Yes, your Honor.  Quoting

 7    the statute.

 8              In the next section, it says:  If the Defendant

 9    commits any of the acts charged in 111(a), with a weapon or

10    with causing injury, then this is a felony as well.

11              But this -- there is a circuit or two who have

12    actually found that because the statute references assault

13    and says where the acts in violation constitute only simple

14    assault it's a misdemeanor, but where the acts involve

15    more -- involve physical contact or intent, it's a felony,

16    that if you don't have that assault, you cannot enhance to a

17    felony on those grounds.  And so I want to raise that.

18              Again, I didn't -- I don't have any more than that

19    at this point.  If you'd like me to brief it, I can.  I know

20    there are differing opinions.  I have read the case law.

21    But there is at least one circuit who has found that you

22    cannot have -- you cannot enhance to a felony without at

23    least that base of assault under that provision.  You can

24    enhance to a felony under the weapons provision with any of

25    the acts charged, resisting, opposing, impeding or

1  interfering.

2          Your Honor, I next want to talk about

3  Mr. Stevens's intent and his knowledge as it relates to

4  Count 34, which is the obstruction count, unless you have

5  any other questions about the --

6          THE COURT:  No.  Thank you.

7          MS. COBB:  Okay.  Your Honor, the evidence against

8  Mr. Stevens as it relates to the obstruction and to his

9  intent or knowledge is even less than it is against the

10  other two Defendants here for this one basic reason:  There

11  is no direct evidence that Mr. Stevens knew that the

12  certification of the vote was occurring on January 6th, was

13  about to occur or that it was a congressional proceeding.

14  We don't have that admission from him the same way we do

15  from Mr. McCaughey and from Mr. Mehaffie.

16          And the case law is really clear that you cannot

17  obstruct something you don't know about or anticipate,

18  starting back in 1995 with *United States v. Aguilar*, which

19  is a Supreme Court case dealing with 18 United States Code

20  1503, which is a similar statute.  The Supreme Court says

21  that a person lacking knowledge of a pending proceeding

22  necessarily lacks the evil intent to obstruct it.

23          Since then, every circuit that has looked at

24  1512(c)(2), which is the statute Mr. Stevens is charged with

25  here, has found the same thing, that a successful

 1    prosecution requires proof beyond a reasonable doubt that

 2    the Defendant contemplated a particular foreseeable

 3    proceeding.

 4          The evidence is that the day before January 6th,

 5    on January 5th, there's a text message, a group message

 6    between Mr. Stevens and some other people talking about

 7    meeting up at the rally, who's coming.  One of them says

 8    something to the effect of, "Wow, I can't believe I'm going

 9    to be a marcher."

10          We know that at least for a few seconds

11    Mr. Stevens was at the rally.  We have the video that he

12    made on his phone, that the Government has said includes a

13    statement by Professor Eastman.

14          But other than the actions that the Government's

15    arguing, we don't have any evidence that he even knew that

16    the certification was occurring.  Like not one bit of direct

17    evidence.

18          And so I know the Government wants to say:  Okay.

19    We've got this circumstantial evidence that shows his

20    intent.  But we've got to prove his knowledge as well.  We

21    can't prove his intent without proving that he at least knew

22    about it as well.

23          And our position is that the circumstantial

24    evidence that the Government has presented via these videos

25    of what happened and what Mr. Stevens was involved in on

1    that day is not sufficient, your Honor.  It's not sufficient

2    to prove that he knew the certification was occurring and

3    that he intended to obstruct it.

4            THE COURT:  And obviously, I get your point.  Your

5    client hasn't testified.  You don't have to have an

6    alternative theory.

7            But the Government's suggestion that, Gee, someone

8    is working really hard to get inside this building where

9    this unique event is occurring must know about it and must

10   want to stop it, I mean, that's not a crazy argument.

11           MS. COBB:  Your Honor, I think it would be a

12   little bit more powerful if there wasn't this rally taking

13   place at the exact same time.  Mr. Stevens didn't schedule

14   the rally to occur on January 6th.

15           THE COURT:  Are you talking about the Trump

16   rally --

17           MS. COBB:  Yes.

18           THE COURT:  -- on the Ellipse?

19           MS. COBB:  Yes.  And we believe from the testimony

20   that thousands of people left the Trump rally and went to

21   the Capitol.  And again, Mr. Stevens didn't schedule it on

22   that day.  He went -- all we know is that he went to that

23   rally.  And then we know that he went with a very large

24   crowd to the Capitol.

25           And I think:  Sure, do his actions show that he

1    was attempting to get inside?  There's evidence of that.

2    Yes.  He's in the tunnel.  He's trying to get through.

3           But that doesn't prove that he knew there was an

4    official proceeding happening and that he was intending to

5    stop it.

6           We heard from the officers that there is -- when

7    there are these events that can turn to riots, there can be

8    violence.  There can be strange things that no one really

9    expects.  And so I don't think that on these facts the

10   Government can prove his knowledge and intent.

11          THE COURT:  But we also heard -- I forgot if it

12   was Sergeant Mastony; I think it was him -- who said that he

13   kind of contrasted this event from other riots he's handled

14   and that in this one, uniquely you had all of these people

15   who had the singular purpose to try to get into the

16   building.

17          MS. COBB:  I did, your Honor.  And I think

18   generally -- I'm not trying to say Sergeant Mastony was not

19   being truthful.  I think it is a generalization.  And I

20   don't think you can apply that to every specific case, every

21   single person who actually got in the building or attempted

22   to, guilty of obstruction of an official proceeding.  I

23   don't think so.

24          I know you had asked the Government about some of

25   the other cases that they've charged.  You had asked about

1    the *Seefried* case, which is the case that you actually

2    presided over.  I wasn't here for that, obviously.  But I

3    can tell you that it has been widely reported that at that

4    trial there was evidence that at least one of the Seefrieds

5    was inside, very, very close to the Senate chamber, and

6    asked cops -- or asked law enforcement officers, yelled at

7    them, "Why are you protecting them?"  And that the officer

8    testified that they believe that Mr. Seefried was talking

9    about a member of Congress.  That is more, significantly

10   more, than what we have here with Mr. Stevens.

11        THE COURT:  I imagine Ms. Bond would say that your

12   client's comments about traitors, treason, that type of

13   thing, is a very similar type of comment suggesting that

14   they are protecting the members of Congress.

15        MS. COBB:  I recognize that, your Honor.  And I'm

16   not going to say that that's not circumstantial evidence.

17   It is.

18        I think, though, that we have to put it in context

19   with the rhetoric of that day and of the country in general.

20   How many times on these videos did we hear the word

21   "patriot"?  Time and time and time again.  What's the

22   opposite of patriot?  Traitor.

23        And so again, I will acknowledge that that is some

24   circumstantial evidence.  But I don't at all concede that

25   that is sufficient to prove his knowledge or intent beyond a

1      reasonable doubt.

2           THE COURT:  So as Ms. Bond points out, people

3      rarely say exactly why they're doing what they're doing or

4      what their intent is, and you're supposed to look at all of

5      the evidence.

6           Isn't that by far the most plausible explanation

7      for why someone would try to get in, try so hard to get in

8      on that day?

9           MS. COBB:  Plausible is not proof beyond a

10     reasonable doubt.  That would be my response.  If it were a

11     jury -- I tell the juries all the time:  You can find

12     reasonable doubt in the evidence, but also in the lack of

13     evidence.

14          And that's what we have here.  We don't have one

15     inkling of evidence, direct, that Mr. Stevens knew that the

16     certification was even happening that day.  It's plausible

17     that he went to the rally and that he got caught up and he

18     was upset and got caught up with everybody else.  Does that

19     mean that he was upset about the certification of the vote

20     and trying to stop it?  I don't think it proves it beyond a

21     reasonable doubt.

22          THE COURT:  Okay.

23          MS. COBB:  I'd argue, your Honor, that that same

24     logic also applies to Count 52.  Count 52 requires proof

25     that Mr. Stevens intended to impede, disrupt or disturb the

1    orderly conduct of a session of Congress.  And so it's the

2    same logic that I've just explained.

3              Our position is that the Government has not proven

4    that charge beyond a reasonable doubt, particularly the

5    element of knowledge and intent.

6              Briefly, your Honor, I know you don't want to hear

7    about civil disorder too much.  But I do think it's --

8              THE COURT:  I didn't want to hear from the

9    Government.  You can --

10             MS. COBB:  I do think it's important.

11             THE COURT:  Feel free to try to convince me.

12             MS. COBB:  Thank you.

13             I think that this connection between Mr. Stevens's

14   actions and interstate commerce is less direct than anything

15   I've ever seen before.  And I know that it doesn't really

16   require a significant connection based on the case law.

17             But this connection that -- you know, he didn't go

18   to Safeway and rob it and cause it to be closed.  He didn't

19   drive the getaway car.  He was at the Capitol.  The mayor

20   decided to institute the curfew.  And Safeway decided then

21   to close a little bit early to let their employees go home

22   before the curfew was instituted.

23             Our position is simply that that is too tenuous.

24   There is not enough of a connection between Mr. Stevens and

25   the interstate commerce.

1          THE COURT:  You can aggregate.  Right?  I mean, it

2     sounds like maybe you've looked more at the civil disorder

3     case law than I have.  But this isn't a question about

4     whether the Defendant in and of himself caused these

5     problems; but he was part of this mob that together had this

6     effect on interstate commerce.

7          MS. COBB:  But we have -- there's another step in

8     the middle.  That's the difference.  The other step is the

9     mayor who decided to institute the curfew that then closed

10    down Safeway.

11         THE COURT:  I need to go back and look at the

12    testimony, which I didn't hear live.  But I believe there

13    was testimony that there were employees who were already

14    being sent home.

15         MS. COBB:  In order to let them get home before

16    the curfew started.  It was two hours before that their

17    employees were sent home.  It was at 4:00.  And please read

18    it.  It was at 4:00 that the employees were sent home, and

19    there's an email that's an exhibit.  And it essentially says

20    that:  We are sending you home at 4:00.  Everyone get home

21    safely before the curfew happens.

22          So I think there is certainly a link to that

23    curfew order.  And that is what I'm saying is sort of the

24    separation between Mr. Stevens --

25         THE COURT:  I see.

1          MS. COBB:  -- and interstate commerce.

2          Your Honor, I don't have any additional prepared

3     remarks.  Do you have any other questions for me?

4          THE COURT:  No.  Thank you.

5          Mr. Shipley.

6          MR. SHIPLEY:  May it please the Court.

7          Your Honor, with respect to Mr. Mehaffie, the

8     outcome of the case I think is dictated by two general

9     principles:  first, significant failures of proof in the

10    Government's case in chief on each of the five counts that

11    Mr. Mehaffie's charged with.  And I'll get to that in just a

12    minute.

13         But secondly, the testimony of Mr. Mehaffie

14    largely went unchallenged and certainly went unrebutted.

15         So unless Mr. Mehaffie's testimony is dismissed

16    out of hand as uncredible [sic], Mr. Mehaffie's testimony

17    undermines any finding of criminal responsibility for

18    conduct that he clearly and certainly engaged in.

19         What he did is not necessarily in much doubt.

20    It's well-captured in the video.  His purpose in doing so is

21    where the criminal liability falls away, because the

22    statute, based on the Government's own jury instructions or

23    elements of the offenses submitted and accepted by the

24    Court, requires that he have the purpose of impeding,

25    obstructing, interfering with -- assuming we've taken

1    assault off the table, as was discussed at the close of

2    business yesterday with regard to Mr. Mehaffie.

3            It's a broad statute, as the Court pointed out

4    earlier in the case.  It goes beyond simply assaultive

5    conduct.  The Government acknowledged -- and we

6    appreciate -- that there's no assaultive conduct by

7    Mr. Mehaffie and they are not really pursuing an assaultive

8    conduct theory.

9            But did his activity lead him into violations of

10   the balance of the statute which is broadly written?

11           But the fourth element says that the Defendant

12   must have acted for the purpose of, singular, to aid,

13   assist, abet others in committing the offense of resisting,

14   opposing, impeding, intimidating or interfering with the

15   officers.

16           Mr. Mehaffie testified quite frankly and I believe

17   quite credibly that his purpose was to try to prevent people

18   from getting seriously injured.  He took specific steps

19   while he was up on that wall to maintain ingress and egress

20   so people could continue to move.

21           And that -- as he acknowledged, and I think the

22   video makes clear, the nature of the event was such that he

23   was never going to prevent people from going inside.  There

24   were enough rioters -- and I appreciate the testimony from

25   Sergeant Mastony, and in fact I think Ms. Bond acknowledged

1    earlier, there was a variety of motivations and intentions

2    on the people that went into the tunnel.  We saw it.  I

3    mean, some of them were just photographing.  Others were

4    standing against the wall and not doing anything.  As

5    Mr. Mehaffie said, there was some people in there for the

6    purpose of engaging in a fight.

7           So you have a variety of entrants into the tunnel.

8    Mr. Mehaffie acknowledged he was not going to stop the

9    people that really wanted to go inside for some malign

10   intent.  But what he could try to accomplish was to at least

11   not let everybody rush inside in one direction at the same

12   time if they would listen to him.

13          And to some degree, they did.  More importantly, I

14   think what he accomplished was he said based upon his own

15   experience was it's important that people be able to get out

16   because once they get to the front, they're going to want to

17   get out.

18          He said in his testimony -- and it went

19   unrebutted -- that from the moment he was at the very front

20   when he doesn't realize there's -- frankly, it wasn't until

21   just recently when I was looking at those videos again that

22   I came across the recognition when he opened that door and

23   stepped to the side -- and that door is frosted, and you

24   looked at -- he's leaning there against the wall with kind

25   of a blank look on his face and he's looking back at the

1    rioters coming in.  He does not even know the police are

2    there.  He doesn't realize what he's just opened the door

3    into.

4              And as soon as he did, his entire goal at that

5    point was to try to minimize the violence.  He's telling

6    people:  Don't hit the police.  Don't hit the police.  And

7    then when the impossibility of his circumstance dawns on

8    him, his only goal was to get out.

9              And it took him several minutes to do that.  And

10   we've seen some of the video of how packed it was behind

11   him.

12             Now -- and I would ask the Court to -- I'm not

13   going to play the videos.  You've seen them.  You're going

14   to have an opportunity to watch them again.  I would ask the

15   Court, though, to watch not the snippets, but to watch the

16   longer length that -- if you put them all together, you're

17   talking about maybe two hours.

18             Watch them -- the first 45 or 60 seconds of the

19   Farina video is important, because that when there's people

20   coming out.  It's where Mr. Mehaffie is caught at 2:52

21   coming out.  Look -- take a look at the look on his face as

22   he's exiting.  I mean, he looks like a guy that just had his

23   life flash before his eyes.  He's got this, you know, sort

24   of vacant, blank look on his face.  At that moment, he had a

25   choice:  Keep walking or stop.  And he stopped.

1           And, you know, if he keeps walking and by chance

2     he wakes up the next morning and there's a headline:  Five

3     people died in a tunnel trying to get into the Capitol, then

4     he lives with that regret.

5           But he comes from a background -- two important

6     experiences in his formative years.  And neither are

7     deniable.  I mean, he was living 50 miles from Cincinnati

8     when he's 20 years old and 11 people die at The Who concert.

9     And he has a close friend who's caught up in that crowd and

10    he hears the story.  It's the kind of thing that maybe

11    sticks with you when you find yourself in a similar

12    circumstance.

13          His prior protest activities in his younger adult

14    life give him the perspective of understanding that if a

15    protest doesn't have formal organization or leadership, it

16    becomes chaotic.  Those two things combine in his mind at

17    that moment to the thought of:  Can I leave this better than

18    I find it?  He goes up on the wall.  And he did a variety of

19    things, you know.

20          But you can't deny that he kept telling people:

21    Don't hurt the police.  And he kept trying to take things

22    that he recognizes are dangerous weapons from being carried

23    inside, more than one effort, telling people, "Don't throw

24    stuff," grabbing the one piece of wood and passing it away,

25    trying to wrestle the flagpole away from the next gentleman

1    unsuccessfully, then signaling to the person who's got

2    tripods in his backpack to take them out.  Over and over

3    again, his actions on the video are consistent with his

4    explanation and his testimony.

5              THE COURT:  But not so much the "Push, push" and

6    waving people in.  I mean, honestly, that feels very

7    inconsistent with his description of The Who concert.  That

8    feels like he's reenacting The Who concert and creating that

9    crush of people.

10             MR. SHIPLEY:  But as long as he knows the people

11   are circulating, he's not going to have the crush.  And he's

12   got the crowd outside.

13             And if you watch -- that's why I said, watch all

14   the video, because one thing the Government didn't

15   introduce -- and it's always interesting to look at what

16   doesn't get introduced.  They didn't introduce any of the

17   video from the outside showing the crowd moving towards the

18   tunnel.

19             But if you watch Mr. Mehaffie from the outside,

20   you can see he's paying as much attention to what's going on

21   outside as he is inside.  He's not focused just on what's

22   happening inside and trying to encourage them.  He's not

23   yelling inside.  When he's saying "Push, push," he's simply

24   trying to keep everybody moving.

25             As space develops, don't create an obstacle

1    outside where eventually everybody will want to come to the

2    tunnel and push at one time.  You can always -- it's the

3    tack of making people wait their turn.  You come now; you

4    stay back; you come now; you stay back, balanced by people

5    coming out at the same time.

6          He's not going to stop what's going on outside.

7    He's not shouting instructions inside.  He's just kind of

8    keeping his eyes inside and outside.  And it's an organic

9    beast at that point.  It's changing every second.  He's

10   simply reacting to what he sees.

11         So he had -- I think his testimony is clear that

12   if you look at the fourth and fifth elements, his testimony

13   is clear that his purpose was to try to minimize risk and

14   the chances of injury.  And his intentions in his actions

15   was to keep people moving.  That's what the whole "In on the

16   right, out on the left," is.

17         You can -- if you -- if everybody comes into the

18   entire width of the tunnel at one time, you get more people

19   in all at once, but nobody can get out.  So sending people

20   in just on one side of the tunnel while maintaining egress

21   on the other side of the tunnel minimizes the number of

22   people who come in at any given time and keeps a manageable

23   flow to the extent that was even possible.

24         THE COURT:  But it also allows fresh protesters to

25   come in against tired and overwhelmed police officers.

```
 1                    MR. SHIPLEY:  Well -- but that's not his doing.
 2         He's --
 3                    THE COURT:  Sure.  By circulating rioters, you are
 4         exactly.
 5                    MR. SHIPLEY:  So -- but he knows they're coming
 6         anyway.  He knows they're coming.  The crowd is coming up.
 7         He can't stop that.  And there's people inside yelling,
 8         "Fresh troops, fresh troops" or whatever.  But that's not
 9         him.
10                    THE COURT:  Well, he facilitates it.  Right?
11                    MR. SHIPLEY:  But what's his purpose?  I mean, are
12         we now going to, you know, discount and find his explanation
13         for his reasoning as not credible?  Because if --
14                    THE COURT:  It's not the first defendant who I'm
15         found incredible.
16                    MR. SHIPLEY:  No question.  But I don't think that
17         happened here yesterday.
18                    THE COURT:  Okay.
19                    MR. SHIPLEY:  So in this circumstance, that
20         gentleman testifying in the manner he did, answering
21         questions in the manner he did, I don't think there's a
22         basis to find him incredible.
23                    Defendants are often found incredible.  No
24         question about it.  But he sat there for several hours and
25         responded to every inquiry, never blinked, never altered his
```

1    point of view.  And it's consistent with his history.

2    That's the most important thing.

3           What he testified to, if he had no present

4    history, if he had no event in his background such as The

5    Who concert, then that might all sound like an invention.

6    But what he said is consistent with his history and his

7    experience.

8           The fifth element of the assault charge or the act

9    of aiding and abetting on the assault charge is that he

10   acted with the intent, singular, that others commit the

11   offense of resisting, opposing, impeding, intimidating,

12   interfering with law enforcement.

13          So his purpose is to try to minimize the risk of

14   injury by creating a method for people to go in and out at

15   the same time.  His intention is to keep that space directly

16   in front of him clear, clear of both, clear of people, so

17   that it does not become congested and all the pressure goes

18   in one direction.

19          And if you look at almost every comment that he

20   makes on the video, it is made to just one or two people.

21   It's made to the people right below him.

22          THE COURT:  Mr. Shipley, can I ask you, just going

23   through the aiding and abetting elements, you do agree that

24   others were interfering with police officers.  Right?

25          MR. SHIPLEY:  You know, I have a problem with that

Closing Arguments by Mr. Shipley

1    principle.  I'll tell you why.  None of those others have

2    stood trial or explained themselves.  None of those

3    others -- they're all innocent in the eyes of the law.

4        THE COURT:  Well, that suggests that you have a

5    problem with the aiding and abetting theory.  Obviously, you

6    know the Government doesn't have to convict someone

7    before -- as a principal before they charge someone with

8    aiding and abetting.

9        MR. SHIPLEY:  Well, when you don't charge the

10   principal, it creates this issue.  Yes.

11       THE COURT:  Which is completely permissible under

12   the law.

13       MR. SHIPLEY:  I understand that.

14       But I'm simply trying to answer your question that

15   when you don't have a principal offender that's convicted,

16   you're assuming the Defendant as the aider and abettor is

17   attempting to aid and abet a crime that maybe didn't happen.

18   And again, you're right:  It's sort of a theoretical problem

19   with the aiding and abetting principle.

20       But in this case, I think he was aware that, you

21   know, activity taking place in front of him -- he didn't

22   have awareness of the actual statute, but activity taking

23   place in front of him is having that effect.  But I

24   think this is --

25       THE COURT:  This is the second element.

1     MR. SHIPLEY:  Right.  But I think the

2     circumstances here are such that we fall into that hole of

3     merely being in the proximity of criminal activity in the

4     same time as criminal activity doesn't necessarily make your

5     actions in furtherance or for the purpose of encouraging or

6     assisting in that criminal activity's success.

7          THE COURT:  To be sure.  And I think there are

8     other people right around there, including that rather

9     fantastic lady with the glasses, who maybe wasn't aiding and

10    abetting.

11         But he was, according to the Government, doing a

12    lot more than to wave, direct, what have you.

13         MR. SHIPLEY:  According to the Government.  Okay?

14    And that -- you know, when we're at Rule 29 and all the

15    evidence is viewed in the light most favorable to the

16    Government and all reasonable inferences are drawn in favor

17    of the Government's theory, that's true.  But you have to

18    dismiss Mr. Mehaffie's explanation for what he was doing to

19    reach guilt beyond a reasonable doubt on the Government's

20    theory alone.

21         THE COURT:  Well, I wonder if that's actually

22    correct.  I mean, it occurs to me that, A, I think the

23    Government agrees your client was not trying to assault

24    police officers, which is more than they say for either of

25    his Co-Defendants.  Ms. Bond can speak to this.  But my

1    guess is they wouldn't necessarily disagree that The Who

2    concert had some impact.

3            But I could imagine that he wanted to minimize

4    injury to the other rioters while at the same time seeking

5    to assist them in interfering with police officers.  Right?

6    I don't think those are mutually inconsistent desires.

7            MR. SHIPLEY:  But I think only if you simply rely

8    on the circumstantial evidence to draw that information or

9    conclusion.

10           THE COURT:  Which, as you know, we often have to

11   do.

12           MR. SHIPLEY:  I'm sorry?

13           THE COURT:  Which we often have to do.

14           MR. SHIPLEY:  Oh, no question.  No question.

15           But in this case, you would have to do it over his

16   explanation.  And that's why I think seeing the Government's

17   evidence, circumstantial on that issue, combined with his

18   explanation, unless you dismiss his explanation, the

19   Government's evidence doesn't surmount the beyond a

20   reasonable doubt standard.

21           It's just like:  Yeah, his background and history

22   is such that it certainly could have been his only

23   motivation for what he was doing.  And he really had no

24   motive.

25           He knew, as he testified, the crowd wasn't getting

 1    through the police.

 2            And Ms. Bond a couple of times -- and I made a

 3    little note -- referred to the common goal.  There was no

 4    evidence of a common goal.  His goal certainly wasn't to go

 5    through, because he knew that was never going to happen.

 6    Once he got to the police line, realized how deep the police

 7    were and how well prepared they were, he knew getting

 8    through that line was impossible.

 9            So his goal wasn't to help the crowd get through

10    the police line.  His goal was just to manage the chaos,

11    because he knew that was an impossibility.  And he testified

12    to that.

13            And that's why he -- as he made the point of he's

14    a little anxious in the tunnel.  His anxiety goes up a

15    little bit as the crowd comes in behind him and he's

16    confronted with locked doors.  When he goes in the tunnel,

17    he doesn't know where it goes.  And he's confronted with

18    locked doors.

19            And then when he realizes that the police line is

20    there and it's several officers deep, going forward is no

21    longer an option; going left is not an option; going right

22    is not an option.  He knows that going forward is

23    impossible.  He's going out.

24            And he's of a mind that that's what everybody else

25    is eventually going to have to do.  They're just going to

1    have to come to that decision for themselves, because

2    they're coming in.

3         So the fourth element is the purpose.  The fifth

4    element is the intent.  I think his explanation cuts the

5    pegs out from underneath both those elements.

6         It's getting late.  I'm prepared to move on unless

7    the Court has other questions on the assault count.

8         THE COURT:  Thank you.  I think I understand your

9    argument on that.

10        MR. SHIPLEY:  I'm sorry?

11        THE COURT:  I think I understand your argument on

12   that.  Thank you.

13        MR. SHIPLEY:  Count 34:  I think the Court

14   recognizes that there's a failure of proof on Count 34.

15   That's the obstruction count, obstruction of a congressional

16   proceeding.

17        There was no proof in the Government's case, but

18   they benefited from the standard of review on Rule 29, you

19   know, the little speech on the wall.  We take his words

20   literally.  He's actually calling for a literal physical

21   battle.  You know, taking those words in the light most

22   favorable to the Government, you know, okay.  They pass Rule

23   29.

24        But now it's clear after his testimony and without

25   the benefit of that standard anymore, his little

1    speechifying there was rhetorical.  It was not literal.

2         He testified, because he had a frame of reference

3    from 2017, that -- how quick the proceeding happened in

4    2017.  He did not think whatever was going to take place on

5    Capitol Hill in terms of the certification was going to take

6    very long.  They were certainly in no hurry as a family to

7    get from the rally to the Capitol.  They weren't trying to

8    get there in time to influence any proceeding.

9         And his testimony was that "I thought it was over,

10   because of the time of day when we left for the Capitol."

11   He then heard the murmuring in the crowd that Vice President

12   Pence had certified the election.  And he heard the

13   murmuring in the crowd that people were already inside the

14   Capitol.

15        So in his state of mind, moving towards the

16   Capitol, the state of the evidence is he did not have any

17   knowledge that any further proceedings were going on.  He's

18   not at the bike rack line.  He's not encountering the police

19   officers and yelling and screaming.  There's no evidence of

20   that.  There's no social media.  There's no text messages.

21   There's nothing in advance of the trip that suggests they're

22   going there for that purpose.  Both Mrs. Mehaffie and

23   Mr. Mehaffie testified it was to go hear the speech at the

24   Ellipse.

25        Ms. Bond tried to bootstrap in what Mr. McCaughey

Closing Arguments by Mr. Shipley

1    said he heard.  And she argued that Mr. Mehaffie must have

2    heard something similar, you know.

3            That's not evidence against Mr. Mehaffie.  In

4    fact, Mr. Mehaffie testified that where they were, they

5    could hear about two-thirds of what was said and they

6    weren't really hanging on every word.

7            So I don't think there's any -- the record is such

8    that I don't even think there's significant circumstantial

9    evidence that Mr. Mehaffie knew when he went to the Capitol

10   and approached the building that the congressional

11   certification was still underway.

12           On the civil disorder count, an interesting

13   requirement under that charge is similar to the problem I

14   expressed with regard to the aiding and abetting charge.  It

15   requires that the acts --

16           THE COURT:  I'm sorry.  Back to the wall speech.

17           What am I supposed to make of that?  What was he

18   trying to accomplish there?

19           MR. SHIPLEY:  He was trying to urge the people

20   behind them, who were hanging back, to be involved.  Make

21   your voices heard.  There is a crowd of 10,000 people

22   already across the street up making their voices heard.  Why

23   stay way back here?

24           He saw no barriers, no reason why people couldn't

25   move forward with the rest of the crowd.  So, you know, he

1    is an outspoken person about his:  Step forward; make

2    yourself known.  And he said -- he's turned around

3    backwards.  He's talking to people behind him.  And he said,

4    you know, they were on the other side of the street and kind

5    of hanging back.  You know, he was encouraging people:  Come

6    forward.

7              THE COURT:  So he's trying to get people to go to

8    the lawn?

9              MR. SHIPLEY:  Just -- yeah.  Why are you 400 yards

10   behind?  Everybody else is up there, or whatever that gap

11   is.  We can see on the video.  The bigger crowd was much

12   further forward.  So just follow them and be part of this

13   exercise; not, Let's go storm the castle.

14             THE COURT:  What was the exercise?

15             MR. SHIPLEY:  Just the -- it was just the protest.

16   The rally had become a protest and gone to the Capitol.

17   Some people went, obviously.  We know there were people who

18   went to the Capitol before the rally even happened.  There

19   were some who started on the way, and that's when some of

20   the barriers were taken down.  It happened by people who

21   didn't even go to the rally.

22             THE COURT:  So why does he then leave the mass of

23   the people on the lawn and try so hard to break into the

24   Capitol Building?

25             MR. SHIPLEY:  Well, his testimony was that

1      initially he was just looking for some elevation because he

2      couldn't see from where he was.  He stayed behind the crowd,

3      skated -- or skirted; I keep saying "skated" -- to the

4      outside, was looking -- because it's a hill.  He was walking

5      up the hill.  He can't see anything except the big crowd in

6      front of him.  He goes around, looking for elevation, has

7      two options:  the stairway or scaffolding.  And he's climbed

8      scaffolding his whole life.  He sees other people on the

9      scaffolding.

10            He starts to climb the scaffolding and realizes:

11     There's a stairway right below me, so why don't I get down

12     and walk?  He's looking for a vantage point to see whatever

13     it is everybody else is seeing, whatever that might be.  But

14     we know from the timeline that the Government established

15     that he's not in a position to see until 2:33.  We know by

16     2:33 everything with the police and the crowd had ended.

17     The police had pulled back and were going up the stairs.

18     And at 2:35, Sergeant Mastony said they were already up that

19     little narrow stairwell.

20            At 2:15, the bike racks had disappeared.  That

21     barrier line was gone.  The crowded had disassembled it.

22            And 2:25, we had the teargas canister --

23            THE COURT:  Why does he go into the tunnel?

24            MR. SHIPLEY:  He sees other people going into the

25     tunnel.  He thinks it's an entry.  He's already heard that

1    people are already in the Capitol.  He sees people going in

2    the tunnel and he just follows.  He doesn't know where the

3    tunnel goes.  He thinks it's an entry to the Capitol.  His

4    understanding is people are already inside.

5              THE COURT:  Okay.

6              MR. SHIPLEY:  When he finds the police line, he

7    realized this is not an entry to the tunnel or to the

8    Capitol and reverses.

9              THE COURT:  All right.  Civil disorder.  Sorry to

10   interrupt you there.

11             MR. SHIPLEY:  There's a requirement.  An element

12   of this offense is that he committed an act with the

13   intended purpose of obstructing, impeding or interfering --

14   no.  That's actually -- that's not -- oh, yes.  I'm sorry.

15   I'm thinking about the misdemeanors.  Again, that he have a

16   purpose of obstructing, impeding or interfering with law

17   enforcement.

18             And we get back to the same question as the aiding

19   and abetting.  So --

20             THE COURT:  Are you on civil disorder?

21             MR. SHIPLEY:  I think so.  Let me make sure --

22             THE COURT:  Yes.  All right.  I see where you are.

23   So you're saying for the same reasons that you don't believe

24   he's guilty of 111(a), he's not guilty of civil --

25             MR. SHIPLEY:  His purpose is different.  Yeah.

1    He's doing things, and they may have an unintended

2    consequence or a collateral consequence that impedes the

3    police.  But that's not what he's trying to do.

4         And I don't think the statute -- and especially

5    111(a) -- is meant to sort of encompass -- here's the

6    problem I have with -- and this is the issue that I think --

7    maybe even the Court struggles with it, because you

8    mentioned 111(a) being so broadly written.  The same statute

9    can cover Thomas Webster, who viciously beats a Capitol

10   Police officer with a dangerous instrument and is found

11   guilty under 111(a).

12        And if Mr. Mehaffie is guilty here, he's going to

13   be guilty because the unintended consequences of what he was

14   doing seemed to maybe fall under the obstructing provision.

15   It's just such a huge gulf between the two factual

16   scenarios.  But the two individuals involved on opposite

17   ends of the spectrum are guilty of the same crime.

18        THE COURT:  It strikes me that that's a sentencing

19   issue, isn't that?

20        MR. SHIPLEY:  It could be.  I don't dismiss that,

21   you know.  That's the question for your Honor to wrestle

22   with.  But I think it's a miscarriage of justice to draw in

23   unintended consequences of obstructing as being a violation

24   of the statute.

25        On the civil disorder, again, I don't think --

Closing Arguments by Mr. Shipley

1  it's the same basic argument, that his purpose as he

2  testified to is not a purpose that seems to fall within the

3  language of the statute. So I'm not going to beat that

4  horse further if the Court has heard enough.

5         He's only charged with the Title 40 counts. He's

6  not charged with Title 18 misdemeanors. So this is just

7  Counts 52 and 53. And an issue there, I think, is we have a

8  technical defect in the two counts, because neither count

9  charges -- both counts have 18 USC 2 listed in the caption,

10  but neither of them have an aiding and abetting allegation

11  in the text of the charge. And my understanding over many

12  years is that the caption does not cure a defect in the text

13  of the charge.

14         So if you go strictly on the text of the charge,

15  Count 52, I believe there's a failure with respect to the

16  second element. The disruptive conduct must have been done

17  with the intent to impede, disrupt or disturb the orderly

18  conduct of a session of Congress.

19         But we are back to the issue: Does he know that

20  there's a session of Congress underway? If he doesn't know,

21  then he doesn't have that specific purpose as is required

22  under the statute.

23         Count 53, I think that the failure of proof there

24  is simply -- it requires that the Defendant engaged in a

25  physical act of violence. And I think the Government has

1    conceded there's no physical act of violence engaged in by

2    Mr. Mehaffie.

3            Ordinarily, I might have some rhetorical flourish

4    with a jury; but I've had to really think about how this

5    argument would go today in closing, you know, in

6    juxtaposition to what my normal inclination might be.

7            Unless the Court has any questions, I think I've

8    said all I need to on behalf of my client.

9            THE COURT:  So I just want to make sure I

10   understand you on the last point.

11           Count 52, I think the aiding and abetting issue

12   would not help, you're saying, because he did not know that

13   there was an act of -- or that Congress was in session.  He

14   can't be guilty under any theory on 52.

15           On 53, you're saying maybe they could show aiding

16   and abetting, but they haven't charged that; therefore, he

17   would be found not guilty on Count 53.  Is that --

18           MR. SHIPLEY:  Correct.  It's lack of notice to the

19   Defendant and lack of proof of what's actually charged,

20   which is an act of violence by him.

21           THE COURT:  Okay.  Understood.  Thank you,

22   Mr. Shipley.

23           MR. LOPEZ:  Your Honor, might I have a moment to

24   speak with Mr. Shipley before we pass?

25           THE COURT:  Yes.  Very briefly.

Closing Arguments by Mr. Shipley

```
1                    MR. LOPEZ:  Thank you.

2                    (Confers with co-counsel privately.)

3                    MR. SHIPLEY:  Thank you for the indulgence, your

4         Honor.  I think that counsel and I are satisfied.

5                    THE COURT:  Thank you, gentlemen.

6                    Ms. Paschall.

7                    MS. PASCHALL:  I'm just going to take things in

8         the chunks.  To the extent you have questions, I know you'll

9         stop me.

10                    I'll turn first to the credibility of the

11        testifying officers.

12                    A couple of things are noteworthy.  First, even

13        though I think everyone is attuned to the fact that some of

14        these officers are slightly differently situated than they

15        normally would be when they're just coming in to discuss an

16        arrest or an investigation.

17                    There is nothing in their testimony that shows

18        that they've been impeached with any of those prior

19        statements, with any of those interviews, with anything that

20        has been presented.

21                    THE COURT:  Isn't the bigger issue -- I think I

22        discussed this with Ms. Cobb -- I don't know that there's

23        really -- they kind of are embracing Sergeant Gonell's

24        testimony that he was impeded.  I mean, so I don't know that

25        their credibility really matters very much here where it's
```

 1   just so heavily reliant on the --

 2          MS. PASCHALL:  I think that's correct.  And we

 3   have all the video.  So even if there was a question, we

 4   have plenty of evidence to get beyond that.

 5          THE COURT:  So maybe we can talk about Sergeant

 6   Gonell's description of his, honestly, lack of injury.  And

 7   doesn't that -- why isn't that problematic for you on that

 8   charge?

 9          MS. PASCHALL:  So I think it's absolutely

10   probative.  It's something the Court can always consider

11   when we're thinking about serious bodily injury.  It would

12   of course be incredibly probative evidence for the

13   Government if they had sustained a serious bodily injury.

14          But it's not dispositive.  The *Webster* case that

15   Mr. Shipley just --

16          THE COURT:  Which I'm familiar with.  I have

17   enough of my own cases, by the way.  Yes.

18          MS. PASCHALL:  Just to --

19          THE COURT:  Is this the former police officer?

20          MS. PASCHALL:  It is, your Honor.  And the facts

21   there are actually very instructive.  And not only because

22   there's a jury verdict on a 111(b), but also a ruling from

23   Judge Mehta on post-trial briefing on Rule 29 with respect

24   to the deadly and dangerous weapon and the use and the

25   manner.

1    And part of the reason we ended up proffering that

2    jury instruction is we actually do think they are similar,

3    that there is an item:  Not an inherently dangerous weapon

4    when taken on its own used in such a manner that it becomes

5    a deadly and dangerous weapon that didn't touch the officer.

6    That pole that gets used in the *Webster* case never touched

7    Officer Rathbun.

8            THE COURT:  So I am interested now.  Tell me about

9    *Webster*.

10           MS. PASCHALL:  I thought you might be.

11           He's carrying a large pole with a flag on it, and

12   he is approaching the bike rack that now your Honor is quite

13   familiar with on the west front.  Officer Rathbun -- I think

14   he's going to be to the right of Officer Hodges in the

15   lineup.

16           You've seen -- your Honor has seen much evidence

17   now of people rattling at the bike racks, hurling insults,

18   that kind of thing.

19           He makes a step forward.  Officer Rathbun pushes

20   his hand out to create distance between himself and the

21   Defendant.  And the Defendant takes that large heavy metal

22   flagpole and smacks it down.  He hits the bike rack.  He

23   doesn't touch Officer Rathbun.

24           That was found to be sufficient under the 111(b)

25   statute, because that use of that pole -- I don't think

1    there was testimony about how heavy it was; probably not 13

2    pounds, just based on a flagpole -- used in that manner

3    could have caused serious bodily injury if Officer Rathbun

4    had his hand still on the bike rack, if his head had gotten

5    in the way.

6              He didn't.  He wasn't hit.

7              THE COURT:  I see.

8              MS. PASCHALL:  He actually is subsequently then

9    attacked and --

10             THE COURT:  So it's kind of like an attempt?  Is

11   that --

12             MS. PASCHALL:  I think the charging language

13   encompasses both of those things.  That's actually included

14   in our charging language as well.  It's sufficient to meet

15   the statute, because you could envision a scenario where

16   that object used in that way could have caused serious

17   bodily injury.

18             Your Honor asked us about serious bodily injury.

19   It is frustratingly not in the 111(b) statute.  I don't

20   think it's in Title 18 at all, actually.

21             But we have been referring to the sentencing

22   guidelines 1B1.1, which is permissible for your Honor to

23   review.  And the serious bodily injury there means an injury

24   involving extreme physical pain; protracted impairment of

25   the function of a bodily member, organ or mental faculty; or

1    requiring medical intervention as surgery, hospitalization

2    or physical rehabilitation.  That's what sentencing

3    guideline 1B1.1 allows for.

4         And every assault that we have charged, even if

5    they didn't experience that serious bodily injury, you could

6    imagine based on the actions of the Defendant those officers

7    experiencing serious bodily injury.

8         Extreme physical pain:  We know we have that from

9    the testimony of Officer Hodges.  You could also conceive

10   what Ms. Cobb calls a bop, what I call an assault, of taking

11   that 13-pound shield and hitting someone in the head with

12   it.  Again, he has a helmet on.  Right?  So he may not

13   experience serious bodily injury.

14        But the fact is in Exhibit 301 -- and I do have

15   that list for your Honor of exactly what videos we want you

16   to look at -- you see the pressure exerted for quite a

17   period of time.  There's a struggle back and forth.  And

18   then there's a distinct moment where he pulls it away and

19   hits him in the head.

20        And you can infer the intent there to assault that

21   officer with this 13-pound shield, even if he doesn't

22   experience serious bodily injury.  A 13-pound shield to the

23   head, you can imagine.  It could cause any of those things

24   that are listed in 1B1.1.

25        The same thing with Officer Foulds.  And I take

1    defense's point that the videos are very chaotic.  It's a

2    little difficult.  But Exhibit 961 -- which, again, I'll

3    give you the list -- married with Officer Foulds's testimony

4    gives us the very first and what I think is the most

5    important moment.

6         It's not that the Defendant is standing there

7    holding the shield and not doing anything.  What Officer

8    Foulds testified to and what you can see on the video is

9    that the Defendant has his arm around the inside of that

10   shield and he swings it at Officer Foulds.  He's not just

11   holding it.  He's not just standing there.  You can see on

12   Officer Foulds's body-worn camera and you can see it from

13   the top view down, which is one of the Lewis Cantwell videos

14   that's married up together in 961.  It's turned to the side

15   and used in that affirmative strike that Sergeant Mastony

16   was talking about.  It's not a defensive posture.

17        That is the moment that kind of tees off this

18   back-and-forth, back-and-forth use of the shield, use of the

19   baton, use of the shield, use of the baton.

20        Actually, I think in watching, when defense

21   counsel replayed one of those attempts where he's saying,

22   Well, he's using the shield to keep the door open.

23        Perhaps.  But he also incidentally makes contact

24   with Officer Foulds's arm.  And again, you can see it in

25   961.

1          You can imagine a scenario where if Officer

2     Foulds's arm is up against the door on one side and the

3     Defendant has brought this shield down on his arm on the

4     other side -- Officer Foulds didn't testify that he

5     sustained any serious bodily injury.  But it's pretty darned

6     likely that he could have, and especially when it is being

7     used in that manner.  It's not defensive; it's affirmative.

8     And that is what the statute requires us to prove.

9          Your Honor asked about the counts merging.  Our

10    indictment is incredibly specific as to the timing because

11    of those separations.

12          It's also important for pointing people to the

13    correct evidence over time.  It wouldn't have been very

14    useful for us to have charged four 111(a)s and stayed with

15    it.

16          But part of the reason that that's so important is

17    it shows the separation of time.  And your Honor can see in

18    Exhibit 101 in its entirety there are times where the

19    Defendants move in and out.  They have specific intent to

20    come back in and commit different offenses.

21          THE COURT:  Do they just stay separate throughout?

22    Is this something --

23          MS. PASCHALL:  I think they're not going to merge

24    until sentencing.  And then there is some debate about

25    whether or not specific things will merge.  Where we have

1    different named victims, they certainly should not merge.

2              And I don't think the three that Defendant Stevens

3    is charged with should merge because they are different

4    actions at very distinct points in time.  So it's the

5    Government's position that they shouldn't merge.

6              THE COURT:  At any point?

7              MS. PASCHALL:  What happens at sentencing is

8    something we can tackle down the road.

9              Ms. Cobb is correct about the felony prong for the

10    assault.  But that's not the only thing we have to rely on.

11              So in the versions where we've charged assault --

12    and we mean assault in the traditional, unlawful-touching

13    sense -- the Government gets to the felony by physical

14    contact.

15              THE COURT:  All right.

16              MS. PASCHALL:  That's correct.

17              THE COURT:  So which one are you talking about

18    specifically?

19              MS. PASCHALL:  So that would be Counts 21, 24 and

20    25.

21              THE COURT:  So those are the assaults on the

22    specific officers?

23              MS. PASCHALL:  Exactly right.

24              THE COURT:  Right.

25              MS. PASCHALL:  The other three, which is going to

1    be 14, 16 and 33 --

2                THE COURT:  Yes.

3                MS. PASCHALL:  -- I think --

4                THE COURT:  So that's primarily Defendant Stevens

5    and then McCaughey as well on 14.

6                MS. PASCHALL:  I actually think -- and this is

7    speaking a little bit off the cuff, but I'm going to think

8    it through:  If those are charges of aiding and abetting,

9    which I believe they all are, and you are assisting the

10   person at the front of the line who is making contact, that

11   those actually could be assaults in the traditional sense

12   and that your Honor could find them guilty because they are

13   assisting the people at the front of the line in making that

14   contact.

15               And then in my list of videos that I'm going to

16   give you, you're going to see a body-worn camera for a

17   specific officer at each of those assaults who is on the

18   receiving end.

19               THE COURT:  Okay.  So I thought -- perhaps I'm

20   misremembering this, but I thought that Ms. Bond kind of

21   agreed that the Government was not alleging that Defendant

22   Mehaffie -- have we talked about Mehaffie?

23               MS. PASCHALL:  No.  We'll get to that.

24               THE COURT:  Okay.

25               MS. PASCHALL:  So I think the more appropriate way

Rebuttal Closing Arguments by Ms. Paschall

1    to view the charge is to look at the opposing, resisting,

2    impeding, interfering.  And then the Government gets to the

3    felony by looking at the intent to commit another felony.

4        Because I think Ms. Cobb is actually correct that

5    we only get to the felony about contact with an officer if

6    assault is in play.

7        THE COURT:  So I'm confused now.

8        MS. PASCHALL:  She threw in a monkey wrench, but I

9    actually tend to agree with it.

10        THE COURT:  I think her point is that you threw in

11    a monkey wrench by giving this theory right at the very end.

12        MS. PASCHALL:  Yeah.  But at the end of the day,

13    it doesn't kill our counts because 231 is an appropriate

14    felony to reference in this case.

15        THE COURT:  231 is the civil disorder?

16        MS. PASCHALL:  The civil disorder.

17        And Judge Jackson has found this in the

18    *Leffingwell* case, that it is appropriate to find the felony

19    prong of that assault, resist, impede, et cetera, et cetera,

20    when the secondary felony that is intended to be committed

21    is the civil disorder as opposed to the 1512.  That is her

22    decision in *Leffingwell*.

23        I think we have relied on it.  Probation has at

24    least accepted that in other cases where we haven't had to

25    litigate it:  the *Hamner* case, the *Duke Wilson* case.  It has

1    come up before and has been agreed that 231 would count.

2            1512 also counts.  And of course, the Government

3    believes all of these people are guilty of committing 1512.

4    So you could reference the 1512 felony, but it would be

5    permissible for your Honor to reference the 231 as well.

6            THE COURT:  But on 14, 16 and 33, you're saying I

7    would either have to find that the Defendants were aiding

8    and abetting an actual assault or they can be aiding and

9    abetting one of these other nonassaultive things plus a

10   felony?

11           MS. PASCHALL:  You've got it.

12           THE COURT:  With the intent to commit a felony,

13   which would be civil disorder.  Okay.

14           And then you're going to talk to me about

15   Mr. Mehaffie?

16           MS. PASCHALL:  Yes.

17           THE COURT:  Is that the same?

18           MS. PASCHALL:  Yes.  So a couple of things with

19   respect to the assault and the 231.

20           The idea that Mr. Mehaffie didn't know that there

21   are police officers behind those double doors is simply not

22   credible.  You've seen the video of him banging on the door.

23   The door is open.  The only reason we have that video is

24   because officer -- Sergeant Bogner and Paul Riley are

25   standing inside the door with it open looking out at

1    Mr. Mehaffie as he's banging on the door.

2              Then when the glass breaks, Sergeant Bogner sprays

3    the people who are immediately behind it with pepper spray.

4    And what we can see in the Cantwell video and the Bisignano

5    video is that Mr. Mehaffie is right there, right behind the

6    broken glass, because he's the first one to walk through.

7    So it's simply not credible.

8              Also, it's not credible that he is somehow just

9    acting as a gentleman and opening the door and then hiding

10   behind it because he thought no one was on the other side.

11   If this is a building that he wants to get into, why doesn't

12   he open the door and walk through it if he thinks no one's

13   on the other side?

14             What the evidence shows and is the more logical

15   conclusion is that he knows exactly what's on the other

16   side.  He knows he has no gas mask, no helmet, no gear.  But

17   the people behind him are really determined, and they all

18   have those things.  So why not open the door and let them

19   take the first hit and then come around and come through?

20             It's impossible for anyone to believe that he is

21   looking at this crowd and listening to the people behind him

22   who are all screaming about getting in the building, taking

23   our country back --

24             THE COURT:  I understand your point on that.

25             MS. PASCHALL:  There's just no way that he doesn't

```
 1        know that there are officers there.

 2                  THE COURT:  I understand your point.

 3                  What do I do on the elements with him?

 4                  MS. PASCHALL:  Which elements specifically?

 5                  THE COURT:  Because I think you're conceding that

 6        he wasn't trying to aid and abet an assault.

 7                  MS. PASCHALL:  Oh, the same analysis as the

 8        Stevens one?  That -- I guess that it would be --

 9                  THE COURT:  It would have to be in furtherance of

10        civil disorder or obstruction.

11                  MS. PASCHALL:  Right.  Yes.  Same analysis.

12                  THE COURT:  Okay.  Thank you.

13                  Can you talk about obstruction?

14                  MS. PASCHALL:  Sure.  Or would you like me to give

15        the best evidence for the assaults before we move?

16                  THE COURT:  Were you --

17                  MS. PASCHALL:  We can file something.  I'm happy

18        to do it whatever way your Honor wants.  I have a list of

19        the videos that are best evidence for each of those

20        assaults.

21                  THE COURT:  Yes.  If you could just email me.

22                  MS. PASCHALL:  Will do.

23                  THE COURT:  Thanks.

24                  MS. PASCHALL:  Can I touch on civil disorder

25        quickly?
```

```
 1              THE COURT:  Sure.
 2              MS. PASCHALL:  The interstate commerce is a
 3    jurisdictional nexus.  It's similar to when we charge 18 USC
 4    922(g), felon in possession.  We don't make the Defendant
 5    think that he needs to know that there's no gun
 6    manufacturers in D.C. and those firearms passed in
 7    interstate commerce.
 8              And in fact, in our filing as to the jury
 9    instructions, the third element says the civil disorder in
10    any way or degree obstructed, delayed or adversely affected
11    interstate commerce.
12              That element is not tagged to the actions of the
13    Defendant; it's tagged to the civil disorder, which they are
14    a part of.  So that's the difference there.
15              1512:  So I was here when your Honor gave the
16    Seefried verdict, and I've had it up on my computer for this
17    entire trial, because my understanding of your Honor's
18    ruling was that for somebody to have the intent to commit
19    the 1512 in this circumstance, your Honor looks to three
20    very specific things:  the Defendant's experience, political
21    acumen or knowledge of the proceeding; their actions taken
22    on that day; and their willingness to join a mob with a
23    specific intent.
24              All three of these Defendants have all three of
25    those things.
```

1        I think it was Mr. Urso who was talking about

2    intent before he came down and there's no evidence that he

3    intended to disrupt the proceedings beforehand.

4        I think that's true and correct on the evidence

5    that we have.  But, of course, as your Honor knows, intent

6    can be formed in the moments before a crime is committed.

7    So it's not something that your Honor has to hang your hat

8    on.

9        What we do know about that first kind of

10    component, his knowledge, political acumen, understanding of

11    the proceedings, is that we had testimony from his friend,

12    Mr. Paranjape, who talked about their discussions, about

13    politics and the voting machines, his concern about the

14    fraud and Mr. McCaughey's own testimony about his concern

15    about electoral integrity and that he knew that the

16    proceeding was happening.

17        Then we have his own statements and the statements

18    of those who are around him.  And the most potent

19    concentration of those statements in a time where they are

20    most audible comes when he's standing at the police line at

21    the southwest scaffolding.

22        And your Honor can see that on Exhibit 210, which

23    is Officer Chapman's body-worn camera, and 241, which is

24    Officer Green's body-worn camera, specifically between about

25    14:06 and 14:09, 2:06 and 2:09.

1          We have statements from Mr. McCaughey, including

2    things like:  Our issue is not with you, with the cops; it's

3    not worth your paycheck.  And there's a particularly potent

4    moment on Officer Gonell's body-worn camera of him pointing

5    at the building behind the officers and saying:  People in

6    there make more in a month than you do in a year and they

7    don't do shit.  And you are risking your life for them.

8    Why?  Just go home, dude.

9          That indicates some knowledge that there are

10   people in that building doing something that he doesn't want

11   happening and that he's trying to convince these officers to

12   leave in order to help him accomplish that goal.

13         The others are around him in those same moments

14   saying to the police:  You guys have been against President

15   Trump from the beginning.  Why are you protecting them in

16   here?  Our president got beat out for fraud and you guys are

17   going to allow that crap.

18         All of that is important for Mr. McCaughey's

19   intent because he stays with that mob.  He stays when those

20   barricades go down.  He stays when they get sprayed.  He

21   pushes through the scaffolding.  He stays with that mob

22   that's trying to get into that building.

23         And then of course we have his actions.  In the

24   *Seefried* case, we had the Seefrieds chasing Officer Goodman

25   and one of the Seefrieds -- and I forget which one is

1    which -- who was using his flagpole to jab at the officers.

2    Here, for Mr. McCaughey, our actions are much worse because,

3    yes, he didn't get into the building; but the testimony from

4    Agent Hawa that was stipulated to discusses how the

5    proceeding couldn't go on while people are outside or

6    inside, and he is using these weapons to assault officers to

7    get in.

8           The thing speaks for itself.

9           For Mr. Stevens:  That little clip of his

10   telephone video from the speeches at the Ellipse is not just

11   relevant to say he was there.  In fact, I know that your

12   Honor has said in the *Seefried* case that that alone is not

13   going to be sufficient.  It is the words that are being said

14   in that very specific moment.  And that is Exhibit 419.1.

15          I encourage your Honor to listen as closely as you

16   can, because that is when Professor Eastman is saying:  We

17   are demanding of Vice President Pence this afternoon at 1:00

18   p.m. that he let the legislators take a look at this so we

19   can get to the bottom of it and the American people know we

20   have control of the direction of our government.

21          That is what the Defendant taped.  Not the crowded

22   cheering, not "Reelect President Trump."  He taped the

23   moment where they're discussing what is about to happen.

24          Then we have him on body-worn camera a couple of

25   times, actually.

```
 1                 THE COURT:  So, A, thanks for flagging that clip.
 2    I had not focused on that, and I will go back and listen to
 3    it.
 4                 But this all happens well after 1:00, doesn't it?
 5                 MS. PASCHALL:  His activities?
 6                 THE COURT:  Yes; like up at the Capitol.
 7                 MS. PASCHALL:  Yes.  Of course.
 8                 THE COURT:  So I imagine Ms. Cobb would tell me:
 9    Well, that just shows that he would have believed that it
10    was all done by then.
11                 MS. PASCHALL:  Sure.  And I think I'm going to
12    address that for all three of them together and why that
13    just doesn't make sense.
14                 THE COURT:  Okay.
15                 MS. PASCHALL:  Again, times that we hear some
16    other very interesting moments that go to the intent is when
17    Defendant Stevens is on the police line at the barricades.
18    Your Honor has seen and heard from Officer Curtice, his
19    body-worn camera.  That's Exhibit 214.  They're talking
20    about the traitors and cowards and surrounded and all of
21    that.
22                 But another particularly important moment that we
23    didn't end up playing but we just admitted is Officer
24    Madison's body-worn camera.  And that is Exhibit 225.  And
25    from about 1:50 to 1:57, before you see Defendant Stevens
```

Rebuttal Closing Arguments by Ms. Paschall

1    link arms and push back against the police line, you can

2    hear again a lot of people there.  The Defendant is talking

3    about falling back, yelling at them to fall back and follow

4    the lawful order to fall back.

5            Other individuals are around them saying:  We're

6    doing this for you, for your children, for your

7    grandchildren.  When Kamala and Biden take over, you are

8    next.

9            And then an important moment happens, and I think

10   this is coincident in time with when the northwest

11   scaffolding would have been breached.  But at about 13:54,

12   the Defendant starts to point at the building.  And he says:

13   They've gotten in over there.  You have to surrender soon.

14   What takes courage is to stand up and say what's right and

15   what's wrong.

16           Then there's a guy next to him on a bullhorn

17   yelling about:  Why the hell are you guys doing this today?

18           And again, we see on his phone subsequent to that

19   when the police line breaks and he has his thumbs up and he

20   is helping people climb up onto the stairs and then all of

21   his physical actions that we see subsequent in the tunnel,

22   we have all of those three major components there.

23           If he was so concerned -- if he was not so

24   concerned with breaking in and stopping all of this from

25   happening, then what is he doing there?

1    And then the same thing for Mr. Mehaffie. His own
2    testimony says that he has the political acumen, that he
3    knew what the proceeding was, that he had followed this
4    proceeding in the past. He paid attention to it. He knows
5    what it is. There's testimony about, you know, he didn't
6    hear exactly what Trump said. But his wife testified that
7    they did hear that President Trump said that they needed to
8    go to the Capitol.

9    We have the phone evidence about how adamant he
10   was that they all needed to get there on the 6th. We have
11   the fight on the -- "Fight over this wall" speech.

12   And then again, there are several videos,
13   particularly in the moments before they break the glass,
14   where everyone around him is talking about taking their
15   country back. The Gina Bisignano set of videos in the 400
16   series is particularly instructive on this.

17   Officer Bogner's body-worn camera, Exhibit 206.3,
18   at 14:44, in that same moment where we know Defendant
19   Mehaffie is up at the front of the line at the police
20   officers, you hear on Officer Bogner's camera, "They fucking
21   stole this and you fucking know it."

22   We have the political chants video, Exhibit 304,
23   where the whole group is chanting, "Stop the Steal, Stop the
24   Steal," as Mr. Mehaffie is climbing up onto that archway to
25   start directing traffic.

 1          And then most importantly -- and I think this is

 2     just such an interesting factual moment for your Honor,

 3     because the defense is trying to say that in the moments

 4     after the tunnel is cleared and Mr. Mehaffie is at the front

 5     of the line when they've reached this sort of détente about

 6     the 3:20 p.m. timeframe, that this is supposed to show that

 7     he isn't there to obstruct the proceeding and that he's

 8     there for this sit-in-type activity.

 9          But what you hear on Officer Abdi's body-worn

10     camera totally belies that.  And it belies the idea that he

11     thought that this was over, because everyone at the front of

12     that line from about 15:23 until 15:35 is continuing to talk

13     with the officers not about how we want to just stay here

14     and protest, but about how they want to speak to somebody

15     inside who will make a difference.

16          The crowd behind them is chanting, "No Trump, no

17     peace; no Trump, no peace."

18          And the people right next to Mr. Mehaffie are

19     talking about how they need to stay there now because they

20     are negotiating right now.  They don't mean they, the

21     rioters and the police.  They're pointing into the building.

22     "They."  The lawmakers are negotiating right now.

23          And at 15:33, on Officer Abdi's body-worn camera,

24     Exhibit 201.2, there's a gentleman who reaches over the guy

25     who we talked about quite a bit with the scarf and says:

1  "Tell that guy with the bullhorn," who at that moment is

2  David Mehaffie, "tell them they are negotiating right now.

3  It's important we put pressure on them right now."

4       And then you can hear Mr. Mehaffie -- he actually

5  introduces himself to the crowd through the bullhorn.

6  They're talking about staying there because they think

7  they're going to make a difference.  And I don't mean make a

8  difference in the very legal and very important protest

9  sense; I mean make a difference because they think the

10  people inside are still negotiating and that they have

11  stopped the proceeding from happening.

12       We talked a little bit with your Honor about

13  proving intent.  And your Honor has heard me say to a jury

14  at about this point in time that when you walk through those

15  doors to be a trier of fact in my case, you don't leave your

16  common sense behind those doors.

17       Someone can still be guilty of the specific-intent

18  crime of second-degree murder when they strangle someone and

19  for moments and minutes have their hands around their neck

20  but never say anything.

21       The same thing is true here.  These Defendants are

22  here for moments, for minutes, for hours, acting in a way

23  that proves that specific intent.  It's something that keeps

24  coming up for judges in a lot of these cases, at the bench

25  trials, at the sentencings.

1          Why are these people here?  Why did it happen?

2     Why are they here?  And you heard from the officers.  This

3     was so different because their specific intent to get into

4     the building was so clear.

5          It's common sense, your Honor.  We know why they

6     were here.  And your Honor has more than enough evidence to

7     find them guilty because of it.

8          THE COURT:  Thank you, Ms. Paschall.

9          I want to thank all the attorneys for their hard

10    work and arguments and presentation of the evidence in this

11    case and particularly for your efforts to work together

12    collaboratively.  I think that certainly makes my job easier

13    and I think it's best for all your clients, too.  So my

14    appreciation on that.

15         Does anybody want to file something specifically

16    on legal issues?

17         I don't know, Ms. Cobb.  We talked about this

18    earlier.  I certainly am not asking for it.  But if you

19    think there's kind of unresolved issues after today, I want

20    to give you a chance to.  And I think we do have time for

21    it.  Are you asking for that, Ms. Cobb?

22         MS. COBB:  I'm asking for the opportunity.

23         THE COURT:  Very well.

24         MS. COBB:  So I think as I was sitting here

25    listening to Ms. Paschall I felt like:  Well, wait a second.

Rebuttal Closing Arguments by Ms. Paschall

1    With that whole issue with the assault and the intent, I

2    felt like my closing was sort of formulated towards one way,

3    which was this nonassault, but with physical contact.

4         And then Ms. Paschall said:  No.  I agree with

5    you.  We can't do nonassault with physical contact.  It has

6    to be either assault or intent to commit another felony.  So

7    I want to sort of just think about that a little bit.  I

8    feel like I didn't really get an opportunity to address

9    that.

10        Could I have maybe until the end of the day

11   tomorrow?

12        THE COURT:  I was going to give you until --

13        MS. COBB:  Oh, more than that?  That would be

14   great.

15        THE COURT:  -- the end of the day tomorrow.

16        MS. COBB:  That's fine.  That's fine.

17        THE COURT:  Let me say --

18        MS. COBB:  May I -- go ahead.

19        THE COURT:  If anybody wants to file anything --

20   and I'm looking for legal arguments, not further factual

21   arguments -- I'll accept --

22        MS. COBB:  Yes.

23        THE COURT:  -- any briefs you wanted to file by

24   tomorrow, whether that's the Government or the Defendants.

25   If Ms. Cobb files something tomorrow, the Government has

 1    until we'll say the end of the day Saturday to file a reply.

 2    And, vice versa, if the Government decides they want to file

 3    something tomorrow, I'd accept any replies by the end of the

 4    day on Saturday.

 5             Obviously, I'd encourage you all to talk so that

 6    we don't have briefs crossing in the night.  I think it

 7    makes sense for --

 8             MS. COBB:  I may not file something.  I need to

 9    think.

10             THE COURT:  I'm not asking for anybody to file

11    something.  But I know there have been some new legal issues

12    for me here at the very least and perhaps for you all,

13    including -- I mean, Ms. Paschall just gave the sentencing

14    guideline definition on serious bodily assault.  That looked

15    like a pretty stringent standard to me just at first glance.

16    But if any Defendant thinks that there is a different

17    standard that I should be looking to, that would be your

18    deadline to file something, by sometime tomorrow.

19             I'll ask the parties to return at 3:00 p.m. on

20    Tuesday the 13th.

21             Mr. Shipley, were you asking for me to set it on

22    Monday?  I am not sure that I am going to be ready on

23    Monday.

24             MR. SHIPLEY:  What day did you want?

25             THE COURT:  On Tuesday for a verdict.

```
 1              MR. SHIPLEY:  I can do that.

 2              THE COURT:  So I'll ask everyone to return at 3:00

 3     p.m. on Tuesday, Courtroom No. 2.

 4              Obviously, I'll say -- I'm directing the

 5     Defendants to return; and if you fail to return, a warrant

 6     will be issued for your arrest.

 7              Attorneys, I'm going to be issuing the verdict

 8     then.  If you can't come, if you want to have somebody stand

 9     in for you, that's fine with me.

10              I did ask -- I'll just ask Ms. Paschall if you can

11     send that email of the -- what you think are the most

12     relevant exhibits and times to Mr. Dibblee, obviously

13     copying defense counsel.  And if there are specific clips of

14     other exhibits that any defense counsel thinks I should look

15     at in relation to certain counts, please feel free to reply

16     to that.

17              MS. PASCHALL:  Yes, your Honor.

18              THE COURT:  You can leave the shield with me.

19              MS. PASCHALL:  Sure thing.

20              THE COURT:  I'm protecting myself from my law

21     clerks.  Also, any exhibits.  Make sure that Ms. Chaclan and

22     Mr. Dibblee have copies of those.

23              MS. PASCHALL:  Would your Honor want the physical

24     cell phones and the --

25              THE COURT:  No.
```

1          MS. PASCHALL:  -- physical jackets taken?

2          THE COURT:  No.  Sorry.  I don't want those.

3          MS. PASCHALL:  I believe Mr. Dibblee has

4    everything except for one video from me at this point.  But

5    I will confirm with him.

6          THE COURT:  Okay.  Ms. Paschall, anything further

7    from the Government?

8          MS. PASCHALL:  No, your Honor.

9          THE COURT:  Thank you.

10          Mr. Urso?

11          MR. URSO:  Judge, if we have exhibits that we

12    haven't pointed out, can we do -- email you similarly as the

13    Government has?

14          THE COURT:  Yes.  I'm sorry if I didn't make that

15    clear.  I certainly am not just asking for the Government to

16    do that.  Feel free to reply.

17          Ms. Cobb, anything further?

18          MS. COBB:  Nothing further, your Honor.

19          THE COURT:  Mr. Shipley?

20          MR. SHIPLEY:  Nothing, your Honor.  Thank you.

21          THE COURT:  Thanks, folks.  See you on Tuesday.

22          (Proceeding concluded.)

23

24

25

1                        **<u>CERTIFICATE</u>**

2

3                I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10               Dated this 13th day of October, 2022.

11

12           <u>/s/ Lisa Edwards, RDR, CRR</u>
             Official Court Reporter
13           United States District Court for the
               District of Columbia
14           333 Constitution Avenue, Northwest
             Washington, D.C. 20001
15           (202) 354-3269

16

17

18

19

20

21

22

23

24

25

**'**

**'go** [1] - 24:9

**/**

**/s** [1] - 190:12

**0**

**06901** [1] - 1:21

**1**

**10,000** [1] - 156:21
**100** [1] - 77:2
**101** [5] - 43:10, 43:22, 127:7, 128:8, 169:18
**101.2** [8] - 9:19, 9:22, 10:19, 11:3, 11:6, 12:2, 12:13, 15:4
**101.6** [1] - 16:25
**11** [2] - 99:11, 145:8
**111** [3] - 72:7, 122:4, 125:13
**111(a** [14] - 8:3, 8:15, 8:16, 9:2, 37:20, 72:3, 108:15, 108:18, 109:14, 109:17, 132:9, 159:24, 160:5, 160:8
**111(a)** [8] - 17:17, 68:5, 72:22, 114:14, 119:24, 127:3, 132:4, 160:11
**111(a)s** [1] - 169:14
**111(b** [8] - 83:3, 108:3, 109:17, 114:14, 119:13, 164:22, 165:24, 166:19
**111(b)** [2] - 108:14, 114:4
**12** [2] - 38:18, 79:13
**120** [1] - 3:7
**13** [5] - 27:12, 34:8, 34:22, 48:9, 166:1
**13-pound** [9] - 18:8, 23:16, 35:16, 36:16, 87:1, 103:18, 167:11, 167:21, 167:22
**13:54** [1] - 181:11
**13th** [2] - 187:20, 190:10
**14** [12] - 8:13, 9:11, 9:14, 13:11, 17:12,

75:18, 127:1, 127:7, 127:8, 171:1, 171:5, 173:6
**141** [1] - 3:8
**14:06** [1] - 177:25
**14:09** [1] - 177:25
**14:44** [1] - 182:18
**14:56:49** [1] - 15:13
**15** [1] - 16:22
**15-minute** [1] - 78:7
**1503** [1] - 133:20
**1512** [7] - 66:9, 172:21, 173:2, 173:3, 173:4, 176:15, 176:19
**21-00040** [1] - 1:3
**1512(c)(2** [1] - 133:24
**15:23** [1] - 183:12
**15:33** [1] - 183:23
**15:35** [1] - 183:12
**16** [10] - 8:13, 14:24, 15:12, 17:12, 127:1, 127:7, 127:11, 128:7, 171:1, 173:6
**163** [1] - 3:9
**16:25** [1] - 34:2
**16:45** [1] - 33:17
**1752** [1] - 70:2
**1752(a)(2** [1] - 70:6
**1752(a)(4)** [1] - 70:18
**17:59** [1] - 118:8
**18** [12] - 2:5, 8:3, 8:15, 8:16, 9:2, 17:17, 132:3, 133:19, 161:6, 161:9, 166:20, 176:3
**19** [1] - 28:1
**1979** [1] - 30:4
**1995** [1] - 133:18
**1:00** [2] - 179:17, 180:4
**1:35** [1] - 106:15
**1:50** [1] - 180:25
**1:56** [1] - 56:2
**1:57** [1] - 180:25
**1B1.1** [3] - 166:22, 167:3, 167:24

**2**

**2** [3] - 91:16, 161:9, 188:3
**2)** [1] - 39:12
**20** [2] - 20:17, 145:8
**200** [5] - 1:25, 20:4, 20:14, 21:2, 23:17
**200-pound** [2] - 25:22, 27:15
**20001** [2] - 2:10, 190:14
**201.1** [4] - 90:7, 90:9,

91:5, 93:8
**201.2** [1] - 183:24
**2017** [4] - 58:2, 80:25, 155:3, 155:4
**202** [2] - 2:11, 190:15
**2021** [1] - 6:15
**2022** [2] - 1:6, 190:10
**20530** [1] - 1:18
**206.3** [1] - 182:17
**21** [10] - 17:19, 17:24, 19:22, 19:23, 36:10, 59:23, 120:19, 125:21, 126:1, 170:19
**21-00040** [1] - 1:3
**21-40** [1] - 4:3
**210** [1] - 177:22
**214** [1] - 180:19
**21st** [2] - 58:7, 61:2
**22** [1] - 29:8
**225** [1] - 180:24
**231** [5] - 172:13, 172:15, 173:1, 173:5, 173:19
**233.1** [1] - 45:8
**24** [8] - 17:19, 17:25, 19:8, 19:20, 20:3, 36:10, 82:18, 170:19
**241** [1] - 177:23
**25** [5] - 17:19, 33:5, 36:11, 56:11, 170:20
**26** [3] - 40:17, 43:11, 46:22
**26-minute** [1] - 43:18
**29** [5] - 83:6, 151:14, 154:18, 154:23, 164:23
**2:05** [2] - 51:23, 51:24
**2:06** [1] - 177:25
**2:09** [1] - 177:25
**2:15** [1] - 158:20
**2:19** [1] - 51:24
**2:22** [4] - 51:24, 55:13, 56:10, 90:10
**2:25** [2] - 91:6, 158:22
**2:30** [1] - 52:11
**2:33** [2] - 158:15, 158:16
**2:35** [1] - 158:18
**2:36** [1] - 78:15
**2:40** [1] - 40:2
**2:43** [1] - 90:15
**2:49** [8] - 9:15, 10:12, 10:16, 11:3, 117:2, 117:15, 118:5, 127:9
**2:50** [6] - 9:22, 10:16, 52:16, 117:3, 117:15, 118:5
**2:50:47** [2] - 10:21,

11:11
**2:51** [2] - 9:15, 127:9
**2:51:38** [1] - 13:7
**2:52** [1] - 144:20
**2:56** [6] - 14:25, 42:3, 42:6, 42:10, 42:13, 127:11
**2:58** [3] - 14:25, 43:2, 127:11
**2:59** [1] - 43:5

**3**

**3** [2] - 1:21, 1:24
**30** [3] - 13:3, 26:17, 44:8
**301** [12] - 27:21, 27:25, 28:4, 28:8, 29:10, 33:17, 33:21, 34:4, 126:7, 126:8, 131:5, 167:14
**304** [1] - 182:22
**308** [1] - 61:10
**32502** [1] - 1:25
**33** [7] - 8:14, 16:8, 16:15, 17:13, 127:1, 171:1, 173:6
**333** [2] - 2:9, 190:14
**34** [5] - 47:2, 47:10, 133:4, 154:13, 154:14
**35** [1] - 18:2
**354-3269** [2] - 2:11, 190:15
**36** [4] - 68:23, 69:12, 70:7, 120:20
**37** [4] - 68:23, 69:12, 70:7, 118:18
**3:00** [3] - 118:8, 187:19, 188:2
**3:07** [1] - 33:22
**3:09** [1] - 33:10
**3:11** [7] - 43:13, 43:19, 44:25, 45:18
**3:11:44** [1] - 43:24
**3:12** [5] - 44:25, 45:5, 45:18, 46:15, 52:17
**3:13** [3] - 43:14, 43:19, 45:18
**3:18** [1] - 40:3
**3:20** [1] - 183:6

**4**

**4** [3] - 27:12, 91:16, 116:24
**4-foot** [2] - 18:9, 36:16
**40** [3] - 52:5, 79:7,

161:5
**40-minute** [1] - 40:2
**400** [2] - 157:9, 182:15
**419** [1] - 16:12
**419.1** [1] - 179:14
**419.3** [2] - 16:12, 128:5
**44** [3] - 70:16, 88:22, 120:20
**45** [3] - 70:17, 118:21, 144:18
**45373** [1] - 2:6
**4:00** [3] - 140:17, 140:18, 140:20
**4:15** [2] - 16:20, 116:10
**4:16** [1] - 17:3
**4:19** [1] - 16:20

**5**

**50** [2] - 11:4, 145:7
**5104** [1] - 111:8
**5104(c)(2)(F** [1] - 70:20
**5104(e)(2)(D** [1] - 70:20
**52** [8] - 111:9, 119:7, 138:24, 161:7, 161:15, 162:11, 162:14
**53** [5] - 119:11, 161:7, 161:23, 162:15, 162:17
**555** [1] - 1:17
**5th** [1] - 134:5

**6**

**6** [6] - 1:10, 3:4, 3:5, 20:4, 20:14, 59:22
**6-foot** [2] - 25:22, 27:14
**60** [1] - 144:18
**6706** [1] - 2:10
**6th** [16] - 6:15, 38:20, 50:13, 50:17, 50:21, 58:10, 59:24, 65:20, 66:6, 75:18, 92:3, 93:24, 133:12, 134:4, 135:14, 182:10

**7**

**71** [1] - 3:6
**74** [2] - 9:17, 127:8
**745** [1] - 2:3

**8**

**8** [1] - 1:6
**801** [3] - 102:16, 104:20, 105:18
**810** [1] - 1:20

**9**

**900** [1] - 106:19
**922(g** [1] - 176:4
**960** [4] - 43:22, 43:23, 44:1, 44:19
**961** [7] - 110:2, 110:5, 112:9, 115:24, 168:2, 168:14, 168:25
**96734** [1] - 2:3
**9:44** [1] - 1:7

**A**

**a)(2** [1] - 70:3
**a)(4** [1] - 70:3
**a.m** [1] - 1:7
**aback** [1] - 83:1
**Abdi** [2] - 10:5, 91:9
**Abdi's** [3] - 90:22, 183:9, 183:23
**abet** [6] - 48:8, 49:11, 82:10, 142:13, 150:17, 175:6
**abetted** [6] - 7:22, 16:5, 43:20, 47:25, 82:12, 129:3
**abetters** [1] - 65:7
**abetting** [26] - 8:16, 14:17, 39:14, 39:16, 42:1, 47:12, 48:3, 82:9, 116:25, 117:14, 118:6, 118:12, 149:9, 149:23, 150:5, 150:8, 150:19, 151:10, 156:14, 159:19, 161:10, 162:11, 162:16, 171:8, 173:8, 173:9
**abettor** [3] - 9:3, 48:4, 150:16
**abettors** [2] - 49:4, 50:4
**ability** [2] - 130:1, 190:7
**able** [11] - 11:12, 13:2, 15:3, 16:25, 17:10, 45:8, 60:20, 81:17, 86:16, 97:2, 143:15
**absence** [1] - 107:4

**absolute** [1] - 57:7
**absolutely** [19] - 6:17, 13:20, 19:2, 28:25, 30:20, 36:17, 37:11, 38:1, 39:25, 42:25, 44:3, 48:19, 60:3, 67:19, 71:18, 115:5, 123:16, 164:9
**absurd** [2] - 101:17, 128:19
**accept** [2] - 186:21, 187:3
**accepted** [2] - 141:23, 172:24
**access** [1] - 81:1
**accessible** [1] - 29:25
**accompany** [1] - 116:8
**accomplish** [4] - 46:25, 143:10, 156:18, 178:12
**accomplished** [1] - 143:14
**accordance** [1] - 37:21
**according** [2] - 151:11, 151:13
**account** [1] - 96:17
**accounts** [1] - 78:8
**accurate** [2] - 77:2, 190:4
**achieve** [2] - 39:1, 46:9
**acknowledge** [1] - 137:23
**acknowledged** [7] - 94:3, 94:7, 113:22, 142:5, 142:21, 142:25, 143:8
**acknowledgement** [1] - 94:23
**acquitted** [1] - 108:14
**acquitting** [1] - 83:5
**act** [11] - 43:15, 46:1, 67:20, 67:21, 80:14, 149:8, 159:12, 161:25, 162:1, 162:13, 162:20
**acted** [5] - 69:22, 81:18, 81:20, 142:12, 149:10
**acting** [3] - 25:13, 174:9, 184:22
**Action** [1] - 1:3
**action** [3] - 22:16, 28:12, 126:5
**actions** [28] - 7:9, 8:1, 42:21, 47:8,

47:17, 49:19, 56:9, 57:23, 65:3, 66:2, 67:16, 74:12, 77:23, 82:6, 98:22, 134:14, 135:25, 139:14, 146:3, 147:14, 151:5, 167:6, 170:4, 176:12, 176:21, 178:23, 179:2, 181:21
**activities** [2] - 145:13, 180:5
**activity** [7] - 78:16, 142:9, 150:21, 150:22, 151:3, 151:4, 183:8
**activity's** [1] - 151:6
**acts** [12] - 41:24, 43:18, 68:5, 68:8, 118:25, 131:22, 131:24, 132:9, 132:13, 132:14, 132:25, 156:15
**actual** [3] - 126:20, 150:22, 173:8
**acumen** [3] - 176:21, 177:10, 182:2
**adamant** [1] - 182:9
**add** [4] - 5:25, 77:24, 81:15, 90:24
**added** [1] - 34:17
**adding** [2] - 23:16, 91:9
**addition** [2] - 34:19, 68:13
**additional** [4] - 5:5, 70:23, 125:23, 141:2
**address** [6] - 19:16, 46:13, 71:2, 109:16, 180:12, 186:8
**addressed** [1] - 119:7
**adds** [2] - 78:22, 96:11
**admission** [1] - 133:14
**admissions** [1] - 122:6
**admit** [4] - 5:6, 5:20, 5:23, 131:25
**admitted** [5] - 5:9, 25:18, 64:5, 180:23
**admittedly** [1] - 97:20
**adult** [3] - 34:11, 35:17, 145:13
**advance** [4] - 55:3, 58:1, 115:7, 155:21
**advantage** [2] - 20:20, 40:22
**adversely** [1] -

176:10
**affected** [4] - 68:11, 114:18, 114:23, 176:10
**afoul** [1] - 9:1
**afraid** [2] - 21:9, 46:12
**afternoon** [1] - 179:17
**afterwards** [2] - 24:23, 71:3
**agent** [1] - 64:7
**Agent** [1] - 179:4
**aggregate** [1] - 140:1
**aggression** [1] - 53:5
**aggressive** [1] - 74:25
**ago** [2] - 30:23, 46:5
**agree** [15] - 23:11, 24:5, 24:6, 29:17, 59:11, 66:4, 71:23, 82:8, 89:16, 118:22, 124:14, 125:8, 149:23, 172:9, 186:4
**agreed** [2] - 171:21, 173:1
**agrees** [1] - 151:23
**Aguilar** [1] - 133:18
**ahead** [4] - 50:7, 110:19, 117:10, 186:18
**aid** [19] - 21:14, 21:16, 21:19, 21:21, 21:23, 22:6, 22:8, 22:12, 23:14, 29:25, 48:8, 49:7, 49:11, 82:10, 89:12, 123:24, 142:12, 150:17, 175:6
**aided** [7] - 7:22, 16:5, 41:3, 43:20, 47:24, 82:12, 129:2
**aider** [3] - 9:3, 48:4, 150:16
**aiders** [3] - 49:4, 50:4, 65:7
**aiding** [27] - 8:15, 14:17, 39:13, 39:14, 39:15, 42:1, 47:12, 48:3, 82:8, 116:25, 117:14, 118:6, 118:12, 149:9, 149:23, 150:5, 150:8, 150:19, 151:9, 156:14, 159:18, 161:10, 162:11, 162:15, 171:8, 173:7, 173:8
**air** [6] - 10:22, 11:13, 44:6, 44:12, 88:24, 102:21

**Akers** [3] - 4:10, 27:20, 69:3
**AKERS** [2] - 1:15, 126:7
**alert** [2] - 96:21, 100:11
**Alex** [1] - 55:6
**allegation** [1] - 161:10
**alleging** [2] - 85:16, 171:21
**alleviate** [1] - 91:13
**allow** [1] - 178:17
**allowed** [2] - 75:1, 129:24
**allowing** [1] - 24:19
**allows** [2] - 147:24, 167:3
**almost** [5] - 40:2, 121:1, 126:22, 128:11, 149:19
**alone** [7] - 41:15, 86:10, 108:5, 108:11, 114:15, 151:20, 179:12
**altered** [1] - 148:25
**alternative** [1] - 135:6
**ambulance** [2] - 22:18, 23:12
**ambulances** [2] - 107:10, 107:21
**Amendment** [1] - 80:11
**AMERICA** [1] - 1:3
**America** [1] - 4:3
**American** [1] - 179:19
**Americans** [1] - 76:19
**amount** [1] - 93:23
**ample** [1] - 14:11
**analogous** [3] - 107:14, 107:25, 108:1
**analogy** [2] - 107:7, 107:16
**analysis** [6] - 17:12, 25:12, 32:9, 32:13, 175:7, 175:11
**analyze** [1] - 23:23
**anarchy** [2] - 65:18, 65:24
**ancillarily** [1] - 87:3
**anger** [1] - 26:1
**angle** [5] - 110:3, 110:4, 110:19, 113:13, 113:22
**angled** [1] - 34:8
**angles** [5] - 44:25, 110:1, 113:1, 113:20,

114:24
**angry** [3] - 7:10, 30:11, 38:9
**answer** [5] - 38:8, 47:5, 73:23, 74:14, 150:14
**answered** [2] - 77:5, 77:7
**answering** [2] - 50:6, 148:20
**answers** [3] - 77:7, 77:8, 123:2
**anticipate** [1] - 133:17
**anticipation** [1] - 112:11
**anticorruption** [1] - 80:14
**antifa** [1] - 59:14
**anxiety** [1] - 153:14
**anxious** [5] - 46:16, 46:17, 46:20, 46:23, 153:14
**anytime** [1] - 30:23
**anyway** [1] - 148:6
**apologize** [1] - 106:25
**appear** [1] - 111:13
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:13
**appearing** [1] - 81:10
**applies** [1] - 138:24
**apply** [1] - 136:20
**appreciate** [3] - 69:3, 142:6, 142:24
**appreciation** [1] - 185:14
**approached** [2] - 7:19, 156:10
**approaches** [2] - 15:6, 15:7
**approaching** [1] - 165:12
**appropriate** [5] - 13:23, 130:14, 171:25, 172:13, 172:18
**Aquilino** [1] - 17:25
**archway** [1] - 182:24
**ardent** [1] - 101:14
**area** [4] - 94:17, 111:14, 116:9, 117:10
**argue** [5] - 63:25, 73:4, 125:4, 128:23, 138:23
**argued** [2] - 118:20, 156:1
**arguing** [1] - 134:15

**argument** [18] - 14:8, 14:23, 108:22, 119:11, 122:6, 127:5, 128:22, 129:1, 130:6, 131:2, 131:10, 131:13, 131:18, 135:10, 154:9, 154:11, 161:1, 162:5
**Arguments** [5] - 3:5, 3:6, 3:7, 3:8, 3:9
**arguments** [6] - 41:17, 41:19, 127:4, 185:10, 186:20, 186:21
**arm** [10] - 10:22, 11:12, 89:19, 95:2, 97:10, 168:9, 168:24, 169:2, 169:3
**arms** [14] - 44:10, 44:11, 87:10, 89:11, 90:20, 91:7, 93:5, 94:16, 96:2, 99:3, 99:5, 102:8, 102:12, 181:1
**arrest** [2] - 163:16, 188:6
**arrested** [2] - 74:25, 122:17
**Arrington** [10] - 19:4, 22:21, 22:22, 22:23, 23:1, 23:5, 107:7, 107:9, 107:10, 108:1
**Ashley** [1] - 4:10
**ASHLEY** [1] - 1:15
**aside** [1] - 15:8
**askew** [1] - 122:2
**assault** [51] - 7:10, 8:17, 8:19, 8:24, 13:15, 17:20, 25:7, 26:24, 27:2, 28:18, 28:21, 28:25, 29:16, 32:20, 35:19, 37:25, 38:10, 53:14, 103:1, 106:19, 108:19, 115:8, 131:14, 131:21, 131:23, 132:12, 132:14, 132:16, 132:23, 142:1, 149:8, 149:9, 151:23, 154:7, 167:4, 167:10, 167:20, 170:10, 170:11, 170:12, 172:6, 172:19, 173:8, 173:19, 175:6, 179:6, 186:1, 186:6, 187:14
**assaulted** [1] - 42:19
**assaulting** [8] - 17:22, 17:25, 18:1, 18:3, 29:4, 39:9,

72:15, 95:3
**assaultive** [5] - 101:2, 114:22, 142:4, 142:6, 142:7
**assaults** [8] - 7:17, 22:14, 24:22, 170:21, 171:11, 171:17, 175:15, 175:20
**assist** [3] - 21:23, 142:13, 152:5
**assisted** [1] - 41:11
**assisting** [4] - 40:7, 151:6, 171:9, 171:13
**associated** [2] - 8:9, 68:14
**assume** [1] - 106:19
**assuming** [2] - 141:25, 150:16
**asthma** [1] - 21:20
**attacked** [1] - 166:9
**attempt** [3] - 121:13, 124:8, 166:10
**attempted** [4] - 7:23, 60:5, 114:21, 136:21
**attempting** [3] - 18:5, 136:1, 150:17
**attempts** [1] - 168:21
**attend** [1] - 60:10
**attention** [12] - 26:12, 59:5, 80:24, 86:22, 87:3, 87:8, 110:9, 111:12, 112:3, 112:4, 146:20, 182:4
**ATTORNEY'S** [1] - 1:16
**attorneys** [2] - 185:9, 188:7
**attuned** [1] - 163:13
**audible** [1] - 177:20
**available** [5] - 9:13, 9:19, 10:15, 22:6, 28:5
**Avenue** [2] - 2:9, 190:14
**average** [1] - 92:20
**aware** [6] - 74:23, 92:24, 94:4, 100:19, 104:23, 150:20
**awareness** [3] - 81:18, 81:21, 150:22

---

## B

**b)** [1] - 8:4
**b)(1)(A** [2] - 70:9, 70:10
**b)(1)(A)** [2] - 70:4, 70:8
**back-and-forth** [3] -

58:12, 168:18
**backed** [3] - 10:24, 88:25, 102:4
**background** [4] - 61:18, 145:5, 149:4, 152:21
**backpack** [1] - 146:2
**backtrack** [1] - 94:5
**backwards** [1] - 157:3
**bad** [2] - 46:4, 94:24
**badly** [1] - 26:22
**balance** [2] - 96:5, 142:10
**balanced** [1] - 147:4
**banging** [2] - 173:22, 174:1
**barely** [2] - 69:9, 130:3
**barricades** [2] - 178:20, 180:17
**barrier** [4] - 127:22, 127:23, 129:12, 158:21
**barriers** [2] - 156:24, 157:20
**barring** [1] - 10:2
**base** [1] - 132:23
**based** [12] - 80:20, 104:1, 104:5, 108:8, 120:21, 121:24, 123:2, 139:16, 141:22, 143:14, 166:2, 167:6
**basic** [2] - 133:10, 161:1
**basis** [1] - 148:22
**baton** [16] - 20:22, 24:15, 36:1, 36:6, 36:7, 94:15, 95:5, 99:22, 99:25, 112:11, 112:13, 112:22, 113:4, 114:21, 168:19
**battalion** [1] - 101:16
**battle** [1] - 154:21
**battles** [1] - 59:13
**bear** [1] - 63:17
**bears** [3] - 47:14, 48:16, 108:6
**beast** [1] - 147:9
**beat** [2] - 161:3, 178:16
**beating** [1] - 109:24
**beats** [1] - 160:9
**beautifully** [1] - 13:22
**became** [4] - 22:24, 23:1, 23:2, 23:7
**become** [4] - 21:11, 131:20, 149:17,

157:16
**becomes** [4] - 20:18, 122:2, 145:16, 165:4
**becoming** [1] - 66:5
**Bedford** [1] - 1:20
**beefier** [1] - 103:6
**beeline** [4] - 62:17, 74:8, 78:10, 78:19
**BEFORE** [1] - 1:11
**beforehand** [1] - 177:3
**beg** [1] - 88:6
**begin** [2] - 6:11, 20:21
**beginning** [6] - 39:18, 50:24, 110:8, 125:19, 131:7, 178:15
**begins** [6] - 10:13, 11:10, 11:15, 12:18, 12:20, 15:10, 20:13, 42:4, 42:5, 42:10, 110:12, 110:25
**begs** [1] - 47:1
**begun** [1] - 12:16
**behalf** [2] - 4:25, 162:8
**behind** [31] - 10:24, 20:13, 25:18, 25:20, 33:24, 34:14, 41:1, 66:1, 66:2, 85:20, 86:15, 87:23, 101:25, 102:7, 110:3, 126:17, 144:10, 153:15, 156:20, 157:3, 157:10, 158:2, 173:21, 174:3, 174:5, 174:10, 174:17, 174:21, 178:5, 183:16, 184:16
**belied** [3] - 93:18, 93:19, 109:11
**belief** [1] - 114:20
**belies** [2] - 183:10
**believes** [4] - 48:16, 50:1, 95:8, 173:3
**below** [4] - 62:24, 63:4, 149:21, 158:11
**BENCH** [1] - 1:10
**bench** [2] - 19:14, 184:24
**bend** [2] - 99:9, 105:19
**bending** [1] - 105:17
**bends** [1] - 112:1
**beneficial** [1] - 116:22
**benefit** [4] - 103:24, 113:14, 119:19, 154:25
**benefited** [1] -

154:18
**besmirch** [2] - 79:19, 92:13
**best** [10] - 4:12, 27:22, 86:4, 88:16, 106:18, 110:19, 175:15, 175:19, 185:13, 190:7
**bet** [1] - 113:22
**better** [2] - 91:7, 145:17
**between** [24] - 6:21, 9:14, 16:20, 23:23, 37:5, 39:4, 43:13, 43:19, 45:18, 59:13, 64:7, 85:18, 87:22, 101:23, 103:14, 124:6, 127:9, 134:6, 139:13, 139:24, 140:24, 160:15, 165:20, 177:24
**beyond** [29] - 8:11, 54:5, 71:21, 73:13, 80:2, 80:4, 80:20, 81:16, 82:16, 82:25, 85:22, 95:23, 98:2, 104:4, 108:17, 108:24, 109:9, 114:15, 118:24, 120:14, 134:1, 137:25, 138:9, 138:20, 139:4, 142:4, 151:19, 152:19, 164:4
**bias** [1] - 101:13
**Biden** [1] - 181:7
**big** [5] - 55:5, 60:6, 76:25, 81:22, 158:5
**bigger** [3] - 87:23, 157:11, 163:21
**bike** [11] - 6:20, 6:23, 56:7, 56:23, 74:6, 155:18, 158:20, 165:12, 165:17, 165:22, 166:4
**Bisignano** [2] - 174:4, 182:15
**bit** [24] - 7:18, 7:20, 10:24, 15:1, 20:17, 26:24, 32:2, 48:13, 57:23, 58:18, 79:17, 79:21, 86:24, 92:4, 93:15, 116:13, 134:16, 135:12, 139:21, 153:15, 171:7, 183:25, 184:12, 186:7
**blaming** [1] - 94:10
**blank** [2] - 143:25, 144:24
**blinked** [1] - 148:25
**block** [3] - 121:11, 121:12, 128:25
**blocked** [2] - 35:13, 123:24
**blocking** [2] - 56:20, 57:19
**blood** [1] - 98:20
**bloodied** [1] - 33:16
**blow** [2] - 18:14
**board** [1] - 36:25
**bodies** [1] - 11:17
**bodily** [31] - 18:19, 19:7, 19:12, 31:10, 84:11, 85:16, 85:21, 86:10, 98:4, 98:10, 98:14, 120:25, 121:19, 124:1, 124:13, 124:18, 125:1, 125:10, 164:11, 164:13, 166:3, 166:17, 166:18, 166:23, 166:25, 167:5, 167:7, 167:13, 167:22, 169:5, 187:14
**body** [38] - 7:22, 15:15, 15:22, 16:4, 17:14, 18:13, 21:17, 23:17, 23:19, 26:1, 33:23, 34:10, 45:9, 45:10, 45:11, 45:17, 56:3, 87:11, 90:22, 99:4, 100:14, 102:9, 109:21, 111:18, 112:19, 168:12, 171:16, 177:23, 177:24, 178:4, 179:24, 180:19, 180:24, 182:17, 183:9, 183:23
**body-worn** [20] - 15:22, 33:23, 45:9, 45:10, 45:17, 56:3, 90:22, 100:14, 109:21, 168:12, 171:16, 177:23, 177:24, 178:4, 179:24, 180:19, 180:24, 182:17, 183:9, 183:23
**Bogner** [6] - 10:5, 15:18, 21:21, 42:14, 173:24, 174:2
**Bogner's** [3] - 15:21, 182:17, 182:20
**Bond** [22] - 3:5, 4:10, 6:12, 18:16, 71:14, 73:9, 77:5, 77:17, 78:25, 86:2, 98:24, 100:12, 107:8, 110:6, 117:1, 118:4, 137:11, 138:2, 142:25, 151:25, 153:2, 171:20
**bond** [2] - 97:2, 155:25
**BOND** [108] - 1:15, 6:13, 6:15, 10:20, 11:3, 11:7, 12:3, 12:9, 12:16, 12:23, 13:13, 13:15, 14:3, 14:18, 14:21, 14:23, 18:25, 19:2, 19:10, 19:13, 19:19, 19:23, 20:3, 22:20, 23:14, 24:6, 24:24, 27:21, 28:1, 28:5, 28:10, 28:16, 28:23, 29:11, 29:14, 29:19, 30:20, 31:1, 31:4, 31:12, 31:15, 32:8, 32:18, 32:25, 33:2, 33:22, 34:5, 36:4, 36:10, 36:25, 37:16, 37:22, 38:1, 38:14, 38:18, 39:14, 39:19, 39:24, 41:16, 42:17, 42:20, 42:25, 43:2, 44:3, 44:7, 44:20, 48:8, 48:11, 49:2, 49:13, 49:17, 50:2, 50:8, 51:20, 54:6, 54:14, 54:20, 55:16, 55:19, 55:23, 55:25, 58:25, 59:15, 60:3, 60:13, 60:16, 63:7, 63:24, 65:11, 66:9, 66:11, 66:25, 67:8, 67:25, 68:2, 68:21, 69:1, 69:5, 69:9, 69:19, 69:22, 69:25, 70:2, 70:7, 70:13, 70:15, 70:23, 71:5
**bond's** [1] - 128:2
**Bond's** [1] - 75:8
**bone** [1] - 84:18
**bootstrap** [1] - 155:25
**bop** [5] - 121:21, 124:5, 126:20, 167:10
**bops** [1] - 126:14
**borne** [2] - 81:22, 109:3
**bothered** [1] - 124:3
**bottom** [1] - 179:19
**bounce** [1] - 77:13
**bouncing** [1] - 58:12
**Box** [1] - 2:3
**boy** [4] - 24:10, 24:13, 26:4, 53:16
**Boys** [3] - 58:20, 59:13, 81:5
**brain** [1] - 31:24
**brazen** [1] - 67:10
**breached** [2] - 10:8, 181:11
**break** [7] - 26:21, 71:1, 71:4, 81:7, 157:23, 182:13
**breaking** [1] - 181:24
**breaks** [3] - 57:4, 174:2, 181:19
**breathing** [1] - 124:10
**Brian** [1] - 56:3
**brief** [3] - 48:10, 84:14, 132:19
**briefing** [1] - 164:23
**briefly** [3] - 105:4, 139:6, 162:25
**briefs** [2] - 186:23, 187:6
**bring** [2] - 45:8, 103:9
**bringing** [2] - 18:15, 29:22
**brings** [6] - 22:20, 26:6, 34:11, 56:10, 65:13, 113:5
**broad** [1] - 142:3
**broader** [1] - 68:4
**broadly** [2] - 142:10, 160:8
**broke** [2] - 7:14, 66:6
**broken** [7] - 9:24, 84:18, 94:8, 94:9, 110:24, 111:19, 174:6
**brought** [2] - 103:20, 169:3
**brown** [1] - 81:10
**bruise** [1] - 97:10
**buddies** [2] - 24:9, 53:16
**Building** [5] - 6:18, 6:24, 66:7, 110:22, 157:24
**building** [50] - 6:21, 7:4, 7:7, 8:7, 10:3, 27:7, 46:11, 46:25, 52:4, 52:10, 53:3, 53:23, 53:24, 56:20, 56:24, 57:7, 57:12, 57:20, 62:13, 67:19, 74:24, 78:1, 78:2, 80:3, 80:5, 80:21, 81:11, 81:15, 82:5, 110:18, 110:25, 111:3, 111:5, 111:19, 113:10, 115:10, 119:8, 135:8, 136:16, 136:21, 156:10, 174:11, 174:22, 178:5, 178:10, 178:22, 179:3, 181:12, 183:21, 185:4
**bullhorn** [3] - 181:16, 184:1, 184:5
**burden** [2] - 109:14, 120:12
**Burton** [1] - 61:12
**business** [1] - 142:2
**BY** [1] - 2:7

## C

**camera** [30] - 9:16, 9:17, 12:16, 15:22, 17:1, 33:23, 44:24, 45:9, 45:10, 45:17, 56:3, 90:22, 100:14, 109:22, 127:8, 128:8, 131:8, 168:12, 171:16, 177:23, 177:24, 178:4, 179:24, 180:19, 180:24, 182:17, 182:20, 183:10, 183:23
**cancel** [1] - 62:2
**canister** [1] - 158:22
**cannot** [6] - 126:11, 131:9, 132:16, 132:22, 133:16
**Cantwell** [2] - 168:13, 174:4
**capabilities** [3] - 18:23, 27:12, 31:2
**capability** [1] - 19:4
**capable** [10] - 18:18, 19:5, 19:6, 20:1, 31:12, 31:22, 31:23, 32:14, 107:15, 124:12
**Capitol** [48] - 6:18, 6:24, 16:2, 51:14, 55:12, 56:1, 61:9, 61:13, 61:18, 64:12, 64:16, 64:21, 66:7, 73:21, 74:5, 76:1, 76:3, 76:6, 80:10, 81:8, 101:11, 103:5, 104:9, 104:13, 104:15, 104:21, 110:18, 110:22, 135:21, 135:24, 139:19, 145:3, 155:5, 155:7, 155:10, 155:14, 155:16, 156:9, 157:16, 157:18, 157:24, 159:1, 159:3, 159:8, 160:9, 180:6, 182:8

**Captain** [3] - 104:13, 104:16, 104:19
**caption** [2] - 161:9, 161:12
**captured** [1] - 141:20
**car** [5] - 23:3, 107:11, 107:14, 107:19, 139:19
**careful** [1] - 92:13
**careless** [1] - 67:10
**Carlton** [1] - 64:8
**carried** [1] - 145:22
**carrying** [3] - 15:7, 116:12, 165:11
**Case** [1] - 4:3
**case** [39] - 8:12, 9:10, 49:3, 54:4, 64:3, 67:1, 67:11, 71:20, 77:12, 79:1, 92:9, 93:20, 118:4, 130:10, 131:19, 132:20, 133:16, 133:19, 136:20, 137:1, 139:16, 140:3, 141:8, 141:10, 142:4, 150:20, 152:15, 154:17, 164:14, 165:6, 172:14, 172:18, 172:25, 178:24, 179:12, 184:15, 185:11
**cases** [9] - 66:4, 66:6, 67:12, 73:4, 92:8, 136:25, 164:17, 172:24, 184:24
**castle** [1] - 157:13
**caught** [5] - 23:4, 138:17, 138:18, 144:20, 145:9
**caused** [7] - 84:9, 85:16, 91:23, 121:22, 140:4, 166:3, 166:16
**causes** [2] - 84:16, 99:13
**causing** [7] - 18:19, 19:7, 89:15, 98:11, 100:4, 124:12, 132:10
**CDU** [1] - 79:14
**cell** [2] - 78:15, 188:24
**ceremonial** [1] - 78:7
**ceremony** [1] - 49:11
**certain** [3] - 77:9, 93:16, 188:15
**certainly** [24] - 7:1, 19:15, 19:17, 23:11, 28:15, 31:13, 47:24, 79:23, 82:4, 97:22, 114:6, 117:19, 124:3, 130:17, 140:22,

141:14, 141:18, 152:22, 153:4, 155:6, 170:1, 185:12, 185:18, 189:15
**CERTIFICATE** [1] - 190:1
**certification** [22] - 47:15, 51:8, 51:9, 58:1, 58:2, 58:24, 60:2, 60:5, 60:20, 62:14, 66:19, 66:22, 77:19, 80:25, 81:20, 133:12, 134:16, 135:2, 138:16, 138:19, 155:5, 156:11
**certifications** [1] - 59:5
**certified** [2] - 78:8, 155:12
**certify** [1] - 190:4
**cetera** [2] - 172:19
**Chaclan** [1] - 188:21
**challenges** [1] - 58:10
**challenging** [2] - 58:10, 58:17
**chamber** [1] - 137:5
**chance** [5] - 26:22, 71:1, 103:17, 145:1, 185:20
**chances** [1] - 147:14
**CHANDLER** [1] - 1:6
**Chandler** [1] - 4:4
**changing** [2] - 32:2, 147:9
**channeled** [1] - 20:15
**channeling** [1] - 23:17
**chanted** [1] - 75:4
**chanting** [2] - 182:23, 183:16
**chants** [6] - 53:20, 53:21, 53:22, 53:24, 54:10, 182:22
**chaos** [3] - 7:13, 63:4, 153:10
**chaotic** [3] - 40:15, 145:16, 168:1
**Chapman's** [1] - 177:23
**character** [2] - 116:14, 116:17
**charge** [28] - 9:1, 17:19, 36:8, 40:4, 63:6, 80:12, 82:5, 102:25, 103:1, 108:14, 110:17, 125:12, 125:18, 129:24, 129:25,

139:4, 149:8, 149:9, 150:7, 150:9, 156:13, 156:14, 161:11, 161:13, 161:14, 164:8, 172:1, 176:3
**charged** [57] - 8:2, 8:5, 8:7, 8:8, 8:14, 9:2, 9:11, 9:14, 14:24, 16:15, 17:21, 17:24, 18:1, 18:3, 21:4, 24:24, 25:1, 25:7, 31:5, 31:6, 32:12, 36:5, 36:6, 39:8, 39:15, 40:7, 47:10, 47:11, 66:7, 68:14, 68:16, 68:21, 69:11, 70:11, 70:16, 70:19, 84:7, 85:7, 110:9, 120:13, 127:2, 132:9, 132:25, 133:24, 136:25, 141:11, 161:5, 161:6, 162:16, 162:19, 167:4, 169:14, 170:3, 170:11
**charges** [6] - 8:11, 17:18, 40:1, 40:2, 161:9, 171:8
**charging** [4] - 66:21, 103:25, 166:12, 166:14
**chasing** [1] - 178:24
**chat** [3] - 55:3, 58:9, 75:24
**chats** [1] - 58:17
**check** [1] - 105:20
**cheering** [1] - 179:22
**chemicals** [1] - 63:18
**chief** [1] - 141:10
**children** [1] - 181:6
**choice** [1] - 144:25
**choices** [1] - 23:1
**choke** [5] - 30:1, 30:5, 30:10, 30:11, 64:17
**choose** [2] - 46:2
**chooses** [2] - 25:23, 63:2
**chose** [1] - 50:21
**chunks** [1] - 163:8
**Cincinnati** [2] - 30:7, 145:7
**circuit** [6] - 92:1, 92:2, 132:11, 132:21, 133:23
**circulating** [2] - 146:11, 148:3
**circumstance** [4] - 144:7, 145:12, 148:19, 176:19

**circumstances** [2] - 67:16, 151:2
**circumstantial** [8] - 125:16, 134:19, 134:23, 137:16, 137:24, 152:8, 152:17, 156:8
**citizen** [3] - 37:25, 80:24, 109:22
**citizens** [1] - 37:23
**city** [4] - 22:17, 50:18, 50:20, 51:4
**civil** [28] - 8:7, 9:9, 14:12, 67:25, 68:4, 68:13, 68:24, 69:6, 72:3, 72:12, 72:18, 118:17, 139:7, 140:2, 156:12, 159:9, 159:20, 159:24, 160:25, 172:15, 172:16, 172:21, 173:13, 175:10, 175:24, 176:9, 176:13
**claim** [1] - 64:14
**claimed** [1] - 40:24
**claiming** [1] - 39:10
**claims** [1] - 62:22
**classic** [2] - 8:19, 8:24
**clear** [36] - 13:1, 14:14, 22:22, 25:10, 30:16, 37:1, 40:18, 40:25, 47:5, 47:22, 50:5, 57:16, 58:17, 61:19, 75:1, 78:9, 82:6, 93:4, 93:25, 94:2, 95:12, 108:25, 113:15, 114:25, 117:7, 122:15, 133:16, 142:22, 147:11, 147:13, 149:16, 154:24, 185:4, 189:15
**cleared** [1] - 183:4
**clearing** [1] - 13:20
**clearly** [11] - 14:19, 19:25, 49:17, 82:7, 99:15, 100:15, 112:14, 112:18, 113:25, 115:6, 141:18
**Clements** [1] - 4:11
**clenched** [2] - 20:7, 26:1
**clerk** [2] - 5:15, 6:3
**clerks** [1] - 188:21
**click** [1] - 42:3
**client** [5] - 85:16, 127:15, 135:5, 151:23, 162:8
**client's** [2] - 77:17,

137:12
**clients** [1] - 185:13
**climb** [2] - 158:10, 181:20
**climbed** [3] - 42:4, 62:16, 158:7
**climbing** [3] - 62:22, 62:23, 182:24
**clip** [2] - 179:9, 180:1
**clips** [1] - 188:13
**close** [5] - 5:8, 16:11, 18:5, 27:3, 27:9, 84:19, 87:10, 112:16, 117:16, 137:5, 139:21, 142:1, 145:9
**closed** [4] - 112:18, 112:24, 139:18, 140:9
**closely** [1] - 179:15
**closer** [1] - 125:2
**Closing** [5] - 3:5, 3:6, 3:7, 3:8, 3:9
**closing** [5] - 121:1, 129:2, 131:18, 162:5, 186:2
**closings** [1] - 6:11
**clue** [2] - 39:6, 63:11
**clueless** [1] - 67:21
**clues** [1] - 26:8
**CO** [1] - 2:5
**co** [1] - 163:2
**Co** [2] - 38:24, 151:25
**co-counsel** [1] - 163:2
**Co-Defendants** [2] - 38:24, 151:25
**Cobb** [15] - 3:7, 4:18, 4:20, 92:24, 107:7, 120:7, 163:22, 167:10, 170:9, 172:4, 180:8, 185:17, 185:21, 186:25, 189:17
**COBB** [46] - 1:23, 4:18, 120:8, 122:9, 122:14, 123:8, 123:20, 124:16, 124:20, 125:12, 125:22, 126:3, 126:8, 126:25, 127:17, 127:21, 128:21, 129:15, 129:21, 130:16, 130:22, 131:1, 131:12, 132:3, 132:6, 133:7, 135:11, 135:17, 135:19, 136:17, 137:15, 138:9, 138:23, 139:10, 139:12,

140:7, 140:15, 141:1,
185:22, 185:24,
186:13, 186:16,
186:18, 186:22,
187:8, 189:18
**Code** [2] - 132:3,
133:19
**cognizable** [1] - 72:2
**coincident** [1] -
181:10
**collaboratively** [1] -
185:12
**collapsed** [1] - 96:3
**collateral** [1] - 160:2
**colleague** [1] - 70:15
**colleagues** [3] - 4:9,
22:10, 118:16
**College** [1] - 62:7
**Columbia** [2] - 2:9,
190:13
**COLUMBIA** [2] - 1:1,
1:16
**combine** [1] - 145:16
**combined** [2] -
11:19, 152:17
**coming** [27] - 10:2,
11:23, 13:10, 27:15,
35:13, 52:25, 57:8,
57:9, 60:10, 61:23,
75:19, 76:17, 82:3,
89:12, 115:21, 116:9,
134:7, 144:1, 144:20,
144:21, 147:5, 148:5,
148:6, 154:2, 163:15,
184:24
**commander** [1] -
101:15
**comment** [3] - 71:13,
137:13, 149:19
**comments** [6] -
24:12, 42:21, 46:13,
77:14, 92:16, 137:12
**commerce** [9] -
68:10, 68:11, 139:14,
139:25, 140:6, 141:1,
176:2, 176:7, 176:11
**commit** [17] - 8:24,
9:5, 9:9, 14:1, 14:5,
14:12, 48:12, 49:7,
49:23, 72:14, 110:17,
149:10, 169:20,
172:3, 173:12,
176:18, 186:6
**commits** [2] - 53:14,
132:9
**committed** [4] -
17:20, 159:12,
172:20, 177:6
**committing** [5] -
49:8, 111:22, 119:9,

142:13, 173:3
**common** [5] - 91:12,
153:3, 153:4, 184:16,
185:5
**commonsense** [1] -
84:22
**comparing** [1] -
30:22
**comparison** [2] -
65:15, 103:14
**competent** [2] -
82:15, 93:20
**complete** [1] - 190:6
**completely** [5] -
35:12, 45:11, 79:11,
79:23, 150:11
**completes** [1] -
64:22
**component** [3] -
122:19, 122:25,
177:10
**components** [1] -
181:22
**compounded** [1] -
35:17
**computer** [1] -
176:16
**concede** [2] - 97:22,
137:24
**conceded** [3] -
71:14, 98:24, 162:1
**conceding** [2] -
122:4, 175:5
**conceive** [1] - 167:9
**concentrated** [1] -
34:18
**concentrating** [1] -
34:16
**concentration** [1] -
177:19
**concern** [5] - 51:16,
51:17, 91:1, 177:13,
177:14
**concerned** [8] -
23:20, 28:17, 28:18,
50:25, 51:2, 51:18,
181:23, 181:24
**concerns** [4] - 59:8,
59:12, 61:21, 62:3
**concert** [7] - 30:9,
99:10, 145:8, 146:7,
146:8, 149:5, 152:2
**concertgoers** [1] -
30:8
**conclude** [1] -
119:10
**concluded** [1] -
189:22
**conclusion** [4] -
22:12, 119:12, 152:9,

174:15
**conclusions** [1] -
71:22
**conclusive** [1] -
110:1
**concussions** [1] -
31:25
**conditions** [1] - 97:3
**conduct** [29] - 8:9,
28:24, 38:20, 39:19,
40:11, 41:23, 60:7,
61:6, 68:15, 68:22,
69:15, 70:21, 81:19,
86:5, 86:6, 88:16,
89:12, 108:5, 109:12,
110:18, 111:22,
119:9, 139:1, 141:18,
142:5, 142:6, 142:8,
161:16, 161:18
**confers** [1] - 163:2
**confined** [1] - 38:3
**confirm** [1] - 189:5
**confirmed** [2] - 5:14,
89:25, 95:20
**confronted** [2] -
153:16, 153:17
**confused** [1] - 172:7
**congested** [1] -
149:17
**Congress** [8] -
80:13, 124:25, 137:9,
137:14, 139:1,
161:18, 161:20,
162:13
**congressional** [4] -
92:2, 133:13, 154:15,
156:10
**connected** [1] -
112:12
**Connecticut** [1] -
1:21
**connection** [4] -
139:13, 139:16,
139:17, 139:24
**connoisseur** [1] -
66:5
**consciousness** [3] -
21:9, 22:9, 23:20
**consecutive** [1] -
130:19
**consequence** [2] -
160:2
**consequences** [2] -
160:13, 160:23
**consider** [6] - 14:15,
18:22, 24:22, 54:4,
83:5, 164:10
**consideration** [2] -
23:13, 120:3
**considered** [1] - 85:3

**consistent** [14] -
73:24, 74:15, 77:23,
80:23, 81:14, 89:10,
89:11, 89:12, 90:5,
95:14, 95:15, 146:3,
149:1, 149:6
**consistently** [4] -
84:2, 97:16, 98:25,
108:25
**constantly** [1] -
126:4
**constitute** [2] -
131:23, 132:13
**constitutes** [1] -
190:4
**Constitution** [2] -
2:9, 190:14
**construed** [1] -
98:14
**CONT'D** [1] - 2:1
**contact** [33] - 9:4,
11:22, 14:10, 14:14,
14:20, 15:17, 32:20,
73:1, 73:3, 73:11,
73:14, 113:2, 113:7,
114:2, 114:12,
117:25, 120:1, 124:6,
129:5, 129:6, 129:11,
129:12, 131:17,
131:21, 131:24,
132:15, 168:23,
170:14, 171:10,
171:14, 172:5, 186:3,
186:5
**contemplated** [4] -
72:13, 72:14, 98:9,
134:2
**contemplates** [2] -
72:5, 72:20
**context** [23] - 18:10,
19:6, 20:5, 21:14,
22:2, 22:13, 23:7,
23:9, 29:24, 30:8,
31:16, 32:2, 37:9,
38:2, 38:12, 39:24,
62:10, 68:18, 91:18,
94:11, 107:9, 107:21,
137:18
**continue** [2] - 12:23,
142:20
**continues** [1] - 20:23
**continuing** [1] -
183:12
**continuously** [1] -
100:10
**continuum** [2] -
37:2, 60:7
**contradicted** [2] -
79:24, 93:22
**contrary** [1] - 80:6

**contrast** [1] - 52:20
**contrasted** [1] -
136:13
**contributed** [2] -
85:9, 97:12
**contributing** [6] -
12:10, 15:15, 16:4,
17:14, 21:1, 46:12
**control** [4] - 89:23,
95:22, 109:5, 179:20
**convict** [1] - 150:6
**convicted** [3] - 76:9,
119:24, 150:15
**convince** [2] -
139:11, 178:11
**coordinated** [2] -
11:16, 17:7
**coordinating** [1] -
41:20
**coordination** [2] -
11:18, 38:25
**copies** [1] - 188:22
**cops** [8] - 26:3,
51:25, 52:6, 53:11,
77:20, 137:6, 178:2
**copy** [1] - 5:24
**copying** [1] - 188:13
**corner** [2] - 110:14,
112:1
**correct** [15] - 14:2,
30:25, 36:3, 55:23,
66:12, 91:17, 122:9,
151:22, 162:18,
164:2, 169:13, 170:9,
170:16, 172:4, 177:4
**correctly** [1] - 27:19
**corresponding** [1] -
56:4
**corroborate** [1] -
116:22
**corroborates** [2] -
116:18, 116:21
**corroborative** [2] -
54:13, 54:15
**corruptly** [1] - 80:17
**council** [1] - 66:14
**counsel** [8] - 4:6,
35:6, 106:20, 163:2,
163:4, 168:21,
188:13, 188:14
**count** [13] - 47:10,
65:10, 66:14, 70:5,
111:4, 116:25,
118:23, 133:4, 154:7,
154:15, 156:12,
161:8, 173:1
**Count** [45] - 8:13,
8:14, 9:11, 9:14,
13:11, 14:24, 15:12,
16:8, 16:15, 17:12,

17:13, 17:24, 17:25,
18:2, 19:8, 19:20,
20:3, 33:5, 38:18,
47:2, 47:10, 68:22,
82:18, 111:9, 116:24,
118:18, 118:21,
119:11, 120:19,
125:21, 126:1, 127:8,
127:11, 128:7, 133:4,
138:24, 154:13,
154:14, 161:15,
161:23, 162:11,
162:17
  **counted** [1] - 110:6
  **counterparts** [1] -
7:19
  **countervailing** [2] -
80:7, 80:22
  **counting** [1] - 10:23
  **country** [5] - 22:17,
23:5, 137:19, 174:23,
182:15
  **Counts** [9] - 17:19,
36:10, 69:12, 70:16,
120:20, 127:1, 127:6,
161:7, 170:19
  **counts** [18] - 8:3,
8:15, 17:21, 118:19,
119:13, 119:20,
119:21, 120:13,
127:2, 129:20,
141:10, 161:5, 161:8,
161:9, 169:9, 172:13,
173:2, 188:15
  **couple** [14] - 41:22,
99:10, 102:18,
103:10, 103:12,
103:16, 105:7, 110:6,
126:11, 130:13,
153:2, 163:12,
173:18, 179:24
  **courage** [1] - 181:14
  **course** [30] - 8:8,
16:1, 22:9, 22:10,
34:13, 35:8, 42:7,
47:18, 50:25, 56:25,
57:3, 57:10, 58:15,
68:2, 68:7, 68:11,
68:12, 68:15, 68:18,
69:13, 70:16, 73:2,
76:8, 100:22, 120:23,
164:12, 173:2, 177:5,
178:23, 180:7
  **COURT** [266] - 1:1,
4:1, 4:14, 4:17, 4:20,
5:2, 5:10, 5:13, 5:17,
5:21, 6:4, 6:7, 6:10,
6:14, 11:1, 12:5,
12:14, 12:21, 13:11,
13:14, 13:25, 14:16,

14:19, 14:22, 18:16,
19:1, 19:9, 19:11,
19:17, 19:22, 20:2,
22:15, 23:11, 23:22,
24:18, 27:18, 27:22,
28:9, 28:11, 28:20,
29:13, 29:17, 30:15,
30:21, 31:3, 31:7,
31:13, 32:5, 32:16,
32:23, 33:1, 35:25,
36:9, 36:21, 37:13,
37:19, 37:24, 38:11,
38:17, 39:12, 39:17,
39:22, 41:12, 42:16,
42:18, 42:21, 43:1,
44:2, 44:5, 48:2, 48:9,
48:21, 49:10, 49:16,
49:22, 50:6, 51:19,
54:2, 54:12, 54:19,
55:14, 55:18, 55:21,
55:24, 58:23, 59:11,
59:25, 60:8, 60:15,
63:5, 63:22, 65:8,
66:3, 66:10, 66:14,
67:6, 67:24, 68:1,
68:20, 68:24, 69:3,
69:7, 69:17, 69:21,
69:24, 70:1, 70:11,
70:14, 70:22, 70:25,
71:8, 71:10, 71:12,
72:6, 72:17, 72:23,
73:8, 73:16, 74:1,
75:7, 76:5, 77:15,
77:17, 84:11, 85:15,
88:6, 92:6, 92:11,
92:23, 95:10, 97:5,
104:8, 104:13,
104:19, 105:1, 105:6,
105:9, 105:21,
106:14, 106:24,
111:3, 111:8, 111:16,
118:15, 120:6, 122:3,
122:8, 122:10, 123:7,
123:19, 124:14,
124:17, 125:8,
125:21, 125:25,
126:24, 127:14,
127:19, 128:17,
129:14, 129:20,
130:9, 130:17,
130:23, 131:11,
132:2, 132:5, 133:6,
135:4, 135:15,
135:18, 136:11,
137:11, 138:2,
138:22, 139:8,
139:11, 140:1,
140:11, 140:25,
141:4, 146:5, 147:24,
148:3, 148:10,
148:14, 148:18,

149:22, 150:4,
150:11, 150:25,
151:7, 151:21,
152:10, 152:13,
154:8, 154:11,
156:16, 157:7,
157:14, 157:22,
158:23, 159:5, 159:9,
159:20, 159:22,
160:18, 162:9,
162:21, 162:25,
163:5, 163:21, 164:5,
164:16, 164:19,
165:8, 166:7, 166:10,
169:21, 170:6,
170:15, 170:17,
170:21, 170:24,
171:2, 171:4, 171:19,
171:24, 172:7,
172:10, 172:15,
173:6, 173:12,
173:17, 174:24,
175:2, 175:5, 175:9,
175:12, 175:16,
175:21, 175:23,
176:1, 180:1, 180:6,
180:8, 180:14, 185:8,
185:23, 186:12,
186:15, 186:17,
186:19, 186:23,
187:10, 187:25,
188:2, 188:18,
188:20, 188:25,
189:2, 189:6, 189:9,
189:14, 189:19,
189:21
  **court** [27] - 10:19,
11:6, 12:2, 12:13,
27:25, 28:4, 28:8,
29:10, 33:21, 34:4,
44:1, 44:19, 86:20,
87:7, 88:3, 88:10,
88:19, 89:6, 90:9,
91:5, 92:22, 93:8,
97:17, 105:16,
105:25, 112:9, 115:24
  **Court** [85] - 2:8, 2:8,
5:9, 9:7, 9:8, 9:23,
10:4, 10:16, 10:20,
12:17, 14:14, 16:3,
16:7, 16:10, 19:20,
20:6, 21:15, 22:22,
24:7, 24:16, 28:17,
28:24, 29:5, 32:18,
33:11, 34:23, 36:7,
37:6, 41:23, 41:25,
43:6, 43:8, 43:17,
46:1, 47:22, 48:14,
48:18, 49:14, 50:3,
50:18, 52:13, 54:8,
63:2, 63:13, 64:4,

64:8, 64:25, 65:1,
65:6, 67:3, 67:14,
67:15, 68:3, 68:7,
68:8, 68:9, 68:17,
69:13, 69:16, 70:23,
80:3, 82:14, 82:16,
83:8, 83:11, 97:1,
111:12, 119:19,
119:22, 120:2,
133:19, 133:20,
141:6, 141:24, 142:3,
144:12, 144:15,
154:7, 154:13, 160:7,
161:4, 162:7, 164:10,
190:12, 190:13
  **Courtroom** [1] -
188:3
  **COURTROOM** [1] -
4:2
  **cover** [2] - 63:19,
160:9
  **COVID** [1] - 62:1
  **cowards** [1] - 180:20
  **cracked** [1] - 33:14
  **crap** [1] - 178:17
  **crazy** [1] - 135:10
  **create** [2] - 146:25,
165:20
  **creates** [1] - 150:10
  **creating** [4] - 45:1,
45:23, 146:8, 149:14
  **credibility** [4] -
116:23, 122:10,
163:10, 163:25
  **credible** [14] - 30:17,
42:22, 61:6, 63:1,
77:3, 77:11, 78:9,
79:3, 91:23, 104:17,
148:13, 173:22,
174:7, 174:8
  **credibly** [1] - 142:17
  **credit** [10] - 24:7,
24:16, 48:21, 49:15,
54:2, 54:8, 63:3,
64:25, 65:1, 85:2
  **credits** [1] - 63:13
  **crime** [7] - 72:4,
72:6, 84:7, 150:17,
160:17, 177:6, 184:18
  **crimes** [4] - 76:9,
77:9, 82:24, 131:15
  **criminal** [6] - 92:8,
141:17, 141:21,
151:3, 151:4, 151:6
  **Criminal** [2] - 1:3,
4:3
  **cross** [7] - 25:18,
77:6, 89:25, 109:18,
114:20, 122:12, 123:3
  **cross-examination**

[5] - 25:18, 109:18,
114:20, 122:12, 123:3
  **crossed** [1] - 39:6
  **crossing** [1] - 187:6
  **crouched** [1] - 34:20
  **crowd** [63] - 12:18,
12:19, 12:20, 12:24,
15:9, 15:10, 15:14,
15:20, 20:25, 21:4,
23:19, 34:14, 34:15,
34:17, 35:18, 39:1,
45:12, 45:13, 51:10,
51:12, 57:5, 60:6,
60:21, 65:19, 65:22,
65:25, 74:5, 74:13,
85:20, 85:24, 88:25,
89:23, 90:14, 97:24,
99:11, 99:13, 99:15,
107:5, 109:1, 109:5,
110:3, 117:23,
135:24, 145:9,
146:12, 146:17,
148:6, 152:25, 153:9,
153:15, 155:11,
155:13, 156:21,
156:25, 157:11,
158:2, 158:5, 158:16,
174:21, 183:16, 184:5
  **crowded** [3] - 86:15,
158:21, 179:21
  **CRR** [3] - 2:7, 190:3,
190:12
  **crush** [3] - 25:21,
146:9, 146:11
  **crushed** [1] - 35:19,
36:18, 46:4
  **crushing** [5] - 18:2,
21:3, 25:7, 27:4,
37:10
  **cue** [1] - 10:11
  **cuff** [3] - 76:4, 82:7,
171:7
  **culture** [1] - 62:3
  **cure** [1] - 161:12
  **curfew** [6] - 139:20,
139:22, 140:9,
140:16, 140:21,
140:23
  **Curtice** [7] - 55:13,
56:12, 56:14, 56:16,
56:17, 56:19, 180:18
  **Cusanelli** [1] - 66:16
  **cut** [2] - 35:20, 49:5
  **cuts** [1] - 154:4

# D

  **D.C** [11] - 1:6, 1:18,
2:10, 50:11, 54:22,

55:9, 58:9, 61:23, 76:15, 176:6, 190:14
**dad** [2] - 116:3, 116:5
**dad's** [1] - 116:3
**damage** [5] - 26:9, 31:22, 32:4, 43:20, 91:15
**danger** [3] - 53:4, 98:14, 107:5
**dangerous** [59] - 8:4, 17:23, 18:18, 18:22, 20:18, 20:24, 22:17, 22:24, 22:25, 23:1, 23:2, 23:6, 23:7, 25:3, 27:17, 28:19, 29:18, 29:23, 30:5, 30:14, 30:24, 32:8, 32:9, 32:19, 32:21, 35:22, 35:23, 36:17, 36:20, 36:23, 37:8, 37:12, 68:18, 69:12, 69:14, 69:20, 69:23, 71:16, 83:22, 103:2, 107:11, 107:15, 107:18, 107:19, 107:21, 114:8, 114:17, 118:19, 120:19, 120:22, 121:5, 122:7, 123:17, 145:22, 160:10, 164:24, 165:3, 165:5
**dangerousness** [2] - 32:14, 107:4
**darned** [1] - 169:5
**date** [1] - 62:6
**Dated** [1] - 190:10
**DAVID** [1] - 1:7
**David** [4] - 4:4, 4:25, 6:16, 184:2
**dawn** [1] - 104:2
**dawns** [1] - 144:7
**DAY** [1] - 1:10
**days** [2] - 58:12, 130:14
**dead** [1] - 108:24
**deadline** [1] - 187:18
**deadliness** [1] - 107:4
**deadly** [18] - 18:18, 18:21, 71:16, 83:22, 103:2, 107:18, 107:20, 114:8, 114:17, 118:19, 120:18, 120:22, 122:4, 122:7, 123:17, 124:15, 164:24, 165:5
**deal** [3] - 78:7, 82:22, 130:21
**dealing** [2] - 53:7,

133:19
**dealt** [3] - 79:4, 79:9, 130:20
**death** [22] - 4:11, 18:19, 19:7, 31:11, 31:24, 83:15, 83:19, 84:19, 84:21, 98:4, 98:8, 98:10, 98:11, 98:15, 108:12, 119:17, 120:25, 121:19, 124:1, 124:13, 124:24, 125:3
**debate** [1] - 169:24
**December** [4] - 58:7, 59:23, 61:2, 75:18
**decided** [4] - 103:5, 139:20, 140:9
**decides** [2] - 55:11, 187:2
**decision** [4] - 81:25, 100:25, 154:1, 172:22
**deed** [1] - 116:12
**deep** [5] - 10:2, 110:14, 112:1, 153:6, 153:20
**defect** [2] - 161:8, 161:12
**Defendant** [40] - 3:4, 4:25, 6:8, 8:8, 18:20, 30:17, 36:1, 86:19, 87:6, 88:2, 88:9, 88:18, 89:5, 105:15, 105:24, 132:8, 134:2, 140:4, 142:11, 150:16, 161:24, 162:19, 165:21, 167:6, 168:6, 168:9, 169:3, 170:2, 171:4, 171:21, 176:4, 176:13, 179:21, 180:17, 180:25, 181:2, 181:12, 182:18, 187:16
**defendant** [3] - 8:24, 67:3, 148:14
**DEFENDANT** [3] - 1:19, 1:23, 2:2
**Defendant's** [4] - 86:18, 105:5, 115:20, 176:20
**defendant's** [1] - 67:2
**defendants** [1] - 67:8
**Defendants** [25] - 1:8, 6:16, 7:2, 7:5, 7:8, 8:2, 36:20, 38:24, 47:9, 58:3, 65:9, 65:25, 66:24, 68:14, 70:20, 123:5, 133:10, 148:23, 151:25,

169:19, 173:7, 176:24, 184:21, 186:24, 188:5
**DEFENDER** [1] - 1:23
**defending** [2] - 7:11, 36:17
**defense** [10] - 28:11, 35:6, 64:3, 71:1, 83:24, 106:20, 168:20, 183:3, 188:13, 188:14
**defense's** [1] - 168:1
**defenseless** [3] - 20:21, 35:12, 96:20
**defensive** [3] - 83:22, 168:16, 169:7
**defensively** [1] - 89:19
**deficit** [2] - 33:12, 33:15
**definitely** [1] - 92:12
**definition** [6] - 18:17, 19:3, 19:11, 84:21, 85:4, 187:14
**definitions** [1] - 125:6
**degree** [4] - 55:20, 143:13, 176:10, 184:18
**delay** [1] - 106:25
**delayed** [1] - 176:10
**deliberate** [1] - 93:5
**deliver** [1] - 6:2
**demand** [1] - 67:17
**demanding** [1] - 179:17
**demonstrate** [2] - 49:6, 75:11
**demonstrated** [2] - 49:20, 50:9
**demonstrates** [6] - 53:10, 53:11, 53:13, 57:18, 57:20, 59:1
**demonstrating** [2] - 75:8, 75:9
**demonstration** [1] - 76:6
**demonstrative** [2] - 86:23, 104:5
**deniable** [1] - 145:7
**deny** [1] - 145:20
**deploy** [1] - 88:13
**deployed** [1] - 88:21
**depth** [1] - 111:14
**DEPUTY** [1] - 4:2
**derogatory** [1] - 24:13
**describe** [1] - 9:20
**described** [1] - 24:22

**describing** [2] - 12:22, 39:23
**description** [2] - 146:7, 164:6
**designed** [2] - 90:3, 90:4
**desire** [3] - 42:19, 80:2, 80:20
**desires** [1] - 152:6
**despite** [2] - 47:5, 47:7
**destroy** [1] - 65:19
**destroyed** [1] - 103:3
**destroying** [1] - 65:19
**details** [1] - 71:17
**determination** [7] - 26:2, 52:9, 53:2, 57:7, 57:20, 63:21, 67:20
**determined** [11] - 6:17, 6:18, 16:19, 26:5, 45:24, 46:24, 47:25, 52:18, 53:15, 67:19, 174:17
**determining** [2] - 18:21, 116:22
**detracts** [1] - 54:17
**developed** [4] - 74:17, 76:4, 76:11, 76:21
**develops** [1] - 146:25
**Dibblee** [3] - 188:12, 188:22, 189:3
**dictated** [1] - 141:8
**die** [1] - 145:8
**died** [1] - 145:3
**difference** [9] - 79:6, 93:21, 94:1, 140:8, 176:14, 183:15, 184:7, 184:8, 184:9
**different** [28] - 8:25, 12:9, 17:18, 17:19, 17:22, 21:15, 30:2, 36:12, 38:20, 39:20, 57:24, 58:18, 65:17, 65:21, 76:16, 78:11, 78:21, 78:22, 79:1, 109:15, 110:6, 122:15, 159:25, 169:20, 170:1, 170:3, 185:3, 187:16
**differently** [2] - 7:20, 163:14
**differing** [1] - 132:20
**difficult** [2] - 21:25, 168:2
**difficulty** [1] - 40:24
**digress** [1] - 95:7
**dimensions** [1] -

90:13
**direct** [8] - 42:5, 99:17, 120:17, 133:11, 134:16, 138:15, 139:14, 151:12
**directing** [5] - 43:5, 45:14, 45:22, 182:25, 188:4
**direction** [6] - 43:3, 44:13, 62:19, 143:11, 149:18, 179:20
**directly** [3] - 58:25, 93:22, 149:15
**disagree** [2] - 32:16, 152:1
**disappeared** [1] - 158:20
**disassembled** [1] - 158:21
**disc** [1] - 5:25
**discount** [1] - 148:12
**discuss** [1] - 163:15
**discussed** [4] - 34:15, 73:9, 142:1, 163:22
**discusses** [1] - 179:4
**discussing** [3] - 6:10, 32:24, 179:23
**discussions** [1] - 177:12
**disdain** [1] - 56:15
**disfigurement** [1] - 125:5
**dismiss** [3] - 151:18, 152:18, 160:20
**dismissed** [1] - 141:15
**disorder** [27] - 8:7, 9:9, 14:13, 67:25, 68:4, 68:13, 68:25, 69:6, 72:3, 72:12, 72:19, 118:17, 139:7, 140:2, 156:12, 159:9, 159:20, 160:25, 172:15, 172:16, 172:21, 173:13, 175:10, 175:24, 176:9, 176:13
**disorderly** [7] - 68:15, 69:15, 69:22, 70:21, 110:18, 111:22, 119:9
**dispositive** [1] - 164:14
**disputes** [1] - 28:11
**disrupt** [3] - 138:25, 161:17, 177:3
**disruptive** [1] -

161:16
**distance** [2] - 112:22, 165:20
**distinct** [2] - 167:18, 170:4
**distinction** [1] - 50:3
**distress** [2] - 115:17, 115:25
**District** [3] - 2:8, 2:9, 190:13
**district** [1] - 190:13
**DISTRICT** [5] - 1:1, 1:1, 1:11, 1:14, 1:24
**disturb** [2] - 138:25, 161:17
**Donald's** [1] - 75:25
**done** [12] - 15:2, 36:19, 40:12, 63:9, 65:2, 73:21, 75:6, 78:6, 81:16, 122:21, 161:16, 180:10
**door** [49] - 18:2, 18:5, 20:11, 27:9, 28:13, 47:4, 63:16, 63:20, 64:14, 64:15, 78:10, 78:17, 84:4, 85:18, 94:8, 94:25, 99:2, 111:1, 111:14, 111:21, 112:16, 112:17, 112:19, 112:23, 112:24, 114:9, 115:11, 117:22, 117:23, 117:24, 119:3, 119:4, 127:20, 128:25, 129:14, 143:22, 143:23, 144:2, 168:22, 169:2, 173:22, 173:23, 173:25, 174:1, 174:9, 174:12, 174:18
**doorjamb** [1] - 111:1
**doors** [22] - 9:25, 11:20, 17:9, 17:11, 21:20, 41:6, 46:18, 110:21, 110:22, 110:23, 111:14, 111:15, 117:17, 127:21, 129:12, 153:16, 153:18, 173:21, 184:15, 184:16
**doorway** [2] - 48:1, 96:10
**double** [6] - 11:20, 17:9, 17:11, 21:20, 79:12, 173:21
**doubt** [40] - 8:11, 54:5, 71:21, 73:14, 80:4, 80:20, 82:17,

82:25, 83:4, 83:9, 83:12, 83:13, 85:23, 86:8, 91:20, 95:23, 97:5, 98:2, 98:23, 104:5, 108:5, 108:7, 108:17, 109:9, 114:16, 118:24, 119:15, 119:19, 119:22, 120:4, 120:14, 134:1, 138:1, 138:10, 138:12, 138:21, 139:4, 141:19, 151:19, 152:20
**doubts** [1] - 83:10
**down** [51] - 34:20, 35:15, 38:7, 38:8, 40:5, 40:6, 51:8, 51:11, 51:12, 51:21, 53:12, 53:21, 55:11, 56:1, 60:4, 60:22, 61:8, 75:16, 76:2, 76:14, 76:15, 78:12, 78:14, 81:3, 81:4, 81:5, 81:7, 81:9, 81:12, 81:20, 81:25, 87:11, 95:16, 99:9, 106:11, 112:1, 116:2, 118:2, 123:21, 128:2, 128:13, 140:10, 157:20, 158:11, 165:22, 168:13, 169:3, 170:8, 177:2, 178:20
**download** [1] - 6:1
**dragged** [2] - 21:17, 23:4
**dramatic** [1] - 98:15
**draw** [4] - 80:4, 82:14, 152:8, 160:22
**drawn** [1] - 151:16
**drive** [2] - 6:1, 139:19
**driving** [2] - 47:16, 107:19
**drop** [2] - 69:20, 89:1
**dropped** [2] - 66:14, 88:24
**drops** [1] - 32:22
**duck** [1] - 113:11
**dude** [2] - 94:22, 178:8
**due** [1] - 120:3
**Duke** [1] - 172:25
**during** [15] - 25:18, 34:23, 40:3, 43:18, 51:7, 61:24, 65:15, 68:12, 72:11, 87:19, 95:21, 96:5, 119:2, 125:13, 127:6

**duties** [1] - 112:18
**duty** [1] - 82:21
**détente** [1] - 183:5

# E

**e)(2)(D)** [1] - 111:10
**early** [5] - 46:7, 52:15, 56:8, 64:3, 139:21
**ease** [1] - 102:18
**easier** [2] - 48:13, 185:12
**easily** [4] - 22:6, 29:25, 87:3, 106:1
**East** [1] - 2:5
**Eastman** [5] - 54:24, 55:1, 55:15, 134:13, 179:16
**Eastman's** [1] - 55:17
**ebb** [1] - 109:7
**echo** [1] - 127:4
**edge** [4] - 83:20, 91:9, 107:17, 130:4
**EDWARD** [1] - 1:6
**Edward** [1] - 4:4
**Edwards** [1] - 190:12
**EDWARDS** [2] - 2:7, 190:3
**effect** [5] - 38:21, 81:19, 134:8, 140:6, 150:23
**effort** [4] - 11:16, 47:3, 61:3, 145:23
**efforts** [4] - 75:10, 81:15, 100:7, 185:11
**egress** [2] - 142:19, 147:20
**eight** [2] - 57:25, 61:1
**eight-hour** [1] - 57:25
**either** [16] - 9:5, 9:9, 14:4, 48:25, 49:3, 52:25, 63:14, 65:6, 89:18, 95:12, 114:7, 119:5, 129:3, 151:24, 173:7, 186:6
**election** [6] - 50:25, 51:2, 51:18, 53:8, 76:20, 155:12
**electoral** [1] - 177:15
**Electoral** [1] - 62:7
**electronic** [1] - 5:25
**element** [17] - 13:25, 14:4, 84:7, 118:23, 119:5, 122:7, 131:14, 139:5, 142:11, 149:8,

150:25, 154:3, 154:4, 159:11, 161:16, 176:9, 176:12
**elements** [11] - 68:4, 73:19, 108:18, 114:13, 120:13, 141:23, 147:12, 149:23, 154:5, 175:3, 175:4
**elevation** [2] - 158:1, 158:6
**Eleventh** [1] - 1:17
**Ellipse** [4] - 60:1, 135:18, 155:24, 179:10
**email** [4] - 140:19, 175:21, 188:11, 189:12
**embracing** [1] - 163:23
**emphasize** [2] - 26:14, 86:1
**employees** [4] - 139:21, 140:13, 140:17, 140:18
**encompass** [1] - 160:5
**encompasses** [4] - 8:19, 8:20, 22:3, 166:13
**encounter** [8] - 110:3, 110:12, 111:24, 113:6, 114:5, 114:7, 114:17, 115:21
**encountering** [1] - 155:18
**encounters** [1] - 117:13
**encourage** [4] - 51:10, 146:22, 179:15, 187:5
**encouraging** [6] - 58:9, 60:21, 61:19, 62:4, 151:5, 157:5
**end** [21] - 18:13, 58:12, 66:18, 72:15, 84:14, 100:8, 106:4, 121:20, 126:13, 127:15, 127:18, 128:12, 171:18, 172:11, 172:12, 180:23, 186:10, 186:15, 187:1, 187:3
**ended** [5] - 106:6, 106:11, 118:9, 158:16, 165:1
**ends** [1] - 160:17
**enemy** [1] - 56:13
**enforcement** [6] - 8:21, 9:4, 102:25,

137:6, 149:12, 159:17
**engage** [2] - 115:9, 115:10
**engaged** [6] - 7:17, 110:15, 118:25, 141:18, 161:24, 162:1
**engaging** [3] - 56:18, 59:7, 143:6
**enhance** [4] - 107:4, 132:16, 132:22, 132:24
**enhanced** [2] - 72:9, 120:21
**enhancement** [1] - 98:9
**ensuing** [1] - 95:15
**enter** [1] - 11:9
**entered** [3] - 6:9, 10:12, 80:10
**enters** [1] - 15:9
**enthusiastically** [1] - 7:9
**entire** [9] - 21:4, 65:22, 84:2, 87:9, 96:3, 126:9, 144:4, 147:18, 176:17
**entirely** [4] - 54:10, 73:24, 93:14, 95:14
**entirety** [1] - 169:18
**entrance** [5] - 7:12, 7:15, 10:2, 13:5, 62:21
**entrances** [1] - 10:8
**entrants** [1] - 143:7
**entry** [3] - 158:25, 159:3, 159:7
**entryway** [1] - 110:22
**envision** [1] - 166:15
**episode** [1] - 98:13
**equally** [1] - 32:9
**equipment** [1] - 116:12
**especially** [5] - 30:21, 80:21, 93:18, 160:4, 169:6
**ESQ** [7] - 1:14, 1:15, 1:15, 1:19, 1:23, 2:2, 2:4
**essential** [1] - 108:18
**essentially** [2] - 39:17, 140:19
**established** [1] - 158:14
**et** [2] - 172:19
**evade** [1] - 77:6
**event** [7] - 55:5, 75:20, 103:5, 135:9, 136:13, 142:22, 149:4

**events** [2] - 71:19, 136:7
**eventually** [3] - 57:1, 147:1, 153:25
**everywhere** [1] - 92:16
**EVIDENCE** [1] - 3:3
**evidence** [100] - 6:9, 8:10, 9:10, 12:5, 14:11, 14:24, 16:8, 19:24, 26:11, 26:25, 36:14, 37:1, 45:3, 47:14, 47:21, 48:16, 49:2, 49:3, 49:6, 52:14, 54:7, 54:8, 54:17, 62:9, 64:2, 64:5, 65:8, 66:21, 68:3, 68:7, 68:9, 69:11, 75:15, 76:12, 77:12, 80:7, 80:8, 80:16, 80:18, 82:15, 83:23, 92:17, 92:21, 93:20, 95:23, 96:1, 98:17, 103:24, 108:9, 108:16, 108:24, 109:8, 114:15, 119:15, 120:3, 121:9, 125:16, 126:20, 129:16, 129:18, 131:3, 131:10, 133:7, 133:11, 134:4, 134:15, 134:17, 134:19, 134:24, 136:1, 137:4, 137:16, 137:24, 138:5, 138:12, 138:13, 138:15, 151:15, 152:8, 152:17, 152:19, 153:4, 155:16, 155:19, 156:3, 156:9, 164:4, 164:12, 165:16, 169:13, 174:14, 175:15, 175:19, 177:2, 177:4, 182:9, 185:6, 185:10
**evident** [1] - 57:22
**evidentiary** [1] - 81:13
**evil** [1] - 133:22
**exacerbated** [1] - 94:14
**exact** [6] - 45:17, 70:5, 79:5, 104:24, 126:14, 135:13
**exactly** [17] - 10:16, 28:21, 41:4, 55:21, 72:13, 76:10, 98:24, 121:7, 122:23, 123:11, 126:12,

138:3, 148:4, 167:15, 170:23, 174:15, 182:6
**exaggerate** [2] - 92:4, 101:13
**exaggerating** [2] - 93:15, 123:6
**exaggeration** [1] - 79:21
**examination** [5] - 25:18, 109:18, 114:20, 122:12, 123:3
**example** [2] - 93:22, 124:4
**except** [2] - 158:5, 189:4
**exchange** [1] - 64:7
**excuse** [3] - 74:13, 75:2, 76:25
**exercise** [2] - 157:13, 157:14
**exercised** [2] - 120:9, 120:10
**exerted** [3] - 108:10, 108:21, 167:16
**exhibit** [14] - 5:18, 5:20, 5:24, 10:15, 11:2, 45:7, 94:20, 94:21, 106:18, 116:10, 125:25, 126:4, 140:19
**Exhibit** [61] - 3:4, 6:8, 9:19, 10:18, 11:3, 11:5, 12:1, 12:12, 16:12, 16:25, 27:24, 28:3, 28:7, 29:9, 33:17, 33:20, 34:3, 43:10, 43:22, 43:23, 43:25, 44:18, 45:8, 61:10, 86:18, 86:20, 87:7, 88:3, 88:10, 88:19, 89:6, 90:7, 90:8, 91:4, 93:7, 102:16, 105:5, 105:11, 105:16, 105:18, 105:23, 105:25, 110:2, 112:8, 115:20, 115:23, 119:7, 127:7, 128:5, 128:8, 131:5, 167:14, 168:2, 169:18, 177:22, 179:14, 180:19, 180:24, 182:17, 182:22, 183:24
**EXHIBITS** [1] - 3:3
**exhibits** [7] - 5:5, 5:8, 6:2, 188:12, 188:14, 188:21, 189:11
**exit** [1] - 46:21

**exiting** [1] - 144:22
**expect** [5] - 67:3, 81:6, 82:5, 100:4, 102:13
**expected** [2] - 82:1, 82:2
**expecting** [2] - 75:22, 76:2
**expects** [1] - 136:9
**experience** [9] - 30:3, 46:5, 46:9, 143:15, 149:7, 167:5, 167:13, 167:22, 176:20
**experienced** [6] - 15:2, 15:19, 38:24, 39:3, 59:10, 125:10
**experiences** [1] - 145:6
**experiencing** [1] - 167:7
**explain** [1] - 103:9, 113:24
**explained** [2] - 139:2, 150:2
**explanation** [15] - 24:17, 47:17, 54:3, 54:5, 101:7, 101:19, 127:19, 138:6, 146:4, 148:12, 151:18, 152:16, 152:18, 154:4
**expressed** [1] - 156:14
**expressing** [1] - 59:8
**extended** [4] - 90:20, 91:7, 99:3, 102:8
**extending** [1] - 93:5
**extent** [5] - 93:16, 113:6, 123:9, 147:23, 163:8
**extinguishers** [1] - 128:18
**extra** [1] - 93:17
**extreme** [2] - 166:24, 167:8
**extricate** [1] - 86:16
**eye** [2] - 128:9, 128:15
**eyes** [7] - 7:5, 115:22, 116:2, 129:17, 144:23, 147:8, 150:3

# F

**face** [13] - 34:22, 34:24, 35:3, 63:15, 81:9, 88:14, 88:21, 89:8, 100:2, 100:8,

143:25, 144:21, 144:24
**facilitates** [1] - 148:10
**fact** [20] - 16:10, 38:15, 45:16, 45:19, 57:15, 82:14, 83:16, 96:25, 97:5, 121:6, 122:20, 126:19, 130:2, 142:25, 156:4, 163:13, 167:14, 176:8, 179:11, 184:15
**factor** [1] - 94:6
**factors** [2] - 92:11, 92:12
**facts** [2] - 136:9, 164:20
**factual** [3] - 160:15, 183:2, 186:20
**faculty** [1] - 166:25
**fail** [1] - 118:19, 118:22, 118:23, 188:5
**failure** [3] - 154:14, 161:15, 161:23
**failures** [1] - 141:9
**fair** [2] - 23:13, 67:8
**fall** [6] - 131:14, 151:2, 160:14, 161:2, 181:3, 181:4
**falling** [1] - 181:3
**falls** [1] - 141:21
**fame** [2] - 122:20, 122:22
**familiar** [3] - 58:4, 164:16, 165:13
**families** [1] - 6:23
**family** [13] - 4:12, 58:8, 58:9, 58:11, 58:12, 58:15, 58:19, 59:7, 59:15, 61:24, 62:2, 63:22, 155:6
**Fanone** [1] - 21:17
**fantastic** [1] - 151:9
**far** [1] - 138:6
**Farina** [5] - 126:3, 128:16, 131:5, 131:8, 144:19
**fascinating** [1] - 65:14
**fast** [1] - 90:10
**fast-forward** [1] - 90:10
**fate** [1] - 77:8
**father** [5] - 50:16, 58:20, 75:16, 75:18, 81:10
**father's** [1] - 78:15
**fatigues** [1] - 81:6
**favor** [2] - 130:4, 151:16

**favorable** [2] - 151:15, 154:22
**FBI** [1] - 46:7
**fearful** [4] - 46:17, 46:20, 46:24
**FEDERAL** [1] - 1:23
**feet** [6] - 20:4, 20:14, 27:12, 56:16, 91:16
**fellow** [4] - 90:22, 91:2, 100:11, 127:24
**felon** [4] - 100:25, 101:2, 115:15, 176:4
**felonies** [4] - 14:12, 71:3, 104:1, 120:21
**felony** [41] - 9:2, 9:5, 9:8, 14:1, 14:6, 32:20, 70:9, 70:12, 72:2, 72:15, 72:19, 72:20, 72:21, 73:3, 73:6, 80:12, 109:14, 114:13, 118:19, 129:4, 131:16, 131:20, 131:25, 132:10, 132:15, 132:17, 132:22, 132:24, 170:9, 170:13, 172:3, 172:5, 172:14, 172:18, 172:20, 173:4, 173:10, 173:12, 186:6
**felt** [7] - 66:2, 84:25, 85:10, 97:11, 123:15, 185:25, 186:2
**female** [2] - 116:6, 116:11
**fervor** [1] - 67:20
**few** [14] - 9:25, 30:22, 33:6, 41:5, 44:15, 53:20, 53:21, 53:22, 53:24, 54:10, 78:21, 117:11, 130:3, 134:10
**field** [1] - 22:6
**fifth** [5] - 13:25, 14:4, 147:12, 149:8, 154:3
**fight** [8] - 61:14, 61:20, 62:10, 62:12, 62:13, 143:6, 182:11
**figure** [1] - 21:21
**figured** [1] - 46:21
**file** [10] - 130:13, 175:17, 185:15, 186:19, 186:23, 187:1, 187:2, 187:8, 187:10, 187:18
**files** [1] - 186:25
**filing** [1] - 176:8
**fill** [2] - 42:11, 44:21
**filling** [2] - 45:2, 45:23

**fills** [1] - 34:14
**finally** [1] - 21:6
**financial** [2] - 122:18, 122:24
**finder** [1] - 82:14
**fine** [7] - 42:23, 50:2, 61:15, 75:9, 186:16, 188:9
**finely** [1] - 49:5
**finish** [2] - 93:3, 93:13
**fire** [1] - 128:18
**firearms** [1] - 176:6
**first** [33] - 8:13, 21:25, 25:24, 44:8, 50:10, 50:11, 51:8, 60:9, 62:18, 71:8, 74:16, 78:18, 96:17, 97:15, 112:5, 112:6, 112:15, 115:16, 115:25, 117:2, 117:9, 122:16, 131:3, 141:9, 144:18, 148:14, 163:10, 163:12, 168:4, 174:6, 174:19, 177:9, 187:15
**First** [1] - 80:11
**fist** [2] - 44:5, 44:12
**fits** [1] - 62:9
**five** [4] - 117:20, 118:15, 141:10, 145:2
**flag** [2] - 112:25, 165:11
**flagging** [1] - 180:1
**flagpole** [5] - 41:8, 145:25, 165:22, 166:2, 179:1
**flash** [1] - 144:23
**flimsier** [1] - 87:1
**floating** [1] - 63:18
**flooding** [2] - 44:14, 45:23
**Floor** [1] - 1:17
**flop** [1] - 105:19
**flopping** [1] - 105:18
**FLORIDA** [1] - 1:24
**Florida** [2] - 1:25, 54:21
**flourish** [1] - 162:3
**flow** [3] - 43:4, 109:7, 147:23
**flying** [1] - 18:14
**focus** [2] - 19:18, 62:20
**focused** [6] - 63:15, 63:20, 100:20, 125:19, 146:21, 180:2
**focusing** [1] - 19:1
**folds** [2] - 56:25, 62:15

**folks** [1] - 189:21
**follow** [3] - 44:13, 157:12, 181:3
**followed** [2] - 74:5, 182:3
**following** [5] - 71:7, 74:13, 76:24, 106:23, 108:18
**follows** [1] - 159:2
**FOR** [6] - 1:1, 1:14, 1:16, 1:19, 1:23, 2:2
**force** [31] - 7:22, 7:24, 11:19, 14:5, 18:9, 18:13, 18:15, 20:9, 20:16, 23:16, 27:13, 27:14, 29:3, 29:22, 31:22, 34:11, 36:16, 89:16, 89:17, 91:11, 91:16, 91:18, 93:5, 93:23, 93:24, 94:1, 108:10, 108:21, 114:22, 117:22
**Force** [1] - 79:2
**forced** [1] - 34:19
**forceful** [2] - 37:9, 37:10
**forcible** [1] - 68:6
**forcibly** [2] - 29:6, 108:20
**forcing** [1] - 25:21
**forearm** [2] - 87:24, 101:25
**foregoing** [1] - 190:4
**foregone** [1] - 22:12
**foresee** [1] - 24:21
**foreseeable** [1] - 134:2
**forget** [3] - 94:14, 94:20, 178:25
**forgot** [1] - 136:11
**formal** [1] - 145:15
**formative** [1] - 145:6
**formed** [1] - 177:7
**former** [1] - 164:19
**formulated** [1] - 186:2
**forth** [5] - 58:12, 121:2, 167:17, 168:18
**forward** [19] - 4:6, 28:1, 43:7, 87:16, 90:10, 99:8, 102:2, 106:9, 109:1, 115:7, 115:10, 121:12, 153:20, 153:22, 156:25, 157:1, 157:6, 157:12, 165:19
**Foulds** [45] - 16:21, 18:4, 18:5, 26:20, 26:25, 27:3, 27:5, 27:8, 27:15, 29:7,

29:15, 30:15, 73:5, 73:13, 82:20, 84:4, 99:2, 109:16, 110:9, 110:10, 110:13, 111:25, 112:5, 112:12, 112:13, 112:15, 112:21, 112:22, 113:2, 113:3, 113:15, 113:16, 113:19, 114:12, 114:19, 119:3, 119:5, 119:18, 119:25, 167:25, 168:8, 168:10, 169:4
**Foulds'** [1] - 28:15
**Foulds's** [5] - 28:16, 168:3, 168:12, 168:24, 169:2
**four** [4] - 13:22, 17:5, 17:9, 169:14
**four-minute** [2] - 17:5, 17:9
**Fourth** [1] - 1:17
**fourth** [3] - 142:11, 147:12, 154:3
**frame** [4] - 18:2, 20:11, 85:18, 155:2
**frankly** [4] - 81:21, 83:1, 142:16, 143:20
**fraud** [2] - 177:14, 178:16
**free** [4] - 95:4, 139:11, 188:15, 189:16
**freedom** [1] - 87:19
**Freedom** [1] - 55:6
**fresh** [3] - 147:24, 148:8
**friend** [7] - 30:3, 30:4, 30:6, 46:5, 75:24, 145:9, 177:11
**front** [53] - 6:19, 11:21, 13:9, 14:9, 14:17, 14:19, 15:11, 15:17, 15:23, 25:15, 33:18, 34:7, 41:5, 42:7, 42:8, 42:15, 43:10, 51:22, 52:23, 55:13, 56:11, 56:25, 61:9, 66:18, 76:1, 76:6, 87:19, 90:19, 95:21, 98:25, 99:3, 108:25, 109:4, 112:6, 117:8, 117:13, 118:9, 121:13, 129:5, 129:10, 131:6, 143:16, 143:19, 149:16, 150:21, 150:23, 158:6, 165:13, 171:10,

171:13, 182:19, 183:4, 183:11
**frosted** [1] - 143:23
**frustrated** [8] - 35:7, 35:8, 35:9, 35:10, 35:11, 35:12, 35:13, 56:23
**frustrating** [1] - 124:2
**frustratingly** [1] - 166:19
**fucking** [2] - 182:20, 182:21
**full** [3] - 44:9, 190:5
**fuller** [1] - 94:20
**fully** [2] - 49:7, 117:3
**fun** [1] - 58:15
**function** [1] - 166:25
**fundamentally** [3] - 25:5, 47:16, 49:14
**furtherance** [2] - 151:5, 175:9

# G

**gap** [1] - 157:10
**Garden** [1] - 1:24
**gas** [5] - 20:22, 25:1, 81:9, 88:15, 174:16
**gates** [1] - 78:12
**gear** [1] - 174:16
**Gee** [1] - 135:7
**general** [7] - 12:6, 77:3, 77:21, 91:21, 116:14, 137:19, 141:8
**generalization** [1] - 136:19
**generally** [1] - 136:18
**gentleman** [4] - 145:25, 148:20, 174:9, 183:24
**gentlemen** [1] - 163:5
**getaway** [3] - 22:23, 23:6, 139:19
**giant** [2] - 80:9, 80:19
**Gina** [1] - 182:15
**given** [6] - 16:18, 41:17, 93:15, 93:17, 147:22
**glad** [1] - 83:6
**glance** [1] - 187:15
**glass** [6] - 9:25, 94:9, 110:24, 174:2, 174:6, 182:13
**glasses** [1] - 151:9
**goal** [14] - 7:6, 46:10,

46:25, 47:13, 56:21, 57:13, 144:4, 144:8, 153:3, 153:4, 153:9, 153:10, 178:12
**goals** [1] - 39:2
**gold** [1] - 110:23
**Gonell** [31] - 17:25, 21:23, 33:4, 33:8, 33:24, 34:9, 34:16, 34:20, 34:22, 34:24, 35:1, 35:18, 35:25, 57:10, 57:11, 79:20, 82:20, 89:22, 89:25, 92:1, 92:3, 92:25, 121:10, 121:14, 120:21, 124:3, 124:7, 125:9, 125:14, 126:10
**Gonell's** [9] - 121:21, 122:10, 122:12, 124:6, 124:9, 126:15, 163:23, 164:6, 178:4
**Goodman** [1] - 178:24
**Government** [66] - 4:7, 8:10, 8:14, 26:10, 35:21, 41:24, 48:16, 59:2, 60:22, 61:4, 62:25, 66:20, 72:2, 82:11, 82:24, 85:15, 101:23, 102:3, 103:8, 103:20, 104:20, 106:17, 108:17, 109:13, 110:2, 115:2, 117:5, 120:12, 120:14, 120:24, 124:21, 125:8, 125:14, 126:4, 127:13, 128:6, 129:24, 131:13, 134:12, 134:18, 134:24, 136:10, 136:24, 139:3, 139:9, 142:5, 146:14, 150:6, 151:11, 151:13, 151:16, 151:23, 154:22, 158:14, 161:25, 164:13, 170:13, 171:21, 172:2, 173:2, 186:24, 186:25, 187:2, 189:7, 189:13, 189:15
**government** [1] - 179:20
**GOVERNMENT** [1] - 1:14
**Government's** [41] - 9:18, 10:18, 11:5, 12:1, 12:12, 27:24, 28:3, 28:7, 29:9, 33:20, 34:3, 41:24,

43:25, 44:18, 90:7,
90:8, 91:4, 93:7,
94:20, 102:15,
105:18, 110:5, 112:8,
115:23, 116:10,
121:1, 127:7, 127:25,
128:5, 129:2, 131:5,
134:14, 135:7,
141:10, 141:22,
151:17, 151:19,
152:16, 152:19,
154:17, 170:5
  **grab** [1] - 24:20
  **grabbing** [6] - 24:2,
95:3, 126:15, 126:19,
126:22, 145:24
  **grand** [5] - 5:10,
5:15, 64:3, 64:6, 64:9
  **grandchildren** [1] -
181:7
  **grasping** [1] - 20:5
  **grateful** [1] - 70:15
  **gray** [1] - 64:11
  **great** [6] - 15:4, 28:6,
61:10, 73:16, 97:11,
186:14
  **green** [1] - 110:10
  **Green's** [1] - 177:24
  **ground** [5] - 40:19,
89:2, 109:21, 115:11,
128:3
  **ground-level** [1] -
109:21
  **grounds** [3] - 61:13,
111:3, 132:17
  **group** [8] - 14:11,
55:2, 58:8, 58:17,
62:18, 81:5, 134:5,
182:23
  **guess** [8] - 18:17,
28:20, 60:8, 66:3,
75:7, 92:6, 152:1,
175:8
  **guideline** [2] - 167:3,
187:14
  **guidelines** [1] -
166:22
  **guilt** [1] - 151:19
  **guilty** [19] - 65:6,
66:12, 80:18, 82:24,
104:6, 130:1, 136:22,
159:24, 160:11,
160:12, 160:13,
160:17, 162:14,
162:17, 171:12,
173:3, 184:17, 185:7
  **gulf** [1] - 160:15
  **gun** [2] - 67:5, 176:5
  **guy** [17] - 64:11,
67:5, 85:6, 87:23,

87:24, 94:14, 95:2,
95:3, 101:16, 101:24,
102:1, 102:2, 110:10,
144:22, 181:16,
183:24, 184:1
  **guys** [6] - 67:18,
103:12, 104:6,
178:14, 178:16,
181:17

# H

  **Hale** [1] - 66:16
  **Hale-Cusanelli** [1] -
66:16
  **half** [3] - 28:2, 44:9,
52:5
  **hammer** [7] - 31:16,
31:17, 31:20, 32:1,
32:6, 32:9
  **hammer's** [1] - 32:4
  **Hamner** [1] - 172:25
  **hand** [21] - 7:19,
25:20, 33:9, 33:10,
33:16, 36:8, 84:20,
87:4, 91:9, 95:4,
95:18, 98:10, 102:20,
117:18, 118:10,
141:16, 165:20, 166:4
  **handing** [1] - 42:6
  **handled** [1] - 136:13
  **handling** [1] - 105:19
  **hands** [15] - 7:20,
15:9, 20:7, 25:25,
36:20, 39:10, 46:19,
87:15, 87:25, 88:13,
88:20, 89:8, 90:23,
96:3, 184:19
  **hang** [2] - 62:18,
177:7
  **hanging** [5] - 107:13,
107:20, 156:6,
156:20, 157:5
  **happily** [1] - 63:14
  **happy** [2] - 30:8,
175:17
  **hard** [13] - 5:24,
21:13, 22:7, 60:23,
62:1, 67:1, 86:2,
118:13, 135:8, 138:7,
157:23, 185:9
  **hat** [1] - 177:7
  **Hawa** [1] - 179:4
  **Hawaii** [1] - 2:3
  **head** [29] - 31:17,
31:18, 31:23, 32:3,
32:6, 34:25, 35:3,
35:20, 41:9, 77:1,
85:6, 97:18, 105:13,

121:16, 121:25,
122:1, 123:14, 124:6,
126:15, 126:19,
126:21, 126:22,
128:15, 131:5, 166:4,
167:11, 167:19,
167:23
  **headed** [2] - 7:14,
62:21
  **heading** [1] - 52:13
  **headline** [1] - 145:2
  **heads** [4] - 40:20,
87:4, 102:19, 106:2
  **hear** [24] - 29:13,
45:19, 48:18, 49:16,
61:3, 64:8, 88:5,
100:13, 100:15,
118:16, 130:14,
137:20, 139:6, 139:8,
140:12, 155:23,
156:5, 180:15, 181:2,
182:6, 182:7, 182:20,
183:9, 184:4
  **heard** [41] - 9:23,
10:4, 11:22, 15:18,
16:21, 20:10, 21:15,
51:4, 51:6, 51:7,
51:10, 51:11, 54:25,
55:1, 55:22, 60:23,
61:4, 61:7, 68:9,
76:17, 76:21, 88:4,
88:7, 92:18, 94:21,
95:7, 100:14, 118:13,
136:6, 136:11,
155:11, 155:12,
156:1, 156:2, 156:21,
156:22, 158:25,
161:4, 180:18,
184:13, 185:2
  **hearing** [3] - 77:18,
97:2, 103:19
  **hears** [3] - 60:18,
74:18, 145:10
  **heave** [5] - 45:5,
45:6, 91:21, 96:9,
99:14
  **heave-ho** [4] - 45:5,
45:6, 96:9, 99:14
  **heave-hoed** [1] -
91:21
  **heavily** [1] - 164:1
  **heavy** [2] - 165:21,
166:1
  **heels** [1] - 26:19
  **held** [5] - 16:23,
50:18, 50:19, 98:25,
123:14
  **hell** [2] - 115:1,
181:17
  **helmet** [11] - 31:19,

32:3, 32:10, 35:4,
88:14, 121:21, 122:1,
126:15, 167:12,
174:16
  **helmeted** [3] - 31:17,
32:4, 32:6
  **help** [28] - 11:16,
12:10, 21:22, 22:10,
26:7, 26:16, 31:9,
42:5, 42:24, 46:24,
48:20, 48:25, 49:20,
49:25, 54:3, 77:8,
86:7, 86:12, 96:20,
96:22, 99:16, 100:7,
100:17, 101:4,
111:23, 153:9,
162:12, 178:12
  **helped** [1] - 101:18
  **helpful** [3] - 19:18,
22:1, 126:1
  **helping** [9] - 41:21,
46:9, 47:4, 111:20,
116:15, 117:20,
117:22, 117:23,
181:20
  **helps** [4] - 19:25,
26:10, 26:11, 48:3
  **hereby** [1] - 190:3
  **hero** [1] - 46:6
  **hide** [1] - 81:9
  **hiding** [1] - 174:9
  **higher** [1] - 110:4
  **highlights** [2] -
41:22, 43:12
  **highly** [2] - 30:14,
37:4
  **hightails** [1] - 113:12
  **Hill** [1] - 155:5
  **hill** [2] - 158:4, 158:5
  **himself** [17] - 29:22,
48:18, 48:24, 57:1,
86:16, 91:10, 94:7,
94:9, 94:12, 94:25,
98:2, 98:23, 108:23,
114:10, 140:4,
165:20, 184:5
  **history** [4] - 149:1,
149:4, 149:6, 152:21
  **hit** [11] - 26:4, 39:10,
99:24, 115:17, 119:4,
126:16, 126:18,
144:6, 166:6, 174:19
  **hits** [2] - 165:22,
167:19
  **hitting** [1] - 167:11
  **ho** [4] - 45:5, 45:6,
96:9, 99:14
  **Hodge's** [1] - 89:12
  **Hodges** [83] - 10:5,
18:1, 19:24, 20:9,

20:10, 20:18, 20:21,
21:3, 21:5, 21:6, 22:8,
23:18, 23:24, 24:2,
24:4, 25:4, 25:8,
25:16, 25:21, 26:2,
26:7, 26:8, 26:11,
26:16, 26:23, 27:4,
27:6, 27:10, 27:12,
30:22, 34:15, 45:19,
45:21, 52:17, 65:22,
66:2, 73:5, 78:25,
79:13, 79:19, 82:18,
82:20, 83:3, 84:24,
84:25, 86:6, 86:9,
86:12, 86:16, 89:14,
89:15, 91:17, 91:25,
92:15, 93:13, 93:23,
94:3, 95:4, 95:25,
96:7, 96:18, 99:16,
100:3, 100:7, 100:16,
101:6, 101:21, 102:7,
108:3, 108:11,
108:15, 108:19,
108:20, 109:11,
111:20, 114:6,
116:16, 119:2,
119:18, 119:24,
165:14, 167:9
  **Hodges's** [9] - 23:19,
65:13, 79:12, 79:18,
84:8, 88:14, 88:21,
90:5
  **hoed** [1] - 91:21
  **hold** [5] - 84:4,
90:14, 114:9, 120:11,
124:9
  **holding** [16] - 10:9,
37:7, 71:15, 84:2,
102:20, 102:21,
106:4, 106:9, 115:11,
128:8, 128:9, 128:10,
131:4, 168:7, 168:11
  **hole** [1] - 151:2
  **holes** [1] - 38:7
  **home** [28] - 6:23,
24:9, 24:10, 24:14,
26:3, 51:25, 52:1,
52:2, 52:7, 53:11,
53:16, 53:17, 77:20,
78:1, 78:20, 81:14,
139:21, 140:14,
140:15, 140:17,
140:18, 140:20, 178:8
  **homicide** [1] - 67:3
  **homicides** [1] - 67:7
  **honestly** [3] -
129:22, 146:6, 164:6
  **Honor** [113] - 4:2,
4:8, 4:15, 4:18, 4:24,
5:7, 6:6, 6:13, 13:13,

13:15, 14:21, 19:19,
22:20, 31:15, 35:21,
36:4, 46:15, 50:8,
53:21, 54:6, 54:14,
58:25, 66:25, 71:9,
71:11, 73:18, 73:22,
77:4, 80:1, 80:8, 88:1,
88:4, 88:12, 90:11,
92:17, 94:6, 96:16,
100:6, 103:4, 105:19,
106:3, 107:2, 107:22,
108:5, 108:14,
109:18, 111:7,
111:10, 112:4,
113:13, 115:19,
116:24, 118:18,
119:10, 119:12,
120:2, 120:5, 120:8,
120:9, 120:23,
121:17, 122:14,
126:3, 128:5, 128:21,
129:15, 130:8,
130:16, 131:12,
131:19, 132:6, 133:2,
133:7, 135:1, 135:11,
136:17, 137:15,
138:23, 139:6, 141:2,
141:7, 160:21,
162:23, 163:4,
164:20, 165:12,
165:16, 166:18,
166:22, 167:15,
169:9, 169:17,
171:12, 173:5,
175:18, 176:15,
176:19, 177:5, 177:7,
177:22, 179:12,
179:15, 180:18,
183:2, 184:12,
184:13, 185:5, 185:6,
188:17, 188:23,
189:8, 189:18, 189:20

**Honor's** [1] - 176:17

**HONORABLE** [1] -
1:11

**hoodie** [1] - 81:10

**hooked** [1] - 89:19

**hooks** [1] - 112:16

**hope** [1] - 21:7

**hopeful** [1] - 9:13

**hoping** [2] - 116:5,
117:21

**horse** [2] - 109:24,
161:4

**hospitalization** [2] -
84:18, 167:1

**hour** [3] - 51:5, 52:5,
57:25

**hours** [6] - 18:13,
61:1, 140:16, 144:17,

148:24, 184:22

**huge** [2] - 80:19,
160:15

**humanity** [3] - 24:23,
25:9, 26:6

**hung** [1] - 116:4

**hurling** [1] - 165:17

**hurry** [1] - 155:6

**hurt** [19] - 7:2, 22:1,
22:9, 26:22, 38:19,
41:18, 42:22, 64:12,
75:10, 85:7, 91:14,
97:10, 101:5, 101:21,
106:12, 113:24,
119:4, 145:21

**hurting** [1] - 99:22

**hurtling** [1] - 18:14

**hyperbole** [1] - 62:12

**hypothetical** [1] -
38:6


# I

**idea** [6] - 74:16, 76:5,
82:8, 96:13, 173:20,
183:10

**identified** [1] - 85:5

**identify** [2] - 4:6,
85:7

**identity** [1] - 81:9

**Ill** [2] - 1:6, 4:4

**illustrates** [1] - 43:19

**illustration** [1] - 30:4

**image** [1] - 15:21

**images** [1] - 9:16

**imagine** [7] - 130:17,
137:11, 152:3, 167:6,
167:23, 169:1, 180:8

**immediately** [8] -
86:6, 86:11, 86:13,
86:15, 108:6, 126:22,
174:3

**impact** [1] - 152:2

**impairment** [1] -
166:24

**impassioned** [1] -
61:13

**impeached** [1] -
163:18

**impede** [8] - 7:11,
72:10, 72:11, 108:20,
109:11, 138:25,
161:17, 172:19

**impeded** [3] - 15:25,
123:24, 163:24

**impedes** [1] - 160:2

**impeding** [17] - 8:20,
13:19, 29:2, 40:8,
41:20, 72:7, 72:10,

112:18, 129:3,
131:16, 132:25,
141:24, 142:14,
149:11, 159:13,
159:16, 172:2

**implement** [1] -
114:9

**importance** [1] -
38:25

**important** [29] - 18:7,
18:10, 21:13, 22:2,
22:13, 23:9, 23:10,
40:13, 44:23, 45:16,
46:11, 53:6, 59:21,
62:11, 130:7, 139:10,
143:15, 144:19,
145:5, 149:2, 168:5,
169:12, 169:16,
178:18, 180:22,
181:9, 184:3, 184:8

**importantly** [3] -
119:13, 143:13, 183:1

**imposing** [1] - 129:3

**impossibility** [2] -
144:7, 153:11

**impossible** [4] -
128:11, 153:8,
153:23, 174:20

**IN** [1] - 3:3

**inaccurately** [1] -
91:25

**inches** [1] - 102:7

**incident** [4] - 97:8,
98:6, 98:7, 117:15

**incidental** [2] -
72:18, 72:19

**incidentally** [2] -
106:11, 168:23

**inclination** [1] -
162:6

**inclined** [1] - 30:16

**include** [1] - 70:3

**included** [8] - 19:14,
32:17, 32:19, 69:15,
69:17, 70:9, 70:10,
166:13

**includeds** [1] - 68:19

**includes** [5] - 8:18,
34:9, 68:5, 70:8,
134:12

**including** [6] - 8:3,
17:2, 30:17, 151:8,
178:1, 187:13

**inconsistent** [5] -
54:10, 54:16, 79:11,
146:7, 152:6

**incredible** [4] -
54:15, 148:15,
148:22, 148:23

**incredibly** [2] -

164:12, 169:10

**indeed** [1] - 47:19

**independent** [2] -
24:21, 83:10

**independently** [1] -
83:11

**indicated** [6] - 78:8,
82:3, 90:20, 107:10,
114:4, 119:1

**indicates** [1] - 178:9

**indication** [3] -
50:23, 81:24, 118:1

**indicative** [4] -
77:22, 89:9, 116:13,
116:17

**indictment** [2] - 40:1,
169:10

**individual** [1] - 21:20

**individuals** [8] -
17:21, 47:24, 52:25,
57:24, 65:6, 68:8,
160:16, 181:5

**indulgence** [1] -
163:3

**infer** [3] - 86:8,
88:16, 167:20

**inference** [4] - 26:5,
80:4, 80:19

**inferences** [3] -
82:14, 86:2, 151:16

**inferential** [2] - 80:9,
82:16

**inflexible** [2] - 18:9,
23:16

**influence** [1] - 155:8

**information** [1] -
152:8

**ingress** [1] - 142:19

**inherently** [5] -
37:20, 83:21, 107:11,
107:15, 165:3

**injure** [3] - 89:13,
89:14

**injured** [17] - 7:2,
30:18, 91:19, 91:20,
96:24, 97:6, 97:8,
97:9, 97:14, 97:17,
97:22, 109:19,
125:15, 126:23,
142:18

**injuries** [3] - 85:10,
97:12, 97:17

**injuring** [2] - 86:9,
125:13

**injury** [71] - 18:19,
19:7, 19:12, 31:4,
31:6, 31:11, 31:14,
31:24, 32:11, 32:12,
32:14, 83:15, 83:19,
84:7, 84:10, 84:12,

84:15, 84:16, 84:17,
84:19, 84:20, 84:25,
85:1, 85:2, 85:3, 85:5,
85:14, 85:16, 85:21,
86:10, 90:2, 90:4,
93:11, 98:4, 98:8,
98:10, 98:12, 98:14,
98:19, 108:12,
119:17, 120:25,
121:19, 121:23,
124:1, 124:13,
124:18, 124:24,
124:25, 125:1, 125:2,
125:10, 132:10,
147:14, 149:14,
152:4, 164:6, 164:11,
164:13, 166:3,
166:17, 166:18,
166:23, 167:5, 167:7,
167:13, 167:22, 169:5

**inkling** [1] - 138:15

**innocent** [1] - 150:3

**inquiry** [1] - 148:25

**inside** [41] - 6:18,
6:25, 7:3, 7:7, 7:23,
8:6, 11:11, 47:7,
47:15, 52:4, 53:9,
53:18, 62:8, 62:13,
67:2, 74:1, 75:11,
78:24, 110:25,
112:16, 113:9, 135:8,
136:1, 137:5, 142:23,
143:9, 143:11,
145:23, 146:21,
146:22, 146:23,
147:7, 147:8, 148:7,
155:13, 159:4, 168:9,
173:25, 179:6,
183:15, 184:10

**insisting** [1] - 109:22

**inspections** [1] -
103:23

**installed** [1] - 111:1

**instantly** [1] - 100:18

**instead** [2] - 7:20,
7:21

**institute** [2] - 139:20,
140:9

**instituted** [1] -
139:22

**instruction** [1] -
165:2

**instructions** [4] -
19:14, 141:22, 147:7,
176:9

**instructive** [2] -
164:21, 182:16

**instrument** [1] -
160:10

**insults** [1] - 165:17

**integrity** [6] - 50:25, 51:3, 51:18, 53:8, 76:19, 177:15

**intend** [4] - 14:5, 48:15, 48:17, 89:13

**intended** [18] - 9:8, 26:17, 31:21, 48:20, 53:25, 65:5, 76:12, 80:4, 85:24, 98:3, 108:19, 119:16, 124:25, 135:3, 138:25, 159:13, 172:20, 177:3

**intending** [8] - 14:12, 72:10, 72:11, 72:21, 102:6, 109:10, 115:8, 136:4

**intends** [1] - 9:5

**intent** [78] - 14:1, 26:15, 47:21, 47:23, 48:5, 48:6, 48:12, 48:25, 49:6, 49:20, 49:22, 49:25, 50:4, 50:9, 50:10, 50:23, 52:8, 53:10, 53:11, 53:13, 54:18, 56:9, 57:16, 57:18, 57:21, 60:14, 63:8, 63:21, 63:24, 64:22, 66:25, 67:6, 67:12, 67:16, 78:23, 80:1, 80:13, 81:16, 82:10, 82:17, 86:3, 86:5, 88:17, 106:6, 108:6, 131:25, 132:15, 133:3, 133:9, 133:22, 134:20, 134:21, 136:10, 137:25, 138:4, 139:5, 143:10, 149:10, 154:4, 161:17, 167:20, 169:19, 172:3, 173:12, 176:18, 176:23, 177:2, 177:5, 178:19, 180:16, 184:13, 184:17, 184:23, 185:3, 186:1, 186:6

**intent-wise** [1] - 81:16

**intention** [5] - 62:19, 81:3, 81:7, 95:13, 149:15

**intentional** [1] - 126:21

**intentionally** [5] - 25:13, 100:1, 108:10, 108:23, 119:23

**intentions** [2] - 143:1, 147:14

**interaction** [4] -

23:23, 33:25, 126:10, 126:13

**interactions** [1] - 110:7

**interest** [5] - 59:8, 59:16, 60:12, 92:9, 92:19

**interested** [4] - 23:22, 37:2, 58:4, 165:8

**interesting** [9] - 52:20, 64:5, 65:15, 73:8, 122:11, 146:15, 156:12, 180:16, 183:2

**interestingly** [1] - 115:16

**interfere** [3] - 76:12, 108:19, 109:10

**interfered** [1] - 16:1

**interfering** [18] - 8:20, 13:12, 13:21, 17:16, 28:14, 40:9, 42:24, 72:7, 72:16, 133:1, 141:25, 142:14, 149:12, 149:24, 152:5, 159:13, 159:16, 172:2

**interpretation** [3] - 24:12, 71:18, 114:19

**interpreted** [1] - 114:23

**interpreting** [2] - 113:20, 113:21

**interrupt** [1] - 159:10

**interstate** [8] - 68:10, 139:14, 139:25, 140:6, 141:1, 176:2, 176:7, 176:11

**intervening** [1] - 43:9

**intervention** [1] - 167:1

**interview** [4] - 96:18, 96:19, 96:23, 97:3

**interviewed** [1] - 97:15

**interviewing** [1] - 92:16

**interviews** [2] - 122:21, 163:19

**intimately** [1] - 58:4

**intimidating** [4] - 8:20, 40:9, 142:14, 149:11

**introduce** [2] - 146:15, 146:16

**introduced** [3] - 104:17, 104:20, 146:16

**introduces** [1] -

184:5

**invention** [1] - 149:5

**investigation** [1] - 163:16

**invite** [1] - 43:9

**involuntarily** [1] - 119:2

**involve** [6] - 30:9, 30:11, 117:24, 131:24, 132:14, 132:15

**involved** [6] - 30:10, 30:12, 58:7, 134:25, 156:20, 160:16

**involving** [1] - 166:24

**irrespective** [1] - 107:5

**issue** [11] - 83:7, 150:10, 152:17, 160:6, 160:19, 161:7, 161:19, 162:11, 163:21, 178:2, 186:1

**issued** [2] - 103:11, 188:6

**issues** [4] - 14:15, 185:16, 185:19, 187:11

**issuing** [1] - 188:7

**it'd** [1] - 125:4

**item** [1] - 165:3

**itself** [5] - 19:5, 34:5, 108:7, 131:22, 179:8

**Ivermectin** [1] - 62:2

**J**

**jab** [1] - 179:1

**jackets** [1] - 189:1

**Jackson** [1] - 172:17

**jammed** [1] - 91:14

**January** [17] - 6:15, 38:20, 50:13, 50:17, 50:21, 58:10, 59:22, 59:24, 65:20, 66:6, 75:18, 92:3, 93:24, 133:12, 134:4, 134:5, 135:14

**job** [4] - 16:1, 38:9, 121:7, 185:12

**JOCELYN** [1] - 1:15

**Jocelyn** [1] - 4:10

**jockeying** [1] - 105:12

**John** [2] - 54:24, 55:15

**join** [4] - 11:18, 75:22, 85:24, 176:22

**joined** [1] - 7:9

**Jones's** [1] - 55:6

**JOSE** [1] - 2:4

**José** [1] - 4:25

**journalist** [2] - 116:6, 116:19

**JR** [1] - 2:2

**judge** [1] - 86:21

**Judge** [1] - 83:1, 86:8, 87:9, 97:21, 107:1, 109:14, 110:16, 115:16, 164:23, 172:17, 189:11

**JUDGE** [1] - 1:11

**judges** [2] - 105:10, 184:24

**jump** [1] - 110:19

**jumping** [1] - 110:19

**juries** [1] - 138:11

**jurisdictional** [1] - 176:3

**jury** [13] - 5:10, 5:15, 64:4, 64:6, 64:9, 83:5, 138:11, 141:22, 162:4, 164:22, 165:2, 176:8, 184:13

**justice** [1] - 160:22

**justification** [1] - 82:19

**juxtaposition** [1] - 162:6

**K**

**Kailua** [1] - 2:3

**Kamala** [1] - 181:7

**keep** [15] - 16:2, 28:13, 42:12, 44:15, 69:8, 93:10, 101:3, 109:2, 124:5, 144:25, 146:24, 147:15, 149:15, 158:3, 168:22

**keeping** [2] - 43:4, 147:8

**keeps** [4] - 12:17, 145:1, 147:22, 184:23

**kept** [6] - 11:23, 109:22, 109:23, 112:19, 145:20, 145:21

**key** [2] - 38:13, 97:1

**keynote** [1] - 61:3

**kids** [2] - 58:15, 58:16

**kill** [1] - 172:13

**killed** [1] - 67:4

**Kimberly** [1] - 4:8

**KIMBERLY** [1] - 1:14

**kind** [50] - 12:7, 14:1,

16:8, 17:18, 17:19, 24:19, 27:18, 28:12, 39:23, 53:4, 53:5, 58:5, 60:9, 66:4, 72:19, 74:17, 75:15, 76:24, 77:20, 78:16, 79:5, 81:6, 84:9, 84:17, 85:4, 85:17, 87:3, 91:1, 93:25, 98:7, 102:24, 106:10, 106:18, 107:22, 114:16, 128:12, 128:13, 136:13, 143:24, 145:10, 147:7, 157:4, 163:23, 165:18, 166:10, 168:17, 171:20, 177:9, 185:19

**knocked** [1] - 41:6

**knowing** [1] - 77:7

**knowingly** [1] - 94:7

**knowledge** [17] - 47:3, 59:1, 59:3, 59:19, 66:18, 66:25, 133:3, 133:9, 133:21, 134:20, 136:10, 137:25, 139:5, 155:17, 176:21, 177:10, 178:9

**known** [1] - 157:2

**knows** [17] - 38:25, 39:3, 40:13, 42:8, 50:18, 64:19, 96:12, 100:6, 146:10, 148:5, 148:6, 153:22, 174:15, 174:16, 177:5, 182:4

**L**

**lack** [5] - 76:11, 138:12, 162:18, 162:19, 164:6

**lacking** [1] - 133:21

**lacks** [1] - 133:22

**ladies** [1] - 4:14

**lady** [1] - 151:9

**language** [4] - 24:13, 161:3, 166:12, 166:14

**large** [4] - 15:7, 135:23, 165:11, 165:21

**largely** [1] - 141:14

**last** [7] - 5:15, 10:8, 29:14, 76:14, 107:2, 124:6, 162:10

**late** [1] - 154:6

**laugh** [1] - 75:12

**LAUREN** [1] - 1:23

Lauren [1] - 4:18
law [19] - 5:15, 8:21, 9:4, 37:21, 67:17, 102:24, 130:10, 131:20, 132:20, 133:16, 137:6, 139:16, 140:3, 149:12, 150:3, 150:12, 159:16, 188:20
LAW [2] - 1:20, 2:2
lawful [1] - 181:4
lawmakers [1] - 183:22
lawn [3] - 53:23, 157:8, 157:23
lay [2] - 19:25, 49:5
lead [5] - 55:8, 76:1, 82:1, 82:5, 142:9
lead-up [1] - 55:8
leadership [8] - 12:8, 38:25, 40:14, 40:15, 46:8, 46:11, 47:3, 145:15
leading [2] - 25:12, 101:15
leaned [2] - 87:16
leaning [5] - 23:3, 95:16, 99:8, 102:2, 143:24
leap [2] - 80:9, 82:16
learned [1] - 30:6
learning [1] - 58:2
least [14] - 51:5, 55:1, 55:16, 95:4, 100:10, 123:5, 132:21, 132:23, 134:10, 134:21, 137:4, 143:10, 172:24, 187:12
leave [11] - 25:19, 26:21, 100:22, 102:12, 115:14, 126:23, 145:17, 157:22, 178:12, 184:15, 188:18
leaves [1] - 127:12
leaving [2] - 63:22, 127:10
Leffingwell [2] - 172:18, 172:22
left [13] - 33:9, 33:10, 91:6, 112:4, 113:7, 115:5, 115:6, 115:17, 116:1, 135:20, 147:16, 153:21, 155:10
left-hand [2] - 33:9, 33:10
legal [6] - 130:6,

131:2, 184:8, 185:16, 186:20, 187:11
legally [1] - 131:12
legislators [1] - 179:18
legs [2] - 87:17, 99:9
length [1] - 144:16
less [4] - 32:4, 101:10, 133:9, 139:14
lesser [7] - 32:17, 32:19, 33:15, 68:18, 69:15, 69:17, 70:9
level [6] - 29:6, 85:13, 98:1, 109:21, 128:9, 128:15
leverage [5] - 87:16, 94:10, 99:4, 99:9, 102:9
Lewis [1] - 168:13
liability [3] - 21:11, 98:17, 141:21
lied [1] - 79:22
life [4] - 144:23, 145:14, 158:8, 178:7
lifted [2] - 39:10, 83:20
lifting [1] - 103:17
light [4] - 41:2, 128:10, 151:15, 154:21
lighter [1] - 86:25
likely [6] - 76:9, 93:11, 98:3, 98:6, 98:7, 169:6
limited [1] - 9:7
Lindy [1] - 4:15
LINDY [2] - 1:19, 1:20
line [82] - 5:22, 6:20, 6:22, 7:14, 7:21, 7:24, 10:1, 10:6, 10:10, 10:13, 11:10, 11:19, 11:22, 12:11, 13:9, 13:18, 14:9, 14:19, 15:11, 15:16, 15:17, 15:23, 16:6, 17:4, 17:7, 17:8, 17:15, 20:12, 33:18, 34:7, 39:4, 39:7, 40:6, 40:18, 40:20, 41:1, 41:6, 41:9, 42:7, 42:9, 42:14, 42:15, 45:6, 45:24, 46:10, 46:19, 52:11, 52:22, 53:1, 53:3, 53:15, 56:6, 56:23, 57:4, 57:15, 62:15, 74:7, 90:14, 93:10, 95:21, 117:5, 117:9, 128:4, 129:5, 153:6, 153:8, 153:10,

153:19, 155:18, 158:21, 159:6, 171:10, 171:13, 177:20, 180:17, 181:1, 181:19, 182:19, 183:5, 183:12
lines [3] - 37:18, 85:9, 101:9
lineup [1] - 165:15
link [2] - 140:22, 181:1
lip [2] - 85:5, 97:18
LISA [2] - 2:7, 190:3
Lisa [1] - 190:12
list [7] - 104:14, 106:18, 106:21, 167:15, 168:3, 171:15, 175:18
listed [2] - 161:9, 167:24
listen [4] - 99:22, 143:12, 179:15, 180:2
listened [1] - 86:15
listening [2] - 45:17, 174:21, 185:25
lit [1] - 41:2
litany [2] - 67:4, 68:21
literal [2] - 154:20, 155:1
literally [2] - 130:3, 154:20
litigate [1] - 172:25
live [1] - 140:12
lived [2] - 12:25, 26:18
lives [1] - 145:4
livestream [1] - 61:12
living [1] - 145:7
location [1] - 23:9
lock [1] - 110:23
locked [3] - 117:23, 153:16, 153:18
logic [2] - 138:24, 139:2
logical [3] - 26:5, 47:17, 174:14
look [28] - 15:8, 19:17, 54:6, 54:7, 81:22, 86:5, 88:23, 89:3, 102:17, 103:12, 106:1, 112:25, 121:7, 138:4, 140:11, 143:25, 144:21, 144:24, 146:15, 147:12, 149:19, 167:16, 172:1, 179:18, 188:14
looked [5] - 95:8,

133:23, 140:2, 143:24, 187:14
looking [21] - 48:9, 48:10, 63:9, 64:17, 64:18, 64:20, 67:14, 67:15, 106:12, 108:8, 143:21, 143:25, 158:1, 158:4, 158:6, 158:12, 172:3, 173:25, 174:21, 186:20, 187:17
looks [7] - 11:13, 15:7, 90:14, 103:13, 104:11, 144:22, 176:19
LOPEZ [4] - 2:4, 2:5, 162:23, 163:1
Lopez [2] - 4:25, 5:3
lose [1] - 23:20
losing [1] - 21:9
lost [1] - 22:9
louder [2] - 47:8, 65:3
love [1] - 106:18
loves [1] - 58:15
low [1] - 98:20
lower [1] - 7:11
luncheon [1] - 106:22
lying [1] - 100:1

# M

machines [1] - 177:13
Madison's [2] - 56:3, 180:24
magic [6] - 67:9, 67:11, 67:12, 67:14, 67:17, 67:23
magistrate [1] - 105:10
maintain [2] - 96:5, 142:19
maintaining [1] - 147:20
major [1] - 181:22
male [2] - 34:11, 35:17
malign [1] - 143:9
man [14] - 21:22, 25:20, 25:22, 27:14, 27:15, 46:15, 46:16, 46:22, 46:23, 46:24, 59:4, 63:14
manage [1] - 153:10
manageable [1] - 147:22
manner [31] - 18:20,

18:23, 22:3, 23:8, 23:9, 23:11, 30:14, 31:2, 31:8, 31:10, 31:25, 36:15, 38:16, 69:23, 83:14, 83:22, 107:12, 107:19, 107:21, 108:11, 114:8, 114:17, 120:25, 124:12, 125:20, 148:20, 148:21, 164:25, 165:4, 166:2, 169:7
manning [1] - 6:22
manufacturers [1] - 176:6
march [2] - 51:12, 53:12
marcher [2] - 55:4, 134:9
married [3] - 168:3, 168:14
mask [7] - 20:22, 24:20, 25:2, 88:15, 94:15, 110:10, 174:16
masks [2] - 81:9
mass [8] - 12:24, 16:5, 17:14, 45:5, 45:6, 45:22, 62:7, 157:22
massive [1] - 99:14
Mastony [30] - 10:4, 21:18, 22:11, 33:23, 37:14, 45:7, 45:9, 45:16, 79:2, 79:4, 79:12, 79:15, 79:24, 83:17, 87:18, 89:22, 93:21, 93:22, 93:25, 95:20, 100:13, 103:11, 107:16, 107:25, 109:2, 136:12, 136:18, 142:25, 158:18, 168:15
matter [10] - 6:19, 6:20, 6:22, 7:1, 13:14, 41:12, 48:23, 63:5, 83:16, 123:8
matters [2] - 94:11, 163:25
mayhem [2] - 35:23, 61:16
mayor [2] - 139:19, 140:9
McCaughey [127] - 1:6, 1:20, 4:4, 4:16, 4:23, 6:16, 7:16, 9:12, 9:17, 10:11, 11:8, 11:16, 12:3, 12:5, 12:18, 13:3, 13:23, 17:20, 18:1, 18:3,

19:8, 20:4, 20:5, 20:6, 20:13, 20:22, 21:1, 21:3, 22:5, 23:15, 23:23, 23:24, 24:3, 24:8, 24:11, 24:24, 25:5, 25:13, 25:25, 27:6, 29:1, 29:6, 30:13, 33:6, 36:11, 36:14, 37:11, 38:21, 39:20, 50:15, 50:20, 51:13, 52:12, 52:15, 52:24, 53:7, 53:10, 53:19, 55:10, 56:22, 57:6, 57:21, 59:22, 68:16, 68:23, 69:13, 70:17, 71:19, 82:12, 82:24, 83:13, 84:1, 84:24, 85:8, 85:23, 87:22, 90:15, 94:14, 94:18, 94:19, 94:21, 94:23, 95:5, 95:7, 95:24, 96:12, 96:15, 97:20, 98:2, 99:21, 99:24, 100:18, 101:4, 101:18, 101:20, 101:25, 102:1, 102:6, 108:10, 108:23, 109:4, 109:10, 110:8, 110:15, 112:1, 112:10, 112:13, 112:16, 112:23, 113:5, 113:7, 114:5, 114:16, 115:3, 115:21, 116:11, 117:3, 117:4, 117:8, 117:15, 119:15, 129:17, 133:15, 155:25, 171:5, 178:1, 179:2

**McCaughey's** [33] - 3:4, 6:8, 20:14, 24:7, 24:17, 27:2, 50:9, 60:18, 73:20, 85:19, 86:6, 86:19, 87:6, 87:10, 87:25, 88:2, 88:9, 88:11, 88:18, 88:23, 89:5, 89:8, 89:11, 97:2, 98:21, 102:12, 105:13, 105:15, 105:24, 106:6, 112:7, 177:14, 178:18

**McFADDEN** [1] - 1:11

**mean** [56] - 22:16, 23:25, 31:9, 37:22, 37:24, 48:2, 48:5, 59:12, 66:3, 66:6, 66:20, 72:4, 72:12, 76:22, 76:23, 77:10, 77:20, 78:4, 82:6,

83:8, 84:13, 84:22, 91:12, 92:6, 96:25, 97:9, 97:13, 97:23, 98:9, 100:25, 101:3, 101:12, 101:14, 103:20, 103:24, 104:16, 106:7, 107:8, 108:22, 122:11, 128:18, 135:10, 138:19, 140:1, 143:3, 144:22, 145:7, 146:6, 148:11, 151:22, 163:24, 170:12, 183:20, 184:7, 184:9, 187:13

**means** [3] - 84:12, 124:24, 166:23

**meant** [1] - 160:5

**measure** [1] - 89:23

**media** [4] - 81:2, 92:2, 122:23, 155:20

**medical** [11] - 21:14, 21:16, 21:19, 21:21, 21:23, 22:6, 22:7, 22:12, 23:14, 29:25, 167:1

**meet** [3] - 109:13, 116:3, 166:14

**meeting** [1] - 134:7

**meets** [2] - 68:3, 68:10

**Mehaffie** [87] - 4:5, 5:1, 5:4, 6:17, 7:18, 13:7, 30:5, 38:18, 38:23, 39:8, 40:1, 40:11, 40:23, 41:2, 41:17, 42:3, 42:8, 43:2, 43:8, 43:10, 43:14, 43:15, 44:10, 44:25, 45:13, 45:22, 45:25, 46:3, 46:6, 47:2, 47:6, 48:15, 49:13, 49:19, 52:20, 52:21, 57:23, 58:14, 59:4, 60:17, 60:22, 61:5, 61:9, 61:12, 61:19, 61:21, 62:10, 62:16, 62:22, 63:1, 63:8, 63:14, 64:11, 64:19, 65:5, 128:3, 133:15, 141:7, 141:13, 142:2, 142:7, 142:16, 143:5, 143:8, 144:20, 146:19, 155:22, 155:23, 156:1, 156:3, 156:4, 156:9, 160:12, 162:2, 171:22, 173:15, 173:20, 174:1, 174:5, 182:1, 182:19,

182:24, 183:4, 183:18, 184:2, 184:4

**MEHAFFIE** [2] - 1:7, 2:2

**Mehaffie's** [10] - 30:3, 41:23, 43:17, 59:1, 59:16, 65:3, 141:11, 141:15, 141:16, 151:18

**Mehta** [1] - 164:23

**member** [4] - 58:10, 58:20, 137:9, 166:25

**members** [7] - 30:11, 58:9, 58:19, 59:7, 60:4, 60:6, 137:14

**men** [2] - 6:23, 12:9

**mental** [1] - 166:25

**mention** [6] - 16:9, 61:25, 62:1, 62:2, 96:15, 116:19

**mentioned** [7] - 78:25, 80:24, 83:2, 100:12, 101:24, 109:10, 160:8

**merely** [1] - 151:3

**merge** [7] - 129:20, 130:2, 169:23, 169:25, 170:1, 170:3, 170:5

**merger** [2] - 130:5, 130:14

**merging** [1] - 169:9

**message** [2] - 134:5

**messages** [9] - 55:8, 58:8, 61:25, 66:17, 66:22, 67:4, 76:13, 116:20, 155:20

**metal** [4] - 18:2, 20:11, 27:9, 165:21

**method** [1] - 149:14

**Metz** [1] - 79:3

**middle** [1] - 140:8

**might** [20] - 19:18, 20:8, 31:17, 51:12, 53:20, 59:9, 67:11, 73:22, 81:6, 83:5, 98:16, 101:16, 114:22, 149:5, 158:13, 162:3, 162:6, 162:23, 165:10

**miles** [1] - 145:7

**military** [2] - 81:5, 101:15

**milled** [2] - 78:12, 118:7

**millions** [2] - 76:18, 76:20

**mind** [8] - 38:12, 51:1, 65:12, 67:2, 86:3, 145:16, 153:24,

155:15

**mindset** [1] - 75:3

**minimize** [4] - 144:5, 147:13, 149:13, 152:3

**minimized** [2] - 59:3, 60:22

**minimizes** [2] - 60:23, 147:21

**minimizing** [1] - 61:5

**minimum** [1] - 60:18

**minor** [1] - 84:16

**minute** [8] - 10:13, 17:5, 17:9, 26:21, 33:17, 45:10, 71:4, 141:12

**minutes** [20] - 9:25, 11:25, 24:13, 28:2, 33:7, 40:17, 41:5, 43:7, 43:11, 46:23, 52:6, 52:18, 56:11, 105:7, 117:11, 118:16, 130:3, 144:9, 184:19, 184:22

**miscarriage** [1] - 160:22

**misdemeanor** [6] - 69:18, 70:10, 70:12, 131:24, 132:14

**misdemeanor's** [1] - 109:15

**misdemeanors** [10] - 8:9, 68:14, 68:22, 69:9, 69:10, 71:2, 71:3, 120:21, 159:15, 161:6

**misnomer** [1] - 8:18

**misremembering** [1] - 171:20

**missed** [2] - 69:4, 112:7

**Mister** [1] - 38:19

**mob** [25] - 7:10, 10:2, 10:13, 11:9, 11:15, 11:18, 12:10, 14:9, 16:18, 30:11, 35:13, 38:9, 40:15, 47:20, 60:4, 91:21, 96:8, 96:9, 98:5, 140:5, 176:22, 178:19, 178:21

**model** [1] - 103:22

**moment** [55] - 9:20, 11:15, 13:8, 13:24, 20:20, 20:25, 21:5, 21:11, 22:1, 22:4, 23:21, 24:23, 25:2, 25:9, 25:10, 26:5, 26:6, 26:13, 26:16, 28:19, 33:24, 35:5, 35:13, 35:22, 40:3,

44:7, 44:14, 44:23, 45:11, 45:17, 48:8, 54:25, 62:4, 64:13, 64:17, 64:20, 83:24, 87:21, 111:6, 143:19, 144:24, 145:17, 162:23, 167:18, 168:5, 168:17, 178:4, 179:14, 179:23, 180:22, 181:9, 182:18, 183:2, 184:1

**momentarily** [1] - 12:17

**moments** [11] - 24:9, 25:25, 26:20, 30:23, 177:6, 178:13, 180:16, 182:13, 183:3, 184:19, 184:22

**Monday** [2] - 187:22, 187:23

**monkey** [2] - 172:8, 172:11

**montage** [1] - 110:2

**month** [3] - 76:14, 76:15, 178:6

**morning** [21] - 4:1, 4:8, 4:14, 4:15, 4:17, 4:18, 4:20, 4:21, 4:22, 4:24, 5:2, 5:3, 5:4, 5:14, 6:13, 6:14, 64:3, 71:11, 71:12, 117:1, 145:2

**most** [22] - 7:1, 26:5, 40:21, 47:17, 47:24, 63:14, 67:7, 67:8, 79:3, 92:7, 101:14, 108:14, 119:12, 138:6, 149:2, 151:15, 154:21, 168:4, 177:18, 177:20, 183:1, 188:11

**mostly** [1] - 108:15

**motion** [2] - 34:23, 44:13

**motions** [1] - 27:10

**motivation** [1] - 152:23

**motivations** [1] - 143:1

**motive** [1] - 152:24

**mounds** [2] - 98:22

**mouth** [4] - 13:10, 16:24, 17:10, 63:19

**move** [19] - 17:10, 28:1, 45:12, 83:25, 89:23, 90:1, 99:4, 100:8, 113:3, 116:24, 121:13, 121:18, 123:15, 142:20, 154:6, 156:25,

169:19, 175:15
**moved** [3] - 68:24, 109:6, 119:2
**movement** [5] - 34:24, 84:3, 87:19, 109:5, 110:7
**movements** [2] - 17:7, 95:22
**moves** [3] - 33:18, 47:1, 112:2
**moving** [13] - 20:12, 33:2, 38:18, 43:2, 43:4, 99:15, 100:8, 112:2, 121:17, 146:17, 146:24, 147:15, 155:15
**MPD** [1] - 103:10
**MR** [89] - 4:15, 4:24, 5:7, 5:12, 5:14, 5:19, 5:22, 71:9, 71:11, 71:13, 72:7, 72:18, 73:2, 73:12, 73:17, 74:2, 75:13, 76:8, 77:16, 77:22, 84:13, 85:22, 86:21, 87:8, 88:4, 88:7, 88:11, 88:20, 89:7, 90:10, 91:6, 92:10, 92:12, 93:2, 93:9, 95:11, 97:7, 104:10, 104:18, 104:22, 105:4, 105:8, 105:11, 105:17, 105:23, 106:1, 107:1, 111:4, 111:11, 111:17, 112:10, 115:25, 118:17, 122:5, 141:6, 146:10, 148:1, 148:5, 148:11, 148:16, 148:19, 149:25, 150:9, 150:13, 151:1, 151:13, 152:7, 152:12, 152:14, 154:10, 154:13, 156:19, 157:9, 157:15, 157:25, 158:24, 159:6, 159:11, 159:21, 159:25, 160:20, 162:18, 162:23, 163:1, 163:3, 187:24, 188:1, 189:11, 189:20
**MS** [201] - 4:8, 4:18, 6:6, 6:13, 6:15, 10:20, 11:3, 11:7, 12:3, 12:9, 12:16, 12:23, 13:13, 13:15, 14:3, 14:18, 14:21, 14:23, 18:25, 19:2, 19:10, 19:13, 19:19, 19:23, 20:3,

22:20, 23:14, 24:6, 24:24, 27:21, 28:1, 28:5, 28:10, 28:16, 28:23, 29:11, 29:14, 29:19, 30:20, 31:1, 31:4, 31:12, 31:15, 32:8, 32:18, 32:25, 33:2, 33:22, 34:5, 36:4, 36:10, 36:25, 37:16, 37:22, 38:1, 38:14, 38:18, 39:14, 39:19, 39:24, 41:16, 42:17, 42:20, 42:25, 43:2, 44:3, 44:7, 44:20, 48:8, 48:11, 49:2, 49:13, 49:17, 50:2, 50:8, 51:20, 54:6, 54:14, 54:20, 55:16, 55:19, 55:23, 55:25, 58:25, 59:15, 60:3, 60:13, 60:16, 63:7, 63:24, 65:11, 66:9, 66:11, 66:25, 67:8, 67:25, 68:2, 68:21, 69:1, 69:5, 69:9, 69:19, 69:22, 69:25, 70:2, 70:3, 70:7, 70:8, 70:13, 70:15, 70:23, 71:5, 111:9, 120:8, 122:9, 122:14, 123:8, 123:20, 124:16, 124:20, 125:12, 125:22, 126:3, 126:7, 126:8, 126:25, 127:17, 127:21, 128:21, 129:15, 129:21, 130:16, 130:22, 131:1, 131:12, 132:3, 132:6, 133:7, 135:11, 135:17, 135:19, 136:17, 137:15, 138:9, 138:23, 139:10, 139:12, 140:7, 140:15, 141:1, 163:7, 164:2, 164:9, 164:18, 164:20, 165:10, 166:8, 166:12, 169:23, 170:7, 170:16, 170:19, 170:23, 170:25, 171:3, 171:6, 171:23, 171:25, 172:8, 172:12, 172:16, 173:11, 173:16, 173:18, 174:25, 175:4, 175:7, 175:11, 175:14, 175:17, 175:22, 175:24, 176:2, 180:5,

180:7, 180:11, 180:15, 185:22, 185:24, 186:13, 186:16, 186:18, 186:22, 187:8, 188:17, 188:19, 188:23, 189:1, 189:3, 189:8, 189:18
**multiple** [16] - 7:17, 8:3, 10:1, 11:23, 30:7, 40:25, 43:6, 51:24, 52:18, 61:22, 75:10, 83:10, 86:13, 126:17
**multiplied** [2] - 20:15, 23:18
**multiplier** [11] - 18:9, 20:9, 20:16, 23:16, 27:13, 36:16, 89:16, 89:17, 89:18, 91:11, 91:18
**multiplying** [1] - 27:14
**multistate** [2] - 50:15, 54:21
**murder** [1] - 184:18
**murmuring** [2] - 155:11, 155:13
**must** [7] - 92:23, 97:25, 135:9, 142:12, 156:1, 161:16
**mutually** [1] - 152:6

## N

**name** [1] - 94:15
**named** [1] - 170:1
**narrow** [1] - 158:19
**natural** [1] - 81:19
**nature** [2] - 73:24, 142:22
**near** [3] - 106:4, 108:25, 117:16
**nearly** [1] - 78:18
**necessarily** [11] - 22:25, 31:15, 68:5, 92:7, 128:22, 130:18, 133:22, 141:19, 151:4, 152:1
**necessary** [1] - 114:13
**neck** [1] - 184:19
**need** [20] - 5:17, 14:14, 19:16, 48:6, 53:23, 54:4, 61:15, 67:6, 67:23, 69:7, 88:5, 96:21, 118:16, 123:1, 123:10, 130:24, 140:11, 162:8, 183:19, 187:8

**needed** [6] - 21:15, 21:21, 53:24, 103:5, 182:7, 182:10
**needs** [3] - 21:19, 83:8, 176:5
**negate** [1] - 26:16
**negotiating** [4] - 183:20, 183:22, 184:2, 184:10
**nervous** [2] - 58:19, 116:7
**never** [15] - 67:2, 88:24, 91:2, 99:3, 100:25, 115:10, 115:18, 116:1, 122:17, 142:23, 148:25, 153:5, 165:6, 184:20
**new** [1] - 103:7, 187:11
**news** [4] - 56:4, 78:7, 92:23, 92:25
**next** [18] - 5:22, 17:18, 26:19, 42:3, 42:10, 43:7, 94:14, 105:7, 124:23, 127:1, 130:13, 132:8, 133:2, 145:2, 145:25, 181:8, 181:16, 183:18
**nexus** [1] - 176:3
**nice** [1] - 52:2
**night** [3] - 5:16, 55:6, 187:6
**nobody** [5] - 46:4, 58:16, 104:10, 106:10, 147:19
**nonassault** [2] - 186:3, 186:5
**nonassaultive** [1] - 173:9
**none** [3] - 100:15, 150:1, 150:2
**nonetheless** [1] - 42:23
**noninherently** [2] - 107:18, 107:19
**nonspecific** [1] - 97:13
**normal** [1] - 162:6
**normally** [3] - 33:15, 125:6, 163:15
**NORTHERN** [1] - 1:24
**Northwest** [3] - 1:17, 2:9, 190:14
**northwest** [1] - 181:10
**note** [3] - 123:22, 131:3, 153:3
**noted** [1] - 109:18

**notes** [2] - 123:20, 190:5
**noteworthy** [1] - 163:12
**nothing** [16] - 7:6, 58:24, 61:5, 78:22, 80:1, 80:2, 80:3, 90:16, 96:23, 98:1, 98:7, 107:21, 155:21, 163:17, 189:18, 189:20
**notice** [1] - 162:18
**notion** [1] - 131:20
**nowhere** [1] - 38:4
**number** [6] - 5:18, 70:5, 113:15, 126:6, 129:12, 147:21
**numerous** [2] - 50:10, 120:13

## O

**oath** [3] - 94:5, 96:8, 97:16
**object** [9] - 15:7, 18:18, 18:21, 18:23, 18:24, 19:5, 22:3, 38:15, 166:16
**objection** [1] - 6:6
**objects** [1] - 18:14
**oblivious** [1] - 63:14
**obstacle** [6] - 7:6, 27:6, 52:3, 57:12, 57:17, 146:25
**obstacles** [2] - 53:17, 53:18
**obstruct** [16] - 47:21, 47:25, 48:5, 48:23, 48:24, 48:25, 49:25, 60:2, 60:5, 76:16, 81:8, 82:12, 133:17, 133:22, 135:3, 183:7
**obstructed** [2] - 47:20, 176:10
**obstructing** [6] - 49:12, 141:25, 159:13, 159:16, 160:14, 160:23
**obstruction** [21] - 8:5, 9:9, 14:13, 47:2, 48:7, 49:23, 65:10, 66:8, 66:13, 71:25, 72:13, 73:18, 79:25, 112:25, 133:4, 133:8, 136:22, 154:15, 175:10, 175:13
**obvious** [1] - 31:25
**obviously** [26] - 28:21, 30:21, 37:25,

60:9, 74:25, 76:18, 82:13, 83:8, 84:8, 99:14, 99:16, 102:3, 106:20, 109:18, 114:14, 114:25, 119:12, 119:22, 120:9, 135:4, 137:2, 150:5, 157:17, 187:5, 188:4, 188:12

**OC** [1] - 121:12

**occasions** [2] - 67:10, 96:16

**occur** [2] - 133:13, 135:14

**occurred** [2] - 50:1, 71:19

**occurring** [5] - 59:13, 133:12, 134:16, 135:2, 135:9

**occurs** [1] - 151:22

**October** [1] - 190:10

**OF** [8] - 1:1, 1:3, 1:10, 1:16, 1:20, 1:23, 1:24, 2:2

**offender** [1] - 150:15

**offense** [7] - 48:12, 49:7, 49:8, 49:23, 142:13, 149:11, 159:12

**offenses** [2] - 141:23, 169:20

**offensive** [4] - 28:12, 37:14, 38:2, 89:20

**offensively** [2] - 90:2, 90:3

**OFFICE** [2] - 1:16, 1:23

**Office** [1] - 2:3

**Officer** [171] - 10:5, 16:21, 18:1, 18:3, 18:5, 19:24, 20:9, 20:10, 20:18, 20:21, 21:3, 21:5, 21:6, 21:17, 22:8, 23:17, 23:19, 23:24, 24:1, 24:2, 24:4, 25:4, 25:7, 25:16, 25:21, 26:2, 26:7, 26:8, 26:11, 26:16, 26:20, 26:23, 26:25, 27:3, 27:4, 27:5, 27:6, 27:8, 27:10, 27:12, 27:15, 28:15, 28:16, 29:6, 29:15, 30:15, 30:22, 34:15, 45:19, 45:21, 52:17, 55:13, 56:3, 56:11, 56:14, 56:16, 56:17, 56:19, 64:8, 64:10, 65:13, 65:22, 66:2, 73:5, 73:13,

78:25, 79:2, 79:11, 79:13, 79:18, 79:19, 79:20, 82:18, 82:19, 83:3, 84:4, 84:8, 84:24, 84:25, 86:6, 86:12, 86:16, 88:14, 88:21, 89:14, 89:15, 89:22, 89:25, 90:5, 90:22, 91:8, 91:17, 91:25, 92:1, 92:3, 92:15, 93:13, 93:23, 94:3, 95:4, 95:24, 96:7, 96:17, 99:1, 99:16, 100:3, 100:7, 100:16, 101:6, 101:21, 102:6, 108:3, 108:11, 108:15, 108:18, 108:20, 109:11, 109:16, 110:9, 110:10, 110:13, 111:20, 111:25, 112:5, 112:12, 112:13, 112:15, 112:21, 112:22, 113:2, 113:3, 113:14, 113:16, 113:18, 114:6, 114:12, 114:18, 116:15, 119:4, 119:24, 119:25, 121:20, 121:21, 165:7, 165:14, 165:23, 166:3, 167:9, 167:25, 168:3, 168:7, 168:10, 168:12, 168:24, 169:1, 169:4, 177:23, 177:24, 178:4, 178:24, 180:18, 180:23, 182:17, 182:20, 183:9, 183:23

**officer** [39] - 24:14, 24:15, 24:19, 32:21, 37:24, 38:8, 38:10, 45:19, 56:19, 64:15, 72:8, 72:11, 79:8, 83:17, 90:17, 90:19, 90:22, 92:20, 93:4, 95:10, 95:11, 101:10, 104:21, 107:13, 122:13, 122:16, 137:7, 160:10, 164:19, 165:5, 165:13, 165:19, 167:21, 171:17, 172:5, 173:24

**officer's** [2] - 91:8, 100:10

**officers** [96] - 6:22, 7:2, 7:5, 7:11, 7:17, 7:21, 8:17, 10:1, 10:7,

10:14, 11:10, 11:23, 14:10, 15:11, 15:17, 15:24, 17:16, 17:22, 18:14, 20:13, 21:11, 23:3, 34:9, 36:12, 36:17, 36:23, 37:22, 38:4, 39:9, 40:9, 40:12, 41:9, 41:14, 42:19, 45:11, 52:11, 53:14, 56:15, 57:15, 57:16, 57:19, 75:10, 82:21, 89:19, 89:20, 90:12, 91:3, 92:7, 92:14, 93:4, 93:6, 96:21, 100:9, 100:11, 100:15, 100:19, 103:10, 104:9, 104:15, 111:21, 115:8, 115:9, 117:13, 118:10, 121:2, 128:12, 128:14, 128:19, 128:25, 129:6, 129:11, 136:6, 137:6, 142:15, 147:25, 149:24, 151:24, 152:5, 153:20, 155:19, 163:11, 163:14, 167:6, 170:22, 173:21, 175:1, 178:5, 178:11, 179:1, 179:6, 182:20, 183:13, 185:2

**OFFICES** [2] - 1:20, 2:2

**Official** [1] - 2:8

**official** [8] - 8:6, 47:10, 49:23, 50:1, 72:1, 136:4, 136:22, 190:12

**often** [4] - 8:17, 148:23, 152:10, 152:13

**Ohio** [1] - 2:6

**old** [4] - 103:21, 125:1, 125:2, 145:8

**omitted** [1] - 5:23

**once** [20] - 10:20, 15:2, 15:10, 25:14, 34:14, 37:9, 56:20, 57:20, 76:3, 77:6, 77:25, 80:5, 81:11, 106:8, 108:25, 109:4, 143:16, 147:19, 153:6

**one** [106] - 8:23, 8:25, 9:7, 10:23, 11:13, 12:24, 14:6, 16:9, 18:12, 19:13, 21:12, 23:4, 29:14, 33:3, 36:22, 40:10,

42:10, 43:7, 47:10, 47:23, 48:6, 50:21, 52:15, 55:3, 55:5, 56:1, 58:10, 58:18, 60:13, 64:2, 65:8, 65:12, 67:5, 69:14, 69:24, 70:1, 75:20, 78:18, 79:7, 81:25, 83:19, 86:4, 87:4, 87:21, 90:11, 93:5, 95:4, 97:19, 99:15, 100:10, 101:10, 101:16, 101:23, 102:20, 103:3, 103:22, 104:3, 104:8, 104:19, 105:9, 105:12, 106:9, 108:19, 111:4, 112:25, 113:15, 114:13, 115:2, 121:15, 122:24, 125:7, 126:5, 128:2, 130:11, 131:9, 132:21, 133:10, 134:7, 134:16, 136:8, 136:14, 137:4, 138:14, 143:11, 145:23, 145:24, 146:14, 147:2, 147:18, 147:20, 149:18, 149:20, 168:13, 168:21, 169:2, 170:17, 173:9, 174:6, 174:10, 175:8, 178:25, 186:2, 189:4

**one's** [2] - 39:9, 174:12

**one-off** [1] - 52:15

**open** [46] - 10:19, 11:6, 12:2, 12:13, 22:6, 27:25, 28:4, 28:8, 28:13, 29:10, 33:21, 34:4, 44:1, 44:19, 84:4, 86:20, 87:7, 88:3, 88:10, 88:19, 89:6, 90:9, 91:5, 93:8, 99:2, 105:16, 105:25, 110:21, 110:24, 111:15, 112:9, 112:19, 114:10, 115:12, 115:24, 117:22, 117:24, 119:3, 127:20, 128:23, 128:24, 168:22, 173:23, 173:25, 174:12, 174:18

**opened** [3] - 74:7, 143:22, 144:2

**opening** [2] - 64:14, 174:9

**opinions** [1] - 132:20

**opportunity** [5] - 6:4, 11:8, 144:14, 185:22, 186:8

**oppose** [2] - 7:10, 27:10

**opposed** [4] - 15:25, 45:12, 113:21, 172:21

**opposing** [12] - 8:20, 13:18, 29:2, 29:6, 40:8, 109:21, 129:3, 131:16, 132:25, 142:14, 149:11, 172:1

**opposite** [3] - 56:5, 137:22, 160:16

**opposition** [3] - 16:6, 17:15, 41:19

**option** [3] - 153:21, 153:22

**options** [1] - 158:7

**order** [5] - 131:20, 140:15, 140:23, 178:12, 181:4

**orderly** [2] - 139:1, 161:17

**ordinarily** [1] - 162:3

**organ** [1] - 166:25

**organic** [1] - 147:8

**organization** [1] - 145:15

**organized** [1] - 81:4

**organizing** [1] - 39:23

**Ortega** [3] - 104:13, 104:16, 104:19

**outcome** [1] - 141:8

**outside** [12] - 44:24, 75:8, 92:21, 146:12, 146:17, 146:19, 146:21, 147:1, 147:6, 147:8, 158:4, 179:5

**outspoken** [1] - 157:1

**outward** [3] - 110:21, 110:25, 111:15

**overall** [2] - 97:12, 116:23

**overrun** [2] - 9:24, 52:11

**overwhelmed** [1] - 147:25

**overwhelming** [1] - 83:12

**own** [14] - 7:20, 7:21, 33:13, 47:23, 59:8, 61:5, 126:15, 141:22, 143:14, 164:17, 165:4, 177:14,

177:17, 182:1
**Oxley** [1] - 80:14

**P**

**p.m** [14] - 9:15, 9:22,
15:1, 33:10, 33:23,
40:2, 40:3, 46:15,
56:2, 179:18, 183:6,
187:19, 188:3
**pack** [1] - 44:16
**packed** [8] - 22:7,
30:1, 88:25, 89:1,
109:5, 117:3, 144:10
**PAGE** [1] - 3:3
**Page** [6] - 3:5, 3:6,
3:7, 3:8, 3:9, 48:9
**paid** [3] - 59:4,
80:24, 182:4
**pain** [24] - 21:7,
35:11, 84:9, 84:16,
84:25, 85:8, 85:10,
89:16, 90:2, 90:4,
91:2, 91:23, 93:11,
96:24, 97:11, 98:1,
100:4, 121:23, 123:9,
123:11, 125:2, 125:5,
166:24, 167:8
**pane** [1] - 94:8
**pans** [1] - 126:11
**Paranjape** [1] -
177:12
**parcel** [2] - 38:14,
56:9
**pardon** [1] - 88:6
**part** [20] - 14:3,
16:13, 29:18, 32:12,
38:10, 38:14, 38:16,
53:1, 55:2, 56:9,
65:25, 73:3, 81:4,
111:18, 126:22,
140:5, 157:12, 165:1,
169:16, 176:14
**participate** [1] -
16:14
**participated** [2] -
50:13, 55:20
**participating** [1] -
12:19
**participation** [2] -
12:6, 12:7
**particular** [15] - 13:6,
16:11, 21:14, 28:24,
30:10, 45:4, 45:10,
45:15, 46:1, 54:9,
82:12, 82:23, 87:1,
106:17, 134:2
**particularly** [8] -
12:25, 126:1, 139:4,

178:3, 180:22,
182:13, 182:16,
185:11
**parties** [2] - 106:15,
187:19
**partway** [2] - 127:9,
127:12
**Paschall** [11] - 3:9,
4:9, 6:4, 6:12, 163:6,
185:8, 185:25, 186:4,
187:13, 188:10, 189:6
**PASCHALL** [49] -
1:14, 4:8, 6:6, 70:3,
70:8, 111:9, 163:7,
164:2, 164:9, 164:18,
164:20, 165:10,
166:8, 166:12,
169:23, 170:7,
170:16, 170:19,
170:23, 170:25,
171:3, 171:6, 171:23,
171:25, 172:8,
172:12, 172:16,
173:11, 173:16,
173:18, 174:25,
175:4, 175:7, 175:11,
175:14, 175:17,
175:22, 175:24,
176:2, 180:5, 180:7,
180:11, 180:15,
188:17, 188:19,
188:23, 189:1, 189:3,
189:8
**pass** [6] - 75:11,
98:16, 98:19, 154:22,
162:24
**passed** [4] - 80:13,
102:19, 106:8, 176:6
**passing** [3] - 98:18,
106:7, 145:24
**passion** [1] - 67:21
**past** [13] - 12:10,
13:5, 26:2, 46:10,
53:3, 59:5, 59:10,
74:25, 79:5, 79:7,
79:10, 80:23, 182:4
**PATRICK** [1] - 1:6
**Patrick** [2] - 4:3, 6:16
**patriot** [2] - 137:21,
137:22
**Paul** [1] - 173:24
**pause** [1] - 44:7
**causing** [1] - 105:6
**pay** [7] - 86:22, 87:3,
87:8, 110:9, 111:12,
112:3, 112:4
**paycheck** [1] - 178:3
**paying** [1] - 146:20
**peace** [2] - 183:17
**peaceful** [6] - 37:3,

39:4, 46:7, 56:18,
59:9, 63:9
**pegs** [1] - 154:5
**penalty** [1] - 72:9
**Pence** [3] - 60:20,
155:12, 179:17
**pending** [1] - 133:21
**Pensacola** [1] - 1:25
**people** [106] - 6:25,
14:17, 21:15, 30:1,
30:2, 30:7, 40:21,
41:10, 44:3, 44:25,
45:23, 45:24, 48:5,
48:20, 48:25, 49:17,
49:20, 49:25, 52:22,
53:3, 61:20, 65:18,
67:19, 74:18, 74:24,
78:18, 79:7, 89:23,
94:2, 98:19, 99:11,
102:25, 103:25,
105:12, 106:7, 117:4,
118:3, 129:5, 129:10,
134:6, 135:20,
136:14, 138:2,
142:17, 142:20,
142:23, 143:2, 143:5,
143:9, 143:15, 144:6,
144:19, 145:3, 145:8,
145:20, 145:23,
146:6, 146:9, 146:10,
147:3, 147:4, 147:15,
147:18, 147:19,
147:22, 148:7,
149:14, 149:16,
149:20, 149:21,
151:8, 155:13,
156:19, 156:21,
156:24, 157:3, 157:5,
157:7, 157:17,
157:20, 157:23,
158:8, 158:24, 159:1,
159:4, 165:17,
169:12, 171:13,
173:3, 174:3, 174:17,
174:21, 178:5,
178:10, 179:5,
179:19, 181:2,
181:20, 183:18,
184:10, 185:1
**people's** [1] - 87:4
**pepper** [5] - 63:18,
128:17, 129:14,
129:17, 174:3
**percent** [1] - 77:2
**perch** [5] - 40:5,
40:16, 40:17, 42:4,
46:22
**perfect** [3] - 30:4,
93:9, 93:22
**perfectly** [1] - 13:17

**perhaps** [3] - 168:23,
171:19, 187:12
**period** [11] - 9:15,
13:6, 14:25, 17:9,
40:2, 40:3, 40:6,
43:18, 43:19, 45:18,
167:17
**permissible** [3] -
150:11, 166:22, 173:5
**person** [14] - 18:19,
31:20, 55:10, 86:11,
100:16, 107:10,
107:20, 118:25,
121:13, 133:21,
136:21, 146:1, 157:1,
171:10
**personal** [2] - 92:8,
92:19
**personally** [1] - 39:9
**perspective** [1] -
145:14
**phone** [8] - 54:24,
78:15, 81:1, 116:3,
128:9, 134:12,
181:18, 182:9
**phones** [1] - 188:24
**photographing** [1] -
143:3
**physical** [57] - 9:4,
11:22, 14:4, 14:10,
14:14, 14:20, 15:17,
18:22, 19:4, 27:11,
31:1, 32:20, 70:17,
70:21, 73:1, 73:3,
73:11, 73:14, 83:14,
83:19, 84:15, 84:17,
84:19, 84:20, 85:1,
85:2, 85:3, 85:13,
98:8, 98:19, 108:12,
114:1, 114:12,
117:24, 118:25,
119:17, 120:1, 129:4,
129:6, 129:10,
129:11, 131:17,
131:21, 131:24,
132:15, 154:20,
161:25, 162:1,
166:24, 167:2, 167:8,
170:13, 181:21,
186:3, 186:5, 188:23,
189:1
**physically** [4] - 7:16,
29:20, 89:13, 115:9
**physics** [1] - 91:12
**picked** [2] - 36:11,
107:22
**picking** [1] - 107:17
**picks** [2] - 33:3,
112:1
**picture** [1] - 81:23

**piece** [5] - 60:13,
63:7, 131:3, 131:10,
145:24
**pieces** [1] - 64:2
**pinned** [2] - 20:19,
96:9
**pinning** [2] - 24:19,
85:17
**place** [12] - 8:6, 38:4,
50:11, 63:19, 74:17,
85:8, 95:18, 105:7,
135:13, 150:21,
150:23, 155:4
**places** [1] - 78:22
**Plaintiff** [1] - 1:4
**plan** [4] - 74:16,
75:15, 75:16, 76:25
**plane** [3] - 111:19,
111:21, 113:9
**planet** - 63:15
**planned** [2] - 55:4,
55:5
**planning** [3] - 55:3,
58:7, 61:1
**plastic** [1] - 85:18
**platoon** [1] - 45:20
**plausible** [6] -
102:23, 103:17,
127:19, 138:6, 138:9,
138:16
**play** [11] - 10:15,
20:6, 29:8, 34:2,
43:23, 61:15, 111:24,
117:5, 144:13, 172:6
**playing** [2] - 9:20,
180:23
**plays** [3] - 10:20,
10:21, 126:4
**plaza** [6] - 7:14, 9:23,
33:13, 51:21, 52:12,
53:13
**Plaza** [1] - 55:6
**plenty** [6] - 108:4,
115:7, 115:9, 119:14,
164:4
**plus** [1] - 173:9
**point** [57] - 5:11,
9:13, 9:22, 13:4,
16:23, 24:8, 26:14,
30:1, 30:5, 30:10,
30:12, 33:16, 33:18,
41:8, 42:4, 43:14,
44:10, 48:19, 60:9,
64:17, 71:14, 73:8,
73:25, 75:2, 75:8,
77:21, 83:19, 88:12,
92:6, 107:2, 107:3,
110:13, 110:15,
111:22, 115:2,
121:15, 122:6,

210

126:11, 126:13,
127:25, 130:12,
132:19, 135:4, 144:5,
147:9, 149:1, 153:13,
158:12, 162:10,
168:1, 170:6, 172:10,
174:24, 175:2,
181:12, 184:14, 189:4
  **pointed** [4] - 82:11,
108:4, 142:3, 189:12
  **pointing** [4] - 108:9,
169:12, 178:4, 183:21
  **points** [7] - 77:14,
77:17, 96:2, 108:9,
122:12, 138:2, 170:4
  **pole** [3] - 165:6,
165:11, 165:25
  **police** [79] - 6:22,
7:14, 7:24, 10:6,
11:19, 11:22, 12:10,
13:2, 13:18, 13:20,
15:15, 16:6, 17:4,
17:7, 17:8, 17:10,
17:15, 23:3, 39:5,
40:5, 40:12, 40:20,
40:21, 41:1, 41:5,
41:7, 41:18, 42:14,
45:6, 45:24, 46:10,
46:19, 51:22, 51:23,
53:3, 53:15, 56:6,
57:4, 57:15, 62:15,
72:15, 72:16, 78:20,
83:13, 90:14, 115:8,
115:9, 117:25,
122:13, 122:15,
128:4, 131:9, 144:1,
144:6, 145:21,
147:25, 149:24,
151:24, 152:5, 153:1,
153:6, 153:10,
153:19, 155:18,
158:16, 158:17,
159:6, 160:3, 164:19,
173:21, 177:20,
178:14, 180:17,
181:1, 181:19,
182:19, 183:21
  **Police** [6] - 103:5,
104:9, 104:14,
104:15, 104:21,
160:10
  **policy** [1] - 114:22
  **political** [5] - 92:19,
176:20, 177:10,
182:2, 182:22
  **politics** [1] - 177:13
  **pool** [1] - 116:2
  **portion** [6] - 11:21,
28:18, 28:19, 69:20,
102:20, 114:13

  **position** [32] - 28:25,
30:23, 34:20, 35:2,
35:10, 36:21, 37:19,
42:18, 42:25, 56:5,
88:11, 94:7, 94:12,
94:13, 94:24, 95:1,
97:24, 100:17,
102:13, 120:12,
120:23, 121:2,
121:24, 122:5,
123:14, 123:16,
123:25, 134:23,
139:3, 139:23,
158:15, 170:5
  **possession** [1] -
176:4
  **possibility** [1] -
123:6
  **possible** [1] - 147:23
  **possibly** [3] - 31:24,
99:7
  **post** [1] - 164:23
  **Post** [1] - 2:3
  **post-trial** [1] -
164:23
  **posture** [1] - 168:16
  **potent** [2] - 177:18,
178:3
  **pounds** [8] - 20:4,
20:14, 21:2, 23:17,
27:12, 34:8, 34:22,
166:2
  **pouring** [2] - 46:8,
47:2
  **power** [1] - 7:3
  **powerful** [2] - 29:21,
135:12
  **PowerPoint** [6] -
9:13, 15:5, 15:12,
15:22, 17:2, 61:11
  **practice** [1] - 105:21
  **PRATT** [1] - 2:5
  **prearranged** [1] -
116:3
  **precarious** [1] - 35:1
  **precleared** [1] -
40:11
  **preclude** [1] - 71:22
  **predicament** [2] -
99:17, 99:21
  **preface** [1] - 28:23
  **prepared** [5] - 5:8,
77:14, 141:2, 153:7,
154:6
  **presence** [2] - 56:8,
107:3
  **present** [2] - 56:2,
149:3
  **presentation** [1] -
185:10

  **presented** [2] -
134:24, 163:20
  **presided** [1] - 137:2
  **president** [3] - 77:18,
82:1, 178:16
  **President** [10] -
51:10, 51:11, 60:19,
75:22, 82:2, 155:11,
178:14, 179:17,
179:22, 182:7
  **press** [1] - 25:16
  **pressed** [4] - 35:16,
91:8, 91:19, 91:22
  **pressing** [8] - 34:8,
57:11, 84:9, 90:19,
90:21, 91:1, 95:24
  **pressure** [11] -
64:18, 89:9, 90:24,
91:10, 91:12, 91:13,
100:1, 100:3, 149:17,
167:16, 184:3
  **presumably** [2] -
102:3, 110:25
  **pretty** [12] - 22:22,
30:16, 37:1, 38:6,
38:13, 39:22, 104:17,
111:6, 122:15,
122:24, 169:5, 187:15
  **prevent** [3] - 112:17,
142:17, 142:23
  **prevented** [5] -
20:12, 56:18, 56:23,
121:17, 123:24
  **previewed** [1] - 83:2
  **previously** [2] -
110:24, 118:20
  **primarily** [2] - 28:14,
171:4
  **primary** [3] - 14:16,
29:4, 62:3
  **principal** [11] - 9:3,
9:5, 9:8, 14:4, 14:5,
39:8, 47:24, 50:5,
150:7, 150:10, 150:15
  **principals** [7] - 14:9,
14:11, 15:16, 17:21,
47:12, 49:4, 65:7
  **principle** [2] - 150:1,
150:19
  **principles** [1] - 141:9
  **print** [1] - 5:23
  **privately** [1] - 163:2
  **privy** [1] - 55:7
  **probable** [1] - 81:19
  **Probation** [1] -
172:23
  **probative** [2] -
164:10, 164:12
  **problem** [7] - 48:21,
49:1, 149:25, 150:5,

150:18, 156:13, 160:6
  **problematic** [1] -
164:7
  **problems** [2] - 99:13,
140:5
  **proceeding** [49] -
7:7, 7:25, 8:6, 47:6,
47:10, 47:19, 47:20,
47:22, 48:1, 48:17,
48:22, 49:24, 50:1,
51:14, 52:4, 53:8,
53:25, 56:24, 59:17,
62:14, 64:23, 65:5,
72:1, 74:10, 75:5,
76:13, 76:16, 78:3,
78:5, 80:5, 80:7,
80:17, 81:8, 81:11,
133:13, 133:21,
134:3, 136:4, 136:22,
154:16, 155:3, 155:8,
176:21, 177:16,
179:5, 182:3, 182:4,
183:7, 184:11
  **Proceeding** [1] -
189:22
  **proceedings** [7] -
71:7, 80:23, 106:23,
155:17, 177:3,
177:11, 190:6
  **process** [4] - 7:8,
66:19, 66:23, 72:15
  **procure** [1] - 103:3
  **procured** [1] -
103:22
  **procuring** [1] -
104:23
  **produced** [1] - 190:6
  **Professor** [2] -
134:13, 179:16
  **proffering** [1] - 165:1
  **progress** [1] - 51:8
  **prolonged** [1] -
125:5
  **prone** [2] - 79:20,
92:18
  **prong** [4] - 68:11,
73:7, 170:9, 172:19
  **proof** [15] - 71:21,
73:13, 80:19, 85:22,
85:25, 114:15,
118:24, 134:1, 138:9,
138:24, 141:9,
154:14, 154:17,
161:23, 162:19
  **propelled** [1] - 109:1
  **property** [1] - 119:1
  **prosecution** [1] -
134:1
  **prosecutor** [1] - 64:7
  **protect** [2] - 6:24,

114:10
  **protecting** [4] -
137:7, 137:14,
178:15, 188:20
  **protection** [1] -
33:15
  **protest** [18] - 37:3,
39:5, 46:7, 56:18,
59:9, 63:9, 74:1, 74:3,
77:21, 78:24, 80:16,
82:2, 145:13, 145:15,
157:15, 157:16,
183:14, 184:8
  **protested** [1] - 74:15
  **protester** [3] - 38:24,
39:3, 95:9
  **protesters** [3] -
127:24, 128:1, 147:24
  **protesting** [1] - 62:6
  **protestors** [1] - 76:1
  **protests** [4] - 40:10,
50:19, 59:14, 74:24
  **protracted** [1] -
166:24
  **Proud** [3] - 58:20,
59:13, 81:5
  **prove** [13] - 67:1,
82:24, 108:17, 109:9,
131:15, 134:20,
134:21, 135:2, 136:3,
136:10, 137:25, 169:8
  **proved** [1] - 54:4
  **proven** [8] - 84:23,
97:8, 114:12, 119:6,
120:14, 120:24,
127:18, 139:3
  **proves** [3] - 8:11,
138:20, 184:23
  **provided** [3] - 19:15,
40:14
  **province** [1] - 82:13
  **proving** [3] - 98:2,
134:21, 184:13
  **provision** [3] -
132:23, 132:24,
160:14
  **proximity** [1] - 151:3
  **published** [25] -
10:19, 11:6, 12:2,
12:13, 27:25, 28:4,
28:8, 29:10, 33:21,
34:4, 44:1, 44:19,
86:20, 87:7, 88:3,
88:10, 88:19, 89:6,
90:9, 91:5, 93:8,
105:16, 105:25,
112:9, 115:24
  **pull** [4] - 15:3, 86:17,
86:18, 95:2
  **pulled** [4] - 21:24,

67:5, 94:16, 158:17
**pulling** [3] - 20:21, 25:1, 94:15
**pulls** [1] - 167:18
**purpose** [27] - 38:22, 57:14, 59:17, 59:24, 60:1, 62:21, 65:23, 66:1, 67:22, 136:15, 141:20, 141:24, 142:12, 142:17, 143:6, 147:13, 148:11, 149:13, 151:5, 154:3, 155:22, 159:13, 159:16, 159:25, 161:1, 161:2, 161:21
**purposely** [6] - 79:22, 84:24, 86:9, 91:25, 95:24, 108:21
**purposes** [4] - 72:2, 80:11, 114:3, 114:11
**pursuing** [1] - 142:7
**push** [47] - 7:21, 10:13, 11:10, 11:15, 11:19, 12:10, 12:16, 12:20, 12:24, 13:2, 13:19, 15:10, 16:5, 16:11, 16:13, 17:3, 17:4, 17:5, 17:14, 18:6, 20:8, 20:14, 20:23, 38:19, 39:10, 40:5, 43:5, 45:15, 45:22, 45:24, 85:24, 87:14, 89:23, 90:4, 102:6, 102:10, 117:20, 117:24, 121:12, 124:8, 127:20, 146:5, 146:23, 147:2, 181:1
**pushed** [16] - 13:4, 13:7, 16:23, 17:8, 17:15, 35:2, 35:3, 35:4, 36:18, 42:14, 46:18, 91:21, 117:10, 118:7, 119:1
**pushes** [3] - 37:10, 165:19, 178:21
**pushing** [31] - 15:15, 15:23, 17:7, 18:4, 24:1, 25:25, 27:10, 34:12, 34:13, 34:19, 35:15, 41:14, 84:24, 85:17, 85:19, 87:14, 87:24, 90:2, 90:21, 93:4, 96:8, 96:9, 96:12, 96:13, 97:24, 99:5, 99:6, 102:14, 117:19, 117:20, 127:24
**pussy** [2] - 75:25,

82:3
**put** [22] - 5:17, 5:24, 35:2, 45:5, 46:19, 53:4, 66:1, 77:5, 89:8, 90:23, 94:7, 94:9, 94:12, 94:25, 103:8, 108:23, 121:2, 130:7, 137:18, 144:16, 184:3
**puts** [2] - 112:10, 112:23
**putting** [2] - 100:1, 100:3
**puzzle** [2] - 60:13, 63:8, 64:22

## Q

**questioned** [1] - 94:4
**questions** [17] - 16:7, 27:23, 43:8, 70:24, 76:19, 77:15, 108:8, 120:4, 120:17, 123:3, 125:23, 133:5, 141:3, 148:21, 154:7, 162:7, 163:8
**quick** [3] - 84:14, 112:25, 155:3
**quickly** [3] - 28:22, 101:4, 175:25
**quite** [9] - 31:21, 49:10, 59:9, 81:21, 142:16, 142:17, 165:12, 167:16, 183:25
**quoting** [2] - 132:5, 132:6

## R

**rabbit** [1] - 38:7
**rack** [4] - 155:18, 165:12, 165:22, 166:4
**racks** [6] - 6:21, 6:23, 56:7, 74:6, 158:20, 165:17
**raise** [2] - 130:11, 132:17
**raised** [1] - 122:11
**rallies** [1] - 50:19
**rally** [32] - 50:14, 50:18, 54:23, 55:20, 57:25, 59:7, 59:17, 59:19, 60:10, 60:17, 61:1, 62:7, 74:4, 75:19, 75:20, 76:15, 76:16, 78:5, 134:7, 134:11, 135:12, 135:14, 135:16, 135:20, 135:23,

138:17, 155:7, 157:16, 157:18, 157:21
**Rally** [3] - 50:22, 51:2, 60:1
**ramp** [1] - 118:13
**range** [1] - 106:19
**ranging** [1] - 38:6
**rarely** [2] - 67:12, 138:3
**Rathbun** [5] - 165:7, 165:13, 165:19, 165:23, 166:3
**rather** [1] - 151:8
**rattling** [1] - 165:17
**RDR** [3] - 2:7, 190:3, 190:12
**reach** [3] - 88:13, 112:6, 151:19
**reached** [4] - 100:9, 111:19, 111:20, 183:5
**reaches** [1] - 183:24
**reaching** [1] - 112:23
**reacting** [1] - 147:10
**read** [4] - 123:1, 123:10, 132:20, 140:17
**reading** [1] - 55:7
**ready** [5] - 27:20, 62:10, 62:12, 187:22
**real** [4] - 66:18, 76:18, 76:19, 108:8
**realize** [2] - 143:20, 144:2
**realized** [2] - 153:6, 159:7
**realizes** [3] - 26:22, 153:19, 158:10
**really** [40] - 8:17, 21:12, 26:9, 28:12, 30:4, 34:18, 37:3, 41:12, 43:19, 44:23, 51:7, 52:19, 54:17, 59:3, 60:23, 62:25, 63:12, 64:14, 66:23, 84:14, 92:5, 104:2, 120:3, 122:11, 123:11, 126:5, 133:16, 135:8, 136:8, 139:15, 142:7, 143:9, 152:23, 156:6, 162:4, 163:23, 163:25, 174:17, 186:8
**reason** [14] - 50:10, 50:16, 53:4, 64:21, 75:13, 96:9, 96:19, 97:1, 101:17, 133:10, 156:24, 165:1, 169:16, 173:23
**reasonable** [45] -

8:11, 24:12, 54:5, 71:18, 71:21, 71:22, 73:14, 80:4, 80:20, 82:14, 82:17, 82:25, 83:4, 83:9, 83:10, 83:11, 83:13, 85:23, 86:8, 95:23, 97:23, 98:2, 98:23, 104:4, 108:5, 108:7, 108:17, 109:9, 114:15, 118:24, 119:15, 119:19, 119:22, 120:4, 120:14, 134:1, 138:1, 138:10, 138:12, 138:21, 139:4, 151:16, 151:19, 152:20
**reasoning** [1] - 148:13
**reasons** [10] - 58:23, 61:23, 66:15, 108:4, 108:13, 108:16, 109:9, 118:20, 120:2, 159:23
**rebuttal** [2] - 19:16, 77:14
**Rebuttal** [1] - 3:9
**recalled** [1] - 34:1
**RECEIVED** [1] - 3:3
**received** [1] - 5:15
**receiving** [1] - 171:18
**recently** [1] - 143:21
**recess** [2] - 71:6, 106:22
**recognition** [1] - 143:22
**recognize** [1] - 137:15
**recognized** [1] - 94:19
**recognizes** [2] - 145:22, 154:14
**recoiled** [1] - 102:12
**recollection** [3] - 30:15, 66:12, 123:13
**record** [4] - 4:7, 5:17, 130:8, 156:7
**recorded** [2] - 55:19, 96:17
**recording** [1] - 16:13
**recounting** [1] - 64:10
**redirect** [2] - 123:20, 123:22
**redundant** [1] - 120:16
**reelect** [1] - 179:22
**reenacting** [1] - 146:8

**reference** [4] - 155:2, 172:14, 173:4, 173:5
**references** [1] - 132:12
**referred** [1] - 153:3
**referring** [1] - 166:21
**refers** [1] - 9:18
**refocused** [1] - 83:6
**regard** [3] - 79:24, 142:2, 156:14
**regardless** [2] - 54:5, 82:25
**regret** [6] - 25:11, 26:7, 26:13, 26:14, 26:18, 145:4
**rehabilitation** [1] - 167:2
**reiterate** [1] - 119:14
**relates** [3] - 130:7, 133:3, 133:8
**relating** [1] - 123:4
**relation** [1] - 188:15
**relative** [1] - 102:18
**released** [1] - 97:2
**relevant** [16] - 29:24, 31:13, 32:5, 32:8, 63:23, 63:24, 64:1, 68:20, 73:10, 73:12, 84:8, 87:9, 87:10, 122:11, 179:11, 188:12
**reliant** [1] - 164:1
**relied** [1] - 172:23
**relieve** [1] - 64:18
**rely** [7] - 15:4, 41:25, 43:17, 46:1, 61:11, 152:7, 170:10
**relying** [3] - 28:14, 28:16, 41:19
**remain** [1] - 120:10
**remarks** [1] - 141:3
**remember** [6] - 21:13, 37:15, 51:7, 70:5, 104:14, 113:21
**remembered** [2] - 33:25, 58:2
**remembering** [2] - 27:19, 64:16
**remembers** [1] - 64:10
**remind** [1] - 18:16
**removed** [1] - 96:3
**rendering** [1] - 123:24
**reopened** [1] - 97:1
**repeat** [2] - 99:19, 125:23
**repeatedly** [6] - 7:10, 8:22, 27:16, 41:18, 53:1, 57:8

**replayed** [1] - 168:21
**replies** [1] - 187:3
**reply** [3] - 187:1, 188:15, 189:16
**reported** [1] - 137:3
**REPORTED** [1] - 2:7
**REPORTER** [1] - 11:1
**Reporter** [2] - 2:8, 190:12
**require** [4] - 31:4, 84:18, 85:22, 139:16
**required** [2] - 124:11, 161:21
**requirement** [3] - 31:6, 156:13, 159:11
**requires** [10] - 9:3, 22:2, 67:17, 125:4, 134:1, 138:24, 141:24, 156:15, 161:24, 169:8
**requiring** [1] - 167:1
**rescue** [1] - 21:8
**resist** [2] - 7:10, 172:19
**resistance** [3] - 16:6, 17:16, 41:19
**resisted** [2] - 15:24, 45:13
**resisting** [11] - 8:19, 10:9, 13:17, 29:2, 40:8, 129:4, 131:16, 132:25, 142:13, 149:11, 172:1
**respect** [10] - 19:20, 36:10, 73:18, 79:25, 107:7, 118:18, 141:7, 161:15, 164:23, 173:19
**responded** [1] - 148:25
**responders** [1] - 21:25
**response** [1] - 138:10
**responsibility** [1] - 141:17
**responsible** [3] - 25:5, 104:23, 105:2
**rest** [7] - 16:18, 20:25, 54:17, 77:11, 82:20, 118:10, 156:25
**restrict** [1] - 124:10
**return** [5] - 106:15, 187:19, 188:2, 188:5
**reverse** [1] - 15:20
**reverses** [1] - 159:8
**review** [2] - 154:18, 166:23
**rewatch** [1] - 111:12

**rhetoric** [1] - 137:19
**rhetorical** [2] - 155:1, 162:3
**rid** [2] - 101:16, 103:21
**Riley** [1] - 173:24
**rinse** [1] - 116:2
**riot** [31] - 18:4, 18:8, 19:25, 20:5, 20:8, 21:4, 22:5, 22:13, 23:15, 24:25, 25:8, 25:15, 29:19, 33:3, 33:13, 34:7, 34:8, 34:12, 34:22, 35:3, 35:14, 35:16, 36:5, 36:11, 37:7, 42:6, 65:20, 68:12, 71:15, 83:14
**rioter** [11] - 20:20, 23:24, 24:2, 24:4, 24:19, 25:1, 25:3, 25:6, 33:14, 37:7, 41:8
**rioters** [38] - 7:23, 9:24, 10:10, 11:21, 11:23, 13:2, 15:23, 16:22, 17:2, 17:6, 17:9, 18:6, 18:15, 36:22, 37:1, 40:7, 40:19, 42:7, 42:11, 42:15, 43:4, 43:14, 43:21, 44:11, 44:13, 44:21, 46:9, 46:25, 47:4, 47:25, 56:25, 62:4, 128:3, 142:24, 144:1, 148:3, 152:4, 183:21
**riots** [4] - 65:16, 65:17, 136:7, 136:13
**rise** [2] - 85:13, 98:1
**rises** [2] - 28:24, 29:5
**risk** [2] - 147:13, 149:13
**risking** [1] - 178:7
**road** [1] - 170:8
**rob** [1] - 139:18
**rocking** [1] - 17:7
**room** [8] - 86:16, 99:4, 99:9, 102:7, 115:4, 115:7, 115:9, 119:21
**Room** [1] - 2:10
**round** [1] - 33:13
**Rule** [5] - 83:6, 151:14, 154:18, 154:22, 164:23
**ruling** [2] - 164:22, 176:18
**run** [2] - 9:1, 65:18

**rush** [1] - 143:11
**rushed** [1] - 22:10
**rushes** [3] - 16:13, 20:25, 95:21
**rushing** [2] - 16:4, 17:13

### S

**safe** [1] - 16:2
**safely** [1] - 140:21
**Safeway** [4] - 68:11, 139:18, 139:20, 140:10
**sake** [1] - 65:19
**Sarbanes** [1] - 80:14
**Sarbanes-Oxley** [1] - 80:14
**sardine** [1] - 87:17
**sat** [1] - 148:24
**satisfied** [1] - 163:4
**satisfies** [3] - 8:23, 29:3, 29:7
**Saturday** [2] - 187:1, 187:4
**savvy** [1] - 59:4
**saw** [17] - 12:21, 25:12, 25:17, 27:8, 30:22, 34:23, 41:8, 44:8, 46:14, 46:16, 46:19, 78:16, 113:11, 115:19, 117:1, 143:2, 156:24
**scaffolding** [13] - 52:12, 62:16, 62:22, 62:23, 74:8, 78:13, 158:7, 158:8, 158:9, 158:10, 177:21, 178:21, 181:11
**scarf** [1] - 183:25
**scary** [1] - 121:3
**scenario** [2] - 166:15, 169:1
**scenarios** [1] - 160:16
**schedule** [2] - 135:13, 135:21
**scope** [1] - 79:6
**scream** [4] - 26:8, 99:21, 100:13, 109:12
**screamed** [4] - 86:7, 96:20, 97:24, 99:16
**screaming** [4] - 45:19, 45:21, 155:19, 174:22
**screams** [4] - 21:6, 21:7, 21:8
**screen** [1] - 13:1
**seal** [1] - 77:8

**sealed** [1] - 129:14
**seasoned** [1] - 38:23
**second** [11] - 44:21, 51:6, 75:20, 125:3, 128:7, 147:9, 150:25, 161:16, 184:18, 185:25
**second-degree** [1] - 184:18
**secondary** [1] - 172:20
**secondly** [1] - 141:13
**seconds** [13] - 11:4, 13:3, 20:17, 26:17, 26:21, 44:8, 44:16, 88:22, 95:15, 115:21, 117:21, 134:10, 144:18
**secret** [1] - 42:19
**section** [1] - 132:8
**Section** [1] - 8:4
**see** [117] - 6:5, 9:16, 10:21, 10:22, 11:8, 11:11, 11:12, 12:17, 12:24, 13:7, 15:12, 15:14, 15:22, 17:2, 20:7, 23:22, 24:1, 25:24, 28:12, 28:13, 28:21, 30:9, 34:20, 36:7, 36:22, 37:10, 40:19, 40:20, 41:3, 44:12, 44:15, 44:24, 45:4, 45:11, 49:24, 51:23, 51:24, 52:17, 55:18, 56:2, 57:10, 61:18, 62:19, 62:23, 63:2, 63:3, 63:12, 63:16, 63:17, 66:23, 67:2, 70:11, 75:23, 76:14, 88:13, 89:7, 90:11, 90:20, 91:6, 91:7, 91:8, 95:3, 95:12, 99:8, 105:12, 105:17, 106:3, 110:12, 110:13, 111:5, 112:21, 113:3, 113:7, 115:21, 116:9, 116:11, 118:1, 118:14, 124:4, 125:6, 126:12, 127:6, 127:8, 127:18, 128:1, 128:3, 128:8, 128:11, 128:13, 129:7, 129:10, 131:9, 140:25, 146:20, 157:11, 158:2, 158:5, 158:12, 158:15, 159:22, 166:7, 167:16, 168:8, 168:11, 168:12, 168:24, 169:17, 171:16, 174:4, 177:22, 180:25, 181:18, 181:21, 189:21
**Seefried** [5] - 137:1, 137:8, 176:16, 178:24, 179:12
**Seefrieds** [6] - 66:6, 66:11, 66:12, 137:4, 178:24, 178:25
**seeing** [7] - 12:7, 12:14, 15:21, 40:24, 126:1, 152:16, 158:13
**seeking** [2] - 32:17, 152:4
**sees** [5] - 27:4, 147:10, 158:8, 158:24, 159:1
**segments** [25] - 10:18, 11:5, 12:1, 12:12, 27:24, 28:3, 28:7, 29:9, 33:20, 34:3, 43:25, 44:18, 86:19, 87:6, 88:2, 88:9, 88:18, 89:5, 90:8, 91:4, 93:7, 105:15, 105:24, 112:8, 115:23
**self** [1] - 83:24
**self-defense** [1] - 83:24
**selfie** [2] - 74:8, 78:13
**Senate** [2] - 80:10, 137:5
**send** [1] - 188:11
**sending** [3] - 58:8, 140:20, 147:19
**sense** [26] - 29:16, 62:5, 62:10, 64:21, 75:4, 75:14, 84:10, 86:8, 90:25, 91:12, 91:22, 93:9, 93:12, 100:2, 101:4, 101:8, 101:14, 101:20, 103:4, 170:13, 171:11, 180:13, 184:9, 184:16, 185:5, 187:7
**sent** [3] - 140:14, 140:17, 140:18
**sentences** [1] - 130:19
**sentencing** [8] - 130:18, 130:21, 160:18, 166:21, 167:2, 169:24, 170:7, 187:13

**sentencings** [1] - 184:25

**separate** [6] - 24:21, 32:12, 72:21, 109:23, 125:12, 169:21

**separated** [1] - 130:3

**separation** [2] - 140:24, 169:17

**separations** [1] - 169:11

**September** [1] - 1:6

**sergeant** [3] - 34:17, 79:15, 93:22

**Sergeant** [63] - 10:4, 10:5, 15:18, 15:21, 17:25, 21:18, 21:21, 21:23, 22:11, 33:4, 33:8, 33:23, 33:24, 34:9, 34:16, 34:19, 34:22, 34:24, 35:1, 35:18, 35:25, 37:14, 42:14, 45:7, 45:9, 45:16, 57:10, 57:11, 79:1, 79:4, 79:15, 79:24, 83:17, 87:18, 89:21, 92:25, 93:21, 95:20, 100:12, 103:11, 107:16, 109:2, 121:10, 121:14, 122:10, 122:12, 124:3, 124:5, 124:7, 124:9, 125:9, 125:14, 126:10, 136:12, 136:18, 142:25, 158:18, 163:23, 164:5, 168:15, 173:24, 174:2

**series** [1] - 182:16

**serious** [52] - 18:19, 19:7, 19:11, 31:10, 80:12, 83:14, 83:19, 84:11, 84:17, 84:19, 84:20, 84:22, 85:1, 85:3, 85:13, 85:16, 85:21, 86:10, 98:4, 98:8, 98:9, 98:10, 98:12, 98:14, 98:18, 103:25, 108:12, 108:14, 119:17, 120:25, 121:19, 124:1, 124:13, 124:18, 125:1, 125:10, 164:11, 164:13, 166:3, 166:16, 166:18, 166:23, 167:5, 167:7, 167:13, 167:22, 169:5, 187:14

**seriously** [3] - 89:13, 124:23, 142:18

**service** [2] - 79:13, 116:4

**session** [5] - 80:10, 139:1, 161:18, 161:20, 162:13

**set** [3] - 17:18, 182:15, 187:21

**sets** [1] - 15:8

**several** [5] - 100:9, 144:9, 148:24, 162:24, 164:15, 187:21, 189:19

**SEVERT** [1] - 2:5

**shield** [130] - 18:5, 18:8, 19:25, 20:5, 20:9, 20:16, 21:5, 22:5, 22:13, 23:15, 24:25, 25:8, 25:15, 29:20, 30:24, 33:13, 33:19, 34:7, 34:8, 34:12, 34:21, 34:22, 35:2, 35:3, 35:4, 35:14, 35:16, 36:5, 36:22, 37:8, 42:6, 71:16, 83:14, 83:18, 83:20, 83:22, 84:2, 84:4, 84:9, 85:18, 86:24, 87:1, 87:2, 87:14, 87:15, 88:12, 88:13, 88:15, 88:21, 88:23, 89:1, 89:9, 89:15, 89:17, 89:21, 90:12, 90:17, 90:18, 90:23, 91:1, 91:7, 91:9, 91:13, 91:15, 91:19, 91:22, 93:6, 95:17, 95:18, 96:4, 98:3, 98:23, 98:25, 99:1, 99:3, 100:9, 102:15, 103:2, 103:6, 103:18, 104:1, 104:6, 104:16, 106:7, 106:12, 107:14, 107:16, 112:2, 112:7, 112:10, 112:17, 112:24, 113:3, 113:5, 114:5, 114:7, 114:16, 118:9, 119:3, 119:16, 120:24, 121:4, 121:8, 121:11, 121:12, 121:15, 123:17, 123:25, 124:2, 124:7, 124:8, 124:12, 124:14, 125:17, 125:20, 126:14, 167:11, 167:21, 167:22, 168:7, 168:10, 168:18, 168:19, 168:22, 169:3, 188:18

**shield's** [1] - 107:3

**shields** [16] - 33:3, 36:12, 86:25, 90:12, 99:12, 102:19, 103:3, 103:7, 103:11, 103:12, 103:21, 105:12, 106:7, 107:2, 107:6, 126:17

**Shipley** [11] - 3:8, 4:25, 5:2, 5:5, 141:5, 149:22, 162:22, 162:24, 164:15, 187:21, 189:19

**SHIPLEY** [40] - 2:2, 2:2, 4:24, 5:7, 5:12, 5:14, 5:19, 5:22, 141:6, 146:10, 148:1, 148:5, 148:11, 148:16, 148:19, 149:25, 150:9, 150:13, 151:1, 151:13, 152:7, 152:12, 152:14, 154:10, 154:13, 156:19, 157:9, 157:15, 157:25, 158:24, 159:6, 159:11, 159:21, 159:25, 160:20, 162:18, 163:3, 187:24, 188:1, 189:20

**shirt** [1] - 64:11

**shit** [1] - 178:7

**short** [6] - 12:25, 18:12, 26:18, 38:8, 69:2

**short-lived** [2] - 12:25, 26:18

**shorthand** [1] - 8:16

**shortly** [5] - 16:22, 87:13, 92:2, 115:18, 115:20

**shot** [1] - 67:5

**shots** [1] - 61:17

**shoulder** [3] - 91:13, 100:10, 111:21

**shouting** [2] - 10:23, 147:7

**shouts** [1] - 11:13

**shove** [3] - 39:10, 89:24, 113:16

**shoved** [3] - 36:19, 109:22, 113:17

**shoves** [2] - 37:10, 113:23

**shoving** [6] - 27:10, 27:15, 112:13, 112:19, 114:1, 127:16

**show** [24] - 27:22, 28:20, 40:25, 41:1, 41:23, 48:4, 48:6,

49:3, 50:23, 53:5, 87:13, 88:1, 90:7, 102:17, 103:16, 105:4, 105:23, 106:5, 116:5, 125:9, 125:14, 135:25, 162:15, 183:6

**showed** [3] - 45:9, 66:18, 87:22

**showing** [3] - 43:11, 94:21, 146:17

**shown** [4] - 8:11, 126:18, 127:7, 127:25

**shows** [22] - 11:7, 26:11, 36:14, 52:8, 56:4, 56:15, 59:19, 60:11, 61:12, 63:20, 63:21, 90:17, 101:12, 102:5, 113:25, 121:9, 126:5, 134:19, 163:17, 169:17, 174:14, 180:9

**shut** [1] - 81:19

**sic** [4] - 16:22, 118:8, 119:7, 141:16

**sic]** [4] - 25:2, 47:11, 98:24, 120:1

**sickened** [3] - 46:14, 46:15, 46:23

**side** [21] - 33:9, 33:10, 43:3, 107:20, 112:4, 113:7, 121:16, 121:25, 123:14, 128:20, 143:23, 147:20, 147:21, 157:4, 168:14, 169:2, 169:4, 174:10, 174:13, 174:16

**sight** [1] - 40:18

**sign** [2] - 115:16, 115:25

**Signal** [2] - 75:24, 116:20

**signaling** [1] - 146:1

**significant** [6] - 27:11, 31:24, 50:16, 139:16, 141:9, 156:8

**significantly** [1] - 137:9

**silent** [1] - 120:11

**similar** [16] - 14:24, 16:8, 39:19, 39:22, 54:21, 57:6, 103:13, 105:3, 133:20, 137:13, 145:11, 156:2, 156:13, 165:2, 176:3

**similarly** [2] - 92:7, 189:12

**simple** [2] - 131:23, 132:13

**simply** [11] - 69:20, 93:17, 139:23, 142:4, 146:23, 147:10, 150:14, 152:7, 161:24, 173:21, 174:7

**single** [4] - 25:7, 83:8, 83:9, 136:21

**singular** [1] - 136:15, 142:12, 149:10

**singularly** [2] - 63:15, 100:20

**sit** [3] - 40:10, 63:10, 183:8

**sit-in** [2] - 40:10, 63:10

**sit-in-type** [1] - 183:8

**sitting** [1] - 185:24

**situated** [2] - 92:7, 163:14

**situation** [10] - 13:17, 23:14, 25:4, 95:19, 96:14, 117:7, 119:2, 124:11, 129:15, 130:20

**six** [4] - 8:25, 79:14, 102:7, 117:21

**size** [3] - 29:20, 90:12, 104:24

**skated** [2] - 158:3

**skeptical** [1] - 73:23

**skills** [2] - 46:8, 46:9

**skip** [2] - 19:22, 118:17

**skipping** [1] - 43:7

**skirted** [1] - 158:3

**slashing** [1] - 27:18

**slide** [5] - 15:12, 16:10, 42:3, 45:4, 56:1

**slides** [1] - 42:2

**slightly** [1] - 163:14

**slow** [1] - 34:23

**slowing** [1] - 128:13

**slowly** [1] - 110:11

**smacks** [1] - 165:22

**small** [1] - 102:1

**snippets** [1] - 144:15

**so..** [1] - 115:1

**social** [3] - 55:9, 81:2, 155:20

**solid** [1] - 85:18

**someone** [15] - 9:1, 30:24, 31:16, 31:17, 48:14, 60:25, 85:18, 125:13, 135:7, 138:7, 150:6, 150:7, 167:11, 184:17, 184:18

**someplace** [1] - 29:25

**sometime** [1] -

187:18
**sometimes** [4] - 8:4, 71:3, 102:19, 102:20
**soon** [2] - 144:4, 181:13
**sorry** [19] - 11:1, 19:9, 19:22, 42:16, 54:2, 55:14, 68:20, 69:5, 69:25, 107:8, 127:14, 130:9, 152:12, 154:10, 156:16, 159:9, 159:14, 189:2, 189:14
**sort** [31] - 26:8, 34:1, 35:20, 56:5, 58:3, 74:20, 81:25, 83:2, 84:16, 85:23, 99:17, 101:12, 101:18, 106:6, 106:11, 109:16, 116:20, 120:21, 121:7, 121:21, 122:1, 123:14, 125:5, 125:19, 140:23, 144:23, 150:18, 160:5, 183:5, 186:2, 186:7
**sorts** [1] - 30:2
**sought** [1] - 5:8
**sound** [2] - 28:5, 149:5
**sounds** [2] - 73:22, 140:2
**southwest** [1] - 177:21
**space** [12] - 25:18, 25:21, 30:14, 38:3, 45:1, 45:2, 45:23, 87:22, 101:23, 146:25, 149:15
**span** [1] - 52:18
**speaker** [3] - 15:8, 51:6, 61:3
**speaking** [2] - 54:24, 171:7
**speaks** [2] - 34:5, 179:8
**specific** [30] - 9:7, 22:25, 37:17, 41:24, 43:15, 50:16, 54:22, 54:23, 55:10, 57:25, 59:24, 67:6, 67:12, 85:8, 97:18, 136:20, 142:18, 161:21, 169:10, 169:19, 169:25, 170:22, 171:17, 176:20, 176:23, 179:14, 184:17, 184:23, 185:3, 188:13

**specific-intent** [1] - 184:17
**specifically** [13] - 5:10, 24:25, 29:15, 36:5, 48:15, 48:17, 50:12, 50:21, 113:21, 170:18, 175:4, 177:24, 185:15
**specifics** [1] - 123:2
**specify** [2] - 85:1, 97:9
**specs** [1] - 104:24
**spectrum** [1] - 160:17
**speech** [9] - 51:5, 51:7, 55:17, 61:14, 61:24, 154:19, 155:23, 156:16, 182:11
**speeches** [1] - 179:10
**speechifying** [1] - 155:1
**spend** [1] - 68:1
**spent** [1] - 109:23
**spitting** [1] - 56:16
**spot** [4] - 20:12, 20:19, 26:12, 116:3
**spray** [6] - 63:17, 63:18, 115:17, 121:12, 128:17, 129:14, 129:17, 174:3
**sprayed** [4] - 113:8, 113:11, 115:3, 178:20
**sprays** [1] - 174:2
**spreading** [1] - 91:16
**spur** [1] - 83:24
**spur-of-the-moment** [1] - 83:24
**squinting** [1] - 115:22
**squished** [2] - 94:22, 94:24
**stabbed** [1] - 58:21
**stairs** [2] - 158:17, 181:20
**stairway** [2] - 158:7, 158:11
**stairwell** [1] - 158:19
**stake** [1] - 92:19
**Stamford** [1] - 1:21
**stampeded** [1] - 30:7
**stand** [6] - 10:6, 10:9, 41:7, 59:2, 181:14, 188:8
**standard** [5] - 152:20, 154:18, 154:25, 187:15, 187:17
**standing** [26] - 6:21,

6:24, 11:20, 13:8, 33:9, 33:24, 36:2, 37:7, 43:11, 46:18, 46:22, 51:22, 56:11, 56:22, 61:13, 62:4, 71:15, 74:6, 87:17, 99:5, 113:8, 143:4, 168:6, 168:11, 173:25, 177:20
**stands** [1] - 55:12
**start** [8] - 10:17, 17:3, 19:23, 39:5, 71:13, 71:25, 120:18, 182:25
**started** [2] - 140:16, 157:19
**starting** [15] - 4:7, 8:13, 9:11, 9:14, 10:16, 10:21, 11:3, 15:3, 19:8, 20:3, 29:8, 33:17, 49:9, 52:16, 133:18
**starts** [8] - 25:16, 25:17, 40:4, 43:24, 44:10, 76:23, 158:10, 181:12
**state** [2] - 155:15, 155:16
**statement** [8] - 54:9, 54:12, 63:3, 63:13, 64:25, 65:2, 77:21, 134:13
**statements** [8] - 97:1, 97:4, 128:2, 163:19, 177:17, 177:19, 178:1
**States** [8] - 2:8, 4:3, 4:9, 6:18, 132:3, 133:18, 133:19, 190:13
**STATES** [4] - 1:1, 1:3, 1:11, 1:16
**statute** [30] - 8:18, 8:23, 8:25, 22:2, 29:3, 29:7, 31:4, 72:4, 72:13, 72:20, 131:22, 132:5, 132:6, 132:7, 132:12, 133:20, 133:24, 141:22, 142:3, 142:10, 150:22, 160:4, 160:8, 160:24, 161:3, 161:22, 165:25, 166:15, 166:19, 169:8
**stay** [7] - 25:23, 147:4, 156:23, 169:21, 183:13, 183:19
**stayed** [3] - 51:5, 158:2, 169:14

**staying** [1] - 184:6
**stays** [5] - 26:23, 178:19, 178:20, 178:21
**Steal** [6] - 50:22, 51:2, 59:19, 60:1, 182:23, 182:24
**steal** [1] - 53:7
**stenographic** [1] - 190:5
**step** [7] - 25:19, 38:4, 115:10, 140:7, 140:8, 157:1, 165:19
**stepped** [1] - 143:23
**steps** [2] - 86:13, 142:18
**sternum** [1] - 91:14
**STEVENS** [2] - 1:6, 1:23
**Stevens** [100] - 4:4, 4:19, 4:21, 6:16, 7:16, 9:12, 9:17, 10:11, 10:22, 11:9, 11:12, 11:17, 12:4, 12:6, 12:19, 13:4, 13:23, 14:25, 15:11, 15:13, 16:3, 16:10, 16:12, 16:16, 16:18, 17:3, 17:13, 17:20, 17:24, 27:9, 33:2, 33:3, 33:18, 33:25, 34:6, 34:10, 34:21, 35:14, 36:6, 36:11, 37:11, 38:21, 39:20, 39:23, 52:24, 54:1, 54:20, 54:25, 55:2, 55:7, 55:16, 55:25, 56:5, 57:1, 57:14, 57:22, 59:22, 68:16, 68:23, 69:12, 70:17, 117:1, 120:9, 120:19, 120:24, 121:4, 121:8, 121:10, 123:23, 124:7, 124:8, 125:17, 125:20, 126:10, 126:15, 127:2, 127:5, 127:9, 128:6, 129:16, 130:1, 133:8, 133:11, 133:24, 134:6, 134:11, 134:25, 135:13, 135:21, 137:10, 138:15, 138:25, 139:24, 140:24, 170:2, 171:4, 175:8, 179:9, 180:17, 180:25
**Stevens's** [8] - 26:25, 56:21, 121:14, 126:14, 126:21, 131:4, 133:3, 139:13

**stick** [6] - 10:22, 11:12, 23:25, 24:10, 26:4, 95:8
**sticker** [1] - 5:24
**sticks** [2] - 44:11, 145:11
**still** [27] - 9:16, 15:21, 16:17, 16:19, 29:7, 41:11, 48:4, 56:10, 61:7, 61:19, 76:20, 82:23, 87:25, 88:24, 89:1, 89:7, 96:4, 111:25, 112:13, 113:9, 114:3, 123:16, 156:11, 166:4, 184:10, 184:17
**stipulated** [2] - 68:10, 179:4
**stole** [1] - 182:21
**stolen** [1] - 36:1
**stood** [4] - 6:19, 99:2, 115:11, 150:2
**Stop** [6] - 50:22, 51:2, 59:18, 60:1, 182:23
**stop** [34] - 7:7, 7:24, 44:13, 44:14, 44:22, 46:8, 47:6, 47:15, 48:17, 52:4, 52:8, 53:25, 56:24, 64:24, 65:5, 75:19, 78:2, 80:5, 80:17, 81:11, 95:13, 100:18, 106:14, 112:24, 120:16, 135:10, 136:5, 138:20, 143:8, 144:25, 147:6, 148:7, 163:9
**stopped** [2] - 144:25, 184:11
**stopping** [4] - 12:17, 53:7, 53:8, 181:24
**stops** [2] - 44:17, 44:21
**storm** [2] - 81:11, 157:13
**story** [4] - 78:11, 109:15, 120:11, 145:10
**straight** [6] - 7:14, 19:3, 40:20, 44:11, 99:5, 129:9
**straighten** [1] - 122:1
**straining** [1] - 20:8
**strange** [1] - 136:8
**strangle** [1] - 184:18
**Street** [4] - 1:17, 1:20, 1:24, 2:5
**street** [9] - 51:9,

51:11, 53:13, 53:22, 55:11, 60:5, 61:8, 156:22, 157:4
**strength** [1] - 85:19
**strenuously** [1] - 64:1
**stretch** [2] - 74:14
**strictly** [1] - 161:14
**strike** [14] - 24:15, 29:11, 29:15, 31:22, 34:21, 35:20, 36:1, 83:20, 112:11, 112:22, 168:15
**strikes** [7] - 29:12, 37:9, 37:15, 38:2, 114:21, 121:11, 160:18
**striking** [5] - 18:4, 20:22, 27:16, 30:17, 34:24
**stringent** [1] - 187:15
**strong** [3] - 46:1, 65:11, 66:4
**stronger** [1] - 65:9
**strongest** [6] - 13:16, 14:8, 14:13, 41:16, 41:18, 41:25
**strongly** [1] - 59:16
**struck** [2] - 35:19, 36:19
**structure** [1] - 39:1
**struggle** [1] - 167:17
**struggles** [1] - 160:7
**stuck** [3] - 35:5, 35:10, 94:25
**stuff** [3] - 86:7, 99:18, 145:24
**stupid** [7] - 94:25, 100:23, 100:25, 108:24, 115:13, 115:14, 116:14
**subject** [1] - 80:11
**subliminally** [1] - 114:23
**submit** [14] - 25:24, 36:14, 56:20, 71:17, 102:5, 108:16, 109:13, 109:25, 113:13, 121:16, 123:5, 124:11, 128:14, 129:19
**submits** [6] - 8:10, 35:21, 59:2, 60:23, 61:4, 62:25
**submitted** [2] - 110:2, 141:23
**subsequent** [2] - 181:18, 181:21
**subsequently** [1] -

166:8
**substantially** [1] - 105:3
**success** [1] - 151:6
**successful** [1] - 133:25
**suddenly** [1] - 46:18
**suffice** [1] - 41:15
**sufficient** [8] - 9:6, 109:8, 135:1, 137:25, 165:24, 166:14, 179:13
**suffocated** [1] - 99:11
**sugar** [1] - 98:20
**suggest** [2] - 59:16, 101:17
**suggesting** [5] - 115:4, 127:14, 127:17, 130:14, 137:13
**suggestion** [1] - 135:7
**suggests** [2] - 150:4, 155:21
**Suite** [2] - 1:21, 1:25
**suited** [1] - 13:17
**supply** [1] - 18:12
**support** [2] - 131:10, 131:19
**supported** [3] - 26:3, 77:11, 96:1
**supposed** [8] - 19:12, 31:8, 76:6, 89:18, 130:23, 138:4, 156:17, 183:6
**supposedly** [1] - 91:19
**Supreme** [2] - 133:19, 133:20
**surely** [2] - 32:5, 118:23
**surgery** [1] - 167:1
**surmount** [1] - 152:19
**surprising** [1] - 77:20
**surrender** [1] - 181:13
**surrounded** [2] - 56:13, 180:20
**surveillance** [2] - 9:16, 127:8
**suspended** [2] - 88:24, 96:4
**sustained** [2] - 164:13, 169:5
**swearing** [1] - 105:9
**swearing-in** [1] - 105:9

**swept** [1] - 13:5
**swing** [1] - 113:4
**swings** [1] - 168:10
**swung** [2] - 111:15, 112:12

# T

**table** [1] - 142:1
**tack** [1] - 147:3
**tackle** [1] - 170:8
**tagged** [2] - 176:12, 176:13
**talks** [3] - 52:13, 58:19, 58:20
**tap** [1] - 111:21
**taped** [2] - 179:21, 179:22
**tapped** [1] - 100:9
**target** [1] - 101:11
**task** [1] - 7:19
**Task** [1] - 79:2
**teargas** [2] - 39:6, 158:22
**tease** [1] - 121:7
**technical** [1] - 161:8
**technically** [2] - 91:17, 129:24
**technology** [1] - 4:13
**tees** [1] - 168:17
**telephone** [1] - 179:10
**ten** [3] - 26:21, 43:7, 71:4
**ten-minute** [2] - 26:21, 71:4
**tend** [1] - 172:9
**tendency** [1] - 101:13
**tends** [1] - 92:4
**tenuous** [1] - 139:23
**term** [2] - 37:15, 37:17
**terms** [1] - 155:5
**terrace** [6] - 7:12, 8:1, 57:2, 61:18, 62:24, 116:7
**test** [1] - 75:12
**testified** [45] - 16:22, 22:8, 27:13, 30:6, 33:8, 34:17, 35:1, 36:1, 40:23, 51:6, 51:9, 53:19, 58:14, 78:25, 80:6, 83:18, 83:23, 87:18, 89:22, 91:22, 91:25, 96:7, 100:13, 109:19, 113:17, 116:1, 117:19, 117:21,

121:2, 121:14, 121:22, 123:12, 123:13, 135:5, 137:8, 142:16, 149:3, 152:25, 153:11, 155:2, 155:23, 156:4, 161:2, 168:8, 182:6
**testify** [7] - 74:10, 74:23, 77:4, 78:4, 79:3, 92:8, 169:4
**testifying** [5] - 64:7, 92:15, 113:15, 148:20, 163:11
**testimony** [77] - 5:11, 5:12, 5:15, 15:18, 16:21, 21:10, 24:7, 28:15, 28:17, 30:17, 34:23, 36:2, 37:16, 45:2, 47:6, 47:7, 48:18, 48:22, 50:24, 51:19, 60:19, 64:4, 64:6, 64:9, 65:14, 65:15, 68:10, 73:20, 77:10, 77:18, 78:9, 79:12, 79:18, 80:22, 83:16, 84:1, 84:8, 85:2, 89:11, 90:6, 93:16, 93:19, 104:8, 116:18, 116:21, 116:22, 118:13, 121:10, 121:23, 122:13, 123:1, 135:19, 140:12, 140:13, 141:13, 141:15, 141:16, 142:24, 143:18, 146:4, 147:11, 147:12, 154:24, 155:9, 157:25, 163:17, 163:24, 166:1, 167:9, 168:3, 177:11, 177:14, 179:3, 182:2, 182:5
**text** [13] - 55:8, 58:8, 61:24, 66:17, 66:22, 67:4, 76:13, 134:5, 155:20, 161:11, 161:12, 161:14
**texts** [1] - 59:15
**THE** [274] - 1:1, 1:11, 1:14, 1:16, 1:19, 1:23, 1:23, 2:2, 4:1, 4:2, 4:14, 4:17, 4:20, 5:2, 5:10, 5:13, 5:17, 5:21, 6:4, 6:7, 6:10, 6:14, 11:1, 12:5, 12:14, 12:21, 13:11, 13:14, 13:25, 14:16, 14:19, 14:22, 18:16, 19:1,

19:9, 19:11, 19:17, 19:22, 20:2, 22:15, 23:11, 23:22, 24:18, 27:18, 27:22, 28:9, 28:11, 28:20, 29:13, 29:17, 30:15, 30:21, 31:3, 31:7, 31:13, 32:5, 32:16, 32:23, 33:1, 35:25, 36:9, 36:21, 37:13, 37:19, 37:24, 38:11, 38:17, 39:12, 39:17, 39:22, 41:12, 42:16, 42:18, 42:21, 43:1, 44:2, 44:5, 48:2, 48:9, 48:21, 49:10, 49:16, 49:22, 50:6, 51:19, 54:2, 54:12, 54:19, 55:14, 55:18, 55:21, 55:24, 58:23, 59:11, 59:25, 60:8, 60:15, 63:5, 63:22, 65:8, 66:3, 66:10, 66:14, 67:6, 67:24, 68:1, 68:20, 68:24, 69:3, 69:7, 69:17, 69:21, 69:24, 70:1, 70:11, 70:14, 70:22, 70:25, 71:8, 71:10, 71:12, 72:6, 72:17, 72:23, 73:8, 73:16, 74:1, 75:7, 76:5, 77:15, 77:17, 84:11, 85:15, 88:6, 92:6, 92:11, 92:23, 95:10, 97:5, 104:8, 104:13, 104:19, 105:1, 105:6, 105:9, 105:21, 106:14, 106:24, 111:3, 111:8, 111:16, 118:15, 120:6, 122:3, 122:8, 122:10, 123:7, 123:19, 124:14, 124:17, 125:8, 125:21, 125:25, 126:24, 127:14, 127:19, 128:17, 129:14, 129:20, 130:9, 130:17, 130:23, 131:11, 132:2, 132:5, 133:6, 135:4, 135:15, 135:18, 136:11, 137:11, 138:2, 138:22, 139:8, 139:11, 140:1, 140:11, 140:25, 141:4, 146:5, 147:24, 148:3, 148:10, 148:14, 148:18, 149:22, 150:4,

150:11, 150:25,
151:7, 151:21,
152:10, 152:13,
154:8, 154:11,
156:16, 157:7,
157:14, 157:22,
158:23, 159:5, 159:9,
159:20, 159:22,
160:18, 162:9,
162:21, 162:25,
163:5, 163:21, 164:5,
164:16, 164:19,
165:8, 166:7, 166:10,
169:21, 170:6,
170:15, 170:17,
170:21, 170:24,
171:2, 171:4, 171:19,
171:24, 172:7,
172:10, 172:15,
173:6, 173:12,
173:17, 174:24,
175:2, 175:5, 175:9,
175:12, 175:16,
175:21, 175:23,
176:1, 180:1, 180:6,
180:8, 180:14, 185:8,
185:23, 186:12,
186:15, 186:17,
186:19, 186:23,
187:10, 187:25,
188:2, 188:18,
188:20, 188:25,
189:2, 189:6, 189:9,
189:14, 189:19,
189:21
  **themselves** [4] -
49:7, 80:11, 150:2,
154:1
  **then-President** [1] -
51:11
  **theoretical** [1] -
150:18
  **theoretically** [1] -
99:7
  **theory** [14] - 8:16,
13:12, 14:16, 29:4,
39:17, 41:13, 47:12,
135:6, 142:8, 150:5,
151:17, 151:20,
162:14, 172:11
  **thereabouts** [1] -
118:8
  **therefore** [2] - 121:5,
162:16
  **Thereupon** [2] -
71:6, 106:22
  **they've** [8] - 8:5, 8:7,
75:9, 127:18, 136:25,
163:18, 181:13, 183:5
  **thinking** [6] - 18:17,

77:1, 83:3, 124:20,
159:15, 164:11
  **thinks** [6] - 41:24,
158:25, 159:3,
174:12, 187:16,
188:14
  **third** [2] - 110:3,
176:9
  **thirds** [1] - 156:5
  **Thomas** [1] - 160:9
  **thoughts** [2] - 83:2,
124:18
  **thousands** [1] -
135:20
  **three** [31] - 6:15, 7:8,
8:14, 10:23, 11:14,
17:22, 21:15, 22:14,
29:13, 29:14, 36:12,
43:18, 47:9, 47:14,
50:5, 50:12, 50:13,
65:24, 66:5, 68:8,
70:19, 109:23,
113:17, 127:2, 170:2,
170:25, 176:19,
176:24, 180:12,
181:22
  **threw** [2] - 172:8,
172:10
  **throat** [1] - 124:9
  **throng** [1] - 7:23
  **throughout** [3] -
8:22, 9:10, 169:21
  **throw** [2] - 112:21,
145:23
  **throwing** [1] - 34:24
  **throws** [1] - 35:20
  **thumb** [1] - 6:1
  **thumbs** [2] - 57:4,
181:19
  **thumbs-up** [1] - 57:4
  **tightly** [4] - 22:7,
44:17, 88:25, 89:1
  **tilted** [2] - 121:16,
121:25
  **timeframe** [3] -
88:17, 96:6, 183:6
  **timeline** [1] - 158:14
  **timestamp** [4] -
10:21, 11:11, 15:13,
61:8
  **timing** [2] - 45:15,
169:10
  **tired** [2] - 58:21,
147:25
  **Title** [1] - 161:5,
161:6, 166:20
  **today** [5] - 4:11,
123:22, 162:5,
181:17, 185:19
  **together** [6] - 83:12,

140:5, 144:16,
168:14, 180:12,
185:11
  **token** [1] - 115:7
  **tomorrow** [6] -
186:11, 186:15,
186:24, 186:25,
187:3, 187:18
  **took** [8] - 59:12,
74:8, 78:13, 86:13,
88:20, 106:10,
142:18, 144:9
  **top** [5] - 91:6,
110:14, 113:1, 113:6,
168:13
  **torso** [4] - 87:22,
87:23, 101:24, 102:12
  **total** [5] - 57:7,
57:20, 62:20, 75:4,
125:12
  **totality** [3] - 54:7,
67:15, 68:2
  **totally** [5] - 20:21,
65:20, 74:15, 128:23,
183:10
  **touch** [5] - 69:9,
102:15, 165:5,
165:23, 175:24
  **touched** [1] - 165:6
  **touching** [2] - 80:1,
170:12
  **toward** [1] - 13:10
  **towards** [6] - 33:18,
110:9, 126:13,
146:17, 155:15, 186:2
  **towering** [1] - 102:1
  **town** [1] - 60:10
  **tracking** [1] - 72:24
  **traditional** [2] -
170:12, 171:11
  **traffic** [2] - 43:4,
182:25
  **trained** [2] - 83:23,
89:21
  **training** [1] - 37:14
  **traitor** [4] - 56:14,
56:17, 56:19, 137:22
  **traitors** [3] - 57:16,
137:12, 180:20
  **transcript** [3] -
123:11, 190:5, 190:6
  **TRANSCRIPT** [1] -
1:10
  **trapped** [1] - 20:10
  **traumatic** [1] - 121:3
  **traveled** [1] - 60:25
  **treason** [2] - 56:13,
137:12
  **treasonous** [2] -
56:17, 57:16

  **treatment** [1] - 125:5
  **TREVOR** [1] - 1:11
  **trial** [7] - 48:9, 92:22,
120:10, 137:4, 150:2,
164:23, 176:17
  **TRIAL** [1] - 1:10
  **trials** [1] - 184:25
  **tried** [4] - 77:23,
100:11, 103:16,
155:25
  **trier** [2] - 121:6,
184:15
  **tries** [2] - 26:7,
112:15
  **trip** [11] - 50:15,
54:22, 55:3, 55:8,
57:14, 57:25, 58:15,
58:18, 128:7, 155:21
  **tripod** [1] - 131:8
  **tripods** [1] - 146:2
  **Tristan** [3] - 4:4,
4:19, 6:16
  **TRISTAN** [1] - 1:6
  **troops** [2] - 148:8
  **Troy** [1] - 2:6
  **true** [11] - 17:13,
21:8, 50:12, 85:13,
115:5, 123:16,
151:17, 177:4,
184:21, 190:4, 190:5
  **truly** [2] - 37:3, 63:12
  **Trump** [21] - 51:10,
51:11, 51:16, 59:6,
60:10, 60:18, 60:19,
74:4, 75:22, 78:5,
82:2, 82:5, 135:15,
135:20, 178:15,
179:22, 182:6, 182:7,
183:16, 183:17
  **Trump's** [2] - 51:4,
51:7
  **truthful** [1] - 136:19
  **try** [21] - 11:19,
22:10, 28:1, 77:6,
78:2, 89:3, 93:10,
101:19, 110:11,
117:24, 136:15,
138:7, 139:11,
142:17, 143:10,
144:5, 147:13,
149:13, 157:23
  **trying** [50] - 13:19,
16:1, 17:4, 21:18,
21:21, 27:7, 27:9,
28:13, 30:8, 42:23,
48:23, 48:24, 49:5,
72:14, 76:16, 79:19,
84:4, 90:14, 96:5,
96:21, 99:2, 101:5,
101:15, 101:20,

106:9, 111:23, 123:9,
127:20, 128:23,
128:25, 131:15,
136:2, 136:18,
138:20, 145:3,
145:21, 145:25,
146:22, 146:24,
150:14, 151:23,
155:7, 156:18,
156:19, 157:7, 160:3,
175:6, 178:11,
178:22, 183:3
  **tucked** [1] - 102:13
  **Tuesday** [4] -
187:20, 187:25,
188:3, 189:21
  **tunnel** [103] - 7:12,
7:15, 7:17, 7:23, 8:2,
8:22, 9:18, 9:25, 10:6,
10:7, 10:12, 11:9,
11:17, 13:4, 13:5,
13:8, 13:10, 13:20,
15:1, 15:6, 15:9,
15:19, 16:4, 16:17,
16:19, 16:24, 17:3,
17:10, 17:13, 18:11,
18:13, 21:13, 21:16,
21:24, 22:7, 25:14,
25:15, 25:23, 30:7,
33:9, 35:23, 36:13,
36:18, 36:23, 38:12,
38:16, 40:4, 40:8,
40:18, 40:24, 42:11,
44:9, 44:17, 46:4,
46:14, 46:16, 49:17,
52:6, 52:13, 52:14,
52:19, 57:6, 57:8,
57:9, 57:18, 62:17,
62:20, 64:18, 64:19,
74:9, 90:16, 107:9,
108:24, 116:1, 117:2,
117:12, 117:16,
121:3, 121:4, 127:6,
127:10, 127:25,
130:4, 131:7, 136:2,
143:2, 143:7, 145:3,
146:18, 147:2,
147:18, 147:20,
147:21, 153:14,
153:16, 158:23,
158:25, 159:2, 159:3,
159:7, 181:21, 183:4
  **tunnel's** [1] - 44:9
  **turn** [6] - 25:19,
25:22, 86:11, 136:7,
147:3, 163:10
  **turned** [2] - 157:2,
168:14
  **turning** [3] - 26:14,
82:18, 126:23

**turns** [1] - 26:20
**twice** [1] - 100:10, 106:8
**two** [35] - 10:23, 11:13, 11:24, 24:21, 29:13, 57:24, 69:11, 79:3, 88:13, 88:20, 90:21, 94:4, 96:7, 96:15, 108:18, 108:20, 109:20, 109:21, 110:1, 110:14, 113:20, 127:4, 132:11, 133:10, 140:16, 141:8, 144:17, 145:5, 145:16, 149:20, 156:5, 158:7, 160:15, 160:16, 161:8
**two-thirds** [1] - 156:5
**type** [8] - 59:19, 79:9, 93:24, 127:22, 128:18, 137:12, 137:13, 183:8
**typical** [2] - 122:13, 122:15
**typically** [1] - 38:3

## U

**Ukranian** [1] - 116:19
**ultimate** [4] - 7:6, 47:13, 56:21, 57:13
**ultimately** [6] - 17:15, 25:11, 38:22, 77:23, 95:2, 106:10
**unable** [1] - 45:12
**unacceptable** [1] - 82:21
**unbelievable** [3] - 54:13, 104:2, 104:3
**unchallenged** [1] - 141:14
**uncomfortable** [1] - 130:11
**unconformable** [1] - 121:15
**unconscionable** [1] - 102:24
**unconscious** [1] - 21:18
**uncredible** [1] - 141:16
**under** [21] - 8:3, 8:4, 8:15, 47:12, 70:18, 70:20, 85:4, 89:10, 94:5, 96:7, 97:16, 132:23, 132:24,

150:11, 156:13, 160:11, 160:14, 161:22, 162:14, 165:24
**undermine** [1] - 26:15
**undermines** [1] - 141:17
**underneath** [1] - 154:5
**understandable** [1] - 93:14
**understood** [7] - 19:19, 38:11, 55:24, 70:14, 126:24, 131:1, 162:21
**underway** [2] - 156:11, 161:20
**undue** [1] - 93:17
**unequivocally** [1] - 96:19
**unexplained** [1] - 84:10
**unflagging** [1] - 53:2
**unfolded** [1] - 16:17
**unhelmeted** [2] - 31:23, 32:7
**unintended** [3] - 160:1, 160:13, 160:23
**unintentional** [2] - 79:21, 92:5
**unintentionally** [1] - 93:15
**unique** [1] - 135:9
**uniquely** [1] - 136:14
**unit** [1] - 79:14
**united** [1] - 2:8
**UNITED** [4] - 1:1, 1:3, 1:11, 1:16
**United** [7] - 4:3, 4:9, 6:18, 132:3, 133:18, 133:19, 190:13
**unlawful** [1] - 170:12
**unlawful-touching** [1] - 170:12
**unless** [8] - 16:7, 101:20, 107:11, 133:4, 141:15, 152:18, 154:6, 162:7
**unlike** [2] - 40:19, 128:3
**unplanned** [2] - 73:24, 82:7
**unrebutted** [2] - 141:14, 143:19
**unrelenting** [1] - 52:9
**unresolved** [1] - 185:19
**unruly** [1] - 40:15

**unspecified** [1] - 84:25
**unsuccessfully** [1] - 146:1
**unusual** [1] - 94:13
**up** [92] - 10:25, 11:12, 15:3, 16:11, 16:18, 17:1, 20:23, 25:12, 25:15, 33:3, 34:7, 35:3, 36:11, 40:16, 40:17, 42:4, 44:5, 44:11, 45:8, 46:19, 52:12, 55:8, 57:1, 57:4, 57:5, 71:8, 72:15, 74:5, 74:7, 77:5, 78:13, 83:20, 86:17, 86:18, 87:11, 87:17, 88:25, 89:7, 90:19, 93:13, 99:5, 99:10, 101:19, 102:4, 103:17, 106:6, 106:11, 107:17, 107:22, 108:3, 112:2, 112:10, 113:5, 116:5, 116:7, 117:17, 118:9, 119:22, 120:21, 124:8, 128:8, 128:10, 131:8, 134:7, 138:17, 138:18, 142:19, 145:2, 145:9, 145:18, 148:6, 153:14, 156:22, 157:10, 158:5, 158:17, 158:18, 165:1, 168:14, 169:2, 173:1, 176:16, 180:6, 180:23, 181:14, 181:19, 181:20, 182:19, 182:24, 184:24
**up-close** [1] - 16:11
**upgrade** [1] - 103:6
**uphill** [1] - 118:13
**upper** [4] - 34:23, 35:20, 57:2, 101:25
**upper-cut** [1] - 35:20
**upset** [2] - 138:18, 138:19
**urge** [4] - 119:18, 120:2, 121:6, 156:19
**urging** [1] - 61:19
**URSO** [51] - 1:19, 1:20, 4:15, 71:9, 71:11, 71:13, 72:7, 72:18, 73:2, 73:12, 73:17, 74:2, 75:13, 76:8, 77:16, 77:22, 84:13, 85:22, 86:21, 87:8, 88:4, 88:7, 88:11, 88:20, 89:7,

90:10, 91:6, 92:10, 92:12, 93:2, 93:9, 95:11, 97:7, 104:10, 104:18, 104:22, 105:4, 105:8, 105:11, 105:17, 105:23, 106:1, 107:1, 111:4, 111:11, 111:17, 112:10, 115:25, 118:17, 122:5, 189:11
**Urso** [13] - 3:6, 4:15, 4:17, 71:10, 105:6, 106:24, 118:15, 120:6, 120:17, 124:21, 125:24, 177:1, 189:10
**Urso's** [1] - 127:5
**usage** [3] - 108:1, 114:5
**USC** [7] - 8:3, 8:15, 8:16, 9:2, 17:17, 161:9, 176:3
**use-of-force** [1] - 114:22
**useful** [1] - 169:14
**uses** [3] - 30:24, 33:4, 34:21
**utilizing** [1] - 30:13

## V

**vacant** [1] - 144:24
**vacation** [1] - 52:2
**vague** [1] - 85:12
**value** [1] - 81:13
**vantage** [1] - 158:12
**variety** [3] - 143:1, 143:7, 145:18
**vehicle** [7] - 22:21, 22:23, 23:5, 23:6, 107:13, 108:2
**verdict** [4] - 164:22, 176:16, 187:25, 188:7
**verified** [1] - 116:8
**versa** [1] - 187:2
**version** [3] - 5:25, 103:6, 103:18
**versions** [1] - 170:11
**versus** [5] - 4:3, 32:6, 77:14, 79:13, 122:13
**via** [1] - 134:24
**Vice** [2] - 155:11, 179:17
**vice** [1] - 187:2
**viciously** [1] - 160:9
**victim** [1] - 93:18
**victims** [1] - 170:1
**video** [71] - 6:2, 11:7,

15:14, 16:13, 20:6, 25:10, 25:17, 27:8, 27:20, 27:22, 28:17, 34:5, 34:21, 36:7, 54:24, 55:19, 56:4, 57:3, 78:15, 86:18, 87:13, 93:3, 99:8, 101:23, 110:8, 111:13, 111:18, 112:4, 113:21, 113:25, 115:2, 115:18, 116:9, 116:25, 118:6, 121:9, 121:21, 126:3, 126:5, 126:11, 126:18, 127:8, 128:6, 128:11, 128:12, 128:16, 131:4, 131:5, 131:6, 131:7, 134:11, 141:20, 142:22, 144:10, 144:19, 146:3, 146:14, 146:17, 149:20, 157:11, 164:3, 168:8, 173:22, 173:23, 174:4, 174:5, 179:10, 182:22, 189:4
**video-recording** [1] - 16:13
**videos** [26] - 19:21, 37:6, 40:25, 41:1, 43:6, 76:22, 86:22, 101:22, 102:17, 103:16, 109:3, 109:20, 114:19, 114:24, 114:25, 134:24, 137:20, 143:21, 144:13, 167:15, 168:1, 168:13, 171:15, 175:19, 182:12, 182:15
**view** [6] - 16:11, 40:25, 63:1, 149:1, 168:13, 172:1
**viewed** [1] - 151:15
**views** [1] - 109:21
**violate** [1] - 8:25
**violated** [1] - 114:22
**violation** [5] - 17:17, 37:20, 131:23, 132:13, 160:23
**violations** [1] - 142:9
**violence** [20] - 37:3, 39:5, 63:4, 63:10, 63:16, 65:16, 65:17, 70:17, 70:21, 79:1, 79:4, 79:5, 79:9, 118:25, 136:8, 144:5, 161:25, 162:1, 162:20

**violent** [10] - 7:13, 37:4, 40:15, 41:10, 41:13, 57:5, 100:24, 101:1, 104:1, 115:14
**visit** [1] - 55:9
**voice** [1] - 45:20
**voices** [2] - 156:21, 156:22
**volunteer** [1] - 114:20
**vote** [3] - 81:20, 133:12, 138:19
**voting** [1] - 177:13
**vs** [1] - 1:5

**W**

**wait** [2] - 147:3, 185:25
**wakes** [1] - 145:2
**walk** [7] - 41:22, 51:11, 55:11, 158:12, 174:6, 174:12, 184:14
**walked** [1] - 60:4
**walking** [8] - 116:11, 129:9, 129:16, 130:3, 130:4, 144:25, 145:1, 158:4
**walks** [1] - 40:4
**wall** [12] - 61:14, 61:20, 62:4, 62:5, 124:9, 142:19, 143:4, 143:24, 145:18, 154:19, 156:16, 182:11
**waltz** [1] - 53:20
**wants** [8] - 24:14, 41:14, 52:4, 53:17, 134:18, 174:11, 175:18, 186:19
**warrant** [1] - 188:5
**Washington** [5] - 1:6, 1:18, 2:10, 50:11, 190:14
**wasting** [1] - 111:5
**watch** [20] - 11:24, 37:7, 43:9, 43:10, 75:14, 76:10, 76:22, 88:11, 90:11, 92:23, 95:2, 126:9, 131:6, 144:14, 144:15, 144:18, 146:13, 146:19
**watching** [3] - 86:22, 110:20, 168:20
**Water** [1] - 2:5
**wave** [1] - 151:12
**waved** [1] - 44:16
**waving** [8] - 42:10,

43:14, 44:3, 44:10, 44:20, 44:25, 146:6
**ways** [6] - 8:25, 12:10, 31:5, 50:10, 86:4, 122:16
**weapon** [55] - 8:4, 17:23, 18:18, 18:22, 22:24, 22:25, 23:1, 23:2, 23:6, 23:7, 27:1, 27:17, 28:19, 29:18, 29:23, 30:13, 30:14, 30:24, 31:21, 32:9, 32:19, 32:21, 35:22, 35:24, 36:20, 36:24, 37:8, 37:12, 68:15, 68:17, 69:12, 69:14, 69:16, 69:20, 69:23, 70:18, 71:16, 99:12, 103:2, 107:24, 118:19, 120:19, 120:22, 121:5, 121:18, 122:4, 122:7, 123:18, 124:15, 132:9, 164:24, 165:3, 165:5
**weapons** [7] - 30:2, 30:9, 63:17, 81:8, 132:24, 145:22, 179:6
**wearing** [1] - 31:18
**Webster** [4] - 160:9, 164:14, 165:6, 165:9
**week** [2] - 84:14, 96:18
**weeks** [1] - 61:2
**weighing** [1] - 60:11
**weight** [23] - 15:15, 16:5, 17:14, 20:15, 21:1, 21:3, 23:18, 26:1, 29:20, 29:22, 34:10, 34:13, 34:15, 34:16, 34:18, 35:17, 85:20, 93:17, 102:22, 104:5, 112:20
**weird** [1] - 97:24
**well-captured** [1] - 141:20
**west** [10] - 7:11, 7:13, 9:23, 51:21, 53:13, 53:22, 55:12, 56:25, 61:9, 165:13
**West** [1] - 1:24
**whacks** [1] - 31:18
**whatsoever** [1] - 31:14
**whole** [15] - 16:17, 26:1, 34:1, 47:20, 58:11, 68:12, 74:12, 76:5, 89:10, 98:6, 102:11, 147:15, 158:8, 182:23, 186:1

**wholeheartedly** [2] - 71:24, 82:8
**wide** [1] - 38:6
**wide-ranging** [1] - 38:6
**widely** [1] - 137:3
**width** [1] - 147:18
**wielded** [2] - 29:21, 87:4
**wielding** [1] - 31:20
**wife** [1] - 182:6
**wildly** [1] - 39:20
**Wilhoit** [2] - 64:8, 64:10
**William** [1] - 4:24
**WILLIAM** [2] - 2:2, 2:2
**willing** [1] - 59:2
**willingly** [1] - 7:9
**willingness** [1] - 176:22
**Wilson** [1] - 172:25
**window** [1] - 94:8
**windowpane** [2] - 94:17, 112:17
**wise** [2] - 7:18, 81:16
**wished** [1] - 5:6
**witnesses** [1] - 79:3
**woman** [3] - 21:22, 90:18, 116:16
**women** [1] - 6:23
**wonder** [1] - 151:21
**wondering** [2] - 22:16, 23:12
**wood** [1] - 145:24
**word** [9] - 13:16, 29:16, 122:20, 122:22, 124:22, 124:23, 125:3, 137:20, 156:6
**words** [18] - 8:23, 13:16, 26:3, 41:17, 47:8, 53:11, 65:4, 66:1, 67:9, 67:11, 67:13, 67:14, 67:17, 67:23, 125:6, 154:19, 154:21, 179:13
**works** [1] - 22:15
**worldly** [1] - 7:18
**worldly-wise** [1] - 7:18
**worn** [20] - 15:22, 33:23, 45:9, 45:10, 45:17, 56:3, 90:22, 100:14, 109:21, 168:12, 171:16, 177:23, 177:24, 178:4, 179:24, 180:19, 180:24, 182:17, 183:9, 183:23

**worried** [1] - 21:2
**worse** [2] - 95:1, 179:2
**worth** [1] - 178:3
**wow** [1] - 134:8
**wrapping** [1] - 108:3
**wrench** [2] - 172:8, 172:11
**wrestle** [2] - 145:25, 160:21
**write** [1] - 123:21
**written** [2] - 142:10, 160:8
**wrote** [1] - 128:2
**WUSA** [1] - 96:18
**WWW** [4] - 3:4, 5:23, 6:7, 6:8

**Y**

**yards** [1] - 157:9
**year** [4] - 59:14, 59:23, 61:22, 178:6
**years** [5] - 46:5, 79:13, 145:6, 145:8, 161:12
**yelled** [2] - 86:14, 137:6
**yelling** [5] - 146:23, 148:7, 155:19, 181:3, 181:17
**yesterday** [6] - 5:19, 40:23, 47:8, 83:1, 142:2, 148:17
**younger** [2] - 7:19, 145:13
**yourself** [4] - 53:4, 106:2, 145:11, 157:2
**yourselves** [1] - 4:7
**Yvonne** [1] - 61:12